UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 05-11454 RGS

———————————————————————

)
JOSEPH H. KORAN, and KIMBERLY KORAN,        )
Individually and on Behalf of ANA KORAN,        )
JOSEPH KORAN, JR. and ERIK KORAN, Minors, )
     Plaintiffs,        )
v.        )
        )
ELIZABETH WEAVER and        )
TOWN OF SHERBORN,        )
     Defendants.        )
———————————————————————)

## UNOPPOSED MOTION TO AMEND SCHEDULING ORDER

Pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, the defendant, Town of Sherborn [hereinafter "defendant"], hereby moves the Court to amend the Scheduling Order to extend the discovery deadline from August 30, 2006 to October 30, 2006, and to move forward all subsequent deadlines accordingly.

As grounds for the Motion, the defendant states as follows:

1) The plaintiff has identified his primary care provider at the time of this incident as Felipe Diaz, MD.  Initial Disclosures (attached as Exhibit A).

2) Dr. Diaz no longer practices medicine at his last known business addresses, and the plaintiff has not disclosed his current address.  Pl.'s Answers to Interrogs., No. 3 (attached as Exhibit B);  Ex. A.

3) The defendant has made a good faith effort to locate Dr. Diaz, and has not yet been successful.  Aff. of Counsel, p. 1, ¶ 2 (attached as Exhibit C).

4) The additional time sought, together with a concerted effort among the parties and

1

perhaps the services of an investigative firm, will assist in locating Dr. Diaz.

5)  Without Dr. Diaz's deposition, the defense of the matter will be unduly prejudiced.

6)  During his deposition on July 21, 20067, the plaintiff belatedly identified several additional fact witnesses and medical providers that were not identified in his Initial Disclosures.  Compare, Dep. of Pl., pp. 62-69, p. 72:9-24, pp. 97-100 (attached as Exhibit D), to Initial Disclosures.

7)  The defendant needs additional time to gather the requisite information and documentation from these additional individuals, and to depose them as appropriate.

8)  Without information and documentation from these individuals, the defense of the matter will be prejudiced.

9)  Because of the inability to locate Dr. Diaz, the defendant has only recently been able to track down copies Dr. Diaz's complete chart, receiving the materials on August 14, 2006 from his former partner, James Dispenza, MD.

10) Dr. Diaz's chart also included copies of the chart from Dr. Robert Samaan, the plaintiff's prior primary care physician from 2000-2002.  Pertinent Portions of Dr. Samaan's Chart (attached as Exhibit E).

11) In the action at bar the plaintiff alleges, *inter alia*, back injuries, erectile dysfunction and injury-related depression as a result of this accident.  Pl.'s Answers to Interrogs., Nos. 3 & 4; Pl.'s Compl., *e.g.*, p. 2, ¶ 17 (docket no. 1).

12) The plaintiff has always denied treatment for such conditions prior to February 6, 2003, including during his deposition of July 21, 2006.  Pl.'s Answers to Interrogs., Nos. 5 & 8; Dep. of Pl., p. 77:15-17, p. 80:21-24, p. 81:1-6, p. 89:19-21.

13) Dr. Samaan's records, obtained on August 14, 2006, clearly suggest that the plaintiff had

2

been treating for all three conditions from at least 2000-02.  Ex. E.

14) In light of these recent developments, the defendant needs additional time to thoroughly explore the plaintiff's medical history, to obtain all missing medical records from past and recently disclosed providers, to have the records reviewed by a medical expert, and to disclose said medical expert as appropriate.

15) Without the ability to more thoroughly explore the recent developments in the case, the defense of the matter will be prejudiced.

16) On July 31, 2006,  the plaintiff noticed the deposition of three Town employees (two Sherborn Emergency Medical Technicians and the Sherborn Fire Chief), all to take place on August 16, 2006.  Pl.'s Notices of Taking Deposition (attached as Exhibit F).

17) The Town employees were unable to attend on this date due to scheduling conflicts with work and vacations, and the parties are having some difficulty re-scheduling the depositions prior to the August 30, 2006 deadline.

18) During a conference at the plaintiff attorney's office on August 15, 2006, counsel for all parties agreed that 60 days of additional time is necessary to complete discovery under the circumstances.

19) At her deposition on August 15, 2006, the co-defendant, Elizabeth Weaver, identified after-the-fact witnesses and potentially discoverable documentation (a day planner with notes of the events of February 6, 2003) for the first time, and the plaintiff needs additional time to pursue the information and documentation disclosed.

WHEREFORE, the defendant moves that the Scheduling Order be amended, and that all deadlines be moved forward two months, in the interests of justice.

Respectfully submitted,

The Defendants,
TOWN OF SHERBORN,
By their attorneys,

**PIERCE, DAVIS & PERRITANO, LLP**

Michael D. Leedberg, BBO #660832
Ten Winthrop Square
Boston, MA 02110
(671) 350-0950

August 17, 2006

## CERTIFICATE OF SERVICE

I, Michael D. Leedberg, attorney for the defendant in the above-entitled action, hereby certify that I served upon counsel of record a copy of the foregoing by electronically filing with the U.S. District Court, on this 17th day of August, 2006, and also by mailing copies to all counsel of record via first class mail.

Michael D. Leedberg

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No.  05-11454 RGS

JOSEPH H. KORAN, and KIMBERLY )
KORAN, Individually and on Behalf of )
ANA KORAN, JOSEPH KORAN, JR. )
and ERIK KORAN, Minors, )
                               )
                 Plaintiffs )
V. )
                               )
ELIZABETH WEAVER, and )
TOWN OF SHERBORN, )
                               )
                 Defendants )

# PLAINTIFF'S DISCLOSURES UNDER
# FED. R. CIV. P. 26(a)(1), LR 26.2(A) & LR 35.1

## I.  FED. R. CIV. P. 26(a)(1) & LR 26.2(A)

       In accordance with Fed. R. Civ. P. 26(a)(1) and LR 26.2(A), plaintiff makes the following disclosures:

A.     Individuals likely to have discoverable information relevant to disputed facts:

| NAME: | ADDRESS: | SUBJECT |
|---|---|---|
| Joseph Koran | 6101 Twain Drive<br>New Market, MD 21774 | Facts/Medical/Damages |
| Kimberly Koran | 6101 Twain Drive<br>New Market, MD 21774 | Medical/Damages |
| Robert Tiso, M.D. | New York Pain Center<br>7209 Buckley Road, Ste. 2R<br>Liverpool, NY 13088 | Medical |
| James A. Dispenza, M.D. | North Medical, P.C.<br>5100 West Taft Rd., Ste. 10<br>Liverpool, NY 13088 | Medical |

| | | |
|---|---|---|
| Felipe Diaz, M.D. | 5586 Legionnaire Drive<br>Cicero, NY 13039 | Medical |
| Warren Wulff, M.D. | Syracuse Ortho. Specialists<br>4115 Medical Center Drive<br>Fayetteville, NY 13066 | Medical |
| Joseph Catania, M.D. | New York Pain Center<br>7209 Buckley Rd., Ste. 2R<br>Liverpool, NY 13088 | Medical |
| Sergio Zappala, P.T. | CNY Physical Therapy &<br>    AquaticCenters<br>5700 W. Genesee St.<br>Camilus, NY 13031 | Medical |
| Clyde Satterly, M.D. | Lakeshore Family Medicine<br>6221 Route 31 - Ste. 108<br>Cicero, NY 13039 | Medical |
| Harvey Sauer, M.D. | Urology Consultants of Syracuse<br>739 Irving Avenue - Ste. 600<br>Syracuse, NY 13210 | Medical |

B.    Documents produced/identified because they are believed to be relevant to disputed facts:

DESCRIPTION/CATEGORY:                          LOCATION:

Medical Records

| | |
|---|---|
| Sherborn Fire Dept. EMS | Produced |
| Robert Tiso, M.D. (NY Pain Center) | Produced |
| James A. Dispenza, M.D. (Carebest Internal Med.) | Produced |
| Felipe Diaz, M.D. (Carebest Internal Med.) | Produced |
| Warren Wulff, M.D. (Syracuse Orthopedic) | Produced |
| Joseph Catania, M.D. | Identified |
| Sergio Zappala, P.T. | Produced |

2

| | |
|---|---|
| Clyde Satterly, M.D. | Identified |
| Harvey Sauer, M.D. | Identified |

Medical Bills

| | |
|---|---|
| -Warren Wulff, M.D. | Produced |
| -Syracuse Orthopedic Specialists | Produced |
| -Sherborn Fire Dept. | Produced |
| -Magnetic Diagnostic Resources | Produced |
| -New York Pain Center | Produced |
| -CNY Physical Therapy Aquatic Centers | Produced |
| -Carebest Internal Medicine | Produced |
| -North Medical, P.C. | Identified |
| -Magnetic Diagnostic Resources of Central NY | Identified |
| -Clyde Satterly, M.D. | Identified |
| -Harvey Sauer, M.D. | Identified |

C.    Computation of the categories of damages suffered by plaintiff in this action, and the production/identification of relevant documents:

1.    Medical Expenses:  (Incomplete)

2.    Future Medical Expenses: As yet, undetermined.

3.    Lost Wages: Not computed as yet.

4.    Future Lost Wages:  Undetermined.

5.    Lost Earning Capacity: Past and future, undetermined.

6.    Pain and Suffering: Plaintiff continues to suffer with severe back pain.  He expects to undergo back surgery in the near future.

7.    Permanent loss or impairment of a bodily function: This will be supplemented.

3

8.    Substantial disfigurement: Plaintiff will have scarring after he undergoes the necessary back surgery.

D.    Plaintiff has received, and continues to receive, Worker's Compensation benefits, for which there will be a lien.

## II.  LR 35.1

In accordance with LR 35.1, plaintiff makes the following disclosure of medical information:

**1.    Itemized Medical Expenses**: (Incomplete)

| | | |
|---|---|---:|
| a. | Sherborn Fire Dept. EMS 2/6/03 | $   348.40 |
| b. | NY Pain Center (8/8/03-12/11/03) | 2,319.51 |
| c. | St. Joseph's Imaging Assoc. (2/10/03-10/29/03) | 650.00 |
| d. | Magnetic Diagnostic Resource (2/12/03) | 2,000.00 |
| e. | CYN Physical Therapy (3/7/03-7/16/03) | 1,096.98 |
| f. | Carebest Internal Medicine ( 2/10/03-3/24/03) | 421.00 |
| g. | Syracuse Ortho Specialists (7/17/03-11/18/03) | 270.00 |

**2A.    Non-Privileged Medical Records (Produced)**:

| | | |
|---|---|---|
| a. | Robert Tiso, M.D. | Produced |
| b. | James A. Dispenza, M.D. | Produced |
| c. | Felipe Diaz, M.D. | Produced |
| d. | Warren Wulff, M.D. | Produced |
| e. | Sergio Zappala, P.T. | Produced |
| f. | Sherborn Fire Dept. EMS | Produced |

**2B.    Non-Privileged Medical Records (Identified)**:

4

a.    Joseph Catania, M.D.                        Identified

b.    Clyde Satterly, M.D.                        Identified

c.    Harvey Sauer, M.D.                          Identified

**3.    Privileged Medical Records**:    None.

By his Attorney,

CARMEN L. DURSO, ESQUIRE
B.B.O. # 139340
Suite 3232
100 Summer Street
Boston, MA 02110-2104
(617) 728-9123

## CERTIFICATE OF SERVICE

I, Carmen L. Durso, attorney for plaintiffs, hereby certify that I served Plaintiff's Disclosures Under Fed.R.Civ.P. 26a)(1), LR 26.2(A) and LR 35.1 on the parties, by delivering a copy, in hand, to Darlene Tonucci, Esquire, Pierce, Davis & Perritano, LLP, 10 Winthrop Square, Boston, MA 02110 and to Dragan A. Cetkovic, Esquire, Black, Cetkovic & Whitestone, 200 Berkeley Street, Boston, MA 02116.

DATED: November 30, 2005

CARMEN L. DURSO, ESQUIRE

5

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH H. KORAN, and KIMBERLY        )
KORAN, Individually and on Behalf of )
ANA KORAN, JOSEPH KORAN, JR.         )
and ERIK KORAN, Minors,              )
     Plaintiffs   )
                    )
v.                                   )  **C. A. No.  05-11454 RGS**
                    )
ELIZABETH WEAVER, and                )
TOWN OF SHERBORN,                    )
       Defendants   )

## PLAINTIFF JOSEPH H. KORAN'S ANSWERS TO DEFENDANT TOWN OF SHERBORN'S INTERROGATORIES

**INTERROGATORY 1.** Please describe how the incident occurred.

**ANSWER**:  On February 6, 2003, I called 911 after my left foot was run over by Elizabeth Weaver during the aftermath of our minor auto accident. The ambulance came to the scene of the accident and I was placed on a gurney by the paramedics, and then into the back of the ambulance. I was strapped to the gurney in an upright position, and transported to the Natick Hospital.  While removing the gurney from the rear of the ambulance, the paramedics dropped me to the ground in the process.

**INTERROGATORY 2.** Kindly explain how you were "negligently dropped", as alleged in your complaint.

**ANSWER**: As I was being removed from the back of the ambulance, the paramedic behind me (the one who exited the ambulance first and grabbed the feet/bottom of the gurney) asked the second paramedic (who was still in the van, at my head/front of the gurney) "You got him?", to which the second paramedic answered "Yep." As I was rolled out of the ambulance, the gurney wheels did not come down to release the legs when the paramedics simultaneously released me from the top of the ambulance.  They dropped me straight onto my tail bone (as I was in a semi-sitting position) from nearly three feet up. The paramedics apologized profusely, and asked if I was OK. I told them to just get the gurney raised to the correct level and to get me inside the hospital as it was freezing outside. They tried unsuccessfully for several minutes to raise and lock the gurney into the proper position.  Eventually they gave up and wheeled me into the hospital at ground level. One of the ER nurses commented about this as it appeared funny to her to see a patient coming in basically on the floor.

**INTERROGATORY 3.**  Please identify each date on which you were examined or treated by any doctor or physician with respect to any injury or disability which you claim to have sustained as a result of the incident, setting forth as to each such date of examination and treatment.

**ANSWER:**  When I was first injured at the scene, and dropped outside the ER, I was examined by the ER doctors and nurses at the Natick Hospital.  I had my left foot x-rayed, and was told it was a lot of soft tissue damage.  I did mention that the paramedics had dropped me, and that I was concerned that my back may be injured.  However, the ER doctors said that this wasn't what I was being seen for.  Two days after the injury/being dropped, I developed the worst back pain of my life (up until that point of my life) and felt as if a golf ball had been lodged in my lower spine.  I went to see my primary care physician, Dr. Felipe Diaz at Carebest Medicine (they have since dissolved the practice) in Cicero, NY.  Dr. Diaz examined me, and determined (based on what I had told him about the accident) that I was in a spastic state from the injury.  He explained that such an injury typically takes several days to manifest when you have that type of back injury.  Dr. Diaz gave me a shot of Demerol to numb the pain, and something to help calm down my back.  He then sent me home with a script for aqua physical therapy, pain medications and anti-spasmodics.  Since that time, I have been to a doctor many times, often weekly, for this injury.  I have sought treatment through physical therapy, orthopedics, MRIs and other tests, pain management appointments and procedures, urologists, and so on.

**INTERROGATORY 4.**  As a result of the incident, how long and between which dates were you:

      a.      Wholly incapacitated from your normal activities, giving particulars as to each such activity from which you were so incapacitated; and

      b.      Partially incapacitated from your normal activities, giving particulars as to each such activity from which you were so incapacitated

**ANSWER:**  When the injury first happened, I was unable to perform any of my work duties involving travel for several weeks.  I worked only periodically on the phone from my home office.  I was unable to care for my children as I couldn't lift them or get on the floor to change a diaper.  I couldn't do any housework or shovel the snow, etc.  I was either on a heating pad or an ice pack while lying in bed or on the couch, or, for brief periods, at my desk chair.  Although I have since been able to go back to work and travel when necessary, it is very uncomfortable.  I have to take a large amount of strong narcotic painkillers, and have regular and painful epidural pain blocks. I also have to keep up on all of the tests that the pain management physicians have to do in order to determine how much worse my back is getting over time, inasmuch as I haven't been able to have surgery (which is the only end result, per my physicians, that I can expect from this injury) as of yet. Having the surgery will incapacitate me for up to three months, and I have yet to find a job where I can take that amount of time off to recover

from such a major operation.  Everyday activities are filled with pain, including caring for my three young children, housework, and even sexual relations with my wife.  These are activities which require me to push through the pain, as it is a part of my life.

My wife and I had another baby after my accident (Erik was born 10/20/04), and because of all of my erectile dysfunction stemming from the accident, and all of the medications that I am now on, as well as a sudden decrease in my sperm count (never a problem when we conceived our first two children - 2 and 4 years prior to Erik), my wife had to undergo painful infertility treatments in order to conceive.  She had to endure painful shots, fertility medications that caused her to have mood swings and hot flashes, and invasive procedures such as IUIs (intrauterine inseminations) and transvaginal ultrasounds.

I have to take medications such as Cialis in order to have sexual relations with my wife, again due to the pain medication and nerve damage from the accident.  I have to pay someone to mow my lawn, plow my driveway, landscape my yard, and paint my deck, etc., because I am in too much pain to do it all.  With difficulty, I can perform, and want to perform, these duties.  However, I know that if I do, I will end up in bed with an ice pack, spending days to recover from the activity.  It's very costly to have to pay others to do work that I should be able to do myself.  It puts a deep hole in our finances.

**INTERROGATORY 5.**  Please describe each and every back injury or back-related medical condition from which you have suffered since February 6, 1993.

**ANSWER:**  Other than pulling a muscle in my shoulder/upper back after working in my yard years before the accident, I have always been perfectly healthy in this respect.  All of my back problems have been diagnosed as a result of the accident on February 6, 2003 according to many of my doctors.  I have clearly visible damage to my spinal discs, which are leaking and appear as "shredded wheat" on the tests that I have had (the exact words my first pain management physician, Dr. Robert Tiso, used to describe my discs upon performing a discogram).

**INTERROGATORY 6.**  If you are still afflicted with or suffering from the effects of any injury or disability you received as a result of the incident, please describe the nature and duration of each present injury or disability.

**ANSWER:**  I still take daily oral pain medication (Kadian 100mg/1X/day; morphine sulphate 30mg/6-8X/day; Motrin 100mg/3X/day) as well as epidural pain block injections every 6-8 weeks.  In addition, my pain management doctor is trying other procedures in an attempt to help with my pain (see recent records from the Capital Area Pain Management in Frederick, MD).

**INTERROGATORY 7.**  If you are claiming any loss of earning capacity as a result of the incident, please state:

    a.    the inclusive dates between which you were unable to work as a result of the incident;

    b.    the total amount of earnings which you lost as a result of your absence; and

    c.    the nature of your employment immediately prior to the incident, indicating the name and address of your employer, your place of business, your job title, classification or position, and the amount of your salary, wages or other compensation.

**ANSWER:** I have not been able to calculate my lost earnings, but will supplement this answer in a timely fashion. At the time of the incident, I was the Northeast Zone Sales Manager for Schwan's Food Service, 115 West College Drive, Marshall MN 56258. I had been with the company for approximately 1 ½ years. My base pay for $95,000 per year and I received an annual bonus based on 25% of my annual income.

**INTERROGATORY 8.** Please identify each doctor that ever treated your back before February 6, 2003.

**ANSWER:** None. Common back aches, caused by over-exertion from working in my yard, were the extent of any back discomfort prior to the accident, none of which required medical treatment.

**INTERROGATORY 9.** Please give the names and addresses of all persons who:

    a.    witnessed the incident;

    b.    were present at or near the scene of the incident, or

    c.    have knowledge with respect to the incident, your injuries, or defendants' alleged negligence.

**ANSWER:** Aside from the two paramedics involved in the accident, any hospital personnel or visitor standing outside of Natick Hospital could have seen me when I was dropped. As to knowledge of defendants' negligence, I cannot answer that question.

**INTERROGATORY 10.** In the 24-hour period preceding the alleged occurrence, please state whether you took or ingested any drug, narcotic, sedative, tranquilizer, or any other form of medication or medical preparation and, if so, state:

    a.    the date and time of any such taking or ingestion;

    b.    the name and identity of any such medication or medical preparation;

    c.    the amount and quantity of any such medication or medical preparation taken or ingested; and

    d.    whether any such medication or medical preparation was procured under a prescription, and, if so, state the name and address of the Person, doctor, or practitioner by whom it was prescribed.

**ANSWER:** I consumed no alcohol or narcotics at all. I was working on this day, and the previous day (February 5). I spent the day driving from my home in Syracuse to Hartford, Connecticut.

**INTERROGATORY 11.** Describe any conversations or other Communications You or anyone on Your behalf had with any employees of Defendant Town of Sherborn ("Sherborn") regarding the Incident, stating the date, time, and place of each such conversation or other Communication, its nature and substance, the name and address of each Person present, and what was said by each.

**ANSWER:** The morning after the incident, I spoke with a woman in the office of the Town of Sherborn, asking for a copy of the ambulance report from the previous night's incident. I also inquired about the gurney and was told that they were looking into it. I made two or three additional follow-up calls over the next few days, until I retained the services of an attorney.

**INTERROGATORY 12.** Kindly Describe any conversations or other Communications You or anyone on Your behalf had with any witnesses regarding the Incident, stating the date, time, and place of each such conversation or other Communication, its nature and substance, the name and address of each Person present, and what was said by each.

**ANSWER:** Upon arrival at the Natick Hospital, after being dropped by the paramedics, they wheeled me into the building at floor level. An ER nurse laughed and commented on this as I was not raised up on the gurney as I should have been. I asked her if she had seen what had happened. Her only response was "Look, it's Mini Me!" (from the movie Austin Powers). The other nurses in the area got a chuckle out of it.

**INTERROGATORY 13.** Identify by name, occupation, professional title, and present address each Person expected to be called as an expert witness at the trial and, for each expert, state the subject matter on which each expert is expected to testify, the substance of the facts to which each expert is expected to testify, the substance of the opinions to which each expert is expected to testify, and a summary of the grounds for each opinion.

**ANSWER:** My attorney has not yet made a determination as to expert witnesses. This answer will be supplemented in a timely fashion.

**INTERROGATORY 14.** Identify each of Your primary care physicians and your health insurance providers since 1993.

**ANSWER:** In Columbus from 1995-2000: Timothy McMullen; in Reynoldsburg, Ohio; in Cincinnati from 2000-2003: Dr. Saaman in Fairfield, Ohio; in Syracuse: Dr. Felipe Diaz in Cicero, NY (practice has closed and they claim to have lost my records); Dr.

Clyde Satterly in Cicero, NY. In Baltimore:    Frederick Primary Care Associates, Heather/Physician Assistant there.

**INTERROGATORY 15.**  Describe all injuries, ailments or pains You claim to have suffered as a result of the Incident, stating the onset date and time, parts of Your body or mind so affected, the nature, extent, and symptoms of such injuries, ailments or pain, and how long each lasted.

**ANSWER:**  When the paramedics dropped the gurney on February 6, 2003, I had an immediate jolt of pain up my spine.  However, the primary pain was in my left foot, as it had just been run over by Ms. Weaver.  My back continued to stiffen and get sore over the next 24 hours.  At approximately 36 hours post incident, I was in very serious pain.  I told my doctor that it felt like there was a golf ball on my spine when I sat back against a seat.  The pain was so excruciating by the time I drove the four hours back to my home in Syracuse from the Boston and Hartford area (where I was doing business and visiting family with my wife and children), that I immediately went in to see my general physician, Dr. Diaz.  The doctor went as far as to shoot my back with a cortisone and steroid solution and also gave me two shots of Demerol for immediate relief.   He prescribed muscle relaxers and pain medications for me.

**INTERROGATORY 16.**   Describe where You were coming from and going to at the time of the Incident.

**ANSWER:**  I was being transported from the scene of the minor auto accident, in which my left foot was run over by Ms. Weaver, to the Natick Hospital for x-rays of my foot.  The incident happened in front of the Natick Hospital as the paramedics were removing me from the back of the ambulance.  I was in town for a business meeting at the Sherborn Inn, and pulling into the hotel parking lot when Ms. Weaver and I were involved in the motor vehicle accident.

**INTERROGATORY 17.**  Describe any and all facts upon which You contend that the Town of Sherborn or its agents were not in the exercise of due care.

**ANSWER:**  The paramedics did not take the time to be certain that the gurney legs were up and in the locked position before removing me/the gurney from the back of the ambulance.  As a result, I was dropped to the ground from a height of approximately 3 feet. The first paramedic asked the other (the one at my feet, who pulled the gurney out partially while waiting for the other paramedic at my head to exit with the rest of the gurney), "You got him?" at which time the other paramedic stated "Yep".   The paramedics then proceeded to push/pull the gurney out of the back of the ambulance and just let go, thinking that the legs of the gurney were locked in place.  They obviously were not, as I fell to the ground, HARD, while still strapped to the gurney.  After this, the paramedics were in a panic, attempting to get the gurney to come up on its legs in order to lock them back into place and wheel me into the hospital.  After what seemed like five

minutes of the paramedics messing with the gurney, I demanded that they just bring me into the hospital NOW, as it was freezing outside and I wanted to be seen in the ER. They had to be told what to do by the patient (me) on their gurney and didn't take any control over the situation. When I asked the paramedics what I should do, or whom I should contact if I had any problems from being dropped while in their care, they told me to contact the office in the morning. About an hour after the paramedics handed me over to the ER staff, they stopped by the room where I was being treated, and pointed to the gurney, which was now in the up and locked position, and said "it works now".

**INTERROGATORY 18.** Please Describe all other automobile accidents, legal claims and lawsuits which you were involved in other than this lawsuit against the Town of Sherborn.

**ANSWER:** I had a minor fender-bender in the parking lot of Kroger's in Reynoldsburg, Ohio in or around 1998. I was not cited, and the driver of the other vehicle paid for the damage to my car. In approximately 1983, while attending the University of Akron in Ohio, I was hit in an intersection by a car that was "timing lights" and ran it too soon. I did not make a claim for personal injury and did not lose any time from school.

Signed under the pains and penalties this 10th day of May, 2006.

_____
JOSEPH H. KORAN

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 05-11454 RGS

_____

                                              )
JOSEPH H. KORAN, and KIMBERLY KORAN,          )
Individually and on Behalf of ANA KORAN,      )
JOSEPH KORAN, JR. and ERIK KORAN, Minors,     )
     Plaintiffs,                              )
                                              )
v.                                            )
                                              )
ELIZABETH WEAVER and                          )
TOWN OF SHERBORN,                             )
     Defendants.                              )
_____)

## AFFIDAVIT OF COUNSEL

     I, Michael D. Leedberg, Esq., do hereby depose and state:

1.     I represent the Town of Sherborn in the above captioned matter.

2.     I have diligently been trying to locate the plaintiff's former primary care physician, Felipe

Diaz, MD, a key witness in the above-captioned matter.  My efforts include:

     a.     Telephone calls to his place of practice while treating the plaintiff, CareBest

Family Practice, 315/464-2242, n/k/a MedBest;

     b.     Telephone calls to his former partner, James Dispenza, MD, now at North

Medical Family Practice, 315/452-2333;

     c.     Internet searches on www.google.com, www.docboard.org, and the official

licensing information web page for the State of New York, www.op.nysed.gov; and

     d.     Telephone calls to St. Joseph's Hospital, 315/448-5704, his last known affiliation

according to the above websites.

3.     Despite my diligence, I have yet to locate Dr. Diaz.

1

4.      The additional time sought, together with a concerted effort among the parties and

perhaps the services of an investigative firm, will assist in locating Dr. Diaz.

5.      On August 14, 2006 I finally received Dr. Diaz's complete treatment records from his

former partner, Dr. Dispenza, after weeks of written requests and research with the above

entities.

6.      Dr. Diaz's treatment records raise significant concerns as to whether his conditions were

pre-existing, or caused in the incident giving rise to this suit.


        Signed under the penalties and pains of perjury.

                                                Michael D. Leedberg

                        8/17/06

# EXHIBIT D

16 (Pages 61 to 64)

Page 61

1    I brought it to the attention of the nurse and asked
2    to have it looked at. The next morning when I got
3    up I had discomfort when I woke up, but my foot was
4    so sore from the injury that I was more focussed on
5    my foot than I was on my back, but I noticed that I
6    was rather stiff in getting up. When I arrived back
7    with my family at the location where we were on
8    Friday night and Saturday night visiting family and
9    relatives, I had been riding in the car a good part
10   of the day driving through a snow storm, and I
11   had--was very uncomfortable when I got back, and
12   just I had discomfort in my lower back to the point
13   where it was--I just felt stiff. I felt like I
14   didn't have a lot of flexibility, and the next
15   morning when I got up, I had a difficult time
16   getting up. My back was extremely sore at that
17   point.
18   Q. What morning was that?
19   A. That was Saturday morning. The incident happened on
20   Thursday evening. So Saturday morning it was
21   starting to really bother me, and throughout the day
22   the pain started to get more and more and was
23   actually increasing to the point where it was more
24   noticeable than the pain in my foot, which was

Page 62

1    fairly aggravated at that point still as well.
2    Sunday, as I drove back to New York, it felt as if I
3    had a golf ball in the small of my back that as I
4    sat back, I could feel this golf ball, and no matter
5    how I sat, I just felt this pressure and pain of
6    this golf ball type feeling in my back that made my
7    legs very uneasy to the point where I said to my
8    wife, "If we have to drive much further, I want you
9    to drive because I just don't feel comfortable."
10   And we got home, and I put ice on it again, which I
11   had done a couple days in a row just to try to help
12   relieve some of the discomfort. So the next morning
13   I got up, and I called Dr. Diaz and asked to come in
14   there, and I had a conference call that I jumped on
15   for 45 minutes and then jumped off and went straight
16   to his office then at that point at which time he
17   administered an injection to relieve--he gave me
18   Demerol to relieve the pain and did a couple of
19   steroid injections into the area where I had the
20   discomfort to see if that would help relieve the
21   pain there, and then he sent me for x-rays and such.
22   So the pain had really increased, just progressively
23   got worse.
24   Q. Was there any event during those few days that

Page 63

1    preceded the increase in pain?
2    A. No. I had--we were visiting family and relatives,
3    and there were a lot of my wife's cousins and such
4    that were playing with the kids, so I didn't have to
5    attend to getting on the floor with the kids. I
6    didn't have to change diapers. I didn't have to
7    carry the kids around, none of the things that I
8    would do in a normal routine, which was good because
9    then I didn't have to worry about, you know, if it
10   was going to aggravate things at that point. So I
11   really didn't have to actually participate in
12   anything like that until we got home on Sunday
13   night, which I wasn't able to participate in at that
14   point.
15   Q. Where was this location where you were visiting in--
16   A. Avon, Connecticut.
17   Q. In Avon?
18   A. Uh-huh.
19   Q. What was the name of the family you were visiting?
20   A. My wife's family, the Somsen Family, her
21   grandmother, who is now deceased, Janet Somsen, and
22   her aunts, uncles, cousins.
23   Q. What are their names?
24   A. There are quite of few of them. There was--you want

Page 64

1    the complete list of everybody?
2    Q. Who you can recall there?
3    A. Well, let's see, there was my wife's brother, Glen,
4    his wife, who is now his ex-wife, which was Christy,
5    his two children, Kaylee and Matthew.
6    Q. What are their last names?
7    A. Somsen. It was my wife's maiden name.
8    Q. Can you spell that for me?
9    A. S-o-m, as in Mary, s-e-n, as in Nancy.
10   Q. Are they from Connecticut as well?
11   A. The Somsen Family grew up in the Connecticut area.
12   My wife did not grow up in this area. She grew up
13   in Ohio.
14   Q. And other Somsens, do they live in Connecticut?
15   A. They're--Janet Somsen, her grandmother, lived in
16   Connecticut. Her biological father lived in--lives,
17   I guess, in Holyoke, Massachusetts. He's estranged
18   from the family.
19   Q. What about the brother and the ex-wife and the kids?
20   A. They, at the time, were living in
21   Upstate New York--well, just outside of New York
22   City in Upstate, but they're divorced, and they live
23   in Atlanta.
24   Q. Atlanta, Georgia?

Page 65

1  A. Yes.
2         (Discussion off the record.)
3  Q. Who else was at the house that weekend?
4  A. Her Aunt Jean, which her last name is Connell, and
5     her daughter, Katie Connell. Her Aunt Jane with her
6     two daughters, Emily and Ellen, and their last name
7     is Strong. Her Uncle Paul Zavarcky.
8  Q. Can I just interject for one minute? If you know
9     their address, could you give that as well?
10 A. Okay. The Connells at the time were living in
11    Sparta, New Jersey.
12 Q. Where are they living now?
13 A. They now live in--it's just outside of Sparta, but
14    it's actually in Pennsylvania. I don't know the
15    name of the little town, but then the Strongs live
16    in West Hartford. The Rappaports, which was
17    Danielle, Margo, Nicole, and her Aunt Joanne, who
18    live in West Hartford as well. The Zavarckys live
19    in Newton, Massachusetts, which was Judy and Paul.
20    They were there.
21 Q. Could you spell their last name for me?
22 A. Z-a-v-a-r-c-k-y, and I believe that's all the folks
23    that were there for the--and Janet Somsen. It was
24    her house that everybody was visiting.

Page 66

1  Q. Was this some kind of planned event?
2  A. It was her Aunt Joanne, her cousin, Kate, and her
3     grandmother all celebrating birthdays within a three
4     week span of each other, and her brother, Glen, all
5     within a three week span of each other celebrating
6     birthdays, and it just happened to be a time that
7     everybody was available to come to town and see each
8     other.
9  Q. What did the events of the weekend entail?
10 A. A lot of playing the game Boggle, which was the
11    grandmother's favorite game. Basically sitting
12    around talking. The kids climbing on Uncle Paul,
13    and him wrestling with them, and a number of
14    conversations and preparing food and eating a lot.
15    Typical family event.
16 Q. Did you guys go out anywhere?
17 A. No, stayed at the house. I mean, maybe we ran to
18    the store to get some more food items, you know, for
19    snacks and such.
20 Q. Did you run to the store?
21 A. No, I didn't leave the house.
22 Q. What did you do all weekend?
23 A. I was in the back bedroom laying down quite a bit.
24    I would come out. I'd sit in a chair and kind of

Page 67

1  just observe and sit and talk with folks. I had a
2  very quiet weekend. It was not--did not participate
3  in any of the games and such or any of that type of
4  activity. I never really participate in the games
5  anyhow. It's not my thing.
6  Q. Do you recall any specific conversations about this
7     entire incident?
8  A. Well, everybody that came in asked why I was wearing
9     a boot, and I explained to them what had happened,
10    and they were just, you know, people found humor in
11    the fact that I got dropped. They found that
12    humorous for some reason.
13 Q. Did you mention your back injury to them?
14 A. Yes, and they said that--they said, "Well, how does
15    it feel now," and I said, "It seems to be getting
16    worse," and they said, "Well, what are you going to
17    do?" I said, "I'm going to see the doctor when I
18    get home."
19 Q. So you were injured, and they found that humorous?
20 A. In a warped way, yes.
21 Q. How did you leave the hospital that day?
22 A. I was given a ride by one of the brokers staff
23    members who happened to be visiting his mother. His
24    name was Tom, and I don't remember his last name.

Page 68

1  He worked for the broker, which was
2  Pilgrim's of New England, and he happened to be
3  visiting his wife's mother at the hospital with his
4  wife, was walking through the ER to leave, looked
5  over and saw me sitting in one of the rooms, and
6  came in and had a conversation, you know, "What's
7  going on," and was actually in there at part of the
8  time when I was having the conversation about my
9  back with the nurse, and then he left, you know,
10 while I was in the midst of conversation because he
11 felt that it was a private conversation, went out,
12 and was making phone calls outside. He came back in
13 and asked if I needed a ride back to the inn, in
14 which I said, "That would be great." So he gave me
15 a ride back to the inn at that point because they
16 said that I was finished. There was nothing else
17 they could do for me.
18 Q. You don't know Tom's last name?
19 A. I don't remember it, but I'm sure the folks at
20    Pilgrim's of New England, if you called Tom Hill or
21    Rich Hill and asked them the gentleman, they would
22    know exactly what his name was.
23 Q. How old is Tom approximately?
24 A. Tom is probably late 30s.

18 (Pages 69 to 72)

**Page 69**

1  Q. What is your relationship with Tom? Is he a friend,
2     a colleague?
3  A. He's just a--he works for the broker, so he knew me
4     because I--the company I represented helped pay for
5     his paycheck in a sense. So he just knew me by
6     association. He knew my regional managers better
7     than he knew me.
8  Q. Did you talk to Tom about your back injury at any
9     point?
10 A. I told him my back was starting to brother me and
11    that, and he said, "You'll probably be hurting in
12    the morning. You know how it is." He said, "If you
13    get an injury, you'll probably--it will hurt more
14    tomorrow than it will today."
15 Q. When did he say that?
16 A. While we were driving back to the hotel.
17 Q. Have you seen Tom since?
18 A. I saw him once since then.
19 Q. Did you discuss this incident at all?
20 A. He just asked how my back was doing, and I said,
21    "I'm still getting treated for it." He said, "I
22    can't believe that." He said, "That's just
23    amazing."
24 Q. Do you remember anything about the nurse you had

**Page 70**

1     this conversation with at the West End?
2  A. What do you mean? As far as--
3  Q. What she looked like? Her name? Her age, height,
4     weight?
5  A. She was probably, I would say, early to mid 30s.
6     Heightwise probably five, four. I think she had
7     like medium brown hair, if I remember accurately. I
8     don't remember her name. I think it's actually on
9     the report. Her name, I think it may have actually
10    appeared on here (witness indicating). If not--
11 Q. You're referring to Defendant's Exhibit 1?
12 A. Yes. I thought that she may have made a notation on
13    there.
14 Q. Do you recall her approximate weight?
15 A. Probably 120, in that range, 130.
16 Q. Any unusual characteristics that you remember?
17 A. No, just very average.
18       (Discussion off the record.)
19       (Brief break.)
20 Q. You've claimed as part of this lawsuit that the
21    incident has affected your sexual relations with
22    your wife; correct?
23 A. Correct.
24 Q. Describe for me your sex life with your wife prior

**Page 71**

1     to the incident?
2  A. Our sex life was actually quite active. I did not
3     have any difficulty with arousal where after having
4     taken the pain medications and some of the
5     injections that started--that I started getting, I
6     began to have less capability of getting aroused,
7     and if I did, it didn't last, and if it did last,
8     there was no completion from my end.
9  Q. How frequently would you and your wife have sex
10    prior to the incident?
11 A. Realistically about twice a week.
12 Q. And was this so even through your times of trouble
13    in your marriage?
14 A. Yes.
15 Q. So your sex life was never affected by the marital
16    difficulties you were experiencing?
17 A. No.
18 Q. And is it your testimony that it's the medications
19    that created erectile dysfunction of some sort?
20 A. Yes.
21 Q. Which medications is that?
22 A. The pain medications have been one of the issues.
23    The pain block injections, because of the nerves
24    that they are injecting into to deaden the nerves

**Page 72**

1     are directly in relation to the same nervous system
2     that is in the genital area.
3  Q. And has the physician told you that?
4  A. The pain management physician has told me that.
5     Both my pain management in Syracuse said that it's a
6     natural side effect unfortunately of the injections,
7     the epidural pain blocks, and the current pain
8     management doctor has said the same thing.
9  Q. Would that be Dr. Tiso?
10 A. Dr. Tiso, yes, in Syracuse and Dr. Gonigar in
11    Maryland.
12 Q. Could you spell Dr. Gonigar's name for me?
13 A. G-o-n-i-g-a-r.
14 Q. What's his first name?
15 A. I don't know, but I'll have to get a card for you.
16    I don't know what his name is, and I don't even want
17    to attempt the spelling or anything.
18 Q. Do you know the address?
19 A. They're on Thomas Johnson Drive in
20    Frederick, Maryland.
21 Q. How often do you see Dr. Gonigar?
22 A. At least once a month.
23 Q. Is he routinely giving you injections?
24 A. I'm getting injections about every six to eight

20 (Pages 77 to 80)

Page 77

1   management doctors.
2   Q. Did you see a urologist at any point?
3   A. I did go see a urologist.
4   Q. Do you remember the person's name?
5   A. I don't remember his name. I apologize, but I did
6       have--I was--I did go see the urologist. He
7       indicated--he did a number of tests indicating to me
8       that as he explained to me, he didn't see that there
9       was anything physically wrong. So he said it had to
10      be medication related based on the physical tests
11      that they did, looking for blockages, looking for
12      restrictions and such through all the examinations
13      that they did. His determination was that it was
14      medication-driven.
15  Q. Did you ever have any sexual dysfunction of any kind
16      prior to the incident?
17  A. No.
18  Q. Dr. Harvey Sour (phonetic); does that sound? Is
19      that the urologist you saw?
20  A. That sounds correct, yeah.
21  Q. Have you seen any other urologist--
22  A. No, he was the only one I've ever seen, and after
23      that visit I don't know that I want to go to another
24      one. No, I take that back. I correct myself. I

Page 78

1   did see a urologist based on--I was being treated
2   for testosterone imbalance, and I went to see a
3   urologist in Frederick, Maryland who referred me to
4   an endocrinologist because of my testosterone levels
5   being low, which Dr. Diaz had continued a treatment
6   with me there as I had with Dr. Samaan after--during
7   around the time of my gout, he noticed that I was
8   having like tendonitis. So he did some testing and
9   found that my testosterone levels were really low.
10  So he started doing testosterone injections for me,
11  and they were working, and it worked great. It got
12  the testosterone back up. Well, in the meantime,
13  when we were trying to get pregnant, the combination
14  of the erectile dysfunction and the fact that I was
15  taking testosterone, which had to do with the fact
16  that I was getting older, helped lower my counts.
17  So it was a combination of the two, and the
18  testosterone became--I ended up going off the
19  testosterone so it helped my counts raise. It
20  didn't help anything else because it made the
21  erectile dysfunction even more exaggerated, but I
22  did go see this urologist in Maryland to check into
23  whether or not I should go back onto a regime with
24  the testosterone, and they referred me to an

Page 79

1   endocrinologist, who I'm waiting to have a follow-up
2   appointment after the testing with them to see if
3   they're going to have me go back on the testosterone
4   again.
5   Q. Did any physician tell you what the cause of this
6       lower testosterone was?
7   A. It's very common actually after men reach the age of
8       40 for it to drop. It's just something that happens
9       in some people. It's almost like male menopause.
10  Q. Are you claiming that it's related to this incident
11      in any way?
12  A. No.
13  Q. Is it your claim that your wife had trouble
14      conceiving after this incident, conceiving a child?
15  A. She did because I was unable to--I mean, I had the
16      erectile dysfunction, and I was unable to finish, if
17      you will. So we did not have difficulty in the past
18      getting pregnant with two other children. Our plan
19      was to have three children. We did not want the
20      incident to come in the middle of that, you know, to
21      be an obstacle for us. So we tried, but it was just
22      not--we were not successful. So we had to go to an
23      artifical insemination type of method or
24      intrauterine injections that she had to get where

Page 80

1   they--you know, I had to go and give a sample that
2   then got scrubbed, if you will, so that the active
3   swimmers were the only part of it that we took, and
4   we put that--took that back to her doctor's office
5   and injected that in her, and then she got to sit
6   for a half hour while, you know, nature took its
7   course.
8   Q. It's your testimony that your wife never had
9       problems conceiving with your first two children?
10  A. She--she did not have--it was--you know, like any
11      other couple, we went and we tried a few times
12      before it was successful. She had two ectopic
13      pregnancies that were--that she miscarried. I mean,
14      if that's a difficulty. You know, that is a
15      difficulty as far as that goes.
16  Q. Were there any problems like that after the incident
17      with your wife?
18  A. She did not have any ectopics, no.
19  Q. Have you ever had any back problems prior to the
20      incident?
21  A. No back problems, no. I mean, no more than just,
22      you know, when you're working in the yard you get
23      sore, but no. Do you know what I mean? No
24      injuries.

Page 81

1  Q. When you'd work in the yard and get sore, would that
2     pain go into your legs or thighs?
3  A. No.
4  Q. It was just localized to your back area?
5  A. It was just your shoulders, and you know, just from
6     working with a shovel or something like that.
7  Q. Did you ever have an x-ray or MRI of your back prior
8     to 2003?
9  A. Not that I'm aware of.
10 Q. Do you think you'd be aware of it if you did have an
11    x-ray or an MRI of your back?
12 A. I can't remember if I did.
13 Q. Have you had an MRI since this incident?
14 A. On my back?
15 Q. Yes.
16 A. I believe they did an MRI on my back.
17 Q. Is that where you lay in the tube?
18 A. Yes.
19 Q. You think you'd remember doing that prior to 2003 if
20    you had done it?
21 A. Yeah. I would hope so, yeah.
22 Q. And it's your testimony here today that you don't
23    recall ever having an MRI?
24 A. I don't recall doing that, no.

Page 82

1  Q. Has any physician indicated to you that you had back
2     problems that you may not have known about prior to
3     this incident?
4  A. If you can clarify the statement a little bit better
5     for me?
6  Q. Has any physician examining you indicated to you
7     that you had a degenerative condition of your lower
8     spine that pre-existed this incident?
9  A. I was informed by the orthopedic specialist as well
10    as the pain management that degenerative--
11 Q. Can you give me their names, please?
12 A. Dr. Tiso and Dr. Wulff, that degenerative disk
13    disease is common in all humans, and it just happens
14    as you get older. Everyone's disks begin to
15    degenerate to some degree. Trauma will amplify the
16    problem and exaggerate it, you know, to a greater
17    degree.
18 Q. Did they indicate that that's your situation, that
19    you had a degenerative condition in your spine prior
20    to this incident that was exacerbated or otherwise
21    made symptomatic as a result of this incident?
22 A. That was the--I believe Dr. Wulff and Dr. Tiso both
23    stated that.
24 Q. Did any physician tell you that your degenerative

Page 83

1     condition was a result of this incident?
2  A. No. That's where they stated that it was just
3     degenerative disk disease is something that everyone
4     has. It's just to what degree it flares up.
5  Q. Dr. Diaz was the first physician you saw as a result
6     of this incident or as a result of your back
7     condition?
8  A. For my back, yes.
9  Q. Describe your treatment from there? What happened
10    next?
11 A. He sent me for x-rays and MRI.
12 Q. Do you know what the results of those were?
13 A. I believe that there is a printed document that
14    states what the actual technical medical statements
15    are, but the first thing he sent me for was a chest
16    x-ray just to see if there was any blunt-force
17    trauma which can happen to organs in situations
18    where you're dropped, or you've been in a jarring
19    type of accident, and those came back negative.
20    There was no blunt-force trauma. Then he did the
21    MRI on that, on the lower back where it was
22    discovered that there was in the disk, the lower
23    disk and one in the lumbar disk and the cervical
24    disk that were both injured. So the cervical disk

Page 84

1     did not generate any pain the way the lumbar disk
2     did.
3  Q. Did you ever experience neck pain as a result of
4     this incident?
5  A. No, and I believe that that was probably
6     pre-existing, that one, because I had a
7     shoulder/neck type injury when I was working back in
8     the seafood industry back, I think, like in 1989. I
9     was unloading a box off of a truck, and I was
10    pulling one of those strapping bands, and I pulled
11    on it, and it broke, and I fell back, my shoulder
12    right into a--I think it was my left shoulder. I
13    fell right into the door of the little box truck. I
14    landed into the door and kind of twisted around, and
15    my neck and shoulder were you know, out of wack for
16    a little time.
17 Q. Who was your employer at the time?
18 A. Waterfront Seafoods.
19 Q. Where were they out of?
20 A. They were in Cleveland. They actually have--they
21    sold their business and have re-opened under another
22    name.
23 Q. Do you know what the name is?
24 A. I believe it's called Catonese (phonetic) Classic

Page 89

1  Q. Any injury or claim come out of that accident?
2  A. No.
3  Q. And what was the other accident?
4  A. The other one was I was backing up in--I had just
5     backed out of a parking space in a Kroger parking
6     lot in Reynoldsburg, Ohio, and a gentleman in a
7     pickup truck just was backing up while he was
8     talking to one of the employees who was gathering
9     carts and backed straight into my vehicle. He never
10    looked behind him.
11 Q. Were you injured in that accident?
12 A. No.
13 Q. Any other accidents of any kind where you recall
14    being injured that required medical care prior to
15    2003?
16 A. No.
17 Q. Any since the 2003 accident?
18 A. No.
19 Q. You've never had treatment for any lower back
20    related problem?
21 A. No.
22 Q. You mentioned earlier that you belonged to a gym
23    prior to this accident?
24 A. Uh-huh.

Page 90

1  Q. And that question, I think, was in response to what
2     were your activities prior to the incident. Any
3     other activities such as hobbies, recreation,
4     sports, anything you did prior to this incident in
5     2003 that you can no longer do as a result of this
6     incident in 2003?
7  A. From the hobby standpoint, I would say that my yard
8     work. I have had to--which was something I always
9     found great pleasure in doing work in my yard. I
10    now have to hire a lawn service, and I've had to
11    hire people to do landscaping for me. Shovelling my
12    driveway. I've had to hire people to do that for me
13    while I lived in Upstate New York. Virginia, they
14    don't really--or in Maryland, I mean, they don't
15    really hire people to do that because it doesn't
16    snow as often. The--you know, as far as routine
17    painting and work around the house in that way,
18    there's a number of projects that I have had to get
19    someone else to do. When we moved to our new house,
20    I had to hire a painter because I was unable to do
21    all of that painting that needed to be done
22    before--you know, when we were moving into it.
23    Essentially any handywork around the house has been
24    an item is something that I've just basically

Page 91

1     haven't been able to do as a result of it.
2     Hobbywise, you know, my greatest joy was playing
3     with my kids, and it's very unfortunate now that my
4     daughter, who is the oldest, remembers me prior to
5     my injury, now will ask me if I'm having good back
6     day or a bad back day in wanting to play with her or
7     do something. My four-year-old son, who is now
8     four, who was just an infant at the time has only
9     known me as a person with a back injury as my
10    21 month old is the same way. He's not even old
11    enough to understand yet, but he only will know me
12    as a guy with a back injury. What its done is I had
13    a lot of fun with my daughter playing on the floor,
14    and you know, we'd go for walks and that kind of
15    thing with regularity. Now I'm restricted to doing
16    that on days that I feel up to it, and it's based on
17    the pain level. I go into the pain management.
18    They ask what your pain level is for the day, and
19    it's very unfortunate that you go in, and there's a
20    pain level that--I mean, there's pain everyday, but
21    you get to a point where you tolerate it, and you
22    just deal with it, if you will, but what you have to
23    do is evaluate how much above that acceptable, this
24    is what I have to live with, level that you give

Page 92

1     them as a response, and I average, you know,
2     basically an eight on the pain scale out of ten on a
3     regular basis when I'm in there. That's just how it
4     is. It's unfortunate, but I've had to come to
5     accept that that's the level of pain that I'm in on
6     a daily basis. It's--you know, I have a high
7     tolerance for pain typically, and a great example of
8     that is I fall asleep during root canals, and I
9     never have problems with it, but the pain in my back
10    has been so severe that it's debilitated me.
11 Q. Any other recreation, sports, hobbies?
12 A. I used to play softball. I don't do that. I used
13    to play golf a lot. I haven't played golf since the
14    accident.
15 Q. Where did you play golf regularly prior to the
16    accident?
17 A. I played with customers. I played--as I travelled,
18    I played in different locations, you know, for work.
19    We'd play in different locations all over. You
20    know, with different clients and that, we'd take
21    them out to different places and play. So it was a
22    regular weekend activity for me to do.
23 Q. Any local courses that you'd go to regularly?
24 A. I never got into any of the ones in the Syracuse

Page 97

1  elevated as it was was directly a result of the pain
2  that I was in, and it noted on the
3  Defendant Item No. 1 in the upper right corner there
4  the blood pressure at 194 over 106. It indicates a
5  high blood pressure right there at that point, and
6  even the paramedics had listed 160 over 120 at the
7  time that they had me in the back of the ambulance.
8  So that was directly related to the pain that I was
9  in at that point.
10 Q. Who's Dr. Cameron Huckle?
11 A. If I remember correctly, he is a doctor that was
12 doing an experimental procedure for disk replacement
13 surgery, and my name was given to him--actually I
14 don't know how my name was given to him, but I was
15 contacted by him to see if I was interested in
16 participating in a disk replacement surgery, and I
17 would be actually as a live guinea pig, if you will.
18 I went through and was examined by him and talk to
19 him and such, and after listening to what they had
20 to say as far as--I looked at the whole scenario and
21 said, "I need to seek advice from--you know, I need
22 to talk to some other doctors to see if this is the
23 right course of action for me," and I just didn't
24 feel right about going with something that, No. 1,

Page 98

1  at the time wasn't FDA approved. No. 2, was still
2  in experimental phase, and it just was too risky to
3  me.
4  Q. So have you since decided not to go forward with
5  this disk replacement surgery?
6  A. Yes, I've decided not to. You're correct.
7  Q. Have you discussed any other treatment options with
8  any of your physicians?
9  A. Most recently I spoke with a neurosurgeon.
10 Q. What was that neurosurgeon's name?
11 A. His name is--let me think of it here. It's
12 Dr. Nathan Swami, S-w-a-m-i, and he's in Maryland.
13 When I went to get my MRI--I had an MRI done on my
14 head for my testosterone. It seems unusual, but the
15 testosterone at times is directly related to
16 sometimes the tumors on the pituitary gland, and the
17 only way they can find that out is to do an MRI. At
18 the time of that, they discovered that maybe it
19 happened when I was a baby, but--I might have been
20 dropped on my head as a baby or something. I had
21 like an indentation or something in the--where there
22 was spinal fluid on the front corner, just a little
23 corner in my brain. It doesn't affect anything, but
24 it showed up on the MRI, and it alarmed the

Page 99

1  endocrinologist because she didn't know how to read
2  it. So they advised me to go immediately to see the
3  neurosurgeon. I went in. We were talking, and I
4  told him about some of the treatment methods that
5  have been discovered--it was a non-related
6  conversation, if you will. They went in and
7  discovered this was nothing to be concerned about.
8  I said, "While I've got you here, can I ask you a
9  question," and I explained the treatments that I'd
10 been going through and that, and he basically told
11 me his advice and not knowing my history and not--he
12 says, "But just in my casual advice, your best
13 option is to not have surgery." He says, "My advice
14 to you is to try to slowly--over time you're going
15 to have to wean yourself off the pain medication and
16 find other ways to manage the pain," in which I
17 said, "What does that mean?" He said, "Well, we'll
18 have to set an appointment and talk about that
19 further." He says, "I really think that surgery is
20 not the answer. Once you start cutting into
21 somebody's back, it presents a problem that becomes
22 a long-time problem."
23 Q. Did you ever actually see Dr. Huckle?
24 A. Yes.

Page 100

1  Q. You did?
2  A. I spent four hours in his office one afternoon.
3      MR. LEEDBERG: For the record, I don't
4  think we have his report.
5  A. It was a--like I said, I got contact--I don't even
6  know who contacted me, and it was in
7  Buffalo, New York that I had to go there for the
8  appointment. I don't know that an actual report was
9  ever generated. He was talking to me kind of as
10 a--it was a discussion to see if I was interested in
11 participating in a--in this study. It was not
12 something that workmen's comp. would endorse either,
13 and they did not feel strongly about it either. So
14 I didn't have any comfort going through with it, but
15 I know that the reports are available if you need
16 them.
17 Q. So your present plan is to stay the course of
18 treatment you're currently receiving?
19 A. At this point to try to manage things as best I can.
20 You know, that's where I'm at at this point until I
21 can get to another doctor--until I get back to
22 Dr. Swami and discuss with him further options that
23 he wasn't at liberty to talk about the day we were
24 there because he didn't have my records in front of

DUNN & GOUDREAU

# EXHIBIT E

NOVEMBER 29, 2000                                               KORAN, JOSEPH

SUBJECTIVE:  Joseph presents to the office today with common complaint of his
gout.  The patient lost 10 pounds since the last visit.  He had to stop the
Vioxx.  Apparently, the Vioxx had bloated him completely.  The patient denies
any chest pain, shortness of breath, nausea, vomiting.  He gets some diffuse
joint pain in the morning and he's very stiff but once he starts moving it
goes away.  He denies any other complaints.  He was seen by Dr. Robert Hill
for his left shoulder and his shoulder is completely improved right now.  The
patient otherwise complains of having some lower back pain which he's had for
many years.  He's been doing some back exercise.

CURRENT MEDICATIONS:
1.  Flonase Nasal Spray 2 sprays in each nostril once a day.
2.  Claritin D 12 1 tablet twice a day.
3.  Allopurinol 300 mg. once a day.

PHYSICAL EXAMINATION:

VITAL SIGNS:  Wt: 222 lbs.  BP: 120/90.  Pulse: 72.

SKIN:  Warm and dry.

HEENT:  Unremarkable.

NECK:  Supple.

LUNGS:  Clear to auscultation.

HEART:  Regular rate and rhythm, S1 and S2.

ABDOMEN:  Soft.  No tenderness.  Bowel sounds are present.

EXTREMITIES:  No edema, cyanosis or clubbing.

BACK EXAM: There is mild tenderness over his lower lumbar vertebrae.
Straight leg raising test is negative bilaterally.

ASSESSMENT:
1.  Gout.
2.  Hyperuricemia.
3.  Back pain.

PLAN: I gave him information about back exercise.  The patient will continue
on Allopurinol.  We'll go ahead and check his uric acid level.

FOLLOW UP PLANS: 3 months for reevaluation.

RGS:rh

NOVEMBER 30, 2001                                            KORAN, JOSEPH

SUBJECTIVE:  Mr. Koran presents to the office today with a common complaint of his anxiety.  He says that he has been doing much better than before.  He has been taking the Xanax on a prn basis.  While he was taking the Paxil, he did not have any erections.  He could not tolerate the medicine and had to discontinue it.  He said that his stress level is much better than before but he is still anxious. He has a lot of stresses at work.  He would like to try something different.  The patient said that he did not have any more gout attacks.

PHYSICAL EXAMINATION:

VITAL SIGNS:  BP: 124/90.  Pulse: 80.    Respiratory rate: 16.    Temperature: 98.1.  Wt: 222 lbs.  He gained six pounds.

SKIN:  Warm and dry.

HEENT:  Unremarkable.

NECK:  Supple.

LUNGS:  Clear to auscultation.

HEART:  Regular rate and rhythm, S1, S2.

ABDOMEN:  Soft. No tenderness.  Bowel sounds are present.

EXTREMITIES:  No edema, cyanosis or clubbing.

ASSESSMENT:

1.  Anxiety.
2.  Erectile dysfunction secondary to Paxil.
3.  Hypertension.

PLAN:

1.  We will go ahead and start the patient on Wellbutrin XR 150 mg to be taken once a day for the first  three days and after this go to twice a day.
2.  We will ask him to only take the Xanax if needed.
3.  He will continue all of his other medications.

FOLLOW-UP PLANS:  He will be back in my office in four weeks for re-evaluation.

RGS:kj



JULY 22, 2002                                          KORAN, JOSEPH

SUBJECTIVE: Joe presents to the office with the common complaint of having pain in his lower back, leg, left hip, and going to the left leg. It is much better today because he has taken a lot of Advil or Ibuprofen. The patient states for the last 1-2 months he has been having a lot of muscle aches and joint pain. There is no swelling. He also has pain in his right elbow. He denies any nausea, vomiting, diarrhea or constipation. He thinks that since he started taking the Tricor he has been having problems with the muscle aches. His gout is not acting up. He otherwise denies any other complaints. He was worried about the fact he is not loosing weight despite he was working very hard to loose it. He does not exercise at all.

PHYSICAL EXAMINATION:

VITAL SIGNS: B: 140/85. Pulse: 79. Temp: 98.2. Wt; 228, he gained 4 pounds.

SKIN: Warm and dry.

HEENT: Unremarkable.

LUNGS: Clear to auscultation.

HEART: Regular rate and rhythm, S1 and S2.

ABDOMEN: Obese. Soft. No tenderness. Bowel sounds are present.

EXTREMITITES: No edema, cyanosis or clubbing.

RIGHT ELBOW: With tenderness of his lateral epicondyl and pain on resistant extension.

BACK: There is no pain.

LEFT HIP: There is free range of motion with pain on extreme rotation of his hip.

ASSESSMENT:
1: Arhtralgia and myalgia.
2: Hip pain.
3: Right tennis elbow.
4: Hyperlipidemia.

AUGUST 5, 2002                                      KORAN, JOSEPH

SUBJECTIVE: Joseph presents to the office with the common complaint of his muscle aches and arthralgia. He states right now his knees are bothering him. The patient states he has never weighed as much as he weighs right now. He gained 2 more pounds since the last visit. He denies any chest pain or shortness of breath. Last time he was in the office we told him to stop the Tricor to evaluate his muscle and joint pain. We did a Sedrate and supposedly a CK was supposed to be drawn, but it was not done. The sedrate came back completely normal. He states the muscle aches did not resolve after stopping the Tricor. The patient denies any chest pain, shortness of breath or any other problems. He is having problems with his erections and he is feeling tired and fatigued.

PHYSICAL EXAMINATION:

VITAL SIGNS: BP: 125/90. Pulse: 78. Temp: 98.9. Wt: 230, he gained 2 pounds.

SKIN: Warm and dry.

HEENT: Unremarkable.

LUNGS: Clear to auscultation.

HEART: Regular rate and rhythm, S1 and S2.

ABDOMEN: Obese. Soft. No tenderness. Bowel sounds are present.

EXTREMITITES: No edema, cyanosis or clubbing.

JOINTS: Did not reveal any swelling of effusion.

ASSESSMENT:
1: Arthralgia.
2: Erectile dysfunction.
3: History of depression.
4: Weight gain.

PLAN:
1: I referred the patient to see a dietician at the hospital. We will check his TSH and testosterone. Continue him on Bextra and his other medications.

FOLLOW UP PLANS: Reevaluation in 2-3 weeks.

RGS:kej



AUGUST 13, 2002                                    KORAN, JOSEPH

SUBJECTIVE: Joseph presents to the office with the common complaint of his
hypogonadism and to discuss his back pain. The patient had an attack of gout over the
weekend. Dr. Kotzin called in Darvocet, Vicodin, and Indocin. The patient states the
gout attack resolved after 24 hours. He states he is still having pain in his lower back.
He denies any numbness or tingling in his feet. He denies any nausea, vomiting,
diarrhea, or constipation. I believe the level of his testosterone will explain a lot of his
fatigue, weakness, arthralgia, and erectile dysfunction. I wanted to start him on
Testaderm TTS, but the insurance requires priorauthorazation. The patient would like to
be started on injection right now.

PHYSICAL EXAMINATION:

VITAL SIGNS: BP: 135/90. Pulse: 98. Resp: 16. Temp: 97.5. Wt: 230 lbs.

SKIN: Warm and dry.

HEENT: Unremarkable.

LUNGS: Clear to auscultation.

HEART: Regular rate and rhythm, S1 and S2.

ABDOMEN: Soft. No tenderness. Bowel sounds are present.

EXTREMITITES: No edema, cyanosis or clubbing.

BACK: Revealed tenderness of his paraspinalis at the level of his lumbar spine on the
right side. His straight leg rising test was negative.

ASSESSMENT:
1: Hypogonadism.
2: Lower back pain.
3: Gout.

PLAN:
1: We will continue the patient on his Bextra. He apparently stopped it so he will
resume taking it. We will give his Testosterone injections in the office, 200mg. He will
be back in 2 weeks. We will try to get priorauthorazation for Androderm vs. Testosterone
patch.

RGS:kej

# EXHIBIT F

LAW OFFICE OF

# CARMEN L. DURSO

Suite 1425
175 Federal Street
Boston, MA 02110-2241
TEL. (617) 728-9123
FAX (617) 426-7972
E-MAIL dursolaw@tiac.net

Carmen L. Durso
Matthew P. Coletti

Rosanne Zuffante
*Paralegal*

Kenneth I. Kolpan, P.C.
Pamela K. Sutherland
Robert C. Gabler
*Of Counsel*

July 12, 2006

**BY MAIL & FAX:     617-536-2387**

Dragan M. Cetkovic, Esquire
Black, Cetkovic & Whitestone
200 Berkeley Street - 16th Floor
Boston, MA 02116-5022

  Re: Joseph Koran, et al v. Elizabeth Weaver, et al

Dear Mr. Cetkovic:

  Enclosed please find Notices of Taking Deposition in the above-entitled action:

| | | |
|---|---|---|
| 1. | Elizabeth Weaver | Tuesday, August 15, 2006, 10:00 a.m. |
| 2. | Northeast EMS | Tuesday, August 15, 2006, 2:00 p.m. |
| 3. | Town of Sherborn | Wednesday, August 16, 2006, 10:00 a.m. |
| 4. | Scott Christensen | Wednesday, August 16, 2006, 1:00 p.m. |
| 5. | Daniel Tolson | Wednesday, August 16, 2006, 3:00 p.m. |

  Thank you for your courtesy in this matter.

      Very truly yours,

      Carmen L. Durso

CLD/sf
Enc.

cc: John J. Cloherty, Esquire / **BY MAIL & FAX:     617-350-7760**
  (w/enclosures)

\cetkovic-731

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH H. KORAN, and KIMBERLY | ) | |
| KORAN, Individually and on Behalf of | ) | |
| ANA KORAN, JOSEPH KORAN, JR. | ) | |
| and ERIK KORAN, Minors, | ) | |
| Plaintiffs | ) | |
| | ) | **C. A. No. 05-11454-RGS** |
| v. | ) | |
| | ) | |
| ELIZABETH WEAVER, and | ) | |
| TOWN OF SHERBORN, | ) | |
| Defendants | ) | |

### NOTICE OF TAKING DEPOSITION

TO:     Dragan M. Cetkovic, Esquire, Black, Cetkovic & Whitestone, 200 Berkeley Street, Boston, MA 02116; John J. Cloherty, Esquire, Pierce, Davis & Perritano, LLP, 10 Winthrop Square, Boston, MA 02110.

Please take notice that the plaintiffs by their attorney will take the deposition of the Town of Sherborn, at **10:00 a.m.**, on **Wednesday, August 16, 2006**, at the Law Office of Carmen L. Durso, 175 Federal Street, Suite 1425, Boston, MA 02110 upon oral examination of the person or persons designated, in accordance with Exhibit A, attached hereto, pursuant to Fed. R. Civ. P. 30(b)(6), and other applicable provisions of the Federal Rules of Civil Procedure before a Notary Public in and for the Commonwealth of Massachusetts or another officer authorized by law to administer oaths. The oral examination will continue from day to day until completed. You are invited to attend and cross-examine.

CARMEN L. DURSO, ESQUIRE
B.B.O. # 139340
175 Federal Street, Suite 1425
Boston, MA 02110-2241
617-728-9123
July 31, 2006

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by mail and FAX, on July 31, 2006.

CARMEN L. DURSO

## EXHIBIT A

**PLEASE NOTE: UNDER FED. R. CIV. P. 30(b)(6), IT IS THE DEFENDANT'S OBLIGATION TO CANVASS ALL OF ITS PERSONNEL AND TO DESIGNATE FOR TESTIMONIAL PURPOSES <u>ALL</u> INDIVIDUALS WHO HAVE <u>ANY</u> PORTION OF THE INFORMATION SOUGHT. IF THERE IS NO ONE IN YOUR ORGANIZATION WHO KNOWS OF A PARTICULAR MATTER, BUT YOU COULD OBTAIN THE INFORMATION FROM AN OUTSIDE SOURCE, SUCH AS A FORMER EMPLOYEE, THEN YOU ARE OBLIGED TO DO SO, AND TO DESIGNATE A PERSON TO TESTIFY REGARDING THAT INFORMATION. YOU MAY STATE, AS TO EACH INDIVIDUAL DESIGNATED BY YOU, THE MATTERS ON WHICH HE OR SHE WILL TESTIFY.**

The defendant shall designate one or more persons, pursuant to Fed. R. Civ. P. 30(b)(6). to testify on its behalf on the following matters:

1.  The persons who witnessed any aspect of the accident in which Joseph H. Koran ("the plaintiff") was injured at Powderhouse Lane, at or near the Sherborn Inn, Sherborn, MA, ("the locus"). on or about February 6, 2003.
2.  The persons who witnessed any aspect of the medical examination, treatment, or transportation of the plaintiff at the locus on the date of the accident.
3.  The person with the most knowledge of the accident.
4.  The persons responsible for the medical examination of the plaintiff on the date of the accident.
5.  The persons responsible for the medical treatment of the plaintiff on the date of the accident.
6.  The persons responsible for the transportation of the plaintiff on the date of the accident.
7.  The persons who witnessed any aspect of the stretcher used to transport the plaintiff on the date of the accident.
8.  The persons responsible for the stretcher used to transport the plaintiff on the date of the accident.
9.  The persons who witnessed any aspect of the accident in which the plaintiff was injured at or near the Metro West Medical Center, Natick, MA, ("the hospital") on or about February 6, 2003 ("the incident").
10. The persons who witnessed the malfunction of the stretcher used to transport the plaintiff on the date of the incident.
11. The person with the most knowledge of the malfunction of the stretcher used to transport the plaintiff on the date of the incident.
12. The persons responsible for the assembly, maintenance and repair of the stretcher used to transport the plaintiff on the date of the incident.
13. The person with the most knowledge of the assembly, maintenance and repair of the stretcher used to transport the plaintiff on the date of the incident.
14. The persons responsible for the assembly, maintenance and repair of the stretcher used to transport the plaintiff for one year prior to the date of the incident.
15. The person with the most knowledge of the assembly, maintenance and repair of the stretcher used to transport the plaintiff for one year prior to the date of the incident.
16. The person with the most knowledge of operations, policy or procedure manuals relating to the stretcher used to transport the plaintiff on the date of the incident.

17. The persons whose duties included enforcement of all rules, policies or procedures relating to the use or operation of the stretcher used to transport the plaintiff on the date of the incident.

18. The persons responsible for the maintenance of the incident log on the date of the incident.

19. The persons responsible for preparing, maintaining or filing any reports required by Massachusetts or Federal law relating to the incident.

20. The persons responsible for preparing, maintaining or filing any reports required by any public or private regulatory agency, or other equivalent authority, relating to the incident.

21. The persons responsible for preparing, maintaining or filing any reports required by any public or private regulatory agency, or other equivalent authority, relating to the malfunction of the stretcher used to transport the plaintiff.

22. The persons whose duties included inspection and/or supervision of the stretcher used to transport the plaintiff on the date of the incident.

23. The persons whose duties included inspection and/or supervision of the stretcher used to transport the plaintiff for one year prior to the date of the incident.

24. The person with the most knowledge of the inspection and/or supervision of the stretcher used to transport the plaintiff on and for one year prior to the date of the incident.

25. The persons whose duties included the investigation of any errors or omissions relating to the stretcher used to transport the plaintiff on the date of the incident.

26. The person with the most knowledge of the investigation of any errors or omissions relating to the stretcher used to transport the plaintiff on the date of the incident.

27. The person with the most knowledge about any and all contracts entered into by the Town of Sherborn and/or its Fire Department, with Northeast EMS Enterprises, Inc., a/k/a EMSAR of New England ("EMSAR"), relating to the stretcher used to transport the plaintiff on the date of the incident.

28. The person with the most knowledge about any and all documents relating to the stretcher used to transport the plaintiff on the date of the incident.

29. The person with the most knowledge about any and all documents relating to the incident.

30. The person with the most knowledge about any and all conversations regarding the stretcher used to transport the plaintiff on the date of the incident.

31. The person with the most knowledge about any and all conversations regarding the incident

32. The person with the most knowledge about any and all records of conversations regarding the stretcher used to transport the plaintiff on the date of the incident.

33. The person with the most knowledge about any and all records of conversations regarding the incident.

34. The person with the most knowledge about any and all records relating to EMSAR regarding the stretcher used to transport the plaintiff on the date of the incident.

35. The person with the most knowledge about any and all records relating to EMSAR regarding the stretcher used to transport the plaintiff for one year prior to the date of the incident.

36. The person with the most knowledge about any and all records relating to EMSAR regarding the incident.

37. The person with the most knowledge about any and all inspections by EMSAR regarding the stretcher used to transport the plaintiff on the date of the incident.

38. The person with the most knowledge about any and all inspections by EMSAR regarding the stretcher used to transport the plaintiff at any time prior to the date of the incident.

39. The person with the most knowledge about any and all service and/or maintenance by EMSAR

regarding the stretcher used to transport the plaintiff on the date of the incident.

40.  The person with the most knowledge about any and all service and/or maintenance by EMSAR regarding the stretcher used to transport the plaintiff at any time prior to the date of the incident.

41.  The person with the most knowledge about any and all repairs by EMSAR regarding the stretcher used to transport the plaintiff on the date of the incident.

42.  The person with the most knowledge about any and all repairs by EMSAR regarding the stretcher used to transport the plaintiff at any time prior to the date of the incident.

43.  The person with the most knowledge about any and all repairs by EMSAR regarding the stretcher used to transport the plaintiff at any time after the date of the incident.

44.  The person with the most knowledge of any facts alleged in the plaintiff's Complaint.

45.  The person with the most knowledge of any proposals or recommendations for changes, repairs or replacement regarding the stretcher used to transport the plaintiff on the date of the incident.

46.  The person with the most knowledge of the physical appearance of the stretcher used to transport the plaintiff prior to the incident.

47.  The person with the most knowledge of the physical appearance of the stretcher used to transport the plaintiff at the time of the incident.

48.  The person with the most knowledge of any changes in the physical appearance of the stretcher used to transport the plaintiff from the date of the incident to the present.

49.  The person with the most knowledge of the present location of the stretcher used to transport the plaintiff.

50.  The person with the most knowledge of the incident.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH H. KORAN, and KIMBERLY          )
KORAN, Individually and on Behalf of   )
ANA KORAN, JOSEPH KORAN, JR.           )
and ERIK KORAN, Minors,            )
      Plaintiffs                         )
                                )          **C. A. No. 05-11454-RGS**
v.                                     )
                                )
ELIZABETH WEAVER, and           )
TOWN OF SHERBORN,                      )
      Defendants                         )

### NOTICE OF TAKING DEPOSITION

TO:     Dragan M. Cetkovic, Esquire, Black, Cetkovic & Whitestone, 200 Berkeley Street, Boston, MA 02116; John J. Cloherty, Esquire, Pierce, Davis & Perritano, LLP, 10 Winthrop Square, Boston, MA 02110.

Please take notice that the plaintiffs by their attorney will take the deposition of Scott Christensen at **1:00 p.m.**, on **Wednesday, August 16, 2006**, at the Law Office of Carmen L. Durso, 175 Federal Street, Suite 1425, Boston, MA 02110 upon oral examination pursuant to the applicable provisions of the Federal Rules of Civil Procedure before a Notary Public in and for the Commonwealth of Massachusetts or another officer authorized by law to administer oaths.  The oral examination will continue from day to day until completed.  You are invited to attend and cross-examine.

                                      CARMEN L. DURSO, ESQUIRE
                                      B.B.O. # 139340
                                      175 Federal Street, Suite 1425
                                      Boston, MA 02110-2241
                                      617-728-9123
                                      July 31, 2006

### CERTIFICATE OF SERVICE

    I hereby certify that a true copy of the above document was served upon the attorney of record for each party by mail and FAX, on July 31, 2006.

                                        CARMEN L. DURSO

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH H. KORAN, and KIMBERLY KORAN, Individually and on Behalf of ANA KORAN, JOSEPH KORAN, JR. and ERIK KORAN, Minors, Plaintiffs | ) ) ) ) ) ) | |
| v. | ) ) | **C. A. No. 05-11454-RGS** |
| ELIZABETH WEAVER, and TOWN OF SHERBORN, Defendants | ) ) ) | |

### NOTICE OF TAKING DEPOSITION

TO:    Dragan M. Cetkovic, Esquire, Black, Cetkovic & Whitestone, 200 Berkeley Street, Boston, MA 02116; John J. Cloherty, Esquire, Pierce, Davis & Perritano, LLP, 10 Winthrop Square, Boston, MA 02110.

Please take notice that the plaintiffs by their attorney will take the deposition of Daniel Tolsen at **3:00 p.m.**, on **Wednesday, August 15, 2006**, at the Law Office of Carmen L. Durso, 175 Federal Street, Suite 1425, Boston, MA 02110 upon oral examination pursuant to the applicable provisions of the Federal Rules of Civil Procedure before a Notary Public in and for the Commonwealth of Massachusetts or another officer authorized by law to administer oaths. The oral examination will continue from day to day until completed. You are invited to attend and cross-examine.

CARMEN L. DURSO, ESQUIRE
B.B.O. # 139340
175 Federal Street, Suite 1425
Boston, MA 02110-2241
617-728-9123
July 31, 2006

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by mail and FAX, on July 31, 2006.

CARMEN L. DURSO