# MOTION FOR SUMMARY JUDGMENT
# EXHIBIT 1
## Plaintiff's Deposition

## Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
-----------------------------
                              *
JOSEPH H. KORAN, AND          *
KIMBERLY KORAN, IND. AND      *
ON BEHALF OF ANA KORAN,       *
JOSEPH KORAN, JR., AND        *
ERIC KORAN, MINORS            *
        Plaintiffs            * CA No. 05-11454 RGS
vs.                           *
                              *
ELIZABETH WEAVER, AND         *
TOWN OF SHERBORN              *
        Defendants            *
-----------------------------
```

DEPOSITION OF: JOSEPH H. KORAN

BLACK CETKOVIC & WHITESTONE

200 Berkeley Street

Boston, MA 02116

July 21, 2006

Commenced at 10:49 a.m.

LESLIE A. D'EMILIA

## Page 2

1  APPEARANCES:
2  Representing the Plaintiff, Joseph H. Koran:
     LAW OFFICE OF CARMEN L. DURSO
3      Suite 1425
       175 Federal Street
4      Boston, MA 02110-2241
       (617) 728-9123
5      dursolaw@tiac.net
6  Representing the Defendant, Elizabeth Weaver:
     BLACK CETKOVIC & WHITESTONE
7      200 Berkeley Street
       Boston, MA 02116
8    BY: DRAGAN CETKOVIC, ESQ.
       (617) 236-1900
9
10 Representing the Defendant, Town of Sherborn:
     PIERCE, DAVIS & PERRITANO, LLP
11     Ten Winthrop Square
       Boston, MA 02110-1257
12   BY: MICHAEL D. LEEDBERG, ESQ.
       (617) 350-0950 EXT. 105
13
14
15
16
17
18
19
20
21
22
23
24

## Page 3

1            INDEX
2  Witness        Direct Cross Redirect Recross
   JOSEPH H. KORAN
3
   By Mr. Cetkovic    5
4  By Mr. Durso
   By Mr. Leedberg      36
5            EXHIBITS
   Number                    Page
6
   1    MetroWest Medical Records    48
7  2    Sherborn & Rescue Records    56
   3    Sherborn Fire Dept. Records    57
8  4    Answers to Interrogatories    88
   5    Report 2-10-03         95
9  6    Medical records        104
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1       MR. CETKOVIC:  Can we agree to the
2  stipulations that all objections and motions to
3  strike are reserved until the time of trial or
4  motion for summary judgment, whichever comes first?
5       MR. DURSO:  Sure.
6       MR. CETKOVIC:  And how about signing the
7  transcript?
8       MR. DURSO:  Waive the notary, 30 days.
9       MR. CETKOVIC:  Any other preliminary
10 matters?
11      MR. DURSO:  No.
12          STIPULATION
13   It is hereby stipulated and agreed by and
14 between counsel for the respective parties that the
15 sealing and filing of the deposition in court are
16 waived; that the witness shall read and sign the
17 deposition transcript under the pains and penalties
18 of perjury, within thirty days of receipt thereof.
19   It is further stipulated that all objections,
20 except as to the form of the question, and all
21 motions to strike are reserved until the time of
22 trial.
23          JOSEPH H. KORAN,
24 having been satisfactorily identified by the

2 (Pages 5 to 8)

| | Page 5 |
|---|---|
| 1 | production of his driver's license and duly sworn by |
| 2 | the Notary Public, testified under oath as follows: |
| 3 | DIRECT EXAMINATION |
| 4 | BY MR. CETKOVIC: |
| 5 | Q. Sir, could you state your full name, please? |
| 6 | A. Joseph Henry Koran. |
| 7 | Q. Mr. Koran, my name is Dragan Cetkovic, and I |
| 8 | represent Elizabeth Weaver in this personal injury |
| 9 | lawsuit that you brought. I'm going to ask you a |
| 10 | series of questions today. This is a deposition |
| 11 | proceeding. Let me ask you first, have you ever |
| 12 | been through a deposition before this one? |
| 13 | A. No. |
| 14 | Q. Just a couple of ground rules. Let me finish my |
| 15 | question before you start answering. Okay? |
| 16 | A. Okay. |
| 17 | Q. You have to give verbal answers so the stenographer |
| 18 | can take it down. In other words, "uh-uh" or |
| 19 | "uh-huh," you never know how that's going to come |
| 20 | out in the transcript. Do you understand that? |
| 21 | A. I do. |
| 22 | Q. If you at any time need a break or want to talk to |
| 23 | your attorney, just let us know. All right? |
| 24 | A. Okay. |

| | Page 6 |
|---|---|
| 1 | Q. What is your current residential address? |
| 2 | A. 6101 Twain Drive, Newmarket, Maryland 21774. |
| 3 | Q. And how long have you been living at this address? |
| 4 | A. October 31, 2005 I moved in. |
| 5 | Q. Is it a house? |
| 6 | A. Yes. |
| 7 | Q. Do you own it? |
| 8 | A. Yes. |
| 9 | Q. What is your Social Security number? |
| 10 | A. 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. |
| 11 | Q. Are you married? |
| 12 | A. Yes. |
| 13 | Q. Your spouse's name? |
| 14 | A. Kimberly Ann Koran. |
| 15 | Q. Do you have kids? |
| 16 | A. Yes. |
| 17 | Q. How many? |
| 18 | A. Three. |
| 19 | Q. Do you currently work? |
| 20 | A. Yes. |
| 21 | Q. What do you do? |
| 22 | A. I'm a senior manager of supplies, seafood and |
| 23 | poultry, for a management company. |
| 24 | Q. What's the name of the management company? |

| | Page 7 |
|---|---|
| 1 | A. Sodexho. |
| 2 | Q. How's that spelled? |
| 3 | A. S-o-d-e-x-h-o. |
| 4 | Q. And how long have you been with Sodexho? |
| 5 | A. Three weeks. |
| 6 | Q. What is your salary? |
| 7 | A. Current salary is $85,000 a year. |
| 8 | Q. Do you have a bonus or profit sharing? |
| 9 | A. Yes. |
| 10 | Q. What is that? |
| 11 | A. Bonus is up to 20 percent of my salary. |
| 12 | Q. So you've been in this job just for three weeks; |
| 13 | correct? |
| 14 | A. Correct. |
| 15 | Q. What did you do before? |
| 16 | A. Worked for US Foodservice as a category manager of |
| 17 | seafood. |
| 18 | Q. And they're similar duties? |
| 19 | A. Yes. |
| 20 | Q. Currently where's your office located physically? |
| 21 | A. Gaithersburg, Maryland. |
| 22 | Q. Gay? |
| 23 | A. G-a-i-t-h-e-r-s-b-u-r-g. |
| 24 | Q. And as a manager what are your duties? |

| | Page 8 |
|---|---|
| 1 | A. Negotiate purchasing contracts. |
| 2 | Q. Does that involve lots of travelling? |
| 3 | A. Can you define lots? |
| 4 | Q. What is currently the percentage of your time spent |
| 5 | in travel? |
| 6 | A. 20 percent. |
| 7 | Q. Tell me a little bit about your educational |
| 8 | background? |
| 9 | A. I graduated from high school in 1980. Attended-- |
| 10 | Q. Which one? |
| 11 | A. --North High in East Lake, Ohio. I went to |
| 12 | Defiance College for two years in Defiance, Ohio. |
| 13 | Q. Did you get a degree? |
| 14 | A. No. Went to University of Akron for two years in |
| 15 | Akron, Ohio. Did not complete my degree. |
| 16 | Q. Did not? |
| 17 | A. No. I'm currently enrolled at the |
| 18 | University of Phoenix on-line. |
| 19 | Q. For what degree? |
| 20 | A. Business management. |
| 21 | Q. For bachelor's degree? |
| 22 | A. Yes. |
| 23 | Q. When do you expect to complete that? |
| 24 | A. 2007. |

Page 9

1  Q. Your date of birth and place?
2  A. November 25, 1961, Painesville, Ohio.
3  Q. In 2003 were you employed?
4  A. Yes.
5  Q. Who did you work for?
6  A. Schwan's Food Service.
7  Q. And where are they out of?
8  A. Marshall, Minnesota.
9  Q. Where was your office?
10 A. Cicero, New York.
11 Q. What's there?  Is it an office building, or do you
12    work out of your house?
13 A. In New York?
14 Q. Yes.
15 A. I worked out of my house.
16 Q. What was your position?
17 A. Zone manager.
18 Q. And what was your zone?
19 A. The northeast United States.
20 Q. And what were your duties?
21 A. Managed a team of regional managers.  I had five
22    regional managers and managed the P & L for the
23    entire zone for foodservice sales.
24 Q. What's P & L?

Page 10

1  A. Profit and loss statement.
2  Q. So you were more in the managerial position rather
3    than, you know, actually selling or purchasing or
4    whatever?  Am I correct?
5  A. I was in a management position, yes.
6  Q. And what was the percentage of your travel outside
7    of your office at that time?
8  A. 80 percent.
9  Q. And what would you do on these business trips?
10 A. Met with--worked with my regional managers.  Met
11    with clients, brokers.
12 Q. Were you purchasing food for Schwan's, or you were
13    selling their food?
14 A. Selling products we manufactured.
15 Q. And what were the products?
16 A. Three categories, pizza, Asian, southwestern.
17 Q. Frozen food?
18 A. Yes.
19 Q. How much were you making at that time in 2003?
20 A. 95,000.
21 Q. Any bonuses?
22 A. Yes, up to 25 percent of my salary.
23 Q. Do you recall what was your bonus in 2002?
24 A. I do not recall what my bonus was.

Page 11

1  Q. Salary was the same?
2  A. Salary was at 92,000 in 2002.  I received an
3    increase in 2003.
4  Q. Did you have any other compensation from your
5    company other than salary and bonus?
6  A. I had a company vehicle.  I don't know if that was
7    considered compensation.
8  Q. Anything else?  Any other perks?
9  A. I guess I would ask to define what perks are.
10 Q. Benefits?
11 A. Well, there was a percentage of health benefits that
12    were paid if that's what you're asking.
13 Q. Health.  Did you at that time in 2003 have any other
14    source of income?
15 A. No.
16 Q. On February 6, 2003 you were on business in
17    Massachusetts; am I correct?
18 A. Correct.
19 Q. What was your mission?  What was your business
20    purpose?
21 A. I had a meeting with a broker and my regional
22    managers.
23 Q. Where was the meeting scheduled?
24 A. At the Sherborn Inn.

Page 12

1  Q. Where?
2  A. In Sherborn, Massachusetts.
3  Q. Had you been there before, before this trip?
4  A. No.
5  Q. You lived at that time in Cicero, New York?
6  A. Correct.
7  Q. Did you travel that day, February 6th?
8  A. Yes.
9  Q. How did you travel from New York to Massachusetts?
10 A. I drove a rented vehicle.
11 Q. What was the vehicle?
12 A. A Ford Expedition.
13 Q. Is that the biggest SUV in the Ford's line-up?
14 A. I'm not familiar with their specifications, so I
15    can't answer that.
16 Q. Have you driven an Expedition before this day?
17 A. Yes.
18 Q. You said you had an employee's vehicle also?
19 A. Yes.
20 Q. Was there any reason why you didn't take the
21    employee's vehicle?
22 A. Yes, there is.  I had a number of things that were
23    shipped to me from our corporate office that I
24    needed to take to the regional managers that I had

4 (Pages 13 to 16)

Page 13

1    there, that I could not carry in that vehicle.
2  Q. Did you have a valid driver's license at that time?
3  A. Yes.
4  Q. Issued by which state?
5  A. New York.
6  Q. Has your driver's license ever been revoked or
7    suspended?
8  A. No.
9  Q. Never in your life?
10  A. I don't recall. I may--not that I remember, not
11    that I remember.
12  Q. Have you at any time in your life maintained a
13    residence in Massachusetts?
14  A. No.
15  Q. What time did you start your trip on
16    February 6, 2003?
17  A. Probably about 10:00 in the morning.
18  Q. And what's the approximate time you arrived in
19    Sherborn?
20  A. I was arriving in Sherborn at the time of the
21    incident. Around 6:00, 6:30, in that range.
22  Q. When was your meeting?
23  A. Where was my meeting?
24  Q. I'm sorry, when? When was your meeting scheduled

Page 14

1    for?
2  A. The meeting was scheduled for 6:30.
3  Q. Were you late for your meeting?
4  A. I was running behind.
5  Q. You had an incident that day when your vehicle hit
6    another vehicle; is that correct?
7  A. Yes.
8  Q. Could you describe how that happened?
9  A. I pulled into the Sherborn Inn, into the area, and
10    as I pulled up I noticed a sign that stated one-way,
11    and I was going the wrong way in the one-way. So I
12    had come to a stop. I looked in both side mirrors,
13    in which one side I could see a snow bank. The
14    other side I could see a clear parking lot. I
15    looked in the mirror out to look behind me. I saw
16    nothing behind me. I turned around and looked and
17    began to back up and bumped into a vehicle behind
18    me.
19  Q. What distance did you back up before you hit the
20    other vehicle?
21  A. Between three and five feet maximum.
22  Q. Have you heard beeping of the horn as you were
23    backing up?
24  A. No.

Page 15

1  Q. Were you talking on the cell phone at that time as
2    you were backing up?
3  A. No.
4  Q. So correct me if I'm wrong, you looked, but you
5    didn't see anyone behind you; is that correct?
6  A. Correct.
7  Q. You bumped into something; correct?
8  A. Correct.
9  Q. How did you learn that the other--that object in
10    which you bumped was the motor vehicle?
11  A. I got out of my vehicle to look behind me.
12  Q. Okay. And what did you see?
13  A. I saw that there was a car there.
14  Q. Can you describe that car?
15  A. It was a small vehicle. It was a Honda Civic.
16  Q. What did you do next?
17  A. I approached the door to see if the person behind me
18    was all right.
19  Q. And why did you do that?
20  A. Because I bumped the vehicle. I just wanted to be
21    sure that I didn't, you know, bump into it too hard
22    or anything. It didn't seem like it, but you never
23    know.
24  Q. So what was the first thing you did as you were

Page 16

1    approaching the other vehicle?
2  A. Well, I started walking towards the vehicle, and the
3    person in the other vehicle got out of their
4    vehicle.
5  Q. Can you describe that person?
6  A. It was an older woman, and you know, dressed--I
7    don't know. Her attire was very LL Bean like I
8    guess you would say.
9  Q. How tall was she?
10  A. I would say approximately five, two, five, three.
11  Q. And you said elderly lady; is that right?
12  A. Yes.
13  Q. Were you able to estimate her age at that time?
14  A. My guess was probably late 60s, early 70s.
15  Q. Did you say anything to her?
16  A. The first thing I said was, "Geez, I'm sorry, I
17    didn't even know you were there."
18  Q. Did she respond to that?
19  A. She did.
20  Q. What did she say?
21  A. She was--she started to yell at me in a very
22    aggressive manner, which took me by surprise.
23  Q. Do you remember any specific words that she said to
24    you?

Page 17

1  A. All I remember is she was very angry and was
2     yelling, and I was just shocked because she was
3     using some expletives that were--I would not find
4     characteristic of a 70-something year old or an
5     elderly woman to use.
6  Q. Could you tell us what words that she used?
7  A. She called me an asshole. She said, "Are you
8     stupid?" And she was went on--it was just the
9     aggressive nature of her yelling. It just did not
10    seem characteristic of a woman. My mother is close
11    to the same age.
12 Q. How tall you are?
13 A. Six foot.
14 Q. And were you afraid for your safety at that time?
15 A. No.
16 Q. You were not scared of this older lady; correct?
17 A. I was shocked. I was not scared.
18 Q. Shocked meaning in a sense of surprise?
19 A. Yes.
20 Q. So what happened next? Did you--what did you do
21    next?
22 A. I said--you know, I apologized again. I said,
23    "Thank goodness nobody got hurt. Let's exchange
24    information." To which I went and got the

Page 18

1     appropriate insurance information out of my daytimer
2     in the car. She was gathering her information. We
3     exchanged information. Went back to our cars to
4     write down each other's information.
5  Q. Did she get out of the car? I think you testified
6     that she got out of the car and starting yelling at
7     you; is that correct?
8  A. Yes.
9  Q. So she gave you her paperwork. You gave her your
10    paperwork. What happened after that?
11 A. I recorded all the information about her. I don't
12    know what she did with my information, but I
13    recorded the information about her, and then I went
14    to return it to her vehicle while she was sitting in
15    her vehicle.
16 Q. Did you say anything to her at that time?
17 A. Yes, I said, "I'm sorry, I made a mistake."
18 Q. And what did she say, if anything?
19 A. She said, you know--I said, "I'm sorry, I made a
20    mistake. Haven't you ever made a mistake?" And she
21    said no. And I said, "You're telling me you never
22    made a mistake in your life," and she said, "No,"
23    and I just said, "Wow, that's amazing," and at that
24    point she threw her car in reverse, backed up. I

Page 19

1     started to step away because the two cars were close
2     together to give her clearance, and as I was backing
3     away, she took off and drove over my foot.
4  Q. Which one?
5  A. My left foot.
6  Q. What would you estimate this exchange, this--what
7     was the time frame from the moment you got out of
8     your car until she drove off?
9  A. Probably less than two minutes.
10 Q. Have you used any profane language towards her?
11 A. I was sarcastic, but I would say profane language
12    was probably after she ran over my foot I did swear.
13 Q. How were you sarcastic? Can you be a little more
14    specific, what exactly you said that was sarcastic?
15 A. I said, "Do you think that I drove here from
16    New York just to back into your vehicle," and she
17    said, "Yes," and I said, "You've got to be kidding
18    me." It was as if--I was just shocked at the fact
19    that she just was very aggressive in thinking that
20    this was intentional in some way when it was clearly
21    just an accident, a simple mistake that was easily
22    corrected.
23 Q. The accident then was your fault; is that correct?
24 A. Yes.

Page 20

1  Q. Did you at any time during this exchange of words
2     make any aggressive movements towards this lady?
3  A. No.
4  Q. And the exact location of this incident was in the
5     parking lot of the Sherborn Inn?
6  A. It was not in the parking lot. It was in the
7     driveway area that was leading to the parking lot
8     and near where the entrance circle was, the drop off
9     area was near that.
10 Q. So off the main street, but not in a parking lot?
11 A. Correct.
12 Q. And do you know what the street name is, the main
13    street there?
14 A. It's almost like an alley. It's Powder House or
15    Powder Home or something like that. I don't
16    remember the name of it. Something along that line.
17 Q. What happened to you when she ran over your left
18    foot?
19 A. Well, it knocked me to the ground.
20 Q. How did you fall to the ground?
21 A. I tried to--I was trying to back away, and it ran
22    over my foot, and I fell trying to move with--you
23    know, as the vehicle was rolling, I just rolled to
24    my left side and fell. It wasn't a fast fall

6 (Pages 21 to 24)

|  | Page 21 |
|---|---|
| 1 | because I was trying to brace myself from pulling my |
| 2 | leg out from underneath the vehicle, and you know, |
| 3 | as she was driving off. |
| 4 | Q. You said you braced yourself. So you landed on your |
| 5 | hands? |
| 6 | A. I landed on one hand and to the side. |
| 7 | Q. Did any part of your back or your shoulders come in |
| 8 | contact with the surface? |
| 9 | A. I believe my--I sat down on my left side on the |
| 10 | ground, but I caught myself with my left hand. |
| 11 | Q. What did you do next? |
| 12 | A. I had yelled, "Hey." I said, "What the hell are you |
| 13 | doing," and then she just kept driving. |
| 14 | Q. What did you do next? |
| 15 | A. I called 911. |
| 16 | Q. And who arrived? |
| 17 | A. Two police officers and an ambulance. |
| 18 | Q. What did you tell police officers? |
| 19 | A. I told the police officers that I had had a minor |
| 20 | traffic incident with a woman, and after exchanging |
| 21 | information she drove off aggressively and drove |
| 22 | over my foot. They asked if I could describe her, |
| 23 | and I gave them the information about her. |
| 24 | Q. What kind of footwear did you have on that day? |

|  | Page 23 |
|---|---|
| 1 | Q. Let's first focus on the foot. Have you received |
| 2 | any treatment to your foot, specifically for your |
| 3 | foot, medical treatment? |
| 4 | A. Other than diagnosis? |
| 5 | Q. Tell me everything. |
| 6 | A. Yes, medical treatment. Yes, I have. |
| 7 | Q. Where was it? |
| 8 | A. I had x-rays-- |
| 9 | Q. Okay. What-- |
| 10 | A. --at the Natick Hospital. Physical exam at the |
| 11 | Natick Hospital. Physical exam by my primary care |
| 12 | physician when I got back to New York, and physical |
| 13 | exam by an orthopedic specialist that I was referred |
| 14 | to by my primary care. |
| 15 | Q. Okay. Let's start first with the x-rays. Did |
| 16 | anyone tell you what the x-rays have shown? |
| 17 | A. The attending physician at the ER said--yes, they |
| 18 | did give me the results of the x-rays. |
| 19 | Q. What did they tell you? |
| 20 | A. That it was not broken, no fractures. |
| 21 | Q. No fractures. Any injuries that they could see |
| 22 | there? |
| 23 | A. They said it was soft tissue damage. |
| 24 | Q. And the same doctor who read the x-rays looked also |

|  | Page 22 |
|---|---|
| 1 | A. I had a pair of loafers, tassel loafers. |
| 2 | Q. Did you look at your foot right after the accident? |
| 3 | A. Did I look-- |
| 4 | Q. Yes. |
| 5 | A. I looked down at my foot, yes. |
| 6 | Q. Did you take off your shoe and stop to see-- |
| 7 | A. No, no. |
| 8 | Q. Did you feel anything? |
| 9 | A. I felt pain, and I felt a shooting pain through my |
| 10 | foot. |
| 11 | Q. And did you tell police officers about pain in your |
| 12 | foot? |
| 13 | A. Yes. |
| 14 | Q. What treatment, medical treatment, did you receive |
| 15 | for your foot? |
| 16 | A. Physical therapy. |
| 17 | Q. For your foot? |
| 18 | A. Uh-huh. |
| 19 | Q. How long was the physical therapy? |
| 20 | A. It was in conjunction with physical therapy for |
| 21 | another injury related to the accident. So it was |
| 22 | about three months. |
| 23 | Q. Is this--this PT was for your back and foot? |
| 24 | A. Yes. |

|  | Page 24 |
|---|---|
| 1 | into your foot; correct? |
| 2 | A. Yes. |
| 3 | Q. Examined? Do you remember the name of the doctor? |
| 4 | A. No. |
| 5 | Q. Did they prescribe any treatment for your foot at |
| 6 | that time? |
| 7 | A. They told me to follow-up with my physician at home. |
| 8 | Q. Was your leg swollen, foot swollen? |
| 9 | A. Yes. |
| 10 | Q. Did they put ice or anything on it? |
| 11 | A. There was ice in the ambulance, and then they put it |
| 12 | into a boot. |
| 13 | Q. What kind of boot? |
| 14 | A. One of the hard sole, and then it wraps around, and |
| 15 | you lace it up style orthopedic boot. |
| 16 | Q. And were you able to drive from Massachusetts to |
| 17 | New York? Were you able to drive back? |
| 18 | A. Yes. |
| 19 | Q. After the conclusion of your business trip? |
| 20 | A. Yes. |
| 21 | Q. Were you wearing the boot as you were driving? |
| 22 | A. Yes. |
| 23 | Q. How long you wore the boot? |
| 24 | A. I wore the boot for about four or five days. |

Page 25

1  Q. Do you currently have any special orthopedic shoe
2     for your left foot or anything like that?
3  A. No.
4  Q. Let's go back.  You went back then to your primary
5     doctor in New York?
6  A. Yes.
7  Q. When did you see him or her?
8  A. The Monday that I returned.  I returned on Sunday
9     afternoon.  I saw the doctor on Monday morning.
10 Q. What was the reason you went to your primary doctor?
11 A. My foot and my back were both injured.
12 Q. Who was your primary doctor at that time?
13 A. Dr. Diaz, D-i-a-z.
14 Q. Is this the doctor that nobody can find his records?
15 A. His practice was dissolved.  So I believe his
16    records were--are--they're having difficulty
17    locating them.
18 Q. Why was his practice dissolved?
19 A. He and his partner, from what I understand, did not
20    get along.
21 Q. Is he still a practicing physician in the
22    State of New York?
23 A. He is an attending physician at hospitals.
24 Q. Do you know where is he now?

Page 26

1  A. I know he's in the hospital system in New York, the
2     University's Hospital, I believe, in Syracuse, I
3     believe.
4  Q. Did you he examine your foot?
5  A. Yes.
6  Q. And what did he tell you?
7  A. He said that if the x-rays did not show any
8     fractures, then it was soft tissue, and I should
9     just keep it elevated when I can and let it run its
10    course and see how it works, and if it continues to
11    bother, you know, go to physical therapy.
12 Q. What was the next medical provider that you saw for
13    your foot?
14 A. The orthopedic doctor, Dr. Warren Wulff.
15 Q. And when was that?
16 A. That was about--I believe it was a couple months
17    later after going to physical therapy.
18 Q. So you went to physical therapy before you saw
19    Dr. Wulff?
20 A. Yes.
21 Q. And this physical therapy, who prescribed the
22    physical therapy?
23 A. Dr. Diaz.
24 Q. And this physical therapy, they treated your back;

Page 27

1     is that right?
2  A. Yes.
3  Q. And foot?
4  A. Yes.
5  Q. In every session both back and foot?
6  A. Yes.
7  Q. Was your foot still swollen at that time?
8  A. Not as swollen, no.
9  Q. Why is it you needed physical therapy on your foot?
10 A. I was having pain in the foot and having cramping
11    spasms in the foot.
12 Q. So after this physical therapy, that lasted, you
13    said, three months?
14 A. Yes.
15 Q. You saw Dr. Wulff?
16 A. While I was attending physical therapy I saw
17    Dr. Wulff.
18 Q. Did he examine your foot?
19 A. Yes.
20 Q. What did he say?
21 A. He said that his opinion was that it was soft tissue
22    damage or nerve damage, and there's really nothing
23    that can be done.  I should just live with it.
24 Q. After you heard that, did you seek any other

Page 28

1     treatment for your foot?
2  A. At that point there was nothing else.  You know,
3     from two different--a physical therapist and a
4     doctor, no, I didn't seek anything further.
5  Q. Does your foot bother you?
6  A. Yes.
7  Q. Do you walk with a limp?
8  A. At times.
9  Q. Do you use a cane?
10 A. No.
11 Q. And you don't use any orthopedic devices; correct?
12 A. No.
13 Q. Where in your foot is the pain?
14 A. The ball of my foot.
15 Q. How active were you before this accident in terms of
16    sports or any type of physical activities?
17 A. I had--I was a member at a gym, which I had gym
18    memberships prior to, and I had just joined a new
19    gym a month prior to the accident.  I had a
20    little--I had two children at the time and was
21    extremely busy with them.  They were both very
22    young.  My daughter was only two.  My son was less
23    than a year.  So I was very busy and very physically
24    active with them.

8 (Pages 29 to 32)

## Page 29

1  Q. Did the foot injury prevent you from doing anything
2     you did before the incident?
3  A. Going on walks and such, yes.
4  Q. Going on walks. Anything else?
5  A. I don't recall at this point, but I'm sure there
6     were other things.
7  Q. When you returned to New York on Sunday, and you
8     went to see the doctor on Monday, when did you go
9     back to work?
10 A. I did not go back to work until--well, I was on a
11    conference call Monday, but I was doing that from my
12    house and went physically back to work to meetings
13    the following week.
14 Q. And then that's in February of 2003. You lost your
15    job sometime in April of that year?
16 A. Yes.
17 Q. Why did you lose your job?
18 A. I don't know.
19 Q. Were you given a reason?
20 A. Yes.
21 Q. What was that?
22 A. The reason I was given was a misuse of a company
23    credit card.
24 Q. And at that time how long you been with this

## Page 30

1     company?
2  A. 19 months.
3  Q. Do you claim in this case that you lost your job
4     because of your foot injury?
5  A. I lost my job--I guess I'm--can you rephrase the
6     question, or can you--
7  Q. Yes, I can try. Is it your claim in this case that
8     somehow your foot injury made you lose your job?
9  A. The result of my foot injury, yes, did cause me to
10    lose my job, yes.
11 Q. How's that? Can you explain that to me?
12 A. Because my company did not want me to have a
13    workmen's compensation case.
14 Q. And when did you make your worker's compensation
15    case?
16 A. I was--the day after the accident I contacted our
17    company office where they filed the claim for me.
18 Q. Are you sure about that?
19 A. I made the call the day after, yes.
20 Q. To report your injury?
21 A. Yes, to the department in our company that handled
22    that.
23 Q. But you returned to work shortly thereafter; is that
24    right? You returned to your work shortly

## Page 31

1     thereafter?
2  A. Shortly thereafter what?
3  Q. Shortly after you reported your injury?
4  A. My--I worked the day after my injury because I had a
5     meeting to attend.
6  Q. Okay.
7  A. And I--so yes, I did.
8  Q. How long were you--how long where you stayed away
9     from work because of your foot injury?
10 A. I was physically unable--I don't know the exact
11    number of days. It's hard to give the exact number
12    of days. I don't know.
13 Q. Have you had a foot injury before this one?
14 A. No.
15 Q. How long were you on worker's comp.?
16 A. Still involved with workmen's comp. for medical
17    treatment.
18 Q. How long were you out of work on worker's comp.?
19 A. I was never paid compensation if that's what you're
20    asking.
21 Q. No, no, no. I'm asking--you weren't working for the
22    company after your termination; is that right?
23 A. Correct.
24 Q. Sometime in April of 2003?

## Page 32

1  A. Correct.
2  Q. Then you were out of a job?
3  A. Correct.
4  Q. Didn't have a job to do; is that right?
5  A. Correct.
6  Q. You were receiving at that time worker's comp.; is
7     that right?
8  A. I was--I guess I don't--I need further definition of
9     that. If I was receiving workmen's compensation as
10    in the form of a compensation check during that time
11    period?
12 Q. Yes.
13 A. No.
14 Q. Have you ever received a worker's compensation check
15    as a result of this incident?
16 A. No. My medical expenses have been covered.
17 Q. But not wage? Wages were not covered?
18 A. No.
19 Q. Between 2000 and 2003 you were treated for gout?
20 A. Yes.
21 Q. What is that?
22 A. Apparently gout is--and I'm not a medical expert,
23    but apparently it is an increased uric acid level in
24    your blood system.

Page 33

1  Q. And where is the pain?  Where does the pain manifest
2     itself?
3  A. In joints in your body.
4  Q. And what joints manifested in your body?
5  A. Big toe, ankle, knee, elbow, shoulder.
6  Q. Big toe on both feet?
7  A. Uh-huh.
8  Q. Yes?
9  A. Yes.
10 Q. And where did you treat for that?
11 A. That was my doctor in Cincinnati, and my doctor in
12    Syracuse.
13 Q. So is it fair to characterize that gout manifests
14    itself as a pain in the foot?
15 A. It can.
16 Q. And it did in your case?
17 A. Yes.
18 Q. Did you take any medications between 2000-2003 for
19    gout?
20 A. Yes.
21 Q. Does it continue to bother you?
22 A. No.
23 Q. Since 2003 you had no episodes?
24 A. No.  Nor do I take medication for it either.

Page 34

1  Q. And I'm sorry, who was the doctor that treated you
2     for that?  Do you remember the name?
3  A. That was Dr. Samaan.
4  Q. Can you spell that?
5  A. S-a-m-a-a-n.  That was in Cincinnati and Dr. Diaz.
6  Q. Cincinnati?
7  A. Yes.  Would you mind if I got up and walked around a
8     little bit?
9  Q. No, not at all, not at all.
10 A. I'm a little stiff sitting.
11    MR. DURSO:  For the record, the witness
12    has some medication that he takes, and he needs to
13    move around occasionally because of that.
14    MR. CETKOVIC:  That's fine.
15    MR. DURSO:  Do you want to take a break?
16 A. Yeah, if we could just take a couple minutes, that
17    would be great.
18    (Brief break.)
19 Q. (Mr. Cetkovic) Are you currently on any medications?
20 A. Yes.
21 Q. What are you taking?
22 A. I take--for--I take Zocor, Tricor.
23 Q. What's Zocor for?
24 A. Zocor is for cholesterol.

Page 35

1  Q. Okay.
2  A. I take Tricor for triglycerides.  I take Effexor,
3     which is an anti-anxiety, which was prescribed by
4     Dr. Diaz as a result of the accident.  I take
5     Kadian, which is a morphine for pain management.
6  Q. For what pain?
7  A. For my back and my foot.  I take an MSIR, which is a
8     morphine sulfate instant release for breakthrough
9     pain.  I take Atacand for blood pressure.  I take
10    Verapamil also for blood pressure.  Two different
11    approaches.  I take an 81 milligram of aspirin, and
12    as needed I take Cialis for erectile dysfunction as
13    a result of the injuries and medication.
14 Q. Did you take all these medications today that you
15    listed?
16 A. I took the Atacand.  Oh, I'm sorry, I also take
17    Xanax as well in conjunction.  I took the Atacand,
18    the Tricor, and the 81 milligram this morning.  The
19    Kadian I take at night, and the morphine sulfate as
20    needed.  So I did not take any of those this
21    morning.
22 Q. And did you take any anti-anxiety medications this
23    morning?
24 A. The Effexor?  No, I took it last night, midnight.

Page 36

1  Q. And you said you take two Xanax and another one?
2  A. I take a Xanax, and I take the Effexor, which are
3     both for anti-anxiety prescribed since the accident.
4  Q. You did not have anti-anxiety medications before the
5     accident at any time, did you?
6  A. I had them once, yes, for reflux.
7  Q. What reflux?
8  A. I had acid reflux.  So they tried that as a method
9     to treat it, but that was back in '99, I believe,
10    '98, '99.
11    MR. CETKOVIC:  I think that's all I have.
12    I may have some follow-ups.  Thank you.
13    CROSS EXAMINATION
14 BY MR. LEEDBERG:
15 Q. Good morning, Mr. Koran.  Is it Koran or Koron?
16 A. Koran.
17 Q. Good morning.  My name is Mike Leedberg.  I
18    represent the Town of Sherborn in the lawsuit that
19    you've brought against them.  I have a few questions
20    for you.  First off, you listed some medications.
21    Just to be clear, have you taken any medications
22    today that might affect your ability to understand
23    my questions or answer them?
24 A. No.

10 (Pages 37 to 40)

Page 37

1 Q. You've explained in some detail the auto accident
2   with Ms. Weaver, and you mentioned that the police
3   and ambulance personnel came to the scene after you
4   called 911; correct?
5 A. Yes.
6 Q. Do you recall having any conversations, first of
7   all, with the officer?
8 A. There were two officers.
9 Q. Okay. Do you recall having any conversation with
10   the officers?
11 A. I did speak with them at the time they came, yes.
12 Q. Do you recall specifically what you said?
13 A. Verbatim, no.
14 Q. Can you give me a general idea of the nature of the
15   conversation?
16 A. I was asked to describe the person that I was
17   involved in the traffic incident with, at which time
18   I provided the name, address, all of her information
19   that we had shared with each other during the time
20   of our exchange of insurance information.
21 Q. And do you recall having any conversations with
22   the EMTs?
23 A. Quite a few actually.
24 Q. Okay. Can you describe those for me?

Page 38

1 A. Well, initially when they got there, there were
2   three of them that arrived at the scene because they
3   were telling me they were involved in a training
4   session. So the supervisor came to observe because
5   the two paramedics had both been away from active
6   calls for nearly six months. So he came to observe.
7 Q. Do you recall any other conversation?
8 A. With the paramedic that was in the back of the
9   ambulance with me on the way to the hospital who
10   kept bumping my foot every time he tried--in trying
11   to put ice, he tripped over the end of the gurney at
12   one point and bumped into my foot. While he was in
13   the back, he said, "You've got to forgive me. I'm a
14   little bit out of practice."
15 Q. Do you know that person's name?
16 A. No.
17 Q. What did he look like?
18 A. At this point I don't remember.
19 Q. Did he in any way injure your foot?
20 A. He bumped into it. I don't believe he injured it,
21   but he didn't make it feel better.
22 Q. So it didn't increase your pain?
23 A. It did at one point, yes.
24 Q. And how long did that increased pain last?

Page 39

1 A. It was just a sharp pain because he had bumped into
2   it.
3 Q. Was there any other increased pain as a result of
4   that?
5 A. As a result of him bumping into it? At that point
6   no.
7 Q. At any point?
8 A. He just--he put ice back on the--he put ice on it,
9   so no.
10 Q. So it was just that one fleeting exacerbation, and
11   then that was it?
12 A. When he bumped into it, yes.
13 Q. Any other conversations with the gentleman in the
14   back?
15 A. I asked them to contact the folks that were in the
16   restaurant and to let them know that I would not be
17   joining them for dinner because they initially had
18   said--you know, at first they said, "It's up to you,
19   if you want to go to the hospital," and I said,
20   "Well, my foot is killing me. I think I need to be
21   x-rayed. I don't know what's wrong with my foot."
22   So they said, "Well, that's up to you. We'll be
23   glad to take you there." But I had asked them to go
24   get the folks from the restaurant that I was joining

Page 40

1   for dinner, to let them know what was going on.
2   They brought them out so I could have a conversation
3   with the people that worked for me.
4 Q. Who did you speak to that worked for you?
5 A. I spoke with Michael Mondoor (phonetic), who was
6   my--one of my regional sales managers, and I spoke
7   with one of the brokers who came out, Jeff Cotton.
8 Q. Jeff Cott?
9 A. Cotton, C-o-t-t-o-n.
10 Q. Describe the conversations you had with
11   Mr. Mondoor (phonetic) and Mr. Cotton.
12 A. They came out and said, you know, "What happened?"
13   I said, "It's a long story, but can you let the
14   folks know that I won't be joining them for dinner.
15   If I do, it will be late. Get started. I'll join
16   you when I get there."
17 Q. As a result of the auto accident, the actual impact
18   with Ms. Weaver's vehicle, did you suffer any
19   injuries as a result of that?
20 A. Yes, my left foot.
21 Q. No. I'm just talking about the impact with the
22   vehicle, between the two vehicles?
23 A. Oh, no.
24 Q. Did you feel any back pain after she ran over your

Page 41

1    foot?
2    A. No.
3    Q. Did you feel any back injury of any type?
4    A. No.
5    Q. Any discomfort?
6    A. In my back, no.
7    Q. Describe the procedure as far as how they got you
8       into the ambulance?
9    A. They helped me step into it on my own. They helped
10      me up one person on each arm, and they had me step
11      up into the back.
12   Q. And how did you get onto the cot?
13   A. They had me sit down on it, and they helped me sit
14      down. They had the back angled at about a 45 degree
15      angle, and they helped me sit down on the cot, and
16      then that's when they removed my shoe and sock to
17      examine my foot.
18   Q. At any point did you become fully--did you lay down
19      on the cot?
20   A. No.
21   Q. So you sat on the cot the entire way?
22   A. Yes.
23   Q. And did your position change at any point as far as
24      on the cot?

Page 42

1    A. My seated position?
2    Q. No. At some point you were strapped into the cot,
3       were you not?
4    A. Yes.
5    Q. When was that?
6    A. When we were getting ready to leave the parking lot
7       and head towards the hospital, but I was left in the
8       same seated position that I had been in.
9    Q. But your feet were up on the cot as well? You
10      weren't sitting off to the side?
11   A. Right. That's right.
12   Q. Describe the cot for me? Does it have a mattress or
13      a cushion?
14   A. It had some type of cushion that was covered with a
15      white sheet.
16   Q. Do you know how thick that cushion was?
17   A. I have no idea.
18   Q. Do you know how tall the cot when it was in its
19      position in the back?
20   A. I would estimate six to eight inches from the floor
21      to the bottom area, and then the mattress or cushion
22      was on top of that.
23   Q. Were there any signs or problems with the cot at any
24      point while you were on your way to the hospital?

Page 43

1    A. No.
2    Q. It seems so in the police report that Ms. Weaver
3       told the officer that you were hostile and flailing
4       your arms about at the scene of the accident, and
5       that's why she left. What would you say to that
6       statement?
7    A. I would say that it was actually the other way
8       around.
9    Q. So Ms. Weaver is lying?
10   A. I believe that the statement is not correct.
11   Q. At any point did you have a conversation with any of
12      the EMTs about an anger management problem?
13   A. No.
14   Q. Have you ever sought treatment for anger management?
15   A. No.
16   Q. Never sought counselling for anger management?
17   A. No, I've seen counselling for my marriage.
18   Q. When was that?
19   A. In 2002.
20   Q. Who did you seek counselling with?
21   A. I don't remember the name of the doctor, but it was
22      a result of our transitional move. My wife just
23      recently having a baby, and a lot of pressures in
24      the household. So somebody to talk to as a neutral

Page 44

1       setting.
2    Q. Where were they located?
3    A. In Syracuse.
4    Q. Do you remember the name of the facility?
5    A. No.
6    Q. Do you remember the address?
7    A. It was near the North Medical Building,
8       North Medical Center, which I believe is--it's hard
9       to remember the names of the road now, but I think
10      it was on--I want to say Taft Road, but I could be
11      wrong on that. It's at the same North Medical
12      Center which is where I had some procedures done.
13   Q. Are they affiliated with North Medical?
14   A. I don't know. I don't remember if they were or not.
15   Q. How did you pay for the counselling?
16   A. It was through my insurance.
17   Q. What was your insurance carrier at the time?
18   A. I don't remember who my insurance--I think it was
19      BlueCross BlueShield of Minnesota is who we had.
20   Q. What kind of problems were you having as a result of
21      these pressures that you've describe that you sought
22      out counselling for?
23   A. My wife and I just--you know, it was just the--we
24      had moved for the second time in a couple of years.

12 (Pages 45 to 48)

Page 45

1 We had just had our second child. She had just lost
2 her father. He passed away. I lost my father only
3 a few years before. A lot of life changing
4 experiences that resulted in some pressures.
5 Q. Okay. I understand the cause. What was the result?
6 Were you fighting?
7 A. We had some disagreements. We had a difficult time
8 communicating with each other effectively. We were
9 both at times sleep deprived from the baby early on
10 because he refused to sleep early in his life, and
11 he was born in May of 2002. So there were just
12 minor things that came out of that, and I just
13 needed someone to talk to outside of the house, and
14 I didn't want to confide in work associates because
15 I didn't think it was appropriate.
16 Q. Okay. Were these disagreements? Were they heated?
17 A. How would you define heated?
18 Q. Yelling, screaming, swearing?
19 A. Our household can be loud. So we talk sometimes at
20 a louder--you know, with the kids yelling, we try to
21 talk over the top of them. So I guess it could be
22 defined as talking loudly, but you know, it's
23 probably no different than any other household.
24 Q. Then why would that require counselling?

Page 46

1 A. I just had never dealt with myself dealing with the
2 change in job, moving twice, losing my father, and
3 then her losing her father who I was also close to,
4 and she also was going to counselling as well, and
5 we just felt that it would be appropriate for
6 ourselves to talk to third-party folks that may
7 have--just, you know, somebody to talk to.
8 Q. Okay.
9 A. It was an opinion that we had through insurance that
10 was cost effective to vent our thoughts and
11 basically not be judged for them.
12 Q. Did the disagreements between you and your wife ever
13 get physical?
14 A. No.
15 Q. Were the police ever called--
16 A. No.
17 Q. --as a result of any of those disagreements?
18 A. No.
19 Q. You said she was already in counselling?
20 A. She had started around the same time that I did.
21 Q. Independently of the marriage counselling that you
22 guys sought?
23 A. We didn't go together as marriage counselling, no.
24 We did not go to marriage counselling together. No,

Page 47

1 we did not. Independently we went to counselling to
2 strengthen our marriage so that we didn't get to a
3 point where we needed to go at that level.
4 Q. And what did the treatment for counselling entail?
5 A. Just conversation.
6 Q. No medications?
7 A. No.
8 Q. And your wife was seeking counselling for the same
9 issues?
10 A. She had some personal issues from her childhood that
11 she needed to work out with her counselor.
12 Q. Was it a counselor or a psychiatrist?
13 A. It's a psychiatrist.
14 Q. Was your wife on any medications for any--
15 A. No.
16 Q. You mentioned earlier that you had taken Effexor,
17 and I think you estimated 1999, 2000; correct?
18 A. Right, for my reflux.
19 Q. Were you taking Effexor as of the time of this
20 incident?
21 A. Not that I remember.
22 Q. Not that you remember?
23 A. I don't remember.
24 Q. You don't remember if you were taking a medicine at

Page 48

1 the time the accident?
2 A. No, I don't.
3 Q. Were you taking any medications at all at the time
4 of this incident in 2003?
5 A. No.
6 Q. You don't remember, or you weren't taking any?
7 A. I don't believe I was taking any medications at that
8 time. If anything, it was related to my gout, which
9 you know, the maintenance for those at the time.
10    MR. LEEDBERG: Can I mark this
11 Defendant's 1, please?
12    (The MetroWest Medical System records were
13 marked Exhibit No. 1 for identification.)
14 Q. I'm going to show you a document that I just had
15 marked as Defendant's 1, and on the first page of
16 that document I'll represent to you that this is the
17 records we received from MetroWest Medical System as
18 a result of an inquiry to them. I want you to look
19 towards the upper left-hand corner where it says,
20 "Current medication." Do you see that area?
21 A. Uh-huh.
22 Q. Can you read those off for me?
23 A. Allopurinol, Norvasc, Effexor, and Trazadone.
24 Q. Were you taking Effexor at that time?

Page 49

1   A. According to this, yes.
2   Q. And what was that for?
3   A. It was probably still related to my reflux.
4   Q. I thought you said that was in 1999 or 2000?
5   A. That's when I began that, yes.
6   Q. What were you taking Trazadone for?
7   A. That was because I had difficulty sleeping.
8   Q. Who prescribed those two drugs for you?
9   A. Dr. Diaz.
10  Q. Where did you have those prescriptions filled?
11  A. Where?
12  Q. Yeah. Where did you routinely, if any, locations
13     were you routinely had your prescriptions filled?
14  A. In Syracuse Kinney Drug.
15  Q. Kinney Drug?
16  A. Uh-huh.
17  Q. What's the address of that facility?
18  A. It was on South Bay Road in Cicero.
19  Q. Any other pharmacies were you'd routinely fill your
20     prescriptions?
21  A. That was our primary. I think later on before we
22     moved we used a--there was another--Eckerdt.
23     Eckerdt Drug, which was right up the street from
24     Kinney. If something was not in inventory in

Page 50

1      Kinney, typically Eckerdt inventoried it.
2   Q. So it's your testimony today that you were taking
3      Effexor for over three years for a reflux problem?
4   A. Yes.
5   Q. Was it working?
6   A. It was.
7   Q. When did you stop taking Effexor for reflux problem?
8   A. When the pain management decided that they wanted to
9      double it to use because of the amount of pain
10     medication they were going to give me. They doubled
11     it because of the amount of pain medication they
12     gave me. So apparently--I never--I wouldn't have
13     been off of it at that point.
14  Q. Did you ever suffer from depression?
15  A. I was--I wouldn't say clinically depressed, no.
16  Q. Did you ever seek treatment for depression?
17  A. I wouldn't say--no, not--I mean, treatmentwise, no.
18  Q. Have you ever been diagnosed with depression?
19  A. No.
20  Q. Back to the ride in the ambulance. Approximately
21     how long did it take you to get to the hospital?
22  A. I don't know the exact time, but I would estimate
23     ten to twelve minutes.
24  Q. And describe for me what happened at the hospital?

Page 51

1   A. Backed up to the emergency room door. The driver of
2      the ambulance came and opened the back door. The
3      gentleman who was sitting in the ambulance with me
4      switched places with him where he got on the
5      outside, and the driver then got on the inside and
6      was behind me. They were talking to each other. I
7      was sitting. Apparently they were unlocking the
8      gurney from whatever was holding it in place while I
9      was in the ambulance, and the gentleman at my feet
10     said, "You ready?" He said, "Yep." He says, "Let's
11     go," and he started walking me out. He said, "You
12     got him," and he says, "Yep," and the next thing I
13     know I was slammed to the ground, and they like,
14     "Oh, gee, we're sorry." They said, "Are you okay?"
15     I said, "Well, that didn't feel very good," and then
16     they started to fumble with the gurney to try to
17     lift it up, and it went on for what seemed like five
18     minutes of doing this, and it was a very, very cold
19     night, and I asked if we could take this inside
20     because I was freezing. I had no coat on and was
21     sitting outside, and it was probably five degrees
22     outside, and they said, "That's fine," and they
23     wheeled me into the ER with the wheels--with the
24     legs of the gurney not extended where I was sitting

Page 52

1      just six inches off the ground basically.
2   Q. Did they pull you all the way out before they
3      dropped you down?
4   A. Yes.
5   Q. Do you recall hearing anything before you were
6      dropped?
7   A. Just the one gentleman saying, "Do you have him? Do
8      you got him," and he said, "Yep," and the next thing
9      I know I hit the ground.
10  Q. Did you hear any noises coming from the cot?
11  A. I don't recall any noises at all.
12  Q. Did it seem like there was anything wrong with the
13     cot to you at that point?
14  A. I had never been on it, so I couldn't judge if there
15     was anything right or wrong. I had never been on a
16     cot in that situation.
17  Q. But did you perceive anything that might have given
18     you an indication that there was something wrong
19     with the cot?
20  A. Not at all.
21  Q. Do you know if the wheels to the cot touched the
22     ground before you were dropped?
23  A. I don't believe the wheels did. I think that--I
24     mean, that was the issue, was if the wheels had come

14 (Pages 53 to 56)

**Page 53**

1    down, then it wouldn't have dropped that way.
2  Q.  Is that an assumption you're making?
3  A.  That's based on what they were saying to each other,
4      that the legs didn't disengage.  They were locked in
5      place.
6  Q.  What exactly did they say in that regard?
7  A.  Verbatim, I don't have the--I don't know verbatim,
8      but I remember them talking about, you know, "I
9      can't believe these legs didn't come down," or
10     something along that line, and they kept fumbling
11     with trying to--it sounded like they were trying to
12     unclick something, and that's when I said, "Can we
13     move this inside?"
14 Q.  Do you recall them saying anything about the legs to
15     the cot not locking properly?
16 A.  They could not get the legs to come up.  I don't
17     know that they said anything about them not locking.
18     They said they could not get the legs up to extend.
19 Q.  And if the EMEs--the EMTs were to testify that the
20     legs did come down, the wheels did touch the ground,
21     and they just didn't lock into place, is that
22     accurate?
23 A.  Based on the way I hit the ground, my interpretation
24     would be no, that's not accurate.

**Page 54**

1  Q.  Describe that for me?  How do you come to that
2      conclusion about based on the way you hit the
3      ground?
4  A.  Because as I came--it was basically a free fall.  I
5      mean, there was no sound, and then all of a sudden I
6      smacked the ground.  So I would think if there were
7      legs, I would have heard something in the process,
8      and it would have sounded like something closing as
9      opposed to just no sound and then hitting.
10 Q.  What were your eyes fixated on as you were being--do
11     you recall looking at anything in particular as you
12     were being unloaded from the--
13 A.  I was just kind of looking around getting my
14     bearings as to where I was, you know, at the
15     hospital, and looking to see if the--because he had
16     wrapped an Ace bandage around the ice pack.  I
17     looked down at the ice pack on my foot to see if
18     that was slipping or anything.  I was just looking
19     at that, and the next thing I know I was falling.
20 Q.  Did you look at the EMTs at any point?
21 A.  I don't remember looking at them, no.
22 Q.  So you can't testify as to where they were looking
23     as you were being unloaded?
24 A.  No, I can't.

**Page 55**

1  Q.  You can't testify as to where they were looking at
2      the time you were allegedly dropped?
3  A.  No.
4  Q.  Can you estimate what the height was that you were
5      dropped?
6  A.  The back of an ambulance, from that level to the
7      ground, which I would estimate being anywhere like
8      36 inches.
9  Q.  Did you feel any pain as a result of being dropped?
10 A.  I felt a--what felt like a shock wave running
11     through my back and legs.  It wasn't a pain.  It was
12     kind of like an electrical shock, if you will.
13 Q.  And did you tell anybody about that?
14 A.  I told the nurse when I got inside.  I told the
15     EMTs.  I said--they said, "Are you all right?"  I
16     said, "That did not feel good," and as they were
17     fumbling everything, I said, "It felt like shock
18     waves running through.  Shocks running through my
19     legs and back," and they just continued to fumble
20     with the cot to try to get it to stand up.  So then
21     I mentioned it to the nurse.  I said, "Listen, when
22     they dropped me, I felt these shock waves through my
23     back," and she said, "You weren't brought in here
24     for your back.  You were brought in here for your

**Page 56**

1      foot," and I said, "Well, can you look at my--can
2      somebody look at my back," and she said, "No."  I
3      said, "Why?"  And she said, "Because you weren't
4      brought in here for that.  You were brought in here
5      to have me look at your foot.  If you want to have
6      your back examined, you need to essentially come
7      back in, and we can do that."
8  Q.  The nurse said that?
9  A.  Yeah, which I said, "I don't understand why."
10 Q.  That's very unusual.
11 A.  Yeah, that's what I thought.
12 Q.  Did you tell the EMTs that you specifically felt
13     pain in your back or your legs?
14 A.  I told them that I felt shock, like an electrical
15     shock run through me.
16     MR. LEEDBERG:  Can I have that marked as
17     Defendant's 2, please?
18     (The Sherborn Fire Department record was
19     marked Exhibit No. 2 for identification.)
20 Q.  I'm going to show you a document in which I've had
21     marked as Defendant's Exhibit 2.  I'm going to ask
22     you to take a look at it while I get copies for
23     counsel.
24     (Discussion off the record.)

Page 57

1  Q. Have you had a chance to read that?
2  A. Uh-huh, yes.
3  Q. What would you say about the narrative under
4     "comments"?
5  A. I would say that there is an inaccurate statement
6     with the fact that it was "the stretcher appeared to
7     gradually release to a lower position," and "asked
8     if he was okay" stating that I had no injury is
9     false.
10 Q. So it's your testimony here today that the EMT put
11    two blatantly false statements in his formal report?
12 A. Yes, it is.
13       MR. LEEDBERG: Can I mark this as the next
14    exhibit?
15       (The Sherborn Fire & Rescue Department
16    report was marked Exhibit No. 3 for identification.)
17 Q. I'll show you the incident report from the
18    Fire & Rescue Department, and ask you to read the
19    description of incident in that.
20 A. "When unloading patient out of ambulance the
21    stretcher did not stay up in lock mode and went down
22    to the ground. Patient was not injured." That's
23    false.
24 Q. And Mr. Christensen appears to be the individual

Page 58

1     that filled out this report. Again, he falsely
2     stated what happened as far as your injuries in his
3     formal report?
4  A. Yes.
5  Q. I've read the West End report that we've had marked
6     as Defendant's 1, and I'll ask you this, and if you
7     want to take a look at it, feel free to do so before
8     you answer. Can you explain to me why none of your
9     conversations with the nurse is found in any of
10    those records regarding your back?
11 A. I don't know. It would probably be the same thing
12    as to why I was not even given something as simply
13    as an Advil or a Tylenol for pain while I was there
14    when I asked for it, and I was denied.
15 Q. So it's your testimony that both EMTs lied about
16    your denying injury from the cot incident, and the
17    nurse didn't put anything about the back injury in
18    the notes? That's your testimony?
19 A. Yes.
20 Q. It seems like quite a conspiracy. Can you give me
21    an idea of why that is?
22       MR. DURSO: Objection to the form of the
23    question.
24 Q. Can you explain to me why they might do that?

Page 59

1  A. I have no idea.
2  Q. Do you know these people?
3  A. No.
4  Q. One of your children was born after the incident;
5     correct?
6  A. Yes.
7  Q. Do you recall any treatment you may have had with
8     Dr. Diaz in the year preceding this incident?
9  A. Regarding?
10 Q. Anything?
11 A. I saw Dr. Diaz for, you know, routine medical
12    checks. We had--I had--if I had a gout flare-up, I
13    saw him for that.
14 Q. Anything else in particular you recall that you saw
15    Dr. Diaz for the year leading up to--
16 A. I don't recall. I've seen a lot of doctors since
17    then, so it's hard to remember.
18 Q. Do you recall receiving an injection in
19    December of '02 of any kind?
20 A. An injection in December? For?
21 Q. Anything at all? I'll represent to you that I have
22    a billing document from Dr. Diaz's office that the
23    insurance company was billed for an injection of
24    Topomil (phonetic). Do you recall having an

Page 60

1     injection?
2  A. It may have been for a gout flare-up.
3  Q. So you would get injections for gout?
4  A. I had them a number of times. They would inject
5     steroids right into the inflamed joint to relieve
6     the pressure and relieve the pain.
7  Q. But do you recall specifically having one of those
8     injections a couple of months before the accident?
9  A. I had a number of them, so I don't remember if there
10    was one prior to this incident or not. I don't
11    remember.
12 Q. Dr. Diaz would administer those injections right at
13    his office?
14 A. Yes.
15 Q. Describe for me the pain in your back from the time
16    you were at West End to the time you first sought
17    treatment with Dr. Diaz such as the location of the
18    pain in your body; the frequency you'd experience
19    the pain; and the level of pain?
20 A. From the time I was at the hospital it began where
21    it was just very--the pain was minor at that point
22    from the standpoint that I felt like small shock
23    waves that I didn't think a lot about it, but I
24    thought something didn't seem right, and that's why

16 (Pages 61 to 64)

Page 61

1  I brought it to the attention of the nurse and asked
2  to have it looked at. The next morning when I got
3  up I had discomfort when I woke up, but my foot was
4  so sore from the injury that I was more focussed on
5  my foot than I was on my back, but I noticed that I
6  was rather stiff in getting up. When I arrived back
7  with my family at the location where we were on
8  Friday night and Saturday night visiting family and
9  relatives, I had been riding in the car a good part
10 of the day driving through a snow storm, and I
11 had--was very uncomfortable when I got back, and
12 just I had discomfort in my lower back to the point
13 where it was--I just felt stiff. I felt like I
14 didn't have a lot of flexibility, and the next
15 morning when I got up, I had a difficult time
16 getting up. My back was extremely sore at that
17 point.
18 Q. What morning was that?
19 A. That was Saturday morning. The incident happened on
20 Thursday evening. So Saturday morning it was
21 starting to really bother me, and throughout the day
22 the pain started to get more and more and was
23 actually increasing to the point where it was more
24 noticeable than the pain in my foot, which was

Page 62

1  fairly aggravated at that point still as well.
2  Sunday, as I drove back to New York, it felt as if I
3  had a golf ball in the small of my back that as I
4  sat back, I could feel this golf ball, and no matter
5  how I sat, I just felt this pressure and pain of
6  this golf ball type feeling in my back that made my
7  legs very uneasy to the point where I said to my
8  wife, "If we have to drive much further, I want you
9  to drive because I just don't feel comfortable."
10 And we got home, and I put ice on it again, which I
11 had done a couple days in a row just to try to help
12 relieve some of the discomfort. So the next morning
13 I got up, and I called Dr. Diaz and asked to come in
14 there, and I had a conference call that I jumped on
15 for 45 minutes and then jumped off and went straight
16 to his office then at that point at which time he
17 administered an injection to relieve--he gave me
18 Demerol to relieve the pain and did a couple of
19 steroid injections into the area where I had the
20 discomfort to see if that would help relieve the
21 pain there, and then he sent me for x-rays and such.
22 So the pain had really increased, just progressively
23 got worse.
24 Q. Was there any event during those few days that

Page 63

1  preceded the increase in pain?
2  A. No. I had--we were visiting family and relatives,
3  and there were a lot of my wife's cousins and such
4  that were playing with the kids, so I didn't have to
5  attend to getting on the floor with the kids. I
6  didn't have to change diapers. I didn't have to
7  carry the kids around, none of the things that I
8  would do in a normal routine, which was good because
9  then I didn't have to worry about, you know, if it
10 was going to aggravate things at that point. So I
11 really didn't have to actually participate in
12 anything like that until we got home on Sunday
13 night, which I wasn't able to participate in at that
14 point.
15 Q. Where was this location where you were visiting in--
16 A. Avon, Connecticut.
17 Q. In Avon?
18 A. Uh-huh.
19 Q. What was the name of the family you were visiting?
20 A. My wife's family, the Somsen Family, her
21 grandmother, who is now deceased, Janet Somsen, and
22 her aunts, uncles, cousins.
23 Q. What are their names?
24 A. There are quite of few of them. There was--you want

Page 64

1  the complete list of everybody?
2  Q. Who you can recall there?
3  A. Well, let's see, there was my wife's brother, Glen,
4  his wife, who is now his ex-wife, which was Christy,
5  his two children, Kaylee and Matthew.
6  Q. What are their last names?
7  A. Somsen. It was my wife's maiden name.
8  Q. Can you spell that for me?
9  A. S-o-m, as in Mary, s-e-n, as in Nancy.
10 Q. Are they from Connecticut as well?
11 A. The Somsen Family grew up in the Connecticut area.
12 My wife did not grow up in this area. She grew up
13 in Ohio.
14 Q. And other Somsens, do they live in Connecticut?
15 A. They're--Janet Somsen, her grandmother, lived in
16 Connecticut. Her biological father lived in--lives,
17 I guess, in Holyoke, Massachusetts. He's estranged
18 from the family.
19 Q. What about the brother and the ex-wife and the kids?
20 A. They, at the time, were living in
21 Upstate New York--well, just outside of New York
22 City in Upstate, but they're divorced, and they live
23 in Atlanta.
24 Q. Atlanta, Georgia?

## Page 65

1  A. Yes.

2          (Discussion off the record.)

3  Q. Who else was at the house that weekend?

4  A. Her Aunt Jean, which her last name is Connell, and

5     her daughter, Katie Connell. Her Aunt Jane with her

6     two daughters, Emily and Ellen, and their last name

7     is Strong. Her Uncle Paul Zavarcky.

8  Q. Can I just interject for one minute? If you know

9     their address, could you give that as well?

10 A. Okay. The Connells at the time were living in

11    Sparta, New Jersey.

12 Q. Where are they living now?

13 A. They now live in--it's just outside of Sparta, but

14    it's actually in Pennsylvania. I don't know the

15    name of the little town, but then the Strongs live

16    in West Hartford. The Rappaports, which was

17    Danielle, Margo, Nicole, and her Aunt Joanne, who

18    live in West Hartford as well. The Zavarckys live

19    in Newton, Massachusetts, which was Judy and Paul.

20    They were there.

21 Q. Could you spell their last name for me?

22 A. Z-a-v-a-r-c-k-y, and I believe that's all the folks

23    that were there for the--and Janet Somsen. It was

24    her house that everybody was visiting.

## Page 66

1  Q. Was this some kind of planned event?

2  A. It was her Aunt Joanne, her cousin, Kate, and her

3     grandmother all celebrating birthdays within a three

4     week span of each other, and her brother, Glen, all

5     within a three week span of each other celebrating

6     birthdays, and it just happened to be a time that

7     everybody was available to come to town and see each

8     other.

9  Q. What did the events of the weekend entail?

10 A. A lot of playing the game Boggle, which was the

11    grandmother's favorite game. Basically sitting

12    around talking. The kids climbing on Uncle Paul,

13    and him wrestling with them, and a number of

14    conversations and preparing food and eating a lot.

15    Typical family event.

16 Q. Did you guys go out anywhere?

17 A. No, stayed at the house. I mean, maybe we ran to

18    the store to get some more food items, you know, for

19    snacks and such.

20 Q. Did you run to the store?

21 A. No, I didn't leave the house.

22 Q. What did you do all weekend?

23 A. I was in the back bedroom laying down quite a bit.

24    I would come out. I'd sit in a chair and kind of

## Page 67

1  just observe and sit and talk with folks. I had a

2  very quiet weekend. It was not--did not participate

3  in any of the games and such or any of that type of

4  activity. I never really participate in the games

5  anyhow. It's not my thing.

6  Q. Do you recall any specific conversations about this

7  entire incident?

8  A. Well, everybody that came in asked why I was wearing

9  a boot, and I explained to them what had happened,

10 and they were just, you know, people found humor in

11 the fact that I got dropped. They found that

12 humorous for some reason.

13 Q. Did you mention your back injury to them?

14 A. Yes, and they said that--they said, "Well, how does

15 it feel now," and I said, "It seems to be getting

16 worse," and they said, "Well, what are you going to

17 do?" I said, "I'm going to see the doctor when I

18 get home."

19 Q. So you were injured, and they found that humorous?

20 A. In a warped way, yes.

21 Q. How did you leave the hospital that day?

22 A. I was given a ride by one of the brokers staff

23 members who happened to be visiting his mother. His

24 name was Tom, and I don't remember his last name.

## Page 68

1  He worked for the broker, which was

2  Pilgrim's of New England, and he happened to be

3  visiting his wife's mother at the hospital with his

4  wife, was walking through the ER to leave, looked

5  over and saw me sitting in one of the rooms, and

6  came in and had a conversation, you know, "What's

7  going on," and was actually in there at part of the

8  time when I was having the conversation about my

9  back with the nurse, and then he left, you know,

10 while I was in the midst of conversation because he

11 felt that it was a private conversation, went out,

12 and was making phone calls outside. He came back in

13 and asked if I needed a ride back to the inn, in

14 which I said, "That would be great." So he gave me

15 a ride back to the inn at that point because they

16 said that I was finished. There was nothing else

17 they could do for me.

18 Q. You don't know Tom's last name?

19 A. I don't remember it, but I'm sure the folks at

20 Pilgrim's of New England, if you called Tom Hill or

21 Rich Hill and asked them the gentleman, they would

22 know exactly what his name was.

23 Q. How old is Tom approximately?

24 A. Tom is probably late 30s.

20 (Pages 77 to 80)

Page 77

1    management doctors.
2    Q. Did you see a urologist at any point?
3    A. I did go see a urologist.
4    Q. Do you remember the person's name?
5    A. I don't remember his name. I apologize, but I did
6       have--I was--I did go see the urologist. He
7       indicated--he did a number of tests indicating to me
8       that as he explained to me, he didn't see that there
9       was anything physically wrong. So he said it had to
10      be medication related based on the physical tests
11      that they did, looking for blockages, looking for
12      restrictions and such through all the examinations
13      that they did. His determination was that it was
14      medication-driven.
15   Q. Did you ever have any sexual dysfunction of any kind
16      prior to the incident?
17   A. No.
18   Q. Dr. Harvey Sour (phonetic); does that sound? Is
19      that the urologist you saw?
20   A. That sounds correct, yeah.
21   Q. Have you seen any other urologist--
22   A. No, he was the only one I've ever seen, and after
23      that visit I don't know that I want to go to another
24      one. No, I take that back. I correct myself. I

Page 78

1    did see a urologist based on--I was being treated
2    for testosterone imbalance, and I went to see a
3    urologist in Frederick, Maryland who referred me to
4    an endocrinologist because of my testosterone levels
5    being low, which Dr. Diaz had continued a treatment
6    with me there as I had with Dr. Samaan after--during
7    around the time of my gout, he noticed that I was
8    having like tendonitis. So he did some testing and
9    found that my testosterone levels were really low.
10   So he started doing testosterone injections for me,
11   and they were working, and it worked great. It got
12   the testosterone back up. Well, in the meantime,
13   when we were trying to get pregnant, the combination
14   of the erectile dysfunction and the fact that I was
15   taking testosterone, which had to do with the fact
16   that I was getting older, helped lower my counts.
17   So it was a combination of the two, and the
18   testosterone became--I ended up going off the
19   testosterone so it helped my counts raise. It
20   didn't help anything else because it made the
21   erectile dysfunction even more exaggerated, but I
22   did go see this urologist in Maryland to check into
23   whether or not I should go back onto a regime with
24   the testosterone, and they referred me to an

Page 79

1    endocrinologist, who I'm waiting to have a follow-up
2    appointment after the testing with them to see if
3    they're going to have me go back on the testosterone
4    again.
5    Q. Did any physician tell you what the cause of this
6       lower testosterone was?
7    A. It's very common actually after men reach the age of
8       40 for it to drop. It's just something that happens
9       in some people. It's almost like male menopause.
10   Q. Are you claiming that it's related to this incident
11      in any way?
12   A. No.
13   Q. Is it your claim that your wife had trouble
14      conceiving after this incident, conceiving a child?
15   A. She did because I was unable to--I mean, I had the
16      erectile dysfunction, and I was unable to finish, if
17      you will. So we did not have difficulty in the past
18      getting pregnant with two other children. Our plan
19      was to have three children. We did not want the
20      incident to come in the middle of that, you know, to
21      be an obstacle for us. So we tried, but it was just
22      not--we were not successful. So we had to go to an
23      artifical insemination type of method or
24      intrauterine injections that she had to get where

Page 80

1    they--you know, I had to go and give a sample that
2    then got scrubbed, if you will, so that the active
3    swimmers were the only part of it that we took, and
4    we put that--took that back to her doctor's office
5    and injected that in her, and then she got to sit
6    for a half hour while, you know, nature took its
7    course.
8    Q. It's your testimony that your wife never had
9       problems conceiving with your first two children?
10   A. She--she did not have--it was--you know, like any
11      other couple, we went and we tried a few times
12      before it was successful. She had two ectopic
13      pregnancies that were--that she miscarried. I mean,
14      if that's a difficulty. You know, that is a
15      difficulty as far as that goes.
16   Q. Were there any problems like that after the incident
17      with your wife?
18   A. She did not have any ectopics, no.
19   Q. Have you ever had any back problems prior to the
20      incident?
21   A. No back problems, no. I mean, no more than just,
22      you know, when you're working in the yard you get
23      sore, but no. Do you know what I mean? No
24      injuries.

Page 81

1  Q. When you'd work in the yard and get sore, would that
2     pain go into your legs or thighs?
3  A. No.
4  Q. It was just localized to your back area?
5  A. It was just your shoulders, and you know, just from
6     working with a shovel or something like that.
7  Q. Did you ever have an x-ray or MRI of your back prior
8     to 2003?
9  A. Not that I'm aware of.
10 Q. Do you think you'd be aware of it if you did have an
11    x-ray or an MRI of your back?
12 A. I can't remember if I did.
13 Q. Have you had an MRI since this incident?
14 A. On my back?
15 Q. Yes.
16 A. I believe they did an MRI on my back.
17 Q. Is that where you lay in the tube?
18 A. Yes.
19 Q. You think you'd remember doing that prior to 2003 if
20    you had done it?
21 A. Yeah. I would hope so, yeah.
22 Q. And it's your testimony here today that you don't
23    recall ever having an MRI?
24 A. I don't recall doing that, no.

Page 82

1  Q. Has any physician indicated to you that you had back
2     problems that you may not have known about prior to
3     this incident?
4  A. If you can clarify the statement a little bit better
5     for me?
6  Q. Has any physician examining you indicated to you
7     that you had a degenerative condition of your lower
8     spine that pre-existed this incident?
9  A. I was informed by the orthopedic specialist as well
10    as the pain management that degenerative--
11 Q. Can you give me their names, please?
12 A. Dr. Tiso and Dr. Wulff, that degenerative disk
13    disease is common in all humans, and it just happens
14    as you get older. Everyone's disks begin to
15    degenerate to some degree. Trauma will amplify the
16    problem and exaggerate it, you know, to a greater
17    degree.
18 Q. Did they indicate that that's your situation, that
19    you had a degenerative condition in your spine prior
20    to this incident that was exacerbated or otherwise
21    made symptomatic as a result of this incident?
22 A. That was the--I believe Dr. Wulff and Dr. Tiso both
23    stated that.
24 Q. Did any physician tell you that your degenerative

Page 83

1     condition was a result of this incident?
2  A. No. That's where they stated that it was just
3     degenerative disk disease is something that everyone
4     has. It's just to what degree it flares up.
5  Q. Dr. Diaz was the first physician you saw as a result
6     of this incident or as a result of your back
7     condition?
8  A. For my back, yes.
9  Q. Describe your treatment from there? What happened
10    next?
11 A. He sent me for x-rays and MRI.
12 Q. Do you know what the results of those were?
13 A. I believe that there is a printed document that
14    states what the actual technical medical statements
15    are, but the first thing he sent me for was a chest
16    x-ray just to see if there was any blunt-force
17    trauma which can happen to organs in situations
18    where you're dropped, or you've been in a jarring
19    type of accident, and those came back negative.
20    There was no blunt-force trauma. Then he did the
21    MRI on that, on the lower back where it was
22    discovered that were in the disk, the lower
23    disk and one in the lumbar disk and the cervical
24    disk that were both injured. So the cervical disk

Page 84

1     did not generate any pain the way the lumbar disk
2     did.
3  Q. Did you ever experience neck pain as a result of
4     this incident?
5  A. No, and I believe that that was probably
6     pre-existing, that one, because I had a
7     shoulder/neck type injury when I was working back in
8     the seafood industry back, I think, like in 1989. I
9     was unloading a box off of a truck, and I was
10    pulling one of those strapping bands, and I pulled
11    on it, and it broke, and I fell back, my shoulder
12    right into a--I think it was my left shoulder. I
13    fell right into the door of the little box truck. I
14    landed into the door and kind of twisted around, and
15    my neck and shoulder were you know, out of wack for
16    a little time.
17 Q. Who was your employer at the time?
18 A. Waterfront Seafoods.
19 Q. Where were they out of?
20 A. They were in Cleveland. They actually have--they
21    sold their business and have re-opened under another
22    name.
23 Q. Do you know what the name is?
24 A. I believe it's called Catonese (phonetic) Classic

22 (Pages 85 to 88)

Page 85

1    Seafood.
2  Q.  Did a claim generate from that shoulder/neck injury?
3  A.  It did because I went to a chiropractic for--I
4    believe it was maybe a month or six weeks.
5  Q.  What was the chiropractor's name?
6  A.  I don't remember. This was in Mentor, Ohio, but I
7    went to him, and he did the stim. thing and twisted
8    my neck and made my neck pop and did alignments, and
9    I did that like twice, sometimes three times a week,
10   and then I was, you know--it feels fine. So I
11   didn't continue on with it.
12 Q.  You didn't have any other treatment as a result of
13   that?
14 A.  No.
15 Q.  Did a lawsuit come out of that prior incident?
16 A.  No.
17 Q.  Did you get any other--was your claim approved for
18   payment? You said you had a claim?
19 A.  Yeah, I mean, they covered it for the--as far as I
20   know. I mean, it was a family-owned business. I
21   went in. They took care of your insurance benefits.
22   So I don't know how it was handled as far as that
23   goes. I know I didn't have any out-of-pocket out of
24   it for that treatment.

Page 86

1  Q.  You said you had a claim as a result of this
2    incident with your employer; correct?
3  A.  Uh-huh, yes.
4  Q.  What was that claim for?
5  A.  The workmen's comp. claim with Schwan's?
6  Q.  Yes.
7  A.  Was for the injury.
8  Q.  Let me clarify. Was it to have your medical
9    expenses paid, or were you looking for wages?
10 A.  I just went in and--I did what they asked me to do,
11   which was to file within our office for it. I was
12   told to contact somebody within the office, let them
13   know of the incident, and then when I went to my
14   doctor, and they ask how it happened, I had to--you
15   know, I was informed to tell him that it happened
16   during--at work, and how it was--you know, how the
17   whole thing happened that way so it was billed
18   appropriately.
19 Q.  Were you ever awarded any wages as a result of this
20   injury?
21 A.  There was a lawsuit that was--for wages that were--a
22   difference in my wages from the time period that I
23   did not get--you know, from the time I was let go
24   from the company until I was able to recoup getting

Page 87

1    back to the same salary level. There was an award
2    given for that.
3  Q.  What was that award?
4  A.  I believe it was, I think, $50,000 for wages over a
5    22 month period.
6  Q.  Was that paid? Did you receive that money?
7  A.  Yes.
8  Q.  In your answer to Interrogatory No. 5, which asks
9    about prior injuries, you indicated that you pulled
10   a muscle in your shoulder and your upper back while
11   working in your yard years before the accident. Is
12   that your recollection?
13 A.  No, it was actually while working in the seafood
14   business prior to the accident.
15 Q.  So you never pulled a muscle in your shoulder or
16   back working in your yard?
17 A.  I may have, but I don't remember.
18 Q.  You have no recollection of it?
19 A.  I don't. I know that it did happen definitely while
20   I was working the seafood business.
21 Q.  And is there any reason you can recall why you
22   didn't tell my client about the incident with the
23   seafood company back in the '80s?
24 A.  That didn't come up in--I don't understand.

Page 88

1  Q.  Did you look at the interrogatories that you
2    answered from my client prior to signing them? Why
3    don't I put them into evidence?
4  A.  I haven't seen the interrogatories from your client.
5        MR. LEEDBERG: Can I have that marked as
6    Exhibit 4?
7        (The answers to interrogatories was marked
8    Exhibit No. 4 for identification.)
9  Q.  You know, I'm going to drop this line of questioning.
10   questioning. It seems to me that that incident was
11   prior to the date that we signed,
12   February 6, 1992. Was it prior to that date?
13 A.  Yes.
14 Q.  Okay. I'm going to drop this line of questioning.
15   Have you ever had any other accidents, whether it be
16   auto accidents, prior to 2003, slip and falls, any
17   accident you can recall where you were injured?
18 A.  I had two automobile accidents. One in 1983 while
19   living in Akron, Ohio. I was driving through an
20   intersection. Somebody coming across, who was
21   timing the lights, T-boned me right into my
22   passenger door.
23 Q.  Did you suffer any injuries in that accident?
24 A.  No.

Page 89

1  Q. Any injury or claim come out of that accident?
2  A. No.
3  Q. And what was the other accident?
4  A. The other one was I was backing up in--I had just
5     backed out of a parking space in a Kroger parking
6     lot in Reynoldsburg, Ohio, and a gentleman in a
7     pickup truck just was backing up while he was
8     talking to one of the employees who was gathering
9     carts and backed straight into my vehicle. He never
10    looked behind him.
11 Q. Were you injured in that accident?
12 A. No.
13 Q. Any other accidents of any kind where you recall
14    being injured that required medical care prior to
15    2003?
16 A. No.
17 Q. Any since the 2003 accident?
18 A. No.
19 Q. You've never had treatment for any lower back
20    related problem?
21 A. No.
22 Q. You mentioned earlier that you belonged to a gym
23    prior to this accident?
24 A. Uh-huh.

Page 90

1  Q. And that question, I think, was in response to what
2     were your activities prior to the incident. Any
3     other activities such as hobbies, recreation,
4     sports, anything you did prior to this incident in
5     2003 that you can no longer do as a result of this
6     incident in 2003?
7  A. From the hobby standpoint, I would say that my yard
8     work. I have had to--which was something I always
9     found great pleasure in doing work in my yard. I
10    now have to hire a lawn service, and I've had to
11    hire people to do landscaping for me. Shovelling my
12    driveway. I've had to hire people to do that for me
13    while I lived in Upstate New York. Virginia, they
14    don't really--or in Maryland, they don't
15    really hire people to do that because it doesn't
16    snow as often. The--you know, as far as routine
17    painting and work around the house in that way,
18    there's a number of projects that I have had to get
19    someone else to do. When we moved to our new house,
20    I had to hire a painter because I was unable to do
21    all of that painting that needed to be done
22    before--you know, when we were moving into it.
23    Essentially any handywork around the house has been
24    an item is something that I've just basically

Page 91

1  haven't been able to do as a result of it.
2  Hobbywise, you know, my greatest joy was playing
3  with my kids, and it's very unfortunate now that my
4  daughter, who is the oldest, remembers me prior to
5  my injury, now will ask me if I'm having good back
6  day or a bad back day in wanting to play with her or
7  do something. My four-year-old son, who is now
8  four, who was just an infant at the time has only
9  known me as a person with a back injury as my
10 21 month old is the same way. He's not even old
11 enough to understand yet, but he only will know me
12 as a guy with a back injury. What its done is I had
13 a lot of fun with my daughter playing on the floor,
14 and you know, we'd go for walks and that kind of
15 thing with regularity. Now I'm restricted to doing
16 that on days that I feel up to it, and it's based on
17 the pain level. I go into the pain management.
18 They ask what your pain level is for the day, and
19 it's very unfortunate that you go in, and there's a
20 pain level that--I mean, there's pain everyday, but
21 you get to a point where you tolerate it, and you
22 just deal with it, if you will, but what you have to
23 do is evaluate how much above that acceptable, this
24 is what I have to live with, level that you give

Page 92

1  them as a response, and I average, you know,
2  basically an eight on the pain scale out of ten on a
3  regular basis when I'm in there. That's just how it
4  is. It's unfortunate, but I've had to come to
5  accept that that's the level of pain that I'm in on
6  a daily basis. It's--you know, I have a high
7  tolerance for pain typically, and a great example of
8  that is I fall asleep during root canals, and I
9  never have problems with it, but the pain in my back
10 has been so severe that it's debilitated me.
11 Q. Any other recreation, sports, hobbies?
12 A. I used to play softball. I don't do that. I used
13    to play golf a lot. I haven't played golf since the
14    accident.
15 Q. Where did you play golf regularly prior to the
16    accident?
17 A. I played with customers. I played--as I travelled,
18    I played in different locations, you know, for work.
19    We'd play in different locations all over. You
20    know, with different clients and that, we'd take
21    them out to different places and play. So it was a
22    regular weekend activity for me to do.
23 Q. Any local courses that you'd go to regularly?
24 A. I never got into any of the ones in the Syracuse

24 (Pages 93 to 96)

Page 93

1 area because by the time I got settled in up there,
2 it was--we got settled in September. It was the end
3 of the season. I didn't really have time to get
4 acclimated as I just moving into the area. So I
5 never got a chance to play up there, but I played in
6 Florida, and I played in Georgia and that type of
7 thing throughout that fall and winter with different
8 meetings that we went to. I played in Las Vegas,
9 that kind of thing, and then after the incident or
10 the accident and everything, I haven't been able to
11 do anything. In fact, I was staying near a driving
12 range, and I still--I love golf. I mean, it's one
13 of those things that I've always--I've been playing
14 since I was 11 years old, and my father-in-law and I
15 used to play, you know, as our--that was a big
16 connection for us, and it was one of those things
17 that, you know, I stopped at a driving range just to
18 kind of be in the environment and see what was going
19 on, and I ran into somebody I knew, and they're
20 like, "Hey, you want to take a couple swings?" And
21 I tried it, and I just felt miserable. I couldn't
22 even do it, and I just handed the club over, and I
23 said, "I can't do this."
24 Q. Who was this person?

Page 94

1 A. It was a gentleman I worked for at the time. He was
2 up in Long Island, Dave Horowitz, and I just
3 didn't--I couldn't hit the ball. I mean, I hit it,
4 but I just--I felt miserable.
5 Q. What was your typical 18-hole score prior to the
6 incident?
7 A. Anywhere from 89 to 91, in that range.
8 Q. Did you say you played softball?
9 A. Yes.
10 Q. Did you play for a league?
11 A. I played in leagues until my wife and I moved to
12 Columbus, and then I was travelling too much so I
13 couldn't play. Our weekends got--we met in
14 Cleveland. I played in Cleveland, and I played
15 shortstop.
16 Q. What year was that?
17 A. I played up until--I played through '93.
18 Q. Prior to the incident you hadn't played softball for
19 a league for ten years?
20 A. No, I didn't have a chance to. I was working too
21 much, travelling too much.
22 Q. Would you call softball one of your pastimes at the
23 time of this incident?
24 A. Not at the time of the incident. Golf was my--was

Page 95

1 definitely the pastime of choice when I had time to
2 do it. My kids were the primary, hobby, pastime,
3 and everything. Once we had children, you know, the
4 time to do other things really went away.
5 Q. Any other hobbies, sports, recreational activities?
6 A. No. There may be, but I can't think of any at this
7 point.
8     MR. LEEDBERG: Can I mark this
9 Defendant's 5, please?
10     (The letter 2-10-03 was marked
11 Exhibit No. 5 for identification.)
12 Q. I'm going to show you a document marked as
13 Defendant's 5. Do you recognize that document?
14 A. If I could have a moment to read it? Yes, I do.
15 Q. Did you create that document?
16 A. Yes.
17 Q. Is that your signature at the bottom?
18 A. Yes.
19 Q. Explain to me the remark about the stretcher being
20 faulty?
21 A. Because the legs did not come down on the stretcher.
22 To me it was the fact that the stretcher did not
23 work.
24 Q. Do you think that's what caused the incident?

Page 96

1 A. I think if the legs had come down, they wouldn't
2 have dropped me.
3 Q. Did you suffer from hypertension prior to this
4 incident?
5 A. My blood pressure had recently started to elevate,
6 yes.
7 Q. Has there been any change in the status of your
8 blood pressure since this incident that you
9 attribute to this incident?
10 A. My blood pressure continued to elevate, and rather
11 than being on one medication, I was--I went to a
12 cardiologist where I was switched to two medications
13 to balance it out, and I currently have my blood
14 pressure under control.
15 Q. How long did it take you to get your blood pressure
16 under control?
17 A. Just under a year.
18 Q. Do you think that any blood pressure related
19 condition was caused by this incident?
20 A. My primary care physician and the pain management
21 doctor, Dr. Tiso and Dr. Diaz both made comments to
22 the fact that when you're in pain, your blood
23 pressure elevates, which was the result of why at
24 the time of the incident my blood pressure was as

Page 97

1  elevated as it was was directly a result of the pain
2  that I was in, and it noted on the
3  Defendant Item No. 1 in the upper right corner there
4  the blood pressure at 194 over 106. It indicates a
5  high blood pressure right there at that point, and
6  even the paramedics had listed 160 over 120 at the
7  time that they had me in the back of the ambulance.
8  So that was directly related to the pain that I was
9  in at that point.
10  Q. Who's Dr. Cameron Huckle?
11  A. If I remember correctly, he is a doctor that was
12  doing an experimental procedure for disk replacement
13  surgery, and my name was given to him--actually I
14  don't know how my name was given to him, but I was
15  contacted by him to see if I was interested in
16  participating in a disk replacement surgery, and I
17  would be actually as a live guinea pig, if you will.
18  I went through and was examined by him and talk to
19  him and such, and after listening to what they had
20  to say as far as--I looked at the whole scenario and
21  said, "I need to seek advice from--you know, I need
22  to talk to some other doctors to see if this is the
23  right course of action for me," and I just didn't
24  feel right about going with something that, No. 1,

Page 98

1  at the time wasn't FDA approved. No. 2, was still
2  in experimental phase, and it just was too risky to
3  me.
4  Q. So have you since decided not to go forward with
5  this disk replacement surgery?
6  A. Yes, I've decided not to. You're correct.
7  Q. Have you discussed any other treatment options with
8  any of your physicians?
9  A. Most recently I spoke with a neurosurgeon.
10  Q. What was that neurosurgeon's name?
11  A. His name is--let me think of it here. It's
12  Dr. Nathan Swami, S-w-a-m-i, and he's in Maryland.
13  When I went to get my MRI--I had an MRI done on my
14  head for my testosterone. It seems unusual, but the
15  testosterone at times is directly related to
16  sometimes the tumors on the pituitary gland, and the
17  only way they can find that out is to do an MRI. At
18  the time of that, they discovered that maybe it
19  happened when I was a baby, but--I might have been
20  dropped on my head as a baby or something. I had
21  like an indentation or something in the--there where
22  was spinal fluid on the front corner, just a little
23  corner in my brain. It doesn't affect anything, but
24  it showed up on the MRI, and it alarmed the

Page 99

1  endocrinologist because she didn't know how to read
2  it. So they advised me to go immediately to see the
3  neurosurgeon. I went in. We were talking, and I
4  told him about some of the treatment methods that
5  have been discovered--it was a non-related
6  conversation, if you will. They went in and
7  discovered this was nothing to be concerned about.
8  I said, "While I've got you here, can I ask you a
9  question," and I explained the treatments that I'd
10  been going through and that, and he basically told
11  me his advice and not knowing my history and not--he
12  says, "But just in my casual advice, your best
13  option is to not have surgery." He says, "My advice
14  to you is to try to slowly--over time you're going
15  to have to wean yourself off the pain medication and
16  find other ways to manage the pain," in which I
17  said, "What does that mean?" He said, "Well, we'll
18  have to set an appointment and talk about that
19  further." He says, "I really think that surgery is
20  not the answer. Once you start cutting into
21  somebody's back, it presents a problem that becomes
22  a long-time problem."
23  Q. Did you ever actually see Dr. Huckle?
24  A. Yes.

Page 100

1  Q. You did?
2  A. I spent four hours in his office one afternoon.
3      MR. LEEDBERG: For the record, I don't
4  think we have his report.
5  A. It was a--like I said, I got contact--I don't even
6  know who contacted me, and it was in
7  Buffalo, New York that I had to go there for the
8  appointment. I don't know that an actual report was
9  ever generated. He was talking to me kind of as
10  a--it was a discussion to see if I was interested in
11  participating in a--in this study. It was not
12  something that workmen's comp. would endorse either,
13  and they did not feel strongly about it either. So
14  I didn't have any comfort going through with it, but
15  I know that the reports are available if you need
16  them.
17  Q. So your present plan is to stay the course of
18  treatment you're currently receiving?
19  A. At this point to try to manage things as best I can.
20  You know, that's where I'm at at this point until I
21  can get to another doctor--until I get back to
22  Dr. Swami and discuss with him further options that
23  he wasn't at liberty to talk about the day we were
24  there because he didn't have my records in front of

26 (Pages 101 to 104)

### Page 101

1  me to look at my history.
2  Q. The truck that you rented and drove back to
3    Connecticut in, was that an automatic or standard?
4  A. Automatic.
5  Q. You mentioned that you were terminated from your
6    employment in your view because they didn't want you
7    to have a worker's compensation case; is that
8    correct?
9  A. Yes.
10 Q. Could you explain that to me?
11 A. My former direct supervisor, Pat McCoy, never once
12   acknowledged my injury at all. Never said, "How are
13   you feeling?" Never said, "Wow, what happened?"
14   Never said anything regarding the injury. In fact,
15   I had to fly--about three or four weeks after the
16   accident I had to fly to Florida for a national
17   sales meeting and awards presentation that the
18   entire company was going to, and I was in a back
19   brace, and I was heavily medicated and falling
20   asleep in meetings in front of people, walking bent
21   over most the time, you know, like I said in a
22   brace, very uncomfortable, and he never once made a
23   comment at all about, you know, "Hey, what's wrong?
24   Hey, how you feeling or anything?" Nothing. No

### Page 102

1  management personnel acknowledged it. Every other
2  person at the event came up and talked to me about
3  it. None of the management personnel ever
4  acknowledged it at all, and then all of a sudden out
5  of the blue after it was--between that and my
6  challenging the fact that they changed the policy on
7  bonuses and it affected one of my employees, and I
8  challenged that to my boss's boss, and asked the HR
9  department how to handle it, they weren't pleased
10 with me getting involved at that level and started
11 to really give me a lot of grief. So they
12 said--they made up this thing about me
13 inappropriately using a company credit card, which
14 was I had a direct billing on the card for my cell
15 phone, and they came out with a policy in January,
16 and I had already had a direct billing for my cell
17 phone. They came out with a policy in January that
18 no more could you charge your cell phone to that.
19 Well, I had contacted the cell phone company to do
20 that, but there were two charges that came through
21 on the card anyhow, and they said that was
22 inappropriate because I had already been given the
23 notice, and then two things came through, and that
24 was their reasoning. So to me in my interpretation,

### Page 103

1  it was very suspect as to why it happened.
2  Q. Do you think them terminating your employment would
3    compromise your ability to bring a worker's
4    compensation claim?
5      MR. DURSO: I'm sorry, could you say that
6    again?
7  Q. Do you think that them terminating your employment
8    would compromise your ability to bring a worker's
9    compensation claim? Your testimony earlier today
10   was that they terminated you because they did not
11   want you to have a worker's compensation case.
12 A. My impression is that they--by the fact that I
13   got a workmen's comp. case--there was a workmen's
14   compensation case, and it was going to raise their
15   insurance rates on workmen's compensation, that that
16   did not go over well with them. They were angry
17   about that.
18 Q. And you think that these other reasons they gave for
19   terminating your employ were a front because they
20   were displeased with your worker's compensation
21   claim?
22 A. Yes, and when I was awarded the back wages, you
23   know, it was based on that same thing, that there
24   was not just cause for termination.

### Page 104

1      MR. LEEDBERG: I'm going to look over my
2    notes. Do you have any questions?
3      MR. CETKOVIC: Nope.
4      MR. LEEDBERG: I'm going to look over my
5    notes.
6      (Brief break.)
7      (The Syracuse Orthopedic records were
8    marked Exhibit No. 6 for identification.)
9  Q. (Mr. Leedberg) Mr. Koran, I'm going to ask you a
10   couple questions on Defendant's 6, which I'll
11   represent to you are the documents that we got back
12   from Warren Wulff as a result of a request for
13   medical records from him, and I want to refer you
14   specifically to the second page under--it says,
15   "Review of Systems 4" and it says, "Review of
16   Systems." Do you see that paragraph a couple down?
17 A. Uh-huh.
18 Q. If you could read that, read that last sentence in
19   that?
20     MR. DURSO: Of which one?
21     MR. LEEDBERG: "Review of Systems," I'm
22   sorry.
23     MR. DURSO: "Review of Systems 4" or--
24     MR. LEEDBERG: No, the one without the

Page 105

1    four.
2  A.  "Patient denies dysuria, hematuria, nocturia,
3    frequency, and sexual dysfunction."
4  Q.  Do you recall denying sexual dysfunction on that
5    date, which seems to be September 7, 2004?
6  A.  No.
7  Q.  And I presume later in record he says it again--it
8    was actually an earlier visit on July 17, 2003, and
9    it would be your testimony here today that that's
10    not accurate?
11  A.  No, because I was taking--you know, if I needed to,
12    I was doing the Cialis.  So that was--I mean, it
13    might have been interpreted that it wasn't
14    dysfunctional because I was taking the Cialis to fix
15    it.  That would be my interpretation.
16  Q.  Do you recall having discussions in particular about
17    sexual dysfunction?
18  A.  No, not at all.
19  Q.  Where do you fill your prescriptions now that you're
20    down in Maryland?
21  A.  We go to a CVS, and then there are some mail order
22    prescriptions, but the pain management ones I do all
23    through a place called Medicine Plus, which is a
24    small pharmacy that I have everything done through

Page 106

1    that pharmacy because the way the State of Maryland
2    is structured, if you're on a controlled substance,
3    you have to declare a single pharmacy.  So I had to
4    call around and find a pharmacy that would have the
5    medications that I was looking for when I needed to
6    fill the prescriptions.  So this small pharmacy
7    called Medicine Plus, which is like an old fashioned
8    pharmacy actually has the items that I need, and as
9    a result of that--
10  Q.  Do you know where they're based out of?
11  A.  They're in Newmarket.  They're actually right in
12    Newmarket.
13  Q.  You were saying as a result?
14  A.  As a result of that, I utilized them for all of my
15    pain management medication.  I do mail order for my
16    other maintenance prescriptions that I'm able to do,
17    but controlled substances have to be done, you know,
18    on a monthly basis.
19  Q.  Do they call that the Rush Limbaugh Act?
20  A.  I have no idea.
21  Q.  The CVS, where is that located?
22  A.  That's in Frederick.
23      MR. LEEDBERG:  Okay.  I'm just going to
24    state for the record that it appears we're missing

Page 107

1    some medical records, some of which we were aware
2    of, some of which we were not, in particularly the
3    records for Diaz pre-loss, and there was some
4    mention of a Dr. Huckle, some physicians down in
5    Maryland that we have no records from.  So just for
6    those reasons, I'm going to state for the record
7    that I think we should reserve our rights to
8    reconvene at a later date if those records raise any
9    issues with regards to the claim.
10      MR. DURSO:  Just so I'm clear, you have
11    some Diaz records.
12      MR. LEEDBERG:  I have the records from
13    Diaz February 10th, your first visit forward, and
14    there were at least seven or eight visits to that
15    office previously, which I understand from
16    conversation yesterday, Dr. Dispensa (phonetic) took
17    Mr. Koran's chart after the business dissolved.
18    That was his partner.  I think Dr. Dispensa
19    (phonetic), but that's what they say at this point,
20    but we'll see if that pans out.
21      MR. DURSO:  Okay.
22      (Deposition suspended at 1:49 p.m.)
23
24

Page 108

1          C E R T I F I C A T E
2
3      I, the undersigned, JOSEPH KORAN, do hereby
4    certify that I have read the foregoing deposition,
5    taken on 21st, July, 2006, and that to the best of
6    my knowledge, said deposition is true and accurate
7    (with the exception of the following corrections
8    listed below):
9  Page   Line        Correction
10
11
12
13
14
15
16
17
                      Signed:_____
18
19
20
21                    Date:_____
22
23
24

28 (Page 109)

Page 109

1    COMMONWEALTH OF MASSACHUSETTS
2
3        I, Leslie D'Emilia, a Court Reporter and Notary
     Public in and for the Commonwealth of Massachusetts,
4    do hereby certify that the foregoing deposition was
     taken before me on the 21st day of July, 2006;
5
         That the witness named in the deposition, prior
6    to being examined, was by me first duly sworn;
7        That said deposition was taken before me at the
     time and place herein set forth, and was taken down
8    by me in shorthand and thereafter transcribed into
     typewriting under my direction and supervision;
9
         That said deposition is a true record of the
10   testimony given by the witness and of all objections
     made at the time of examination.
11
         I further certify that I am neither counsel for
12   nor related to any party to said action, nor in any
     way interested in the outcome thereof.
13
         IN WITNESS WHEREOF I have subscribed my name and
14   affixed my seal of this 21st day of July, 2006.
15
16
17
                    _____
18                  Leslie D'Emilia
                    Notary Public
19                  Massachusetts
                    My Commission Expires:
20                  March 13, 2009
21
22