# MOTION FOR SUMMARY JUDGMENT
## EXHIBIT 2
### EMT Dominick Tolson's Deposition

Dominick Clark Tolson                                    09/19/2006

Page 1

Volume:    I

Pages:     1-60

Exhibits:  None

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 05-11454 RGS

- - - - - - - - - - - - - - - - - - - - - - - x

Joseph H. Koran, and Kimberly Koran, individually

and on behalf of Ana Koran, Joseph Koran, Jr., and

Erik Koran, minors,,

                    Plaintiffs,

        v.

Elizabeth Weaver and Town of Sherborn,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF DOMINICK CLARK TOLSON

Tuesday, September 19, 2006

1:15 p.m.

SHERBORN Fire Department

22 North Main Street

Sherborn, Massachusetts

Reporter:  Lori-Ann London, RPR

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                    09/19/2006

---

Page 2

1  APPEARANCES:
2
3     By Carmen L. Durso, Esquire and
4     Matthew P. Coletti, Esquire
5     LAW OFFICE OF CARMEN L. DURSO
6     175 Federal Street
7     Boston, Massachusetts 02110
8     617.728.9123
9     Appearing for the Plaintiffs
10
11    By Michael D. Leedberg, Esquire
12    PIERCE, DAVIS & PERRITANO, LLP
13    Ten Winthrop Square
14    Boston, Massachusetts 02110-1257
15    617.350.0950
16    Appearing for the Defendants
17
18
19
20
21
22
23
24

---

Page 3

1            INDEX
2
3   DEPOSITION OF:              PAGE
4   DOMINICK CLARK TOLSON
5
6   EXAMINATION BY MR. DURSO          4
7
8   _____X
9            EXHIBITS
10  NO.                      PAGE
11
12
13        No Exhibits Marked
14
15
16
17
18
19
20
21
22
23
24

---

Page 4

1            PROCEEDINGS
2
3        DOMINICK CLARK TOLSON,
4   a witness called for examination by the
5   Plaintiffs, having been satisfactorily identified
6   by the production of his Massachusetts driver's
7   license, and duly sworn by the Notary Public, was
8   examined and testified as follows:
9            EXAMINATION
10  BY MR. DURSO:
11   Q   State your name for the record, please.
12   A   Dominick Clark Tolson.
13   Q   What is your current address, please?
14   A   38 Whitney Street, Sherborn.
15   Q   And what's your date of birth?
16   A   8/13/57.
17   Q   This is a deposition, what we're doing
18  here today.
19   A   Um-hm.
20   Q   Have you ever done this before?
21   A   Yes.
22   Q   Okay. Under what circumstances?
23   A   Land dispute.
24   Q   Okay. I want to ask you briefly about

---

Page 5

1   your education and training.
2   A   Okay.
3   Q   Are you a high school graduate?
4   A   Yes.
5   Q   What year and what high school?
6   A   Natick High School, 1976.
7   Q   And after Natick High School, would you
8   tell me about your further education and training?
9   A   Geez, that was a while ago. About a
10  year -- or two semesters at San Diego State.
11   Q   Yeah.
12   A   Two semesters at Framingham State.
13   Q   Yeah.
14   A   A semester at Quinsigamond.
15   Q   Yeah.
16   A   And 21 years in the United States Navy.
17   Q   Honorable discharge?
18   A   Yes.
19   Q   And what was your -- what was your
20  rating on --
21   A   Chief petty officer.
22   Q   Besides the obvious stuff, what did you
23  do in the Navy?
24   A   I was a hull maintenance technician.

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                    09/19/2006

Page 6

1    Q   Did you do anything medically related in
2  the Navy?
3    A   I did eight years with the special
4  warfare, which would be some combat first aid.
5    Q   Okay. At some point did you get some
6  certifications from the state of Massachusetts?
7    A   Yes.
8    Q   Tell me about those.
9    A   I am a certified EMT.
10   Q   When did you get that?
11   A   Wow. Geez, it's five years ago.
12   Q   So about 2001?
13   A   Yeah, yeah, because my current -- my
14 current expiration is April 2007.
15   Q   Okay. So would it have been five years
16 before that?
17   A   Four years before that, because you
18 recertify every two years. So it's my current
19 expiration.
20   Q   So April 2003?
21   A   That's correct.
22   Q   All right. We're going to talk about
23 something today that happened in February of 2003.
24 Were you certified at that time?

Page 7

1    A   Yes, I was. Yes, I was.
2    Q   Okay. So --
3    A   I'm sorry, it was before that.
4    Q   Yeah.
5    A   It was before that.
6    Q   So did you have another --
7    A   In fact, it's been longer than that.
8    Q   Did you have a four-year term before
9  that or --
10   A   No, it goes in two-year cycles. So I
11 guess it's been longer than that.
12   Q   So sometime before February 2003 you got
13 your initial certification?
14   A   Yes, and I can get the exact dates, we
15 have it on record.
16   Q   Okay. What is your position with the
17 town of Sherborn?
18   A   I am a -- currently a fire fighter on
19 Engine 1.
20   Q   And when did you start as a fire
21 fighter?
22   A   '98, 1998.
23   Q   Okay. Before -- what years were you in
24 the Navy?

Page 8

1    A   I was in the Navy from September 1976
2  until August 1998. 1998? I can tell you.
3        (Pause.)
4    A   '97 would make it 21 years.
5    Q   Okay. And then was the fire fighter
6  position with the town of Sherborn the first thing
7  you did when you got out of the Navy?
8    A   No.
9    Q   What did you do before that?
10   A   I worked for an engineering company,
11 Framingham Welding and Engineering, as a
12 production planner.
13   Q   How long did you work for them?
14   A   Eight years while I was doing time in
15 the reserves, and from there, I went to the
16 Double E Company in West Bridgewater, and I'm a
17 regional sales manager.
18   Q   Okay. And for how long have you -- are
19 you still with Double E?
20   A   Yes.
21   Q   Yeah. Okay.
22        So you've been a fire fighter since
23 1998. Are you a volunteer or --
24   A   Yes. Volunteer, yes.

Page 9

1    Q   Okay. So when did you -- so while you
2  were doing these other things you just told me
3  about, you also have been a volunteer fire fighter
4  in Sherborn?
5    A   That's correct.
6    Q   And when you say you're a fire fighter
7  on -- what did you say, Engine 1?
8    A   Engine 1, yes.
9    Q   Engine 1. Is that in addition to being
10 an EMT?
11   A   That's correct.
12   Q   Okay. So you -- you get -- you get
13 called out both for regular fire fighting duties
14 and as an EMT?
15   A   I'm no longer on the ambulance at this
16 time.
17   Q   Oh, okay. Were you a regular fire
18 fighter continuously from '98 to the present and
19 -- or did you switch back and forth from being a
20 fire fighter and on the ambulance?
21   A   I was continuous until now, till
22 present.
23   Q   Okay. And for how long a period of time
24 were you on the ambulance?

3  (Pages 6 to 9)

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                    09/19/2006

---

**Page 10**

1   A   Up until about two years ago.
2   Q   Okay. But you've maintained your
3   certification as an EMT in the meantime, right?
4   A   That's correct.
5   Q   So how come you're not on the ambulance
6   anymore?
7   A   It's kind of a conflict with work.
8   Q   Okay.
9   A   As you can see, I do a lot of things.
10  Q   Yes. I don't know how you do it all, to
11  be honest with you, but it must be that Navy
12  training.
13  A   Yeah. Absolutely.
14      MR. LEEDBERG: I'm still trying to
15  get over the fact that he's 49 years old. I would
16  have guessed you're about 35.
17      (Off record.)
18  Q   I'm going to show you a document that
19  was marked as Exhibit 1 in the Christensen
20  deposition. Would you take a look at it for me,
21  please?
22  A   Sure.
23      (Document exhibited to witness.)
24      (Witness perusing document.)

---

**Page 11**

1   Q   Did you get a chance to look at that
2   document?
3   A   Yes, I did.
4   Q   Okay. Would you tell me whether or not
5   the handwriting on that document is your
6   handwriting?
7   A   Yes, it is, up until this point.
8   (Indicating.)
9   Q   Up until which point?
10  A   Up until this last statement that
11  says --
12  Q   Addendum?
13  A   -- Natick. It says MetroWest Natick.
14  Q   Okay. Where it says "addendum," that's
15  not your writing?
16  A   That's not my writing.
17  Q   Okay. Do you know whose writing that
18  is?
19  A   No, I don't. This might be Scott's. I
20  don't know. I don't know.
21  Q   Okay. All right. Would you do me a
22  favor and read where it says "comments," just read
23  me the writing there, please, the part you wrote?
24  A   "Patient had left foot and first big toe

---

**Page 12**

1   run over by a car. Patient's first complaint of
2   pressure on the first joint of the big toe, tender
3   to the touch. Transported to MetroWest Natick.
4   Q   Okay. And the other information, the
5   things -- the boxes that are checked and the --
6   the -- the patient information, and the dispatch
7   times, were those written -- all written by you?
8   A   Yes, this was. Yes, it was.
9   Q   And how about the vital signs, did you
10  enter those in there?
11  A   Yes, I took the vitals.
12  Q   Okay. Do you have a memory of this
13  particular incident from February 6, 2003.
14  A   I have -- I remember some of this.
15  Q   Okay.
16  A   Some of what happened, yes.
17  Q   What I'd like you to tell me, if you
18  would, is what you can recall about what happened
19  at that time. Starting with you're at the -- you
20  were at the station here that evening?
21  A   Yes, yes, I was.
22  Q   Would you start with that and tell me
23  what you can recall happened?
24      MR. LEEDBERG: I'm just going to

---

**Page 13**

1   object as to form, but go ahead and answer.
2   A   The tone went off.
3   Q   The -- I'm sorry, the what?
4   A   The tone went off calling out the
5   ambulance.
6   Q   Okay.
7   A   We -- Scott and I left. We were up in
8   the meeting room, went down, got in the ambulance
9   and went to the call site, which was the Sherborn
10  Inn. At that --
11  Q   Can I stop you there?
12  A   Sure.
13  Q   Was it just the two of you who went?
14  A   I don't remember. I know it was --
15  Q   Let me ask you specifically --
16  A   The two of us were in the front of the
17  ambulance, I know that.
18  Q   Do you recall whether or not Deputy
19  Chief Buckler went with you?
20  A   I'm not sure if he rode in the ambulance
21  or if he walked over. It's only a short walk.
22  Q   Did he go to the scene too, though?
23  A   He was at the scene, yes.
24  Q   Okay. All right. So you and Scott went

---

4  (Pages 10 to 13)

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                    09/19/2006

Page 14

1  in the ambulance to the scene. And where was the
2  scene?
3      A    In the parking lot of the Sherborn Inn.
4      Q    Okay. And did you know going over there
5  what the call was for?
6      A    I don't remember exactly how the call
7  came in.
8      Q    Okay. When you got there, what did you
9  find?
10     A    We found a man that was walking around,
11 and we proceeded to ask him what had happened,
12 there was also a couple of officers there.
13     Q    Okay. You say "we," did you speak with
14 him yourself?
15     A    Yes, I did.
16     Q    Yeah. And tell me about that, tell me
17 about your conversation with him, if you will.
18     A    I don't remember my exact words. My
19 best memory would be I asked him what his chief
20 complaint was and asked the officers what had
21 happened trying to evaluate the scene.
22     Q    And do you recall what you learned?
23     A    Yes.
24     Q    What was that?

Page 15

1      A    We learned that his foot had been run
2  over by a car.
3      Q    Okay. And did you render treatment to
4  him yourself personally?
5      A    Yes, I did.
6      Q    Okay. Tell me what you did, if you
7  would.
8      A    First we persuaded the patient to sit
9  down in the back -- on the back step of the
10 ambulance.
11     Q    Okay.
12     A    We asked him if we could remove his shoe
13 so we could examine his foot. With some
14 resistance, he did let us -- finally let us do
15 that.
16     Q    When you say some resistance, what do
17 you mean?
18     A    He wasn't -- at that point he wasn't
19 really receptive to our treatment.
20     Q    Okay. And why was that, if you know?
21     A    Well, he was -- he was not happy about
22 the whole situation, and he was -- he was quite
23 upset. From what I remember, he was -- he was
24 arguing with the police officers and talking

Page 16

1  somewhat with -- with Ron. He didn't pay a whole
2  lot of attention to Scott and I at that time.
3      Q    Okay. Did you hear any of that
4  conversation?
5      A    No, I don't remember exactly what was
6  said.
7      Q    Okay. When you started talking to him,
8  can you remember anything that you said to him and
9  he said to you?
10     A    My -- my conversation with him was I
11 basically asked him where his pain was.
12     Q    Okay. And what did he say, if you
13 remember?
14     A    I don't -- I don't remember exactly what
15 -- what his reply was.
16     Q    Okay. Do you remember whether or not
17 his complaint seemed to be consistent with what he
18 said happened, being run over by a car, his foot
19 being run over by a car?
20     A    Yes, I would say so, yes.
21     Q    Okay. What -- what did you observe --
22 well, tell me the mechanical things you did in
23 order to treat him if you would. You told me you
24 got him to sit down on the -- what did you say,

Page 17

1  the back step of the --
2      A    Yes.
3      Q    -- of the ambulance?
4           And what is that, like the bumper,
5  or is there something else there?
6      A    Yeah, like the back bumper of the
7  ambulance.
8      Q    Okay. And so you got him to sit down,
9  and what happened next; what's the next thing that
10 occurs?
11     A    We got him to remove his shoe --
12     Q    Yeah.
13     A    -- and his sock and we proceeded -- I
14 proceeded to -- to palpitate his foot for
15 tenderness and look for any signs of distortion,
16 broken bones, swelling, bruising, those types of
17 things.
18     Q    Okay. Do you remember what you found?
19     A    Found slight swelling, to my best
20 knowledge. I don't recall if it was bruised or --
21 I don't recall.
22     Q    Okay. What happened next?
23     A    We recommended that we transport, that
24 we take him to the hospital, and that he get it

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                    09/19/2006

Page 18

1  examined and X rayed.
2      Q    Okay.  Why was that?
3      A    It's a trauma injury.  It should be --
4  should be seen by a physician.
5      Q    Okay.  Did he agree to do that?
6      A    Initially, no.
7      Q    And did -- did that change?
8      A    Yes.
9      Q    And how did it change -- did you have
10  further conversation with him about that?
11     A    Yes.
12     Q    And tell me about that conversation.
13     A    We advised him that it was better to
14  have it seen and treated now than to wait and have
15  something develop later.
16     Q    Okay.  So did he ultimately agree that
17  he would be -- he would go to the hospital?
18     A    Yes.
19     Q    Okay.  What did you do in terms of
20  transporting him to the hospital; what are the
21  steps that you took to transport him?
22          MR. LEEDBERG:  Object as to form,
23  but go ahead and answer if you understand the
24  question.

Page 19

1          THE WITNESS:  I under the -- I think
2  I understand the question.
3      A    Are you -- do you mean procedurally what
4  did we do or....
5      Q    Well, the last thing I've got is he's
6  sitting on the back step, you're examining his
7  foot.  What do you do after that in terms of
8  taking him to the hospital; what other steps do
9  you take?
10     A    We got him on the stretcher --
11     Q    Okay.
12     A    -- got him strapped down.
13     Q    Yeah.
14     A    And then left the scene and headed for
15  the hospital.
16     Q    Okay.  Did you -- aside from examining
17  his foot, did you provide any treatment on the
18  scene?
19     A    I don't remember.
20     Q    Do you remember whether you wrapped his
21  foot up or whether you did anything to his foot?
22     A    I don't remember.
23     Q    Given the type of injury that he
24  complained of, what would be the usual procedure,

Page 20

1  the usual treatment that you would apply in that
2  situation?
3      A    A suspected break, you would splint.
4      Q    Okay.  And do you have any recollection
5  as to whether or not you did that?
6      A    I don't remember if we splinted or not.
7  I don't recall.
8      Q    You said -- I think you said, and if I'm
9  wrong, you correct me, I think you said you may
10  have observed some swelling?
11     A    Yes.
12     Q    Okay.  And what would the usual
13  procedure -- the usual treatment be for observing
14  swelling?
15     A    That would be a -- break a cold pack,
16  put a cold pack on, transport.
17     Q    Okay.  And, again, do you have any
18  recollection as to whether or not you did that?
19     A    I believe we did that.  I don't recall
20  whether we did it prior to transport or during
21  transport.
22     Q    Okay.  How many of you were there in the
23  ambulance when you transported him?
24     A    I was there myself, just myself.

Page 21

1      Q    Okay.  And --
2      A    Scott drove.
3      Q    Scott drove.  And you were in the back?
4      A    Yes.
5      Q    Okay.  So this is something you may have
6  done while on route; is that what you're saying?
7      A    That's correct.
8      Q    Okay.  And what can you tell me about
9  Mr. Koran's position in the vehicle at that time?
10  I think you said he was on the stretcher; is that
11  right?
12     A    That is correct, he was on the
13  stretcher.
14     Q    Okay.  And what was the position of the
15  stretcher, was he -- was he prone on the
16  stretcher?
17     A    Yes.  The stretcher was in the prone
18  position, that's correct.
19     Q    Okay.  Is there a reason why he would be
20  prone at that particular time or -- as opposed to
21  say sitting up or having his leg elevated or
22  anything like that?
23     A    No, I don't think -- no particular
24  reason.

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                    09/19/2006

Page 22

1    Q   But your memory is that he was prone; is
2  that correct?
3    A   That's correct, yes.
4    Q   And did he remain that way for the
5  entire time of the transport?
6    A   That's correct.
7    Q   Where was it that you first saw
8  Mr. Koran when you came to the Sherborn Inn?
9    A   I don't remember exactly where he was.
10   Q   Okay.  Did he have a vehicle?
11   A   I don't know.
12   Q   If he did, you didn't see a vehicle; is
13 that --
14   A   I don't know.
15   Q   Yeah.  Okay.  Where did you transport
16 Mr. Koran to?
17   A   MetroWest Natick.
18   Q   Okay.  When you -- by the way, the --
19 the times that are listed for dispatch, do you see
20 them on there?
21   A   Yes.
22   Q   They're in military time, right?
23   A   Yes.
24   Q   Yeah.  And 6:46 sound like the right

Page 23

1  time for the dispatch, the initial dispatch?
2    A   Yes.
3    Q   And I guess you've said it's just down
4  the street so a minute later would be --
5    A   It's right there.
6    Q   Yeah.  Okay.  And then the departure
7  time seems to be 7:08 based on what's listed on
8  there.  Does that sound like the right amount of
9  time that you were at the scene, about 20 minutes
10 or so, 21 minutes I guess technically?
11   A   I don't remember exactly.
12   Q   Okay.  And then the -- the departure
13 time and then the hospital arrival time looks like
14 1950 or 1956.  Does that sound right in terms of
15 the time it would take you to get to the hospital?
16       THE WITNESS:  I don't know how to
17 answer that.
18       MR. LEEDBERG:  If it doesn't sound
19 right, maybe it's -- if it's -- explain it, if you
20 can.
21   A   Well, I can -- I -- we get these times
22 from dispatch.  We don't clock things as they
23 happen.  We call in and dispatch tells us what our
24 times are.

Page 24

1    Q   I see.  Okay.  So you write them, but
2  you don't -- you don't actually look at your watch
3  and say, I'm doing it based on this particular
4  time; is that what you're saying?
5    A   That is correct.
6    Q   Okay.  All right.  So --
7    A   The only times --
8        THE WITNESS:  Can I --
9        MR. LEEDBERG:  Yeah, go ahead.
10   A   The only time I look at my watch is if
11 I'm doing something, if I'm performing something
12 on the patient.
13   Q   Taking a pulse or something?
14   A   Yes.
15   Q   How long would you estimate it
16 ordinarily takes to get from the Sherborn Inn to
17 the MetroWest Hospital?
18   A   10 minutes, 15 minutes.
19   Q   Okay.  All right.  6:52, about --
20 approximately five minutes after you arrived at
21 the scene, would that be a time that you
22 entered --
23   A   That would be a time, yes.
24   Q   -- when you took the vital signs; is

Page 25

1  that correct?
2    A   Yes, that would be.
3    Q   Okay.  And you took the -- well, why
4  don't you tell me what each of the blocks means if
5  you would, please.
6    A   LOC, level of consciousness, times
7  three.
8    Q   What does that mean?
9    A   It basically means I did three
10 observations on his level of consciousness,
11 meaning did he answer me when I spoke with him,
12 was he cognizant of what I was saying, and did he
13 appear to have good motor function, good, you
14 know.  The second was the blood pressure.
15   Q   Yeah.  And -- I see it there, but why
16 don't you tell me what it says, just to be clear.
17   A   160 over 120.
18   Q   Is that high?
19   A   Relatively high I would -- I would say,
20 yes.
21   Q   And what's the next reading?
22   A   Pulse.
23   Q   Yeah.  What's that?
24   A   Would be -- it would be 80.

                                    7  (Pages 22 to 25)

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                    09/19/2006

Page 26

1    Q    And is that --
2    A    That's in normal range.
3    Q    Normal range, okay.
4         What's the next item?
5    A    That -- that would be his respiration,
6    his breathing --
7    Q    Okay.
8    A    -- and it was normal range.
9    Q    I can't make that out at all.  Is that
10   what that says?
11   A    Yeah, that's normal range.
12   Q    Okay.  Sorry.  I thought it was
13   something scratched out; I couldn't tell.  Thank
14   you.
15        Okay.  So is it likely that within
16   five minutes after arriving at the scene you were
17   taking Mr. Koran's vitals?
18   A    Yeah, I would say -- yeah, I would say
19   so.  That's typical, yes.
20   Q    Okay.  So whatever -- whatever problems
21   there were initially with Mr. Koran wanting
22   treatment or not wanting treatment, at least
23   within five minutes after you got there, he was --
24   he was submitting to having you take his vital

Page 27

1    signs apparently; is that a fair statement?
2    A    He submitted, yes.
3    Q    Okay.  All right.  So you transport him
4    to the MetroWest Hospital.  What happens there?
5    A    We unload him from the ambulance.
6    Q    Okay.  And you say we.  Tell me, if you
7    would, just what the procedure was.  Were you
8    still in the back with him?
9    A    Yes, yes, I was.
10   Q    Okay.  And what happened?
11   A    I waited for Scott to open the doors and
12   release the stretcher.  Scott released the
13   stretcher, we guide him out, and that's when it
14   dropped.
15   Q    Okay.  Scott opens the back doors of the
16   ambulance from the outside?
17   A    That's correct.
18   Q    Is that something you can't do from the
19   inside?
20   A    You can, but you can't.  I mean, it has
21   a latch, but you have to -- you have to be at the
22   head of the stretcher.
23   Q    When Mr. Koran went into -- went on the
24   stretcher, did he get on the stretcher from inside

Page 28

1    the ambulance?
2    A    I don't remember.  I don't remember
3    whether --
4    Q    Well --
5    A    Whether he -- I don't remember.
6    Q    Okay.  Let me ask it this way.
7         Do you recall while you were at the
8    Sherborn Inn taking the stretcher out of the
9    ambulance?
10   A    I don't remember.  I don't remember
11   that.
12   Q    Okay.  So -- well, there's -- and if I'm
13   saying this wrong, you correct me.  There's only
14   two ways he could be on the stretcher; one would
15   be if you brought the stretcher out and he got on
16   it; the other would be if he got into the
17   ambulance and then got on the stretcher; is that a
18   fair statement?
19   A    That's correct, that's fair, yes.
20   Q    And you don't remember which it was?
21   A    No, I don't.
22   Q    Okay.  When -- what was the weather like
23   at that time, do you recall?
24   A    I think it was good weather.  I believe

Page 29

1    it was good weather.  It wasn't -- I know it
2    wasn't raining or anything like that.
3    Q    Was there snow on the ground, do you
4    recall?
5    A    No, I don't recall whether or not -- no.
6    Q    Okay.  Was it cold?
7    A    I don't think so.
8    Q    All right.  If I -- if I have the
9    picture correctly, Mr. Koran sits on the back of
10   the ambulance and takes his shoe off or you take
11   his shoe off?
12   A    Um-hm.
13   Q    Which was it, did you take it off or did
14   he take it off?
15   A    I don't remember exactly whether it was
16   him or me.
17   Q    Okay.  Did you examine his foot while he
18   was sitting on the back of the ambulance?
19   A    Yes.
20   Q    Okay.
21   A    Yes.
22   Q    And then did you leave his shoe off
23   during transport?
24   A    Yes.

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                    09/19/2006

Page 30

1    Q   All right.  When he -- how did he get
2  into the ambulance with his shoe off; did someone
3  assist him or did you bring the stretcher down and
4  put him in on the stretcher?
5        MR. LEEDBERG:  Objection as to form.
6    Q   Do you understand what I'm asking you?
7    A   I understand what you're asking me, but
8  I don't remember exactly.
9    Q   What would your usual procedure be if
10 you had someone who didn't have a shoe on in those
11 circumstances?
12   A   You would bring the stretcher out.
13   Q   Okay.  It would be difficult with no
14 shoe on for him to step into it, wouldn't it --
15       MR. LEEDBERG:  Objection as to form.
16   Q   -- step into the ambulance?
17       MR. LEEDBERG:  Objection as to form.
18 Answer if you can.
19   A   Yeah, I think that would be difficult,
20 yeah.
21   Q   And if you had a -- if you had a
22 question as to what the injury was to his foot,
23 you probably wouldn't want him to put any weight
24 on it, particularly as a barefoot, would you --

Page 31

1        MR. LEEDBERG:  Objection as to form.
2    Q   -- in terms of your usual procedure?
3    A   Yes, you would not want him to put
4  weight on it, that's correct.
5    Q   Okay.  Does that make it -- I understand
6  you don't presently recall, but does that make it
7  more likely that the procedure you would follow
8  would be to have him get on the -- pull the
9  stretcher out and have him get on the stretcher
10 rather than have him step up into the ambulance?
11       MR. LEEDBERG:  Objection as to form.
12   A   Yes, that would be -- procedurally, yes,
13 that would be the way you'd do it.
14   Q   Okay.  In any event, he's in the
15 ambulance.  Is he strapped to the stretcher?
16   A   Yes.
17   Q   Okay.  Did you strap him yourself?
18   A   We all did -- we all do.
19   Q   Who's -- who's we all?
20   A   Well, myself, Scott, anybody that would
21 be there.
22   Q   Okay.  Would that be your -- is it Ron
23 Buckler?
24   A   Yes.

Page 32

1    Q   Was he assisting you too, do you
2  remember?
3    A   I don't remember whether he -- whether
4  he did or not.
5    Q   Okay.  He was at the scene I think you
6  said?
7    A   He was at the scene.  He was at the
8  scene.
9    Q   Okay.  Did he go to the hospital with
10 you?
11   A   No, he didn't.
12   Q   In any event, at some point Mr. Koran is
13 strapped to the stretcher and the ambulance goes
14 to the MetroWest Hospital; is that right?
15   A   That's correct.
16   Q   Okay.  You get there, and you've
17 indicated that Scott would have opened the doors
18 from the outside?
19   A   That's correct.
20   Q   Okay.  And you would have been at the --
21 looking in, you would have been at the back or the
22 head end of the stretcher; is that correct?
23   A   That's correct.
24   Q   Okay.  And what -- what did Scott do in

Page 33

1  terms of getting Mr. Koran out of the ambulance?
2    A   I don't know what he did.
3    Q   Well, you said something before about he
4  unlocked the --
5    A   Typically that's what -- yeah, I can't
6  answer as to what he actually -- what he did,
7  but....
8    Q   Okay.  Where was the -- how does that
9  locking device work?
10   A   It's a push bar.
11   Q   And where is it located?
12   A   You push it.  It's located on the
13 right -- sorry, I can't remember -- left -- right
14 side.  Push it and it unlocks.
15   Q   In terms of access to it, is this
16 something that's on the floor?
17   A   Yes, it's mounted to the floor.
18   Q   Okay.  So is it difficult for you at the
19 head of the stretcher to get to that device?
20   A   You could not.
21   Q   Okay.  So then Scott has to be the one
22 that unlocks that device; is that right?
23   A   That's correct.
24   Q   Okay.  So it's -- is it fair to say that

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                        09/19/2006

Page 34

1  he must have unlocked the device or you couldn't
2  have gotten the stretcher out of the ambulance?
3      A   That's correct.
4      Q   Okay.  And does that mean that the two
5  of you were then taking the stretcher out of the
6  ambulance, him at the foot and you at the head?
7      A   That's correct.
8      Q   Okay.  What's your understanding as to
9  how the stretcher works in terms of taking it out
10 of the ambulance, what -- what -- what
11 mechanically occurs in order to bring it out?
12     A   You roll it out and the wheels drop
13 down.
14     Q   Okay.  What makes them do that, is it --
15 is it gravity or is there some device that's --
16 that causes that?
17         MR. LEEDBERG:  Objection as to form.
18 Answer if you know.
19     A   There's a release.
20     Q   Okay.  You have to press -- you have to
21 press something in order for those legs to drop
22 down?
23     A   I'm not sure if it's -- yes, you squeeze
24 the....

Page 35

1      Q   Okay.  And what happens when they drop
2  down?
3      A   They drop down, they hit the -- they hit
4  the ground, when it clicks, you roll away.
5      Q   Okay.  So there's -- is there -- is
6  there an audible sound that you hear when the legs
7  come down?
8      A   Yes, you hear them come down, yes.
9      Q   I mean, you mentioned -- you said click.
10 Do you actually hear a click sound?
11     A   Yeah, you do.  Yes, you do.
12     Q   And is that something that you need to
13 hear to -- so you know that the legs are, in fact,
14 locked in place?
15     A   Yes.  Yes.
16     Q   If the legs didn't click, would the legs
17 -- would they hold the stretcher up?
18         MR. LEEDBERG:  Objection as to form.
19 Go ahead and answer.
20     A   I don't know.  That's the first time
21 I've ever -- I don't know.
22     Q   Okay.  All right.  So you and Scott are
23 taking Mr. Koran out on the stretcher, and as
24 you're doing it, what exactly happens?

Page 36

1      A   The legs drop down --
2      Q   Yeah.
3      A   -- we roll him out and it dropped.
4      Q   Okay.  To what level did it drop?  To
5  what height, I guess, above the ground is what I'm
6  trying to say.
7      A   I don't remember if it was the first or
8  the second or if -- if it was the first or it was
9  all the way down.  I don't remember which one it
10 dropped to.
11     Q   On your body --
12     A   Um-hm.
13     Q   -- and by the way, Mr. Koran is prone at
14 this time, he's not seated?
15     A   I don't remember if he -- if he was
16 prone or seated -- if he was --
17     Q   Okay.  But let's -- let's just talk
18 about the prone -- the prone level.
19     A   Um-hm.
20     Q   Assume for the moment he was completely
21 prone.  You mentioned you weren't sure which one
22 of two levels it went down to.  Where would those
23 two levels come to on your body; could you tell me
24 that?

Page 37

1      A   Standing in the ambulance or on the
2  ground?
3      Q   Oh, well, that's a good question.  Were
4  you standing -- were you still in the ambulance
5  when this occurred?
6      A   Yes.
7      Q   Okay.  Did you come down from the
8  ambulance at that point; did you step down from
9  the ambulance?
10     A   Yes.
11     Q   Okay.  When you were standing next to
12 the stretcher at that point, where did the
13 stretcher come to on your body?
14     A   I don't remember exactly.  I don't
15 remember exactly.
16     Q   Okay.  Was it above the knees or below
17 the knees?
18     A   I don't remember exactly.  It was --
19     Q   Okay.  What happened?  You stepped out
20 of the ambulance and Mr. Koran was at one of those
21 levels.  What -- what happened at that point?  Was
22 there any conversation?  Did you talk to him?  Did
23 he speak with you or --
24         MR. LEEDBERG:  I object as to the

10  (Pages 34 to 37)

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                          09/19/2006

Page 38

1  form.  Go ahead and answer it.
2      A   Yes, I said something to the effect of,
3  That was strange.  And then I asked Mr. Koran, you
4  know, Are you okay?  How are you?  Are you fine?
5      Q   What did he say?
6      A   He said he was fine.  He said he's okay.
7  He just kind of looked up at me and....
8      Q   Okay.  And what happened next?
9      A   We went -- we went right in.
10     Q   Okay.  Was Mr. Koran at the level that
11 patients usually are when you transport them on
12 the stretcher?
13     A   No, no, he was not.
14     Q   So what did you do?  Did you bring him
15 back up to that level or did he stay at the level
16 that the stretcher had fallen to?
17     A   He stayed at the level, he stayed at
18 that level.
19     Q   Okay.  Why was that?
20     A   I don't know.  We just got him in there.
21     Q   Was it possible to raise him back up to
22 a higher level?
23     A   I don't remember if we tried that or
24 not.

Page 39

1      Q   Okay.  Would it have -- well, I guess
2  you said this never happened before, but your
3  ordinary practice was to transport people at a
4  higher level; is that right?
5      A   Yes, that's correct.
6      Q   Okay.  So does it seem likely that you
7  would have tried to raise him back to that level?
8          MR. LEEDBERG:  Objection as to form.
9      A   Yeah, it seems like we would have tried
10 that.
11     Q   And you don't have a recollection as to
12 whether or not you were unable to do that for some
13 reason.
14         MR. LEEDBERG:  Objection as to form.
15     A   I don't remember exactly trying to do
16 it.
17     Q   Okay.  Did you bring him inside the
18 hospital?
19     A   Yes, we did.
20     Q   Okay.  And when you got inside the
21 hospital, what happened?
22     A   Turned him over to the charge nurse.
23     Q   Okay.  Did anyone make note of the fact
24 that he was at a level that was different from the

Page 40

1  level at which patients usually enter the
2  hospital?  A different height I'm talking about.
3      A   I don't recall if anything was said
4  about it, no.
5      Q   Okay.  And what did you do in terms of
6  moving Mr. Koran from the stretcher to any other
7  location?
8      A   I know they directed us to -- to one of
9  the rooms, but I'm not sure how we got him onto
10 the -- I don't remember how we got him onto the
11 hospital bed.
12     Q   Okay.  What would be your usual
13 practice?
14     A   The usual practice would be that
15 everybody line up on one side and the other side,
16 take the sheet and lift him over --
17     Q   Okay.
18     A   -- or backboard, sheet or backboard,
19 whatever.
20     Q   Do you have a memory of Mr. Koran at
21 all; what he looked like?
22     A   (Witness nodded.)
23     Q   No?
24     A   No.

Page 41

1      Q   If I suggested he was a pretty big guy,
2  would that -- would you have a memory one way or
3  the other?
4      A   No.
5      Q   No.  Okay.
6          If you followed the usual procedure,
7  would you have been able to do that if the level
8  of the stretcher was lower than the level you were
9  transferring him to?  Do you understand what I'm
10 asking you?
11     A   Yeah, I think so.  I think so.  Usual
12 procedure you have a lot of -- a lot of people
13 there to help you, and, yes, yes, you -- there's
14 usually six to eight people and that's --
15     Q   Okay.
16     A   -- that can be accomplished.
17     Q   But usually aren't you going from a
18 level of the stretcher to the level of the bed or
19 whatever that is approximately the same height?
20     A   Yes.  They're approximately the same
21 height, yeah.
22     Q   So if the stretcher was at that lower
23 level, you'd have to bring him up from that level
24 to the level of the bed; do you understand what

11  (Pages 38 to 41)

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                    09/19/2006

Page 42

1  I'm asking?
2      A   Um-hm.
3      Q   And do you have any recollection as to
4  whether or not that occurred and whether there was
5  any -- as to whether or not it was necessary to
6  bring him from a -- a different level to the level
7  of the bed?
8      A   I don't remember.  I don't remember.
9      Q   Okay.  All right.  What did you do after
10 Mr. Koran was transferred to the bed or whatever?
11     A   Called dispatch and went to do the
12 paperwork, went to do my paperwork.
13     Q   Which is what?
14     A   Which is basically this (indicating).
15 Called dispatch for the times and then just a
16 quick write-up as to what the call was about.
17     Q   Okay.  Are you talking about the
18 write-up on here (indicating)?
19     A   Yes.
20     Q   Did you fill out any other paperwork in
21 addition to this document?
22     A   Typically, no.  No, I don't recall doing
23 that.
24     Q   Okay.  Do you remember whether in this

Page 43

1  case you filled out anything that was different?
2  You said typically.  I mean, was it because
3  something had happened, would you fill out any
4  additional paperwork?
5      A   Other than the insurance forms, some
6  insurance forms, sometimes it's done by, you know,
7  we get the information.  Most of the time the
8  hospital gets the information.
9      Q   You're talking about the insurance forms
10 for Mr. Koran to get his treatment?
11     A   Yes.
12     Q   Yeah, okay.  I understand.
13         Okay.  So at that point you've done
14 your paperwork.  What did you do next?
15     A   Left the hospital, went back to the
16 station.
17     Q   Okay.  Before you did that, you had to
18 put the -- you had to put the cot back in the --
19 into the ambulance; is that right -- I mean,
20 stretcher, rather, back into the ambulance?
21     A   I believe Scott did that.  Typically
22 what we do is one does the paperwork, one loads
23 the am -- one puts the ambulance back in service.
24     Q   Okay.  Now, in order to get the

Page 44

1  stretcher back into the ambulance it has to be at
2  a certain height; is that right?
3      A   That's correct.
4      Q   Okay.  Do you know whether or not there
5  was -- there was any problem in getting the
6  ambulance -- the stretcher back to the right
7  height for the ambulance?
8      A   I didn't do it.
9      Q   I understand.  But did you -- did you
10 learn from Scott that he had any problem doing it?
11     A   I don't remember exactly what he said,
12 but he -- he just told me, well, he got it back
13 in, he got it up and got it in.  So --
14     Q   Okay.
15     A   -- I don't know exactly what -- I don't
16 remember exactly what he said.
17     Q   But you're clear in your own mind you
18 didn't assist him in getting it in?
19     A   No, no, I don't recall doing that.
20     Q   Okay.  So mechanically, to get it back
21 into the ambulance, the only way he could get it
22 back in would be to get that end raised back up so
23 that it would go in; is that a fair statement?
24         MR. LEEDBERG:  Objection as to form.

Page 45

1  Answer if you can.
2      A   The -- the stretcher has to be in the
3  upright position to load it, the complete upright
4  position to load it.
5      Q   Okay.  Because if it's down, it would
6  just hit the bumper, it wouldn't go up and over;
7  is that --
8      A   Right.
9      Q   Do I understand that correctly?
10     A   You understand that correctly.
11     Q   So one way or another he must have got
12 it back up to the height necessary to do that.
13 That's true, isn't it?
14         MR. LEEDBERG:  Objection as to form.
15     A   I don't know what he did, but he must
16 have.
17     Q   Okay.  Any idea what that thing weighs?
18     A   No.  Not offhand, no.  An idea what -- I
19 don't know what it weighs.  I have no idea.
20     Q   Could one person lift it up and put it
21 in by himself?  You know, just physically lift it
22 up off the ground and put it in the back of the
23 ambulance?
24     A   I don't know.  I never tried it.  I

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                    09/19/2006

---

Page 46

1   don't know. I never -- I never had to load it by
2   myself.
3       Q   Okay. All right. Where did you ride
4   when you went back to the -- to the station?
5       A   The passenger seat if I --
6       Q   Okay. Did you examine the stretcher at
7   all after it was back in the ambulance?
8       A   I don't remember if we did or not. I
9   don't remember offhand.
10      Q   Okay. When you get back to the station,
11  do you remember whether or not you examined the
12  stretcher?
13      A   I don't remember, no, whether or not we
14  did.
15      Q   Did you have a concern about whether or
16  not the stretcher was going to operate properly
17  after that?
18      A   Did I? No.
19      Q   Well, if you -- say you had another call
20  that evening, you would have had to use that
21  stretcher; is that right?
22      A   Yes, that's correct.
23      Q   Okay. So were you concerned that it
24  might drop again?

---

Page 47

1       A   No, no, I don't -- I don't recall having
2   a concern about that.
3       Q   Do you remember talking to anyone
4   when you got back about what had happened?
5       A   What do you mean about what happened,
6   about the call with the stretcher?
7       Q   Yeah, with the stretcher, yeah.
8       A   No, I don't think we -- no, I don't
9   remember saying -- talking to anybody about that.
10      Q   Okay. Was Ron Buckler here?
11      A   I don't know. I don't remember.
12      Q   Okay. Did you ever speak with anyone
13  after that trip about the stretcher and about the
14  problem with the stretcher?
15      A   Yes.
16      Q   Who did you talk to?
17      A   Pam Dowse, I believe.
18      Q   And what's -- Pam Dowse, D-O-W-S-E,
19  right?
20      A   Yes.
21      Q   What's Pam Dowse's position or role?
22      A   At that time she was -- I don't remember
23  whether she was a lieutenant or captain of the
24  ambulance.

---

Page 48

1       Q   Okay. And tell me about your
2   conversation with her.
3       A   She asked me if -- if anything had
4   happened on that -- this particular call, and I
5   told her what had happened, and she asked me to
6   write an addendum explaining what had happened. I
7   did that and I e-mailed it to her.
8       Q   Okay. Where is the addendum?
9       A   The addendum, I don't know.
10      Q   It's not this addendum that's on here,
11  because you told me you didn't write that; is that
12  correct?
13      A   No, I didn't write that.
14      Q   Where did you e-mail from?
15      A   My office.
16      Q   Your office in West Bridgewater?
17      A   Yeah.
18      Q   Think you still got it?
19      A   I know I don't because I looked for it.
20      Q   And where did you e-mail it to?
21      A   To Pam Dowse's e-mail address.
22      Q   Okay. Is that a town address or a
23  personal e-mail address?
24      A   I think it's her personal -- I don't

---

Page 49

1   know. I think it's her personal e-mail address,
2   but it's the same one that's on all of the fire
3   department correspondence.
4           MR. LEEDBERG: I'm sorry, my phone
5   -- my office keeps buzzing me. It must be
6   something important.
7           (Off record.)
8       Q   I'm looking at a couple of pieces of the
9   fire department letterhead here, and I don't see
10  an e-mail address. Do you remember what the
11  e-mail address is?
12      A   No.
13      Q   Is it -- does the town of Sherborn have
14  a town-wide e-mail address, do you think, or is
15  there a separate one for the fire department?
16      A   It's just an -- everybody just gives
17  their e-mail, and it just comes out on -- when you
18  receive an e-mail, there's like 40 or 50 of them
19  on there, and I just picked hers out. I don't
20  remember exactly which one it was, though, or what
21  it said. J. Dowse or something like that. I'm
22  not sure.
23          MR. LEEDBERG: All right. I'll look
24  into that and see if I can find some information

---

13 (Pages 46 to 49)

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                    09/19/2006

```
                                             Page 50
1    for you on that.
2         MR. DURSO:  All right.
3       Q   So when was it that you would have done
4    that -- that e-mail in relation to the event
5    itself.  Would it have been sometime shortly after
6    February 6, 2003?
7       A   After that date, yes.  Yes.
8       Q   I mean, but --
9       A   I don't remember exactly.
10      Q   -- that month?
11      A   How long after.  I don't remember.
12      Q   Okay.  All right.  And aside from that
13   addendum that you did the e-mail on, did you ever
14   fill out anything else or write anything else
15   about the incident?
16      A   No, that was it.
17      Q   Okay.  Was there anybody else you spoke
18   to about the incident other than Pam Dowse?
19      A   I don't remember offhand.  You mean at
20   that time; is that what you're asking me?
21      Q   No, at any time afterwards?
22      A   Sure.  I've spoken with the chief about
23   it a couple of times and....
24      Q   And that's Chief....
```

```
                                             Page 51
1       A   McPherson.
2       Q   McPherson, yeah.
3           Okay.  Other than Chief McPherson,
4    anybody else you've spoken to that you can
5    remember?
6           MR. LEEDBERG:  Besides me.
7       Q   Yeah, besides lawyers.
8       A   Scott.
9       Q   Did you and Scott talk about it on the
10   way back from the trip?
11      A   About the stretcher?  I don't know.  I
12   don't remember.  We usually talk about fishing.
13      Q   Where do you go fishing?
14      A   Cape, down the Cape.
15      Q   Did anyone ever say anything to you
16   about a handle being bent?
17      A   Never heard anything about that.
18      Q   Okay.  Is there anything else about this
19   incident that -- that you can recall that you
20   haven't told me?
21      A   Other than the demeanor of the patient,
22   I think I've -- I think I've told you everything.
23      Q   Okay.
24      A   My --
```

```
                                             Page 52
1       Q   What else is there about the demeanor of
2    the patient that you haven't told me?
3       A   I just -- I just thought it was odd that
4    he was more concerned about the woman that ran
5    over his foot and the cops than he was about his
6    foot.  I just thought that was odd.
7       Q   Okay.  I'm going to show you what was
8    marked Exhibit 2 in Scott's deposition.  Take a
9    look at that for a second, if you would, please,
10   okay?
11          (Document exhibited to witness.)
12          (Witness perusing document.)
13      A   Okay.
14      Q   Have you ever seen that before?
15      A   I don't recall.  I don't recall seeing
16   this.  So Scott did an incident report.
17      Q   Yeah.
18      A   Okay.
19      Q   Do you remember whether or not you
20   assisted him in any way in filling that out?
21      A   I did not.  I would have signed it.
22      Q   Were you aware before this that
23   he had done this incident report?
24      A   No, I don't remember.  I don't remember
```

```
                                             Page 53
1    whether or not....
2       Q   Okay.  And I want to show you what was
3    marked Exhibit 4 in Scott's deposition.
4           (Document exhibited to witness.)
5       Q   Does this appear to you to be the type
6    of stretcher that we're talking about?
7    (Indicating.)
8       A   It looks like it.  I don't know if it's
9    the exact....
10          (Witness perusing document.)
11      A   Yes.
12      Q   Okay.  Referring to page 11 in that
13   exhibit, are you able to tell me looking at this
14   page the position that the -- that the stretcher
15   went into when it came out of the -- out of the
16   ambulance at the hospital?
17      A   From that picture, no.  I -- I couldn't
18   tell.  I'd have to be standing at the side away
19   from it to judge.  I couldn't tell.
20      Q   Okay.
21      A   I was standing up in the ambulance.
22      Q   But didn't you come down and stand next
23   to it after that?
24      A   Yes, yes, I did.
```

14  (Pages 50 to 53)

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                    09/19/2006

Page 54

1    Q   Okay.  So based on standing next to it,
2  can you -- can you tell me from any of these as to
3  what the position was?
4    A   I can't tell you exactly.  I'm not -- I
5  don't know if it was this one or this one.  I'm
6  not sure exactly which position.  (Indicating.)
7    Q   Okay.  I'm going to show you a picture
8  of the stretcher on page 7.  As the stretcher is
9  coming out of the ambulance, what, if anything, do
10 you do in order to have the legs come down?
11   A   There is a -- a lever --
12   Q   Okay.
13   A   -- and you grab it and the legs just
14 drop.
15   Q   Okay.  There's a lever at -- at the head
16 end?
17   A   Yes.
18   Q   Okay.  Is there also a lever at the foot
19 end?
20   A   Yes, I believe so, yes.
21   Q   Okay.  Do you have to press both levers
22 or will either lever let the legs come down?
23        MR. LEEDBERG:  Objection as to form.
24 Go ahead.

Page 55

1    A   You know what, I don't know if you have
2  to do them both at the same time.  I don't know.
3  I don't know.  I've always been at one end or the
4  other, so....
5    Q   Yeah, you can't be at both ends.  How
6  about the auxiliary lock, do you know what that
7  does?
8    A   The lock on the side?
9    Q   Yeah.  (Indicating.)
10   A   If it's still -- still the same, it
11 just -- it locks the -- it locks the stretcher in
12 that position.
13   Q   Okay.  And does that move into place
14 when the legs come down?
15        MR. LEEDBERG:  Objection as to form.
16   A   I believe it's an automatic click, and I
17 never really paid attention to what position.  I
18 just believe it lock -- I believe it moves
19 automatically.
20   Q   Okay.  And is that a device that would
21 release the legs so that they would fold?
22   A   During loading or unloading?
23   Q   Well, you can't reach it while you're
24 loading; is that right?

Page 56

1        MR. LEEDBERG:  Objection as to form.
2    A   You have to walk around to that side of
3  the stretch -- you can't reach it from the head or
4  the foot.
5    Q   Yeah.  Okay.  So what do you do to it to
6  load it into the -- what do you do to load it into
7  the ambulance; you have to release that lever?
8        MR. LEEDBERG:  Objection as to form.
9    A   Yes, you have to unlock it, yes.
10   Q   Okay.  And then you push it into the
11 ambulance; is that what you're saying?
12   A   That is correct.
13   Q   Okay.  And when you're coming out of the
14 ambulance and the legs lock down, that lever moves
15 into a locked position?
16   A   That is -- that is correct.  I've never
17 watched it.  I believe it does, though.  It's
18 locked when you have to load it back, so....
19   Q   Okay.  Did anyone ever say to you
20 anything about that lever being bent?
21   A   Never heard anything about that lever,
22 no.
23   Q   Never heard anything at all about it
24 bent or not bent; is that right?

Page 57

1    A   Nobody said anything to me about the
2  level, no.  I don't recall -- I don't remember
3  anything about the lever.
4    Q   All right.  Thank you.
5        MR. DURSO:  Okay, I think we're
6  almost done.  Just give me two minutes here
7  and....
8        (Pause.)
9        MR. DURSO:  Okay, I think I'm all
10 done with the questions I have for the witness at
11 this time, but I just want to say for the record
12 that if there's anything significant in the e-mail
13 if we get it, then I may have to ask him to come
14 back.
15        MR. LEEDBERG:  Sure.  We'll leave it
16 open.
17        MR. DURSO:  Or I may have to go down
18 and question you in Costa Rica.
19        THE WITNESS:  Well, be more than
20 happy to have you come down and question me down
21 there.  You can all come down.
22        MR. LEEDBERG:  If I do locate the
23 e-mail if it's still available and it's not
24 privileged, work product, or prepared in

15  (Pages 54 to 57)

1bfeaddf-41e8-460f-bbec-cd5060e446f0

Dominick Clark Tolson                                        09/19/2006

Page 58

1  anticipation of litigation, then we'll turn it
2  over --
3         MR. DURSO:  Yeah.
4         MR. LEEDBERG:  -- and if there's any
5  questions you have, we'll be happy to --
6         MR. DURSO:  Sure.  I understand.
7         MR. LEEDBERG:  -- meet again.
8         MR. DURSO:  Okay.  Thank you.
9         (Off record at 2:35 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 60

1              E R R A T A  S H E E T
2        I, DOMINICK CLARK TOLSON, the
3  within-named deponent do hereby certify that I
4  have read the foregoing transcript of my
5  testimony, and further certify that said
6  transcript is a true and accurate record of said
7  testimony (with the exception of the following
8  corrections listed below):
9  Page      Line            Correction
10  ____    ____    _____
11  ____    ____    _____
12  ____    ____    _____
13  ____    ____    _____
14  ____    ____    _____
15  ____    ____    _____
16  ____    ____    _____
17  ____    ____    _____
18  ____    ____    _____
19
20      Signed under the pains and penalties of
21  perjury this      day of            , 2006.
22
23      _____
24           DOMINICK CLARK TOLSON

Page 59

1              C E R T I F I C A T E
2  COMMONWEALTH OF MASSACHUSETTS
3  BRISTOL, SS
4
5        I, Lori-Ann London, Registered
6  Professional Reporter and Notary Public in and for
7  the Commonwealth of Massachusetts, do hereby
8  certify:
9        That, DOMINICK CLARK TOLSON, the witness
10  whose deposition is hereinbefore set forth, was
11  duly sworn by me and that such deposition is a
12  true record of the testimony given by the witness
13  to the best of my knowledge, skill, and ability.
14        I further certify that I am neither
15  related to, nor employed by, any of the parties in
16  or counsel to this action, nor am I financially
17  interested in the outcome of this action.
18        IN WITNESS WHEREOF, I have hereunto set
19  my hand and seal of office this 2nd day of October
20  2006.
21        _____
22        Lori-Ann London, RPR
23        Notary Public
24  My commission expires: 6/15/2012

LegaLink Boston, a Merrill Communications Company
(617) 542-0039

1bfeaddf-41e8-460f-bbec-cd5060e446f0