UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH H. KORAN, and KIMBERLY KORAN, Individually and on Behalf of ANA KORAN, JOSEPH KORAN, JR. and ERIK KORAN, Minors, <br>     Plaintiffs <br><br> v. <br><br> ELIZABETH WEAVER, and TOWN OF SHERBORN, <br>     Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> )   C. A. No. 05-11454-RGS <br> ) <br> ) <br> ) <br> ) <br> ) |

# PLAINTIFFS' RESPONSE TO DEFENDANT TOWN OF SHERBORN'S CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 AND PLAINTIFFS' CONCISE STATEMENT OF MATERIAL FACTS

### I.  PLAINTIFFS' RESPONSES TO DEFENDANT'S STATEMENTS

Plaintiffs respond to each of the defendant's Statements of Undisputed Material Facts as set forth below. Where plaintiffs indicate that a particular statement is "undisputed," it is only for purposes of summary judgment, it is not an admission that the statement is true or correct, and plaintiffs specifically reserve the right to contest all such statements at the trial of this action.

1.  On February 6, 2003 the defendant employees, Town of Sherborn Fire & Rescue Emergency Medical Technicians [hereinafter "EMT's"], transported the plaintiff to Metro-West Medical Center in Natick, Massachusetts after responding to a motor vehicle accident involving the plaintiff. Dep. of Pl., pp. 95-96 (attached as Exhibit 1); Dep. of EMT Tolson, p. 6 (employment status), pp. 35-36 (attached as Exhibit 2); Dep. of EMT Christensen, p. 7 (employment status), pp. 55-57 (attached as Exhibit 3).

**RESPONSE:**  UNDISPUTED

2.  While the EMT'S were unloading the plaintiff from the ambulance, the cot [a/k/a a "stretcher"] onto which the plaintiff was strapped fell to the ground, although staying upright, due to a mechanical failure involving the cot [hereinafter referred to as the "Incident"]. Pl. Letter Dated Feb. 10,2003 (attached as Exhibit 4); Dep. of Pl., pp. 95-96 (attached as Exhibit 1; Dep. of EMT Tolson, pp. 35-36 (attached as Exhibit 2); Dep. of EMT Christensen, pp. 55-57 (attached as Exhibit 3).

**RESPONSE:** DISPUTED. See Plaintiffs' Presentment Letter, pursuant to M.G.L. c. 258, § 4, is attached as Exhibit A to the Complaint: "While removing Mr. Koran from the ambulance, *the stretcher was dropped* and it slammed to the ground." [Emphasis added]; Mr. Koran testified at his deposition that he did not have any "indication that there was something wrong with the cot." Joseph Koran Dep., p. 52; Scott Christensen had "No idea" why it collapsed. Christensen Dep., p. 57; and Dominick Tolson was not concerned that it would drop again. Tolson Dep., p. 46 - 47.

3.   The cot involved in the Incident is a Model 93ES Squadmate Ambulance Cot, is designed so that as it is pulled out of the ambulance, a sub-frame with four wheels drops down to ground level and automatically locks into place so that patients can be transferred at an appropriate level for the operators rolling the cot. Dep. of EMT Tolson, pp. 35-36 (attached as Exhibit 2); Dep. of EMT Christensen. pp. 55-57 (attached as Exhibit 3); Dep. of Deputy Chief John Dowse, pp.23-24 (attached as Exhibit 5); Squadmate Users' Manual, p. 19 (attached as Exhibit 6); Dep. of Cot Repair Technician Paul Bonang, pp. 32-33 (attached as Exhibit 7).

**RESPONSE:** UNDISPUTED, that it is designed to operate in the manner stated.

4.   The only known eyewitnesses to the Incident are the plaintiff Joseph Koran and the two EMT'S. Pl's L.R. 26(a)(1) Disclosures, § A (attached as Exhibit 8).

**RESPONSE:** UNDISPUTED

5.   The defendant purchased the cot new in 1997 and it had never failed to function prior to February 6, 2003. Dep. of Deputy Chief John Dowse, pp. 38-39 (attached as Exhibit 5); Dep. of Tolson, p. 39 (attached as Exhibit 2); Dep. of EMT Christensen. p. 87 (attached as Exhibit 3); Dep. of Fire Captain Pamela Dowse. p. 20 (attached as Exhibit 9); Aff. of Chief McPherson, ¶ 3 (attached as Exhibit 10).

**RESPONSE:** UNDISPUTED

6.   The defendant routinely inspected the cot and tested its functionality when conducting weekly ambulance inventory supply inspections, including one such inspection on February 2, 2003, just four days pre-loss, and such inspections never revealed a mechanical problem with the cot. Dep. of Deputy Chief John Dowse, pp. 20-21, 38-39 (attached as Exhibit 5); Ambulance Checklists, 2/22/01-2/2/03 (attached as Exhibit 11); Aff. of Chief McPherson, ¶¶ 4, 9-11 (attached as Exhibit 10).

**RESPONSE:** UNDISPUTED

7.   The Massachusetts Department of Public Health ["MDPH"] Licensing Division conducted mandatory annual inspections of all of the defendant's Fire Department's equipment, including visual and functional inspections of the cot, and no such inspection ever revealed a problem with the cot. Dep. of Deputy Chief John Dowse, pp. 39 (attached as Exhibit 5); MDPH Ambulance Inspection Report Forms, 2/10/97-4/4/03 (attached as Exhibit 12); Aff. of Chief McPherson, ¶ 11

(attached as Exhibit 10).

**RESPONSE:** UNDISPUTED

8.   Sherborn Deputy Lieutenant Jonathan Dowse testified that he inspected the stretcher the day after the Incident on February 7, 2003, and discovered that it was not functioning properly. Deputy Dowse's closer inspection revealed for the first time that an "auxiliary lock lever" was bent. Deputy Dowse straightened the lever and the cot functioned properly. Dep. of Deputy Chief John Dowse, pp. 12-14, 16-17 (attached as Exhibit 5).

**RESPONSE:** UNDISPUTED

9.   Paul Bonang, a manufacturer-trained and certified cot repair technician of four years, replaced the auxiliary lock lever on February 11, 2003, and has testified that a bent auxiliary lock lever would cause the cot to malfunction as it had on February 6, 2003. Dep. of Bonang, pp. 7-9, 16-17, 33-34 (attached as Exhibit 7).

**RESPONSE:**  UNDISPUTED, but he also testified that the stretcher would drop if an EMT squeezed the foot end handle.  Bonang Dep., p.  41.

10.   Since Mr. Bonang replaced the auxiliary lock lever on February 12, 2003, the cot has performed flawlessly right up to present-day. Aff. of Chief McPherson, ¶ 8 (attached as Exhibit 10).

**RESPONSE:** UNDISPUTED

11.   The auxiliary lock lever extends underneath the mattress and frame of the cot, and only the end handle is visible from the top view. Squadmate Users' Manual, pp. 7, 9 Figure D (attached as Exhibit 6).

**RESPONSE:** UNDISPUTED

12.   There is no evidence regarding how and/or when the auxiliary lock lever was bent. Dep. of Fire Chief McPherson, p.28 (attached as Exhibit 13); Aff. of Chief McPherson, ¶ 7 (attached as Exhibit 10).

**RESPONSE:** DISPUTED.  There is evidence that the handle was not bent on the day before the accident, see ¶ 5 & 6, *supra,* and ¶ 13, *infra*, and there is evidence that it was bent on the date following the accident. See ¶ 8, *supra*.  There is also testimony from Paul Bonang that, in his experience, the placement of the chest restraint strap has resulted in the handle becoming bent, and that this is "due to abuse of the stretcher."  Bonang Dep., p.  41, 56 - 57.

13.   Chief Neil McPherson used the cot during a call on February 5, 2003, the day before the Incident, and it performed flawlessly. Aff. of Chief McPherson, ¶ 5 (attached as Exhibit 10);

Sherborn Fire & Rescue Call Log (attached as Exhibit 14).

**RESPONSE:** UNDISPUTED

14. The defendant denies knowing that the auxiliary lock lever was bent prior to Deputy Chief Dowse's inspection on February 7, 2003, and there is no evidence to the contrary. Aff. of Chief McPherson, ¶ 6 (attached as Exhibit 10).

**RESPONSE:** UNDISPUTED

15. There is no evidence to suggest that Sherborn had reason to know that the stretcher was damaged, faulty or would otherwise not perform as expected on February 6, 2003.

**RESPONSE:** UNDISPUTED

16. All available evidence on the issue supports that the EMT's had every reason to expect that on February 6, 2003 the cot would perform as flawlessly as it had since it was purchased in 1997.

**RESPONSE:** UNDISPUTED, with respect to their expectations only.

17. The only letter received by the defendant that purported to be presentment in compliance with the Massachusetts Tort Claims Act [MTCA] was a letter from Attorney Scott Joseph, representing plaintiff Joseph H. Koran, dated April 3, 2003. Pls.' Compl. (annexed to Complaint as Exhibit A).

**RESPONSE:** UNDISPUTED that there was only one letter, but DISPUTED that it was sent solely on behalf of Joseph Koran. The presentment letter states that Joseph, as a result of his injuries, "can no longer assist his wife with household duties and has difficulty managing his two small children."

18. The defendant received no presentment letter from plaintiffs Kimberly Koran, Ana Koran, Joseph Koran, Jr. and Erik Koran [hereinafter collectively referred to as the "consortium plaintiffs"] or a representative thereof. Aff. of Chief McPherson, ¶ 12 (attached as Exhibit 10).

**RESPONSE:** UNDISPUTED, as to Erik Koran, but DISPUTED as to the remaining plaintiffs. See ¶ 18, *supra*.

19. The plaintiff Erik Koran was born on October 20, 2004, more than 20 months after the Incident, and was thus not yet conceived as of the date of the Incident. Pl. Erik Koran's Answers to Interrogs., # 1 (attached as Exhibit 15).

**RESPONSE:** UNDISPUTED.

## II. PLAINTIFFS' CONCISE STATEMENT OF MATERIAL FACTS

4

1. Plaintiffs Complaint states, in paragraph 12: "Outside the hospital, upon removing Joseph Koran from the ambulance on a stretcher, the paramedics accidentally and negligently dropped him approximately four feet on to the ground on his back, causing him severe personal injuries."

2. In their Presentment Letter, sent pursuant to M.G.L. c. 258, § 4, which is attached as Exhibit A to the Complaint, plaintiffs state: "While removing Mr. Koran from the ambulance, the stretcher was dropped and it slammed to the ground."

3. Joseph Koran's claim is that defendant Town's employees negligently dropped him to the ground when they took him out of the ambulance. He does not claim that the stretcher was defective. Joseph Koran Dep., p. 52.:

   ```
   12  Q.  Did it seem like there was anything wrong with the
   13      cot to you at that point?
   14  A.  I had never been on it, so I couldn't judge if there
   15      was anything right or wrong.  I had never been on a
   16      cot in that situation.
   17  Q.  But did you perceive anything that might have given
   18      you an indication that there was something wrong
   19      with the cot?
   20  A.  Not at all.
   ```

4. Scott Christensen, one of the two Town employees who transported Joseph, stated that he did not know why the fall occurred. Christensen Dep., p. 57.:

   ```
   18   Q  Okay.  What happened next?
   19   A  As I pulled it away, the stretcher
   20      collapsed, not really collapsed, but it came down.
   21   Q  Okay.  And any idea why that happened?
   22   A  No idea.
   ```

5. The other Town employee, Dominick Tolson, had no concerns, after the accident, about the operability of the stretcher. Tolson Dep., p. 46 - 47.:

   ```
    6   Q  Okay.  Did you examine the stretcher at
    7  all after it was back in the ambulance?
    8   A  I don't remember if we did or not.  I
    9  don't remember offhand.
   10   Q  Okay.  When you get back to the station,
   11  do you remember whether or not you examined the
   12  stretcher?
   13   A  I don't remember, no, whether or not we
   14  did.
   15   Q  Did you have a concern about whether or
   16  not the stretcher was going to operate properly
   17  after that?
   18   A  Did I?  No.
   ```

```
19    Q   Well, if you -- say you had another call
20  that evening, you would have had to use that
21  stretcher; is that right?
22    A   Yes, that's correct.
23    Q   Okay.  So were you concerned that it
24  might drop again?
                        47
1    A   No, no, I don't -- I don't recall having
2  a concern about that.
3    Q   Okay.  Do you remember talking to anyone
4  when you got back about what had happened?
5    A   What do you mean about what happened,
6  about the call with the stretcher?
7    Q   Yeah, with the stretcher, yeah.
8    A   No, I don't think we -- no, I don't
9  remember saying -- talking to anybody about that.
```

6.  Paul Bonang is an outside technician who worked on the stretcher after the accident.  He was unable to say whether or not a locking lever had malfunctioned.  Bonang Dep., p. 54 - 56.:

```
21   Q.  I believe you testified earlier that you
22  couldn't particularly recall why you replaced the
23  auxiliary lock lever on this cot, correct?
24     A.  That's correct.
                        55
1    Q.  So you don't recall if it was bent, right?
2     A.  No, I do not.  The only thing I can say is
3  that, like I said, I wouldn't have replaced it if
4  there was nothing wrong with it.
5    Q.  Hypothetically speaking, if they said that
6  this thing had folded to the ground for an unknown
7  reason, might you replace it out of caution?
8     A.  Yes.
9    Q.  So that's a situation where there might not
10  necessarily be anything wrong with it?
11     A.  It's possible.  Like I said, this is three
12  and a half years ago.
13    Q.  Sure.
14     A.  It's speculation.
15    Q.  Would that explain maybe why you marked it
16  good before and after your service?
17     A.  It's possible.  If I remember correctly,
18  they said they bent it and tried to straighten it
19  out, and when I looked at it, and I'm just
20  speculating, but I'm pretty sure this is the place
21  where I was at, and the guy that was on site said
22  they had bent it and straightened it out, and when I
23  looked at it, it seemed to be normal, but I replaced
24  it anyway.
                        56
1    Q.  Did this individual say when it was bent?
```

      2   A.  No.
      3   Q.  And he didn't say when he straightened it
      4  out?
      5   A.  No.

7.    Bonang offered an alternate explanation of how the accident may have happened. Bonang Dep., p. 40.:

      2  Q.  But coming out, the wheels dropping
      3  automatically pulls the auxiliary lock into the
      4  locked position?
      5   A.  That's correct.
      6   Q.  If it's functioning correctly, then it
      7  can't drop, because the auxiliary lock is in place?
      8   A.  That's correct.
      9   Q.  But if it's not locked for some reason or
   10  if it's bent and doesn't lock, that's the way in
   11  which they could drop down to the lowest level?
   12   A.  If the foot end handle is squeezed, yes.
   13   Q.  Okay. So in order for the stretcher to
   14  drop, two things have to happen, the auxiliary lock
   15  must be unlocked or locked in its proper location
   16  and someone must squeeze the foot end handle?
   17   A.  That's correct.

8.    Bonang also explained how the auxiliary lock could become bent:

    8   Q.  Well, let's say, for the sake of argument,
    9  that there's some problem with that auxiliary
   10  locking device that's bending. I think you said to
   11  me that you replaced more than one of them that was
   12  bent; is that correct?
   13   A.  That's correct.
   14   Q.  Isn't that something that Ferno would need
   15  to know about?
   16   A.  No, because it doesn't happen all the time.
   17  To the best of my knowledge, it's due to abuse of
   18  the stretcher, something getting jammed in there,
   19  maybe a restraint or something.
   20   Q.  What do you mean; like a strap?
   21   A.  Yes. That's what they call in here, would
   22  be the actual patient restraint.
Bonang Dep., p. 41.
   18   Q.  You mentioned something about the
   19  possibility of the strap getting caught in the
   20  lever, correct?
   21   A.  Yes.
   22   Q.  Is there a strap that goes near this lever?
   23   A.  Yes.
   24   Q.  What is that strap, what does it do?

                       57

```
 1    A.  That's the chest restraint.
 2    Q.  Do you know how many times you replaced
 3 bent levers that you suspected the chest restraint
 4 played a role?
 5    A.  A handful.
 6    Q.  What is that?
 7    A.  Five or six times.
 8    Q.  What made you suspect that?
 9    A.  Just in the way it was bent.  I don't
10 automatically assume it was the restraint.  It could
11 be a number of things.
12    Q.  Okay.
13    A.  It could be a number of things that got
14 jammed in there.
15    Q.  What made you suspect the restraint?
16    A.  That's the most common.  That's usually
17 what's in the general vicinity.
```
Bonang Dep., p. 56 - 57.

9.  Plaintiffs' presentment letter states that Joseph Koran, as a result of his injuries, "can no longer assist his wife with household duties and has difficulty managing his two small children."

10. Plaintiffs' Complaint, paragraphs 22 through 24, along with the relevant portions of defendant's Answer following each such paragraph, state as follows:

   22.  On April 22, 2003, the plaintiffs, through their attorneys at the time, served a notice and presentment letter on Sherborn, pursuant to G.L. c. 258, et seq.  A true and accurate copy of such letter is attached and hereto as Exhibit A.

   ANSWER:  As to the allegations contained in Paragraph 22, the defendant, Town of Sherborn, admits only that the Sherborn Town Clerk received a letter from Scott A. Joseph on behalf of the plaintiff, but neither admits nor denies the contents of the letter as it is a written document which speaks for itself.  The defendant denies that this letter complied with the presentment requirements for submission of a claim based upon a negligence under M.G.L. c. 258, § 4 and, therefore, calls upon the plaintiff to prove same.

   23.  Sherborn effectively denied the plaintiffs' claim by failing to deny such claim in writing within six months after the date upon which the claims were presented, per G.L. 258, § 4.

   ANSWER:   The defendant, Town of Sherborn admits the allegations in paragraph 23 of the Complaint to the extent it alleges that the plaintiff's claim for money damages was denied.  The defendant denies each and every other allegation in paragraph 23 of the Complaint.

   24.  The plaintiffs in all respects have fully complied with all of the conditions precedent to the commencement of this action.

   ANSWER:   Denied.

11. Defendant's Fifteenth Defense, the only affirmative defense which addresses the subject

of presentment, states: "The defendant, Town of Sherborn, states that the Plaintiffs have failed to comply with presentment requirements of M.G.L. c. 258 and/or made inadequate presentment of their claim."

By their Attorney,

_____
CARMEN L. DURSO, ESQUIRE
B.B.O. # 139340
175 Federal Street, Suite 1425
Boston, MA 02110-2241
617-728-9123
January 31, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party electronically and by mail, on January 31, 2007.

_____
CARMEN L. DURSO