UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 05-11454 RGS

—————————————————————

|  |  |
|---|---|
| JOSEPH H. KORAN, and KIMBERLY KORAN, | ) |
| Individually and on Behalf of ANA KORAN, | ) |
| JOSEPH KORAN, JR. and ERIK KORAN, Minors, | ) |
|     Plaintiffs, | ) |
| v. | ) |
|  | ) |
| ELIZABETH WEAVER and | ) |
| TOWN OF SHERBORN, | ) |
|     Defendants. | ) |

—————————————————————

## DEFENDANT, TOWN OF SHERBORN'S
## MOTION TO COMPEL

Pursuant to Rule 37(a) of the Federal Rules of Civil Procedure, the defendant, Town of Sherborn [hereinafter "defendant"], hereby moves the Court to compel the plaintiff to make further disclosures under Rule 26(a) of the Federal Rules of Civil Procedure and/or to fully respond to the defendant's interrogatories and requests for production within 21 days of the Court's Order.  As grounds therefore, the defendant states that the amended discovery deadline passed on October 30, 2006, and identifiable medical and lost wage data has yet to be produced despite several requests by the defendant in writing, over the telephone and in person.

In further support of this Motion the defendant attaches a separate memorandum of reasons pursuant to Local Rule 7.1(B)(1), and the necessary certification pursuant to Local Rule 7.1(A)(2).

WHEREFORE, pursuant to rule 37(a) of the Federal Rules of Civil Procedure, the defendant moves the Court to compel the plaintiff to provide the documents identified above, and any other outstanding discoverable documents and information, within 21 days of the Court's

1

Order.

Respectfully submitted,

The Defendants,
TOWN OF SHERBORN,
By their attorneys,

PIERCE, DAVIS & PERRITANO, LLP

Michael D. Leedberg, BBO #660832
Ten Winthrop Square
Boston, MA 02110
(671) 350-0950

April 19, 2007

## CERTIFICATE OF SERVICE

I, Michael D. Leedberg, attorney for the defendant in the above-entitled action, hereby certify that I served upon counsel of record a copy of the foregoing by electronically filing it and all related documents with the U.S. District Court, on this 19th day of April 2007.

Michael D. Leedberg

2

# EXHIBIT A

## Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
------------------------------
                             *
JOSEPH H. KORAN, AND          *
KIMBERLY KORAN, IND. AND      *
ON BEHALF OF ANA KORAN,       *
JOSEPH KORAN, JR., AND        *
ERIC KORAN, MINORS            *
    Plaintiffs       * CA No. 05-11454 RGS
vs.                           *
                             *
ELIZABETH WEAVER, AND         *
TOWN OF SHERBORN              *
    Defendants                *
------------------------------
```

DEPOSITION OF:  JOSEPH H. KORAN

BLACK CETKOVIC & WHITESTONE

200 Berkeley Street

Boston, MA 02116

July 21, 2006

Commenced at 10:49 a.m.

LESLIE A. D'EMILIA
Court Reporter

## Page 2

1  APPEARANCES:
2  Representing the Plaintiff, Joseph H. Koran:
   LAW OFFICE OF CARMEN L. DURSO
3     Suite 1425
      175 Federal Street
4     Boston, MA 02110-2241
      (617) 728-9123
5     dursolaw@tiac.net
6  Representing the Defendant, Elizabeth Weaver:
   BLACK CETKOVIC & WHITESTONE
7     200 Berkeley Street
      Boston, MA 02116
8  BY: DRAGAN CETKOVIC, ESQ.
      (617) 236-1900
9
10 Representing the Defendant, Town of Sherborn:
   PIERCE, DAVIS & PERRITANO, LLP
11    Ten Winthrop Square
      Boston, MA 02110-1257
12 BY: MICHAEL D. LEEDBERG, ESQ.
      (617) 350-0950 EXT. 105
13
14
15
16
17
18
19
20
21
22
23
24

## Page 3

1            INDEX
2  Witness      Direct Cross Redirect Recross
   JOSEPH H. KORAN
3
   By Mr. Cetkovic     5
4  By Mr. Durso
   By Mr. Leedberg      36
5            EXHIBITS
   Number              Page
6
   1   MetroWest Medical Records    48
7  2   Sherborn & Rescue Records    56
   3   Sherborn Fire Dept. Records  57
8  4   Answers to Interrogatories   88
   5   Report 2-10-03               95
9  6   Medical records              104
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1      MR. CETKOVIC:  Can we agree to the
2  stipulations that all objections and motions to
3  strike are reserved until the time of trial or
4  motion for summary judgment, whichever comes first?
5      MR. DURSO:  Sure.
6      MR. CETKOVIC:  And how about signing the
7  transcript?
8      MR. DURSO:  Waive the notary, 30 days.
9      MR. CETKOVIC:  Any other preliminary
10 matters?
11     MR. DURSO:  No.
12         STIPULATION
13     It is hereby stipulated and agreed by and
14 between counsel for the respective parties that the
15 sealing and filing of the deposition in court are
16 waived; that the witness shall read and sign the
17 deposition transcript under the pains and penalties
18 of perjury, within thirty days of receipt thereof.
19     It is further stipulated that all objections,
20 except as to the form of the question, and all
21 motions to strike are reserved until the time of
22 trial.
23         JOSEPH H. KORAN,
24 having been satisfactorily identified by the

Page 5

1    production of his driver's license and duly sworn by
2    the Notary Public, testified under oath as follows:
3                DIRECT EXAMINATION
4    BY MR. CETKOVIC:
5    Q. Sir, could you state your full name, please?
6    A. Joseph Henry Koran.
7    Q. Mr. Koran, my name is Dragan Cetkovic, and I
8       represent Elizabeth Weaver in this personal injury
9       lawsuit that you brought. I'm going to ask you a
10      series of questions today. This is a deposition
11      proceeding. Let me ask you first, have you ever
12      been through a deposition before this one?
13   A. No.
14   Q. Just a couple of ground rules. Let me finish my
15      question before you start answering. Okay?
16   A. Okay.
17   Q. You have to give verbal answers so the stenographer
18      can take it down. In other words, "uh-uh" or
19      "uh-huh," you never know how that's going to come
20      out in the transcript. Do you understand that?
21   A. I do.
22   Q. If you at any time need a break or want to talk to
23      your attorney, just let us know. All right?
24   A. Okay.

Page 6

1    Q. What is your current residential address?
2    A. 6101 Twain Drive, Newmarket, Maryland 21774.
3    Q. And how long have you been living at this address?
4    A. October 31, 2005 I moved in.
5    Q. Is it a house?
6    A. Yes.
7    Q. Do you own it?
8    A. Yes.
9    Q. What is your Social Security number?
10   A. 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.
11   Q. Are you married?
12   A. Yes.
13   Q. Your spouse's name?
14   A. Kimberly Ann Koran.
15   Q. Do you have kids?
16   A. Yes.
17   Q. How many?
18   A. Three.
19   Q. Do you currently work?
20   A. Yes.
21   Q. What do you do?
22   A. I'm a senior manager of supplies, seafood and
23      poultry, for a management company.
24   Q. What's the name of the management company?

Page 7

1    A. Sodexho.
2    Q. How's that spelled?
3    A. S-o-d-e-x-h-o.
4    Q. And how long have you been with Sodexho?
5    A. Three weeks.
6    Q. What is your salary?
7    A. Current salary is $85,000 a year.
8    Q. Do you have a bonus or profit sharing?
9    A. Yes.
10   Q. What is that?
11   A. Bonus is up to 20 percent of my salary.
12   Q. So you've been in this job just for three weeks;
13      correct?
14   A. Correct.
15   Q. What did you do before?
16   A. Worked for US Foodservice as a category manager of
17      seafood.
18   Q. And they're similar duties?
19   A. Yes.
20   Q. Currently where's your office located physically?
21   A. Gaithersburg, Maryland.
22   Q. Gay?
23   A. G-a-i-t-h-e-r-s-b-u-r-g.
24   Q. And as a manager what are your duties?

Page 8

1    A. Negotiate purchasing contracts.
2    Q. Does that involve lots of travelling?
3    A. Can you define lots?
4    Q. What is currently the percentage of your time spent
5       in travel?
6    A. 20 percent.
7    Q. Tell me a little bit about your educational
8       background?
9    A. I graduated from high school in 1980. Attended--
10   Q. Which one?
11   A. --North High in East Lake, Ohio. I went to
12      Defiance College for two years in Defiance, Ohio.
13   Q. Did you get a degree?
14   A. No. Went to University of Akron for two years in
15      Akron, Ohio. Did not complete my degree.
16   Q. Did not?
17   A. No. I'm currently enrolled at the
18      University of Phoenix on-line.
19   Q. For what degree?
20   A. Business management.
21   Q. For bachelor's degree?
22   A. Yes.
23   Q. When do you expect to complete that?
24   A. 2007.

Page 9

1  Q. Your date of birth and place?
2  A. November 25, 1961, Painesville, Ohio.
3  Q. In 2003 were you employed?
4  A. Yes.
5  Q. Who did you work for?
6  A. Schwan's Food Service.
7  Q. And where are they out of?
8  A. Marshall, Minnesota.
9  Q. Where was your office?
10 A. Cicero, New York.
11 Q. What's there?  Is it an office building, or do you
12    work out of your house?
13 A. In New York?
14 Q. Yes.
15 A. I worked out of my house.
16 Q. What was your position?
17 A. Zone manager.
18 Q. And what was your zone?
19 A. The northeast United States.
20 Q. And what were your duties?
21 A. Managed a team of regional managers.  I had five
22    regional managers and managed the P & L for the
23    entire zone for foodservice sales.
24 Q. What's P & L?

Page 10

1  A. Profit and loss statement.
2  Q. So you were more in the managerial position rather
3    than, you know, actually selling or purchasing or
4    whatever?  Am I correct?
5  A. I was in a management position, yes.
6  Q. And what was the percentage of your travel outside
7    of your office at that time?
8  A. 80 percent.
9  Q. And what would you do on these business trips?
10 A. Met with--worked with my regional managers.  Met
11    with clients, brokers.
12 Q. Were you purchasing food for Schwan's, or you were
13    selling their food?
14 A. Selling products we manufactured.
15 Q. And what were the products?
16 A. Three categories, pizza, Asian, southwestern.
17 Q. Frozen food?
18 A. Yes.
19 Q. How much were you making at that time in 2003?
20 A. 95,000.
21 Q. Any bonuses?
22 A. Yes, up to 25 percent of my salary.
23 Q. Do you recall what was your bonus in 2002?
24 A. I do not recall what my bonus was.

Page 11

1  Q. Salary was the same?
2  A. Salary was at 92,000 in 2002.  I received an
3    increase in 2003.
4  Q. Did you have any other compensation from your
5    company other than salary and bonus?
6  A. I had a company vehicle.  I don't know if that was
7    considered compensation.
8  Q. Anything else?  Any other perks?
9  A. I guess I would ask to define what perks are.
10 Q. Benefits?
11 A. Well, there was a percentage of health benefits that
12    were paid if that's what you're asking.
13 Q. Health.  Did you at that time in 2003 have any other
14    source of income?
15 A. No.
16 Q. On February 6, 2003 you were on business in
17    Massachusetts; am I correct?
18 A. Correct.
19 Q. What was your mission?  What was your business
20    purpose?
21 A. I had a meeting with a broker and my regional
22    managers.
23 Q. Where was the meeting scheduled?
24 A. At the Sherborn Inn.

Page 12

1  Q. Where?
2  A. In Sherborn, Massachusetts.
3  Q. Had you been there before, before this trip?
4  A. No.
5  Q. You lived at that time in Cicero, New York?
6  A. Correct.
7  Q. Did you travel that day, February 6th?
8  A. Yes.
9  Q. How did you travel from New York to Massachusetts?
10 A. I drove a rented vehicle.
11 Q. What was the vehicle?
12 A. A Ford Expedition.
13 Q. Is that the biggest SUV in the Ford's line-up?
14 A. I'm not familiar with their specifications, so I
15    can't answer that.
16 Q. Have you driven an Expedition before this day?
17 A. Yes.
18 Q. You said you had an employee's vehicle also?
19 A. Yes.
20 Q. Was there any reason why you didn't take the
21    employee's vehicle?
22 A. Yes, there is.  I had a number of things that were
23    shipped to me from our corporate office that I
24    needed to take to the regional managers that I had

4 (Pages 13 to 16)

Page 13

1    there, that I could not carry in that vehicle.
2  Q. Did you have a valid driver's license at that time?
3  A. Yes.
4  Q. Issued by which state?
5  A. New York.
6  Q. Has your driver's license ever been revoked or
7    suspended?
8  A. No.
9  Q. Never in your life?
10  A. I don't recall. I may--not that I remember, not
11    that I remember.
12  Q. Have you at any time in your life maintained a
13    residence in Massachusetts?
14  A. No.
15  Q. What time did you start your trip on
16    February 6, 2003?
17  A. Probably about 10:00 in the morning.
18  Q. And what's the approximate time you arrived in
19    Sherborn?
20  A. I was arriving in Sherborn at the time of the
21    incident. Around 6:00, 6:30, in that range.
22  Q. When was your meeting?
23  A. Where was my meeting?
24  Q. I'm sorry, when? When was your meeting scheduled

Page 14

1    for?
2  A. The meeting was scheduled for 6:30.
3  Q. Were you late for your meeting?
4  A. I was running behind.
5  Q. You had an incident that day when your vehicle hit
6    another vehicle; is that correct?
7  A. Yes.
8  Q. Could you describe how that happened?
9  A. I pulled into the Sherborn Inn, into the area, and
10    as I pulled up I noticed a sign that stated one-way,
11    and I was going the wrong way in the one-way. So I
12    had come to a stop. I looked in both side mirrors,
13    in which one side I could see a snow bank. The
14    other side I could see a clear parking lot. I
15    looked in the mirror out to look behind me. I saw
16    nothing behind me. I turned around and looked and
17    began to back up and bumped into a vehicle behind
18    me.
19  Q. What distance did you back up before you hit the
20    other vehicle?
21  A. Between three and five feet maximum.
22  Q. Have you heard beeping of the horn as you were
23    backing up?
24  A. No.

Page 15

1  Q. Were you talking on the cell phone at that time as
2    you were backing up?
3  A. No.
4  Q. So correct me if I'm wrong, you looked, but you
5    didn't see anyone behind you; is that correct?
6  A. Correct.
7  Q. You bumped into something; correct?
8  A. Correct.
9  Q. How did you learn that the other--that object in
10    which you bumped was the motor vehicle?
11  A. I got out of my vehicle to look behind me.
12  Q. Okay. And what did you see?
13  A. I saw that there was a car there.
14  Q. Can you describe that car?
15  A. It was a small vehicle. It was a Honda Civic.
16  Q. What did you do next?
17  A. I approached the door to see if the person behind me
18    was all right.
19  Q. And why did you do that?
20  A. Because I bumped the vehicle. I just wanted to be
21    sure that I didn't, you know, bump into it too hard
22    or anything. It didn't seem like it, but you never
23    know.
24  Q. So what was the first thing you did as you were

Page 16

1    approaching the other vehicle?
2  A. Well, I started walking towards the vehicle, and the
3    person in the other vehicle got out of their
4    vehicle.
5  Q. Can you describe that person?
6  A. It was an older woman, and you know, dressed--I
7    don't know. Her attire was very LL Bean like I
8    guess you would say.
9  Q. How tall was she?
10  A. I would say approximately five, two, five, three.
11  Q. And you said elderly lady; is that right?
12  A. Yes.
13  Q. Were you able to estimate her age at that time?
14  A. My guess was probably late 60s, early 70s.
15  Q. Did you say anything to her?
16  A. The first thing I said was, "Geez, I'm sorry, I
17    didn't even know you were there."
18  Q. Did she respond to that?
19  A. She did.
20  Q. What did she say?
21  A. She was--she started to yell at me in a very
22    aggressive manner, which took me by surprise.
23  Q. Do you remember any specific words that she said to
24    you?

Page 17

1  A. All I remember is she was very angry and was
2  yelling, and I was just shocked because she was
3  using some expletives that were--I would not find
4  characteristic of a 70-something year old or an
5  elderly woman to use.
6  Q. Could you tell us what words that she used?
7  A. She called me an asshole. She said, "Are you
8  stupid?" And she was went on--it was just the
9  aggressive nature of her yelling. It just did not
10  seem characteristic of a woman. My mother is close
11  to the same age.
12  Q. How tall you are?
13  A. Six foot.
14  Q. And were you afraid for your safety at that time?
15  A. No.
16  Q. You were not scared of this older lady; correct?
17  A. I was shocked. I was not scared.
18  Q. Shocked meaning in a sense of surprise?
19  A. Yes.
20  Q. So what happened next? Did you--what did you do
21  next?
22  A. I said--you know, I apologized again. I said,
23  "Thank goodness nobody got hurt. Let's exchange
24  information." To which I went and got the

Page 18

1  appropriate insurance information out of my daytimer
2  in the car. She was gathering her information. We
3  exchanged information. Went back to our cars to
4  write down each other's information.
5  Q. Did she get out of the car? I think you testified
6  that she got out of the car and starting yelling at
7  you; is that correct?
8  A. Yes.
9  Q. So she gave you her paperwork. You gave her your
10  paperwork. What happened after that?
11  A. I recorded all the information about her. I don't
12  know what she did with my information, but I
13  recorded the information about her, and then I went
14  to return it to her vehicle while she was sitting in
15  her vehicle.
16  Q. Did you say anything to her at that time?
17  A. Yes, I said, "I'm sorry, I made a mistake."
18  Q. And what did she say, if anything?
19  A. She said, you know--I said, "I'm sorry, I made a
20  mistake. Haven't you ever made a mistake?" And she
21  said no. And I said, "You're telling me you never
22  made a mistake in your life," and she said, "No,"
23  and I just said, "Wow, that's amazing," and at that
24  point she threw her car in reverse, backed up. I

Page 19

1  started to step away because the two cars were close
2  together to give her clearance, and as I was backing
3  away, she took off and drove over my foot.
4  Q. Which one?
5  A. My left foot.
6  Q. What would you estimate this exchange, this--what
7  was the time frame from the moment you got out of
8  your car until she drove off?
9  A. Probably less than two minutes.
10  Q. Have you used any profane language towards her?
11  A. I was sarcastic, but I would say profane language
12  was probably after she ran over my foot I did swear.
13  Q. How were you sarcastic? Can you be a little more
14  specific, what exactly you said that was sarcastic?
15  A. I said, "Do you think that I drove here from
16  New York just to back into your vehicle," and she
17  said, "Yes," and I said, "You've got to be kidding
18  me." It was as if--I was just shocked at the fact
19  that she just was very aggressive in thinking that
20  this was intentional in some way when it was clearly
21  just an accident, a simple mistake that was easily
22  corrected.
23  Q. The accident then was your fault; is that correct?
24  A. Yes.

Page 20

1  Q. Did you at any time during this exchange of words
2  make any aggressive movements towards this lady?
3  A. No.
4  Q. And the exact location of this incident was in the
5  parking lot of the Sherborn Inn?
6  A. It was not in the parking lot. It was in the
7  driveway area that was leading to the parking lot
8  and near where the entrance circle was, the drop off
9  area was near that.
10  Q. So off the main street, but not in a parking lot?
11  A. Correct.
12  Q. And do you know what the street name is, the main
13  street there?
14  A. It's almost like an alley. It's Powder House or
15  Powder Home or something like that. I don't
16  remember the name of it. Something along that line.
17  Q. What happened to you when she ran over your left
18  foot?
19  A. Well, it knocked me to the ground.
20  Q. How did you fall to the ground?
21  A. I tried to--I was trying to back away, and it ran
22  over my foot, and I fell trying to move with--you
23  know, as the vehicle was rolling, I just rolled to
24  my left side and fell. It wasn't a fast fall

6 (Pages 21 to 24)

Page 21

1    because I was trying to brace myself from pulling my
2    leg out from underneath the vehicle, and you know,
3    as she was driving off.
4    Q. You said you braced yourself. So you landed on your
5    hands?
6    A. I landed on one hand and to the side.
7    Q. Did any part of your back or your shoulders come in
8    contact with the surface?
9    A. I believe my--I sat down on my left side on the
10   ground, but I caught myself with my left hand.
11   Q. What did you do next?
12   A. I had yelled, "Hey." I said, "What the hell are you
13   doing," and then she just kept driving.
14   Q. What did you do next?
15   A. I called 911.
16   Q. And who arrived?
17   A. Two police officers and an ambulance.
18   Q. What did you tell police officers?
19   A. I told the police officers that I had had a minor
20   traffic incident with a woman, and after exchanging
21   information she drove off aggressively and drove
22   over my foot. They asked if I could describe her,
23   and I gave them the information about her.
24   Q. What kind of footwear did you have on that day?

Page 22

1    A. I had a pair of loafers, tassel loafers.
2    Q. Did you look at your foot right after the accident?
3    A. Did I look--
4    Q. Yes.
5    A. I looked down at my foot, yes.
6    Q. Did you take off your shoe and stop to see--
7    A. No, no.
8    Q. Did you feel anything?
9    A. I felt pain, and I felt a shooting pain through my
10   foot.
11   Q. And did you tell police officers about pain in your
12   foot?
13   A. Yes.
14   Q. What treatment, medical treatment, did you receive
15   for your foot?
16   A. Physical therapy.
17   Q. For your foot?
18   A. Uh-huh.
19   Q. How long was the physical therapy?
20   A. It was in conjunction with physical therapy for
21   another injury related to the accident. So it was
22   about three months.
23   Q. Is this--this PT was for your back and foot?
24   A. Yes.

Page 23

1    Q. Let's first focus on the foot. Have you received
2    any treatment to your foot, specifically for your
3    foot, medical treatment?
4    A. Other than diagnosis?
5    Q. Tell me everything.
6    A. Yes, medical treatment. Yes, I have.
7    Q. Where was it?
8    A. I had x-rays--
9    Q. Okay. What--
10   A. --at the Natick Hospital. Physical exam at the
11   Natick Hospital. Physical exam by my primary care
12   physician when I got back to New York, and physical
13   exam by an orthopedic specialist that I was referred
14   to by my primary care.
15   Q. Okay. Let's start first with the x-rays. Did
16   anyone tell you what the x-rays have shown?
17   A. The attending physician at the ER said--yes, they
18   did give me the results of the x-rays.
19   Q. What did they tell you?
20   A. That it was not broken, no fractures.
21   Q. No fractures. Any injuries that they could see
22   there?
23   A. They said it was soft tissue damage.
24   Q. And the same doctor who read the x-rays looked also

Page 24

1    into your foot; correct?
2    A. Yes.
3    Q. Examined? Do you remember the name of the doctor?
4    A. No.
5    Q. Did they prescribe any treatment for your foot at
6    that time?
7    A. They told me to follow-up with my physician at home.
8    Q. Was your leg swollen, foot swollen?
9    A. Yes.
10   Q. Did they put ice or anything on it?
11   A. There was ice in the ambulance, and then they put it
12   into a boot.
13   Q. What kind of boot?
14   A. One of the hard sole, and then it wraps around, and
15   you lace it up style orthopedic boot.
16   Q. And were you able to drive from Massachusetts to
17   New York? Were you able to drive back?
18   A. Yes.
19   Q. After the conclusion of your business trip?
20   A. Yes.
21   Q. Were you wearing the boot as you were driving?
22   A. Yes.
23   Q. How long you wore the boot?
24   A. I wore the boot for about four or five days.

Page 25

1  Q. Do you currently have any special orthopedic shoe
2     for your left foot or anything like that?
3  A. No.
4  Q. Let's go back. You went back then to your primary
5     doctor in New York?
6  A. Yes.
7  Q. When did you see him or her?
8  A. The Monday that I returned. I returned on Sunday
9     afternoon. I saw the doctor on Monday morning.
10  Q. What was the reason you went to your primary doctor?
11  A. My foot and my back were both injured.
12  Q. Who was your primary doctor at that time?
13  A. Dr. Diaz, D-i-a-z.
14  Q. Is this the doctor that nobody can find his records?
15  A. His practice was dissolved. So I believe his
16     records were--are--they're having difficulty
17     locating them.
18  Q. Why was his practice dissolved?
19  A. He and his partner, from what I understand, did not
20     get along.
21  Q. Is he still a practicing physician in the
22     State of New York?
23  A. He is an attending physician at hospitals.
24  Q. Do you know where is he now?

Page 26

1  A. I know he's in the hospital system in New York, the
2     University's Hospital, I believe, in Syracuse, I
3     believe.
4  Q. Did you he examine your foot?
5  A. Yes.
6  Q. And what did he tell you?
7  A. He said that if the x-rays did not show any
8     fractures, then it was soft tissue, and I should
9     just keep it elevated when I can and let it run its
10     course and see how it works, and if it continues to
11     bother, you know, go to physical therapy.
12  Q. What was the next medical provider that you saw for
13     your foot?
14  A. The orthopedic doctor, Dr. Warren Wulff.
15  Q. And when was that?
16  A. That was about--I believe it was a couple months
17     later after going to physical therapy.
18  Q. So you went to physical therapy before you saw
19     Dr. Wulff?
20  A. Yes.
21  Q. And this physical therapy, who prescribed the
22     physical therapy?
23  A. Dr. Diaz.
24  Q. And this physical therapy, they treated your back;

Page 27

1     is that right?
2  A. Yes.
3  Q. And foot?
4  A. Yes.
5  Q. In every session both back and foot?
6  A. Yes.
7  Q. Was your foot still swollen at that time?
8  A. Not as swollen, no.
9  Q. Why is it you needed physical therapy on your foot?
10  A. I was having pain in the foot and having cramping
11     spasms in the foot.
12  Q. So after this physical therapy, that lasted, you
13     said, three months?
14  A. Yes.
15  Q. You saw Dr. Wulff?
16  A. While I was attending physical therapy I saw
17     Dr. Wulff.
18  Q. Did he examine your foot?
19  A. Yes.
20  Q. What did he say?
21  A. He said that his opinion was that it was soft tissue
22     damage or nerve damage, and there's really nothing
23     that can be done. I should just live with it.
24  Q. After you heard that, did you seek any other

Page 28

1     treatment for your foot?
2  A. At that point there was nothing else. You know,
3     from two different--a physical therapist and a
4     doctor, no, I didn't seek anything further.
5  Q. Does your foot bother you?
6  A. Yes.
7  Q. Do you walk with a limp?
8  A. At times.
9  Q. Do you use a cane?
10  A. No.
11  Q. And you don't use any orthopedic devices; correct?
12  A. No.
13  Q. Where in your foot is the pain?
14  A. The ball of my foot.
15  Q. How active were you before this accident in terms of
16     sports or any type of physical activities?
17  A. I had--I was a member at a gym, which I had gym
18     memberships prior to, and I had just joined a new
19     gym a month prior to the accident. I had a
20     little--I had two children at the time and was
21     extremely busy with them. They were both very
22     young. My daughter was only two. My son was less
23     than a year. So I was very busy and very physically
24     active with them.

Page 29

1  Q. Did the foot injury prevent you from doing anything
2     you did before the incident?
3  A. Going on walks and such, yes.
4  Q. Going on walks. Anything else?
5  A. I don't recall at this point, but I'm sure there
6     were other things.
7  Q. When you returned to New York on Sunday, and you
8     went to see the doctor on Monday, when did you go
9     back to work?
10 A. I did not go back to work until--well, I was on a
11    conference call Monday, but I was doing that from my
12    house and went physically back to work to meetings
13    the following week.
14 Q. And then that's in February of 2003. You lost your
15    job sometime in April of that year?
16 A. Yes.
17 Q. Why did you lose your job?
18 A. I don't know.
19 Q. Were you given a reason?
20 A. Yes.
21 Q. What was that?
22 A. The reason I was given was a misuse of a company
23    credit card.
24 Q. And at that time how long you been with this

Page 30

1     company?
2  A. 19 months.
3  Q. Do you claim in this case that you lost your job
4     because of your foot injury?
5  A. I lost my job--I guess I'm--can you rephrase the
6     question, or can you--
7  Q. Yes, I can try. Is it your claim in this case that
8     somehow your foot injury made you lose your job?
9  A. The result of my foot injury, yes, did cause me to
10    lose my job, yes.
11 Q. How's that? Can you explain that to me?
12 A. Because my company did not want me to have a
13    workmen's compensation case.
14 Q. And when did you make your worker's compensation
15    case?
16 A. I was--the day after the accident I contacted our
17    company office where they filed the claim for me.
18 Q. Are you sure about that?
19 A. I made the call the day after, yes.
20 Q. To report your injury?
21 A. Yes, to the department in our company that handled
22    that.
23 Q. But you returned to work shortly thereafter; is that
24    right? You returned to your work shortly

Page 31

1     thereafter?
2  A. Shortly thereafter what?
3  Q. Shortly after you reported your injury?
4  A. My--I worked the day after my injury because I had a
5     meeting to attend.
6  Q. Okay.
7  A. And I--so yes, I did.
8  Q. How long were you--how long where you stayed away
9     from work because of your foot injury?
10 A. I was physically unable--I don't know the exact
11    number of days. It's hard to give the exact number
12    of days. I don't know.
13 Q. Have you had a foot injury before this one?
14 A. No.
15 Q. How long were you on worker's comp.?
16 A. Still involved with workmen's comp. for medical
17    treatment.
18 Q. How long were you out of work on worker's comp.?
19 A. I was never paid compensation if that's what you're
20    asking.
21 Q. No, no, no. I'm asking--you weren't working for the
22    company after your termination; is that right?
23 A. Correct.
24 Q. Sometime in April of 2003?

Page 32

1  A. Correct.
2  Q. Then you were out of a job?
3  A. Correct.
4  Q. Didn't have a job to do; is that right?
5  A. Correct.
6  Q. You were receiving at that time worker's comp.; is
7     that right?
8  A. I was--I guess I don't--I need further definition of
9     that. If I was receiving workmen's compensation as
10    in the form of a compensation check during that time
11    period?
12 Q. Yes.
13 A. No.
14 Q. Have you ever received a worker's compensation check
15    as a result of this incident?
16 A. No. My medical expenses have been covered.
17 Q. But not wage? Wages were not covered?
18 A. No.
19 Q. Between 2000 and 2003 you were treated for gout?
20 A. Yes.
21 Q. What is that?
22 A. Apparently gout is--and I'm not a medical expert,
23    but apparently it is an increased uric acid level in
24    your blood system.

Page 33

1  Q. And where is the pain? Where does the pain manifest
2     itself?
3  A. In joints in your body.
4  Q. And what joints manifested in your body?
5  A. Big toe, ankle, knee, elbow, shoulder.
6  Q. Big toe on both feet?
7  A. Uh-huh.
8  Q. Yes?
9  A. Yes.
10 Q. And where did you treat for that?
11 A. That was my doctor in Cincinnati, and my doctor in
12    Syracuse.
13 Q. So is it fair to characterize that gout manifests
14    itself as a pain in the foot?
15 A. It can.
16 Q. And it did in your case?
17 A. Yes.
18 Q. Did you take any medications between 2000-2003 for
19    gout?
20 A. Yes.
21 Q. Does it continue to bother you?
22 A. No.
23 Q. Since 2003 you had no episodes?
24 A. No. Nor do I take medication for it either.

Page 34

1  Q. And I'm sorry, who was the doctor that treated you
2     for that? Do you remember the name?
3  A. That was Dr. Samaan.
4  Q. Can you spell that?
5  A. S-a-m-a-a-n. That was in Cincinnati and Dr. Diaz.
6  Q. Cincinnati?
7  A. Yes. Would you mind if I got up and walked around a
8     little bit?
9  Q. No, not at all, not at all.
10 A. I'm a little stiff sitting.
11       MR. DURSO: For the record, the witness
12    has some medication that he takes, and he needs to
13    move around occasionally because of that.
14       MR. CETKOVIC: That's fine.
15       MR. DURSO: Do you want to take a break?
16 A. Yeah, if we could just take a couple minutes, that
17    would be great.
18       (Brief break.)
19 Q. (Mr. Cetkovic) Are you currently on any medications?
20 A. Yes.
21 Q. What are you taking?
22 A. I take--for--I take Zocor, Tricor.
23 Q. What's Zocor for?
24 A. Zocor is for cholesterol.

Page 35

1  Q. Okay.
2  A. I take Tricor for triglycerides. I take Effexor,
3     which is an anti-anxiety, which was prescribed by
4     Dr. Diaz as a result of the accident. I take
5     Kadian, which is a morphine for pain management.
6  Q. For what pain?
7  A. For my back and my foot. I take an MSIR, which is a
8     morphine sulfate instant release for breakthrough
9     pain. I take Atacand for blood pressure. I take
10    Verapamil also for blood pressure. Two different
11    approaches. I take an 81 milligram of aspirin, and
12    as needed I take Cialis for erectile dysfunction as
13    a result of the injuries and medication.
14 Q. Did you take all these medications today that you
15    listed?
16 A. I took the Atacand. Oh, I'm sorry, I also take
17    Xanax as well in conjunction. I took the Atacand,
18    the Tricor, and the 81 milligram this morning. The
19    Kadian I take at night, and the morphine sulfate as
20    needed. So I did not take any of those this
21    morning.
22 Q. And did you take any anti-anxiety medications this
23    morning?
24 A. The Effexor? No, I took it last night, midnight.

Page 36

1  Q. And you said you take two Xanax and another one?
2  A. I take a Xanax, and I take the Effexor, which are
3     both for anti-anxiety prescribed since the accident.
4  Q. You did not have anti-anxiety medications before the
5     accident at any time, did you?
6  A. I had them once, yes, for reflux.
7  Q. What reflux?
8  A. I had acid reflux. So they tried that as a method
9     to treat it, but that was back in '99, I believe,
10    '98, '99.
11       MR. CETKOVIC: I think that's all I have.
12    I may have some follow-ups. Thank you.
13       CROSS EXAMINATION
14 BY MR. LEEDBERG:
15 Q. Good morning, Mr. Koran. Is it Koran or Koron?
16 A. Koran.
17 Q. Good morning. My name is Mike Leedberg. I
18    represent the Town of Sherborn in the lawsuit that
19    you've brought against them. I have a few questions
20    for you. First off, you listed some medications.
21    Just to be clear, have you taken any medications
22    today that might affect your ability to understand
23    my questions or answer them?
24 A. No.

Page 37

1  Q. You've explained in some detail the auto accident
2     with Ms. Weaver, and you mentioned that the police
3     and ambulance personnel came to the scene after you
4     called 911; correct?
5  A. Yes.
6  Q. Do you recall having any conversations, first of
7     all, with the officer?
8  A. There were two officers.
9  Q. Okay. Do you recall having any conversation with
10    the officers?
11 A. I did speak with them at the time they came, yes.
12 Q. Do you recall specifically what you said?
13 A. Verbatim, no.
14 Q. Can you give me a general idea of the nature of the
15    conversation?
16 A. I was asked to describe the person that I was
17    involved in the traffic incident with, at which time
18    I provided the name, address, all of her information
19    that we had shared with each other during the time
20    of our exchange of insurance information.
21 Q. And do you recall having any conversations with
22    the EMTs?
23 A. Quite a few actually.
24 Q. Okay. Can you describe those for me?

Page 38

1  A. Well, initially when they got there, there were
2     three of them that arrived at the scene because they
3     were telling me they were involved in a training
4     session. So the supervisor came to observe because
5     the two paramedics had both been away from active
6     calls for nearly six months. So he came to observe.
7  Q. Do you recall any other conversation?
8  A. With the paramedic that was in the back of the
9     ambulance with me on the way to the hospital who
10    kept bumping my foot every time he tried--in trying
11    to put ice, he tripped over the end of the gurney at
12    one point and bumped into my foot. While he was in
13    the back, he said, "You've got to forgive me. I'm a
14    little bit out of practice."
15 Q. Do you know that person's name?
16 A. No.
17 Q. What did he look like?
18 A. At this point I don't remember.
19 Q. Did he in any way injure your foot?
20 A. He bumped into it. I don't believe he injured it,
21    but he didn't make it feel better.
22 Q. So it didn't increase your pain?
23 A. It did at one point, yes.
24 Q. And how long did that increased pain last?

Page 39

1  A. It was just a sharp pain because he had bumped into
2     it.
3  Q. Was there any other increased pain as a result of
4     that?
5  A. As a result of him bumping into it? At that point
6     no.
7  Q. At any point?
8  A. He just--he put ice back on the--he put ice on it,
9     so no.
10 Q. So it was just that one fleeting exacerbation, and
11    then that was it?
12 A. When he bumped into it, yes.
13 Q. Any other conversations with the gentleman in the
14    back?
15 A. I asked them to contact the folks that were in the
16    restaurant and to let them know that I would not be
17    joining them for dinner because they initially had
18    said--you know, at first they said, "It's up to you,
19    if you want to go to the hospital," and I said,
20    "Well, my foot is killing me. I think I need to be
21    x-rayed. I don't know what's wrong with my foot."
22    So they said, "Well, that's up to you. We'll be
23    glad to take you there." But I had asked them to go
24    get the folks from the restaurant that I was joining

Page 40

1  for dinner, to let them know what was going on.
2  They brought them out so I could have a conversation
3  with the people that worked for me.
4  Q. Who did you speak to that worked for you?
5  A. I spoke with Michael Mondoor (phonetic), who was
6     my--one of my regional sales managers, and I spoke
7     with one of the brokers who came out, Jeff Cotton.
8  Q. Jeff Cott?
9  A. Cotton, C-o-t-t-o-n.
10 Q. Describe the conversations you had with
11    Mr. Mondoor (phonetic) and Mr. Cotton?
12 A. They came out and said, you know, "What happened?"
13    I said, "It's a long story, but can you let the
14    folks know that I won't be joining them for dinner.
15    If I do, it will be late. Get started. I'll join
16    you when I get there."
17 Q. As a result of the auto accident, the actual impact
18    with Ms. Weaver's vehicle, did you suffer any
19    injuries as a result of that?
20 A. Yes, my left foot.
21 Q. No. I'm just talking about the impact with the
22    vehicle, between the two vehicles?
23 A. Oh, no.
24 Q. Did you feel any back pain after she ran over your

Page 41

1    foot?
2  A. No.
3  Q. Did you feel any back injury of any type?
4  A. No.
5  Q. Any discomfort?
6  A. In my back, no.
7  Q. Describe the procedure as far as how they got you
8     into the ambulance?
9  A. They helped me step into it on my own. They helped
10    me up one person on each arm, and they had me step
11    up into the back.
12  Q. And how did you get onto the cot?
13  A. They had me sit down on it, and they helped me sit
14    down. They had the back angled at about a 45 degree
15    angle, and they helped me sit down on the cot, and
16    then that's when they removed my shoe and sock to
17    examine my foot.
18  Q. At any point did you become fully--did you lay down
19    on the cot?
20  A. No.
21  Q. So you sat on the cot the entire way?
22  A. Yes.
23  Q. And did your position change at any point as far as
24    on the cot?

Page 42

1  A. My seated position?
2  Q. No. At some point you were strapped into the cot,
3     were you not?
4  A. Yes.
5  Q. When was that?
6  A. When we were getting ready to leave the parking lot
7     and head towards the hospital, but I was left in the
8     same seated position that I had been in.
9  Q. But your feet were up on the cot as well? You
10    weren't sitting off to the side?
11  A. Right. That's right.
12  Q. Describe the cot for me? Does it have a mattress or
13    a cushion?
14  A. It had some type of cushion that was covered with a
15    white sheet.
16  Q. Do you know how thick that cushion was?
17  A. I have no idea.
18  Q. Do you know how tall the cot was when it was in its
19    position in the back?
20  A. I would estimate six to eight inches from the floor
21    to the bottom area, and then the mattress or cushion
22    was on top of that.
23  Q. Were there any signs or problems with the cot at any
24    point while you were on your way to the hospital?

Page 43

1  A. No.
2  Q. It seems so in the police report that Ms. Weaver
3     told the officer that you were hostile and flailing
4     your arms about at the scene of the accident, and
5     that's why she left. What would you say to that
6     statement?
7  A. I would say that it was actually the other way
8     around.
9  Q. So Ms. Weaver is lying?
10  A. I believe that the statement is not correct.
11  Q. At any point did you have a conversation with any of
12    the EMTs about an anger management problem?
13  A. No.
14  Q. Have you ever sought treatment for anger management?
15  A. No.
16  Q. Never sought counselling for anger management?
17  A. No, I've seen counselling for my marriage.
18  Q. When was that?
19  A. In 2002.
20  Q. Who did you seek counselling with?
21  A. I don't remember the name of the doctor, but it was
22    a result of our transitional move. My wife just
23    recently having a baby, and a lot of pressures in
24    the household. So somebody to talk to as a neutral

Page 44

1     setting.
2  Q. Where were they located?
3  A. In Syracuse.
4  Q. Do you remember the name of the facility?
5  A. No.
6  Q. Do you remember the address?
7  A. It was near the North Medical Building,
8     North Medical Center, which I believe is--it's hard
9     to remember the names of the road now, but I think
10    it was on--I want to say Taft Road, but I could be
11    wrong on that. It's at the same North Medical
12    Center which is where I had some procedures done.
13  Q. Are they affiliated with North Medical?
14  A. I don't know. I don't remember if they were or not.
15  Q. How did you pay for the counselling?
16  A. It was through my insurance.
17  Q. What was your insurance carrier at the time?
18  A. I don't remember who my insurance--I think it was
19    BlueCross BlueShield of Minnesota is who we had.
20  Q. What kind of problems were you having as a result of
21    these pressures that you've describe that you sought
22    out counselling for?
23  A. My wife and I just--you know, it was just the--we
24    had moved for the second time in a couple of years.

Page 45

1   We had just had our second child.  She had just lost
2   her father.  He passed away.  I lost my father only
3   a few years before.  A lot of life changing
4   experiences that resulted in some pressures.
5   Q.  Okay.  I understand the cause.  What was the result?
6   Were you fighting?
7   A.  We had some disagreements.  We had a difficult time
8   communicating with each other effectively.  We were
9   both at times sleep deprived from the baby early on
10  because he refused to sleep early in his life, and
11  he was born in May of 2002.  So there were just
12  minor things that came out of that, and I just
13  needed someone to talk to outside of the house, and
14  I didn't want to confide in work associates because
15  I didn't think it was appropriate.
16  Q.  Okay.  Were these disagreements?  Were they heated?
17  A.  How would you define heated?
18  Q.  Yelling, screaming, swearing?
19  A.  Our household can be loud.  So we talk sometimes at
20  a louder--you know, with the kids yelling, we try to
21  talk over the top of them.  So I guess it could be
22  defined as talking loudly, but you know, it's
23  probably no different than any other household.
24  Q.  Then why would that require counselling?

Page 46

1   A.  I just had never dealt with myself dealing with the
2   change in job, moving twice, losing my father, and
3   then her losing her father who I was also close to,
4   and she also was going to counselling as well, and
5   we just felt that it would be appropriate for
6   ourselves to talk to third-party folks that may
7   have--just, you know, somebody to talk to.
8   Q.  Okay.
9   A.  It was an opinion that we had through insurance that
10  was cost effective to vent our thoughts and
11  basically not be judged for them.
12  Q.  Did the disagreements between you and your wife ever
13  get physical?
14  A.  No.
15  Q.  Were the police ever called--
16  A.  No.
17  Q.  --as a result of any of those disagreements?
18  A.  No.
19  Q.  You said she was already in counselling?
20  A.  She had started around the same time that I did.
21  Q.  Independently of the marriage counselling that you
22  guys sought?
23  A.  We didn't go together as marriage counselling, no.
24  We did not go to marriage counselling together.  No,

Page 47

1   we did not.  Independently we went to counselling to
2   strengthen our marriage so that we didn't get to a
3   point where we needed to go at that level.
4   Q.  And what did the treatment for counselling entail?
5   A.  Just conversation.
6   Q.  No medications?
7   A.  No.
8   Q.  And your wife was seeking counselling for the same
9   issues?
10  A.  She had some personal issues from her childhood that
11  she needed to work out with her counselor.
12  Q.  Was it a counselor or a psychiatrist?
13  A.  It's a psychiatrist.
14  Q.  Was your wife on any medications for any--
15  A.  No.
16  Q.  You mentioned earlier that you had taken Effexor,
17  and I think you estimated 1999, 2000; correct?
18  A.  Right, for my reflux.
19  Q.  Were you taking Effexor as of the time of this
20  incident?
21  A.  Not that I remember.
22  Q.  Not that you remember?
23  A.  I don't remember.
24  Q.  You don't remember if you were taking a medicine at

Page 48

1   the time the accident?
2   A.  No, I don't.
3   Q.  Were you taking any medications at all at the time
4   of this incident in 2003?
5   A.  No.
6   Q.  You don't remember, or you weren't taking any?
7   A.  I don't believe I was taking any medications at that
8   time.  If anything, it was related to my gout, which
9   you know, the maintenance for those at the time.
10      MR. LEEDBERG:  Can I mark this
11  Defendant's 1, please?
12      (The MetroWest Medical System records were
13  marked Exhibit No. 1 for identification.)
14  Q.  I'm going to show you a document that I just had
15  marked as Defendant's 1, and on the first page of
16  that document I'll represent to you that this is the
17  records we received from MetroWest Medical System as
18  a result of an inquiry to them.  I want you to look
19  towards the upper left-hand corner where it says,
20  "Current medication."  Do you see that area?
21  A.  Uh-huh.
22  Q.  Can you read those off for me?
23  A.  Allopurinol, Norvasc, Effexor, and Trazadone.
24  Q.  Were you taking Effexor at that time?

Page 49

1  A. According to this, yes.
2  Q. And what was that for?
3  A. It was probably still related to my reflux.
4  Q. I thought you said that was in 1999 or 2000?
5  A. That's when I began that, yes.
6  Q. What were you taking Trazadone for?
7  A. That was because I had difficulty sleeping.
8  Q. Who prescribed those two drugs for you?
9  A. Dr. Diaz.
10 Q. Where did you have those prescriptions filled?
11 A. Where?
12 Q. Yeah. Where did you routinely, if any, locations
13    were you routinely had your prescriptions filled?
14 A. In Syracuse Kinney Drug.
15 Q. Kinney Drug?
16 A. Uh-huh.
17 Q. What's the address of that facility?
18 A. It was on South Bay Road in Cicero.
19 Q. Any other pharmacies were you'd routinely fill your
20    prescriptions?
21 A. That was our primary. I think later on before we
22    moved we used a--there was another--Eckerdt.
23    Eckerdt Drug, which was right up the street from
24    Kinney. If something was not in inventory in

Page 50

1     Kinney, typically Eckerdt inventoried it.
2  Q. So it's your testimony today that you were taking
3     Effexor for over three years for a reflux problem?
4  A. Yes.
5  Q. Was it working?
6  A. It was.
7  Q. When did you stop taking Effexor for reflux problem?
8  A. When the pain management decided that they wanted to
9     double it to use because of the amount of pain
10    medication they were going to give me. They doubled
11    it because of the amount of pain medication they
12    gave me. So apparently--I never--I wouldn't have
13    been off of it at that point.
14 Q. Did you ever suffer from depression?
15 A. I was--I wouldn't say clinically depressed, no.
16 Q. Did you ever seek treatment for depression?
17 A. I wouldn't say--no, not--I mean, treatmentwise, no.
18 Q. Have you ever been diagnosed with depression?
19 A. No.
20 Q. Back to the ride in the ambulance. Approximately
21    how long did it take you to get to the hospital?
22 A. I don't know the exact time, but I would estimate
23    ten to twelve minutes.
24 Q. And describe for me what happened at the hospital?

Page 51

1  A. Backed up to the emergency room door. The driver of
2     the ambulance came and opened the back door. The
3     gentleman who was sitting in the ambulance with me
4     switched places with him where he got on the
5     outside, and the driver then got on the inside and
6     was behind me. They were talking to each other. I
7     was sitting. Apparently they were unlocking the
8     gurney from whatever was holding it in place while I
9     was in the ambulance, and the gentleman at my feet
10    said, "You ready?" He said, "Yep." He says, "Let's
11    go," and he started walking me out. He said, "You
12    got him," and he says, "Yep," and the next thing I
13    know I was slammed to the ground, and they like,
14    "Oh, gee, we're sorry." They said, "Are you okay?"
15    I said, "Well, that didn't feel very good," and then
16    they started to fumble with the gurney to try to
17    lift it up, and it went on for what seemed like five
18    minutes of doing this, and it was a very, very cold
19    night, and I asked if we could take this inside
20    because I was freezing. I had no coat on and was
21    sitting outside, and it was probably five degrees
22    outside, and they said, "That's fine," and they
23    wheeled me into the ER with the wheels--with the
24    legs of the gurney not extended where I was sitting

Page 52

1     just six inches off the ground basically.
2  Q. Did they pull you all the way out before they
3     dropped you down?
4  A. Yes.
5  Q. Do you recall hearing anything before you were
6     dropped?
7  A. Just the one gentleman saying, "Do you have him? Do
8     you got him," and he said, "Yep," and the next thing
9     I know I hit the ground.
10 Q. Did you hear any noises coming from the cot?
11 A. I don't recall any noises at all.
12 Q. Did it seem like there was anything wrong with the
13    cot to you at that point?
14 A. I had never been on it, so I couldn't judge if there
15    was anything right or wrong. I had never been on a
16    cot in that situation.
17 Q. But did you perceive anything that might have given
18    you an indication that there was something wrong
19    with the cot?
20 A. Not at all.
21 Q. Do you know if the wheels to the cot touched the
22    ground before you were dropped?
23 A. I don't believe the wheels did. I think that--I
24    mean, that was the issue, was if the wheels had come

14 (Pages 53 to 56)

Page 53

1    down, then it wouldn't have dropped that way.
2    Q. Is that an assumption you're making?
3    A. That's based on what they were saying to each other,
4        that the legs didn't disengage. They were locked in
5        place.
6    Q. What exactly did they say in that regard?
7    A. Verbatim, I don't have the--I don't know verbatim,
8        but I remember them talking about, you know, "I
9        can't believe these legs didn't come down," or
10       something along that line, and they kept fumbling
11       with trying to--it sounded like they were trying to
12       unclick something, and that's when I said, "Can we
13       move this inside?"
14   Q. Do you recall them saying anything about the legs to
15       the cot not locking properly?
16   A. They could not get the legs to come up. I don't
17       know that they said anything about them not locking.
18       They said they could not get the legs up to extend.
19   Q. And if the EMEs--the EMTs were to testify that the
20       legs did come down, the wheels did touch the ground,
21       and they just didn't lock into place, is that
22       accurate?
23   A. Based on the way I hit the ground, my interpretation
24       would be no, that's not accurate.

Page 54

1    Q. Describe that for me? How do you come to that
2        conclusion about based on the way you hit the
3        ground?
4    A. Because as I came--it was basically a free fall. I
5        mean, there was no sound, and then all of a sudden I
6        smacked the ground. So I would think if there were
7        legs, I would have heard something on the ground,
8        and it would have sounded like something closing as
9        opposed to just no sound and then hitting.
10   Q. What were your eyes fixated on as you were being--do
11       you recall looking at anything in particular as you
12       were being unloaded from the--
13   A. I was just kind of looking around getting my
14       bearings as to where I was, you know, at the
15       hospital, and looking to see if the--because he had
16       wrapped an Ace bandage around the ice pack. I
17       looked down at the ice pack on my foot to see if
18       that was slipping or anything. I was just looking
19       at that, and the next thing I know I was falling.
20   Q. Did you look at the EMTs at any point?
21   A. I don't remember looking at them, no.
22   Q. So you can't testify as to where they were looking
23       as you were being unloaded?
24   A. No, I can't.

Page 55

1    Q. You can't testify as to where they were looking at
2        the time you were allegedly dropped?
3    A. No.
4    Q. Can you estimate what the height was that you were
5        dropped?
6    A. The back of an ambulance, from that level to the
7        ground, which I would estimate being anywhere like
8        36 inches.
9    Q. Did you feel any pain as a result of being dropped?
10   A. I felt a--what felt like a shock wave running
11       through my back and legs. It wasn't a pain. It was
12       kind of like an electrical shock, if you will.
13   Q. And did you tell anybody about that?
14   A. I told the nurse when I got inside. I told the
15       EMTs. I said--they said, "Are you all right?" I
16       said, "That did not feel good," and as they were
17       fumbling everything, I said, "It felt like shock
18       waves running through. Shocks running through my
19       legs and back," and they just continued to fumble
20       with the cot to try to get it to stand up. So then
21       I mentioned it to the nurse. I said, "Listen, when
22       they dropped me, I felt these shock waves through my
23       back," and she said, "You weren't brought in here
24       for your back. You were brought in here for your

Page 56

1        foot," and I said, "Well, can you look at my--can
2        somebody look at my back," and she said, "No." I
3        said, "Why?" And she said, "Because you weren't
4        brought in here for that. You were brought in here
5        to have me look at your foot. If you want to have
6        your back examined, you need to essentially come
7        back in, and we can do that."
8    Q. The nurse said that?
9    A. Yeah, which I said, "I don't understand why."
10   Q. That's very unusual.
11   A. Yeah, that's what I thought.
12   Q. Did you tell the EMTs that you specifically felt
13       pain in your back or your legs?
14   A. I told them that I felt shock, like an electrical
15       shock run through me.
16           MR. LEEDBERG: Can I have that marked as
17       Defendant's 2, please?
18           (The Sherborn Fire Department record was
19       marked Exhibit No. 2 for identification.)
20   Q. I'm going to show you a document in which I've had
21       marked as Defendant's Exhibit 2. I'm going to ask
22       you to take a look at it while I get copies for
23       counsel.
24           (Discussion off the record.)

Page 57

1    Q. Have you had a chance to read that?
2    A. Uh-huh, yes.
3    Q. What would you say about the narrative under
4       "comments"?
5    A. I would say that there is an inaccurate statement
6       with the fact that it was "the stretcher appeared to
7       gradually release to a lower position," and "asked
8       if he was okay" stating that I had no injury is
9       false.
10   Q. So it's your testimony here today that the EMT put
11      two blatantly false statements in his formal report?
12   A. Yes, it is.
13      MR. LEEDBERG: Can I mark this as the next
14      exhibit?
15      (The Sherborn Fire & Rescue Department
16      report was marked Exhibit No. 3 for identification.)
17   Q. I'll show you the incident report from the
18      Fire & Rescue Department, and ask you to read the
19      description of incident in that.
20   A. "When unloading patient out of ambulance the
21      stretcher did not stay up in lock mode and went down
22      to the ground. Patient was not injured." That's
23      false.
24   Q. And Mr. Christensen appears to be the individual

Page 58

1       that filled out this report. Again, he falsely
2       stated what happened as far as your injuries in his
3       formal report?
4    A. Yes.
5    Q. I've read the West End report that we've had marked
6       as Defendant's 1, and I'll ask you this, and if you
7       want to take a look at it, feel free to do so before
8       you answer. Can you explain to me why none of your
9       conversations with the nurse is found in any of
10      those records regarding your back?
11   A. I don't know. It would probably be the same thing
12      as to why I was not even given something as simply
13      as an Advil or a Tylenol for pain while I was there
14      when I asked for it, and I was denied.
15   Q. So it's your testimony that both EMTs lied about
16      your denying injury from the cot incident, and the
17      nurse didn't put anything about the back injury in
18      the notes? That's your testimony?
19   A. Yes.
20   Q. It seems like quite a conspiracy. Can you give me
21      an idea of why that is?
22      MR. DURSO: Objection to the form of the
23      question.
24   Q. Can you explain to me why they might do that?

Page 59

1    A. I have no idea.
2    Q. Do you know these people?
3    A. No.
4    Q. One of your children was born after the incident;
5       correct?
6    A. Yes.
7    Q. Do you recall any treatment you may have had with
8       Dr. Diaz in the year preceding this incident?
9    A. Regarding?
10   Q. Anything?
11   A. I saw Dr. Diaz for, you know, routine medical
12      checks. We had--I had--if I had a gout flare-up, I
13      saw him for that.
14   Q. Anything else in particular you recall that you saw
15      Dr. Diaz for for the year leading up to--
16   A. I don't recall. I've seen a lot of doctors since
17      then, so it's hard to remember.
18   Q. Do you recall receiving an injection in
19      December of '02 of any kind?
20   A. An injection in December? For?
21   Q. Anything at all? I'll represent to you that I have
22      a billing document from Dr. Diaz's office that the
23      insurance company was billed for an injection of
24      Topomil (phonetic). Do you recall having an

Page 60

1       injection?
2    A. It may have been for a gout flare-up.
3    Q. So you would get injections for gout?
4    A. I had them a number of times. They would inject
5       steroids right into the inflamed joint to relieve
6       the pressure and relieve the pain.
7    Q. But do you recall specifically having one of those
8       injections a couple of months before the accident?
9    A. I had a number of them, so I don't remember if there
10      was one prior to this incident or not. I don't
11      remember.
12   Q. Dr. Diaz would administer those injections right at
13      his office?
14   A. Yes.
15   Q. Describe for me the pain in your back from the time
16      you were at West End to the time you first sought
17      treatment with Dr. Diaz such as the location of the
18      pain in your body; the frequency you'd experience
19      the pain; and the level of pain?
20   A. From the time I was at the hospital it began where
21      it was just very--the pain was minor at that point
22      from the standpoint that I felt like small shock
23      waves that I didn't think a lot about it, but I
24      thought something didn't seem right, and that's why

16 (Pages 61 to 64)

Page 61

1    I brought it to the attention of the nurse and asked
2    to have it looked at. The next morning when I got
3    up I had discomfort when I woke up, but my foot was
4    so sore from the injury that I was more focussed on
5    my foot than I was on my back, but I noticed that I
6    was rather stiff in getting up. When I arrived back
7    with my family at the location where we were on
8    Friday night and Saturday night visiting family and
9    relatives, I had been riding in the car a good part
10   of the day driving through a snow storm, and I
11   had--was very uncomfortable when I got back, and
12   just I had discomfort in my lower back to the point
13   where it was--I just felt stiff. I felt like I
14   didn't have a lot of flexibility, and the next
15   morning when I got up, I had a difficult time
16   getting up. My back was extremely sore at that
17   point.
18   Q. What morning was that?
19   A. That was Saturday morning. The incident happened on
20   Thursday evening. So Saturday morning it was
21   starting to really bother me, and throughout the day
22   the pain started to get more and more and was
23   actually increasing to the point where it was more
24   noticeable than the pain in my foot, which was

Page 62

1    fairly aggravated at that point still as well.
2    Sunday, as I drove back to New York, it felt as if I
3    had a golf ball in the small of my back that as I
4    sat back, I could feel this golf ball, and no matter
5    how I sat, I just felt this pressure and pain of
6    this golf ball type feeling in my back that made my
7    legs very uneasy to the point where I said to my
8    wife, "If we have to drive much further, I want you
9    to drive because I just don't feel comfortable."
10   And we got home, and I put ice on it again, which I
11   had done a couple days in a row just to try to help
12   relieve some of the discomfort. So the next morning
13   I got up, and I called Dr. Diaz and asked to come in
14   there, and I had a conference call that I jumped on
15   for 45 minutes and then jumped off and went straight
16   to his office then at that point at which time he
17   administered an injection to relieve--he gave me
18   Demerol to relieve the pain and did a couple of
19   steroid injections into the area where I had the
20   discomfort to see if that would help relieve the
21   pain there, and then he sent me for x-rays and such.
22   So the pain had really increased, just progressively
23   got worse.
24   Q. Was there any event during those few days that

Page 63

1    preceded the increase in pain?
2    A. No. I had--we were visiting family and relatives,
3    and there were a lot of my wife's cousins and such
4    that were playing with the kids, so I didn't have to
5    attend to getting on the floor with the kids. I
6    didn't have to change diapers. I didn't have to
7    carry the kids around, none of the things that I
8    would do in a normal routine, which was good because
9    then I didn't have to worry about, you know, if it
10   was going to aggravate things at that point. So I
11   really didn't have to actually participate in
12   anything like that until we got home on Sunday
13   night, which I wasn't able to participate in at that
14   point.
15   Q. Where was this location where you were visiting in--
16   A. Avon, Connecticut.
17   Q. In Avon?
18   A. Uh-huh.
19   Q. What was the name of the family you were visiting?
20   A. My wife's family, the Somsen Family, her
21   grandmother, who is now deceased, Janet Somsen, and
22   her aunts, uncles, cousins.
23   Q. What are their names?
24   A. There are quite of few of them. There was--you want

Page 64

1    the complete list of everybody?
2    Q. Who you can recall there?
3    A. Well, let's see, there was my wife's brother, Glen,
4    his wife, who is now his ex-wife, which was Christy,
5    his two children, Kaylee and Matthew.
6    Q. What are their last names?
7    A. Somsen. It was my wife's maiden name.
8    Q. Can you spell that for me?
9    A. S-o-m, as in Mary, s-e-n, as in Nancy.
10   Q. Are they from Connecticut as well?
11   A. The Somsen Family grew up in the Connecticut area.
12   My wife did not grow up in this area. She grew up
13   in Ohio.
14   Q. And other Somsens, do they live in Connecticut?
15   A. They're--Janet Somsen, her grandmother, lived in
16   Connecticut. Her biological father lived in--lives,
17   I guess, in Holyoke, Massachusetts. He's estranged
18   from the family.
19   Q. What about the brother and the ex-wife and the kids?
20   A. They, at the time, were living in
21   Upstate New York--well, just outside of New York
22   City in Upstate, but they're divorced, and they live
23   in Atlanta.
24   Q. Atlanta, Georgia?

Page 65

```
 1   A.  Yes.
 2       (Discussion off the record.)
 3   Q.  Who else was at the house that weekend?
 4   A.  Her Aunt Jean, which her last name is Connell, and
 5       her daughter, Katie Connell.  Her Aunt Jane with her
 6       two daughters, Emily and Ellen, and their last name
 7       is Strong.  Her Uncle Paul Zavarcky.
 8   Q.  Can I just interject for one minute?  If you know
 9       their address, could you give that as well?
10   A.  Okay.  The Connells at the time were living in
11       Sparta, New Jersey.
12   Q.  Where are they living now?
13   A.  They now live in--it's just outside of Sparta, but
14       it's actually in Pennsylvania.  I don't know the
15       name of the little town, but then the Strongs live
16       in West Hartford.  The Rappaports, which was
17       Danielle, Margo, Nicole, and her Aunt Joanne, who
18       live in West Hartford as well.  The Zavarckys live
19       in Newton, Massachusetts, which was Judy and Paul.
20       They were there.
21   Q.  Could you spell their last name for me?
22   A.  Z-a-v-a-r-c-k-y, and I believe that's all the folks
23       that were there for the--and Janet Somsen.  It was
24       her house that everybody was visiting.
```

Page 66

```
 1   Q.  Was this some kind of planned event?
 2   A.  It was her Aunt Joanne, her cousin, Kate, and her
 3       grandmother all celebrating birthdays within a three
 4       week span of each other, and her brother, Glen, all
 5       within a three week span of each other celebrating
 6       birthdays, and it just happened to be a time that
 7       everybody was available to come to town and see each
 8       other.
 9   Q.  What did the events of the weekend entail?
10   A.  A lot of playing the game Boggle, which was the
11       grandmother's favorite game.  Basically sitting
12       around talking.  The kids climbing on Uncle Paul,
13       and him wrestling with them, and a number of
14       conversations and preparing food and eating a lot.
15       Typical family event.
16   Q.  Did you guys go out anywhere?
17   A.  No, stayed at the house.  I mean, maybe we ran to
18       the store to get some more food items, you know, for
19       snacks and such.
20   Q.  Did you run to the store?
21   A.  No, I didn't leave the house.
22   Q.  What did you do all weekend?
23   A.  I was in the back bedroom laying down quite a bit.
24       I would come out.  I'd sit in a chair and kind of
```

Page 67

```
 1       just observe and sit and talk with folks.  I had a
 2       very quiet weekend.  It was not--did not participate
 3       in any of the games and such or any of that type of
 4       activity.  I never really participate in the games
 5       anyhow.  It's not my thing.
 6   Q.  Do you recall any specific conversations about this
 7       entire incident?
 8   A.  Well, everybody that came in asked why I was wearing
 9       a boot, and I explained to them what had happened,
10       and they were just, you know, people found humor in
11       the fact that I got dropped.  They found that
12       humorous for some reason.
13   Q.  Did you mention your back injury to them?
14   A.  Yes, and they said that--they said, "Well, how does
15       it feel now," and I said, "It seems to be getting
16       worse," and they said, "Well, what are you going to
17       do?" I said, "I'm going to see the doctor when I
18       get home."
19   Q.  So you were injured, and they found that humorous?
20   A.  In a warped way, yes.
21   Q.  How did you leave the hospital that day?
22   A.  I was given a ride by one of the brokers staff
23       members who happened to be visiting his mother.  His
24       name was Tom, and I don't remember his last name.
```

Page 68

```
 1       He worked for the broker, which was
 2       Pilgrim's of New England, and he happened to be
 3       visiting his wife's mother at the hospital with his
 4       wife, was walking through the ER to leave, looked
 5       over and saw me sitting in one of the rooms, and
 6       came in and had a conversation, you know, "What's
 7       going on," and was actually in there at part of the
 8       time when I was having the conversation about my
 9       back with the nurse, and then he left, you know,
10       while I was in the midst of conversation because he
11       felt that it was a private conversation, went out,
12       and was making phone calls outside.  He came back in
13       and asked if I needed a ride back to the inn, to
14       which I said, "That would be great."  So he gave me
15       a ride back to the inn at that point because they
16       said that I was finished.  There was nothing else
17       they could do for me.
18   Q.  You don't know Tom's last name?
19   A.  I don't remember it, but I'm sure the folks at
20       Pilgrim's of New England, if you called Tom Hill or
21       Rich Hill and asked them the gentleman, they would
22       know exactly what his name was.
23   Q.  How old is Tom approximately?
24   A.  Tom is probably late 30s.
```

18 (Pages 69 to 72)

Page 69

1  Q. What is your relationship with Tom? Is he a friend,
2     a colleague?
3  A. He's just a--he works for the broker, so he knew me
4     because I--the company I represented helped pay for
5     his paycheck in a sense. So he just knew me by
6     association. He knew my regional managers better
7     than he knew me.
8  Q. Did you talk to Tom about your back injury at any
9     point?
10 A. I told him my back was starting to brother me and
11    that, and he said, "You'll probably be hurting in
12    the morning. You know how it is." He said, "If you
13    get an injury, you'll probably--it will hurt more
14    tomorrow than it will today."
15 Q. When did he say that?
16 A. While we were driving back to the hotel.
17 Q. Have you seen Tom since?
18 A. I saw him once since then.
19 Q. Did you discuss this incident at all?
20 A. He just asked how my back was doing, and I said,
21    "I'm still getting treated for it." He said, "I
22    can't believe that." He said, "That's just
23    amazing."
24 Q. Do you remember anything about the nurse you had

Page 70

1     this conversation with at the West End?
2  A. What do you mean? As far as--
3  Q. What she looked like? Her name? Her age, height,
4     weight?
5  A. She was probably, I would say, early to mid 30s.
6     Heightwise probably five, four. I think she had
7     like medium brown hair, if I remember accurately. I
8     don't remember her name. I think it's actually on
9     the report. Her name, I think it may have actually
10    appeared on here (witness indicating). If not--
11 Q. You're referring to Defendant's Exhibit 1?
12 A. Yes. I thought that she may have made a notation on
13    there.
14 Q. Do you recall her approximate weight?
15 A. Probably 120, in that range, 130.
16 Q. Any unusual characteristics that you remember?
17 A. No, just very average.
18        (Discussion off the record.)
19        (Brief break.)
20 Q. You've claimed as part of this lawsuit that the
21    incident has affected your sexual relations with
22    your wife; correct?
23 A. Correct.
24 Q. Describe for me your sex life with your wife prior

Page 71

1     to the incident?
2  A. Our sex life was actually quite active. I did not
3     have any difficulty with arousal where after having
4     taken the pain medications and some of the
5     injections that started--that I started getting, I
6     began to have less capability of getting aroused,
7     and if I did, it didn't last, and if it did last,
8     there was no completion from my end.
9  Q. How frequently would you and your wife have sex
10    prior to the incident?
11 A. Realistically about twice a week.
12 Q. And was this so even through your times of trouble
13    in your marriage?
14 A. Yes.
15 Q. So your sex life was never affected by the marital
16    difficulties you were experiencing?
17 A. No.
18 Q. And is it your testimony that it's the medications
19    that has created erectile dysfunction of some sort?
20 A. Yes.
21 Q. Which medications is that?
22 A. The pain medications have been one of the issues.
23    The pain block injections, because of the nerves
24    that they are injecting into to deaden the nerves

Page 72

1     are directly in relation to the same nervous system
2     that is in the genital area.
3  Q. And has the physician told you that?
4  A. The pain management physician has told me that.
5     Both my pain management in Syracuse said that it's a
6     natural side effect unfortunately of the injections,
7     the epidural pain blocks, and the current pain
8     management doctor has said the same thing.
9  Q. Would that be Dr. Tiso?
10 A. Dr. Tiso, yes, in Syracuse and Dr. Gonigar in
11    Maryland.
12 Q. Could you spell Dr. Gonigar's name for me?
13 A. G-o-n-i-g-a-r.
14 Q. What's his first name?
15 A. I don't know, but I'll have to get a card for you.
16    I don't know what his name is, and I don't even want
17    to attempt the spelling or anything.
18 Q. Do you know the address?
19 A. They're on Thomas Johnson Drive in
20    Frederick, Maryland.
21 Q. How often do you see Dr. Gonigar?
22 A. At least once a month.
23 Q. Is he routinely giving you injections?
24 A. I'm getting injections about every six to eight

Page 73

1    weeks, but I get my medication. I need to see him
2    every 30 days to get refills for the medication.
3  Q.  And I understand you're not a physician, but it's
4    your understanding based upon your conversations
5    with your physicians that the erectile dysfunction
6    didn't actually happen in the accident, but is a
7    side effect of treatment you're receiving?
8  A.  Correct.
9  Q.  How often did you have sexual relations with your
10    wife after the accident?
11  A.  Well, there was--it was a couple of months after
12    before we even attempted anything. After I had been
13    on a regime of some pain medication and would have
14    good days, if you will, where pain was--there's pain
15    everyday, it's just to what level it's being managed
16    so that it's tolerable that you can go about things,
17    and it was a couple months before that came under
18    control, and then it became maybe twice a month at
19    most, and that was only with help, if you will. It
20    had to be planned out and such.
21  Q.  And at any point did that change, or are you still
22    today only having sexual relations a couple times a
23    month?
24  A.  It's still very infrequent. It's

Page 74

1    just--unfortunately it's the nature of the way it is
2    for us. We have to plan it out, and it's not
3    always--you know, there's no spontaneity because I
4    have to take medication to help things along. So
5    unless I have it planned that I'm going to take the
6    medication, it can't be something that's
7    spontaneous. We have to actually--we make
8    appointments practically.
9  Q.  And when you do have sexual relations, is it
10    otherwise similar to the way you had sexual
11    relations before the incident?
12  A.  No, because it's limited to certain positions and
13    certain manners in which, you know, we can do
14    things. It's not as free spirited as it used to be.
15  Q.  And I don't mean to make you feel uncomfortable, but
16    as part of your damages I really need to
17    understand--
18  A.  No, I'm not uncomfortable.
19  Q.  --what kind of positions that you could do before
20    that you can't do now?
21  A.  Sure. I'm not uncomfortable with it. That's fine.
22  Q.  Okay. Good. So help me understand what kind of
23    positions you could do before that--
24  A.  Well, now it's basically--because I have a difficult

Page 75

1    time hyperextending my back, meaning that if I'm in
2    the missionary position on the bed, my back is
3    being--it creates pressure on the nerve because your
4    back is arched in an opposite direction. So now I'm
5    restricted to essentially two positions. Either her
6    on top, or me standing on the side of the bed, and
7    her, you know, coming to the side of the bed in that
8    way. That's it. I'm not--the other opportunities
9    are not there. There's just--other positions are
10    very uncomfortable.
11  Q.  Now when you take the Cialis is it effective?
12  A.  It is. It is. The only side effect is the fact
13    that many times I'm unable to finish, if you will or
14    reach an orgasm.
15  Q.  Is sex with your wife less enjoyable in any other
16    respect other than the ways you've explained to me?
17  A.  My--what I have--my focus has been is to make things
18    as good for her as possible. It's not as enjoyable
19    for me as it used to be. To me--but I want to not
20    let her down, if you will. So I do everything I can
21    to make it as pleasurable for her as possible. So
22    it's more giving than receiving.
23  Q.  Any other ways where sex with your wife is less
24    enjoyable since the accident?

Page 76

1  A.  Just, you know, the fact that there's no
2    spontaneity.
3  Q.  Besides the ones you've already mentioned?
4  A.  Yeah, I'm sure that there are other things that just
5    don't come to me at this moment.
6  Q.  Has your physician or any physician indicated
7    whether these erectile dysfunction problems are
8    going to be permanent, or if you stop the treatment
9    did they say whether or not you'll resume normal
10    activity?
11  A.  The belief when I asked that question as well, the
12    belief was that if I was to get off of the
13    medication, there's a good possibility that I will
14    gain that back, but they don't know unless I do
15    that, and at this point, the medication is a
16    maintenance for me to be able to do my daily
17    functions. So there's really not a choice at this
18    point.
19  Q.  Do you recall which physician you had that
20    conversation with?
21  A.  Dr. Tiso and I had that conversation. Dr. Gonigar
22    and I had that conversation. I'm trying to think of
23    who else I talked with about. Those are probably
24    the two primarily because they were my pain

20 (Pages 77 to 80)

Page 77

1    management doctors.
2  Q. Did you see a urologist at any point?
3  A. I did go see a urologist.
4  Q. Do you remember the person's name?
5  A. I don't remember his name. I apologize, but I did
6      have--I was--I did go see the urologist. He
7      indicated--he did a number of tests indicating to me
8      that as he explained to me, he didn't see that there
9      was anything physically wrong. So he said it had to
10     be medication related based on the physical tests
11     that they did, looking for blockages, looking for
12     restrictions and such through all the examinations
13     that they did. His determination was that it was
14     medication-driven.
15 Q. Did you ever have any sexual dysfunction of any kind
16     prior to the incident?
17 A. No.
18 Q. Dr. Harvey Sour (phonetic); does that sound? Is
19     that the urologist you saw?
20 A. That sounds correct, yeah.
21 Q. Have you seen any other urologist--
22 A. No, he was the only one I've ever seen, and after
23     that visit I don't know that I want to go to another
24     one. No, I take that back. I correct myself. I

Page 78

1      did see a urologist based on--I was being treated
2      for testosterone imbalance, and I went to see a
3      urologist in Frederick, Maryland who referred me to
4      an endocrinologist because of my testosterone levels
5      being low, which Dr. Diaz had continued a treatment
6      with me there as I had with Dr. Samaan after--during
7      around the time of my gout, he noticed that I was
8      having like tendonitis. So he did some testing and
9      found that my testosterone levels were really low.
10     So he started doing testosterone injections for me,
11     and they were working, and it worked great. It got
12     the testosterone back up. Well, in the meantime,
13     when we were trying to get pregnant, the combination
14     of the erectile dysfunction and the fact that I was
15     taking testosterone, which had to do with the fact
16     that I was getting older, helped lower my counts.
17     So it was a combination of the two, and the
18     testosterone became--I end up going off the
19     testosterone so it helped my counts raise. It
20     didn't help anything else because it made the
21     erectile dysfunction even more exaggerated, but I
22     did go see this urologist in Maryland to check into
23     whether or not I should go back onto a regime with
24     the testosterone, and they referred me to an

Page 79

1      endocrinologist, who I'm waiting to have a follow-up
2      appointment after the testing with them to see if
3      they're going to have me go back on the testosterone
4      again.
5  Q. Did any physician tell you what the cause of this
6      lower testosterone was?
7  A. It's very common actually after men reach the age of
8      40 for it to drop. It's just something that happens
9      in some people. It's almost like male menopause.
10 Q. Are you claiming that it's related to this incident
11     in any way?
12 A. No.
13 Q. Is it your claim that your wife had trouble
14     conceiving after this incident, conceiving a child?
15 A. She did because I was unable to--I mean, I had the
16     erectile dysfunction, and I was unable to finish, if
17     you will. So we did not have difficulty in the past
18     getting pregnant with two other children. Our plan
19     was to have three children. We did not want the
20     incident to come in the middle of that, you know, to
21     be an obstacle for us. So we tried, but it was just
22     not--we were not successful. So we had to go to an
23     artifical insemination type of method or
24     intrauterine injections that she had to get where

Page 80

1      they--you know, I had to go and give a sample that
2      then got scrubbed, if you will, so that the active
3      swimmers were the only part of it that we took, and
4      we put that--took that back to her doctor's office
5      and injected that in her, and then she got to sit
6      for a half hour while, you know, nature took its
7      course.
8  Q. It's your testimony that your wife never had
9      problems conceiving with your first two children?
10 A. She--she did not have--it was--you know, like any
11     other couple, we went and we tried a few times
12     before it was successful. She had two ectopic
13     pregnancies that were--that she miscarried. I mean,
14     if that's a difficulty. You know, that is a
15     difficulty as far as that goes.
16 Q. Were there any problems like that after the incident
17     with your wife?
18 A. She did not have any ectopics, no.
19 Q. Have you ever had any back problems prior to the
20     incident?
21 A. No back problems, no. I mean, no more than just,
22     you know, when you're working in the yard you get
23     sore, but no. Do you know what I mean? No
24     injuries.

Page 81

1  Q. When you'd work in the yard and get sore, would that
2     pain go into your legs or thighs?
3  A. No.
4  Q. It was just localized to your back area?
5  A. It was just your shoulders, and you know, just from
6     working with a shovel or something like that.
7  Q. Did you ever have an x-ray or MRI of your back prior
8     to 2003?
9  A. Not that I'm aware of.
10 Q. Do you think you'd be aware of it if you did have an
11    x-ray or an MRI of your back?
12 A. I can't remember if I did.
13 Q. Have you had an MRI since this incident?
14 A. On my back?
15 Q. Yes.
16 A. I believe they did an MRI on my back.
17 Q. Is that where you lay in the tube?
18 A. Yes.
19 Q. You think you'd remember doing that prior to 2003 if
20    you had done it?
21 A. Yeah. I would hope so, yeah.
22 Q. And it's your testimony here today that you don't
23    recall ever having an MRI?
24 A. I don't recall doing that, no.

Page 82

1  Q. Has any physician indicated to you that you had back
2     problems that you may not have known about prior to
3     this incident?
4  A. If you can clarify the statement a little bit better
5     for me?
6  Q. Has any physician examining you indicated to you
7     that you had a degenerative condition of your lower
8     spine that pre-existed this incident?
9  A. I was informed by the orthopedic specialist as well
10    as the pain management that degenerative--
11 Q. Can you give me their names, please?
12 A. Dr. Tiso and Dr. Wulff, that degenerative disk
13    disease is common in all humans, and it just happens
14    as you get older. Everyone's disks begin to
15    degenerate to some degree. Trauma will amplify the
16    problem and exaggerate it, you know, to a greater
17    degree.
18 Q. Did they indicate that that's your situation, that
19    you had a degenerative condition in your spine prior
20    to this incident that was exacerbated or otherwise
21    made symptomatic as a result of this incident?
22 A. That was the--I believe Dr. Wulff and Dr. Tiso both
23    stated that.
24 Q. Did any physician tell you that your degenerative

Page 83

1     condition was a result of this incident?
2  A. No.  That's where they stated that it was just
3     degenerative disk disease is something that everyone
4     has.  It's just to what degree it flares up.
5  Q. Dr. Diaz was the first physician you saw as a result
6     of this incident or as a result of your back
7     condition?
8  A. For my back, yes.
9  Q. Describe your treatment from there?  What happened
10    next?
11 A. He sent me for x-rays and MRI.
12 Q. Do you know what the results of those were?
13 A. I believe that there is a printed document that
14    states what the actual technical medical statements
15    are, but the first thing he sent me for was a chest
16    x-ray just to see if there was any blunt-force
17    trauma which can happen to organs in situations
18    where you're dropped, or you've been in a jarring
19    type of accident, and those came back negative.
20    There was no blunt-force trauma.  Then he did the
21    MRI on that, on the lower back where it was
22    discovered that there was in the disk, the lower
23    disk and one in the lumbar disk and the cervical
24    disk that were both injured.  So the cervical disk

Page 84

1     did not generate any pain the way the lumbar disk
2     did.
3  Q. Did you ever experience neck pain as a result of
4     this incident?
5  A. No, and I believe that that was probably
6     pre-existing, that one, because I had a
7     shoulder/neck type injury when I was working back in
8     the seafood industry back, I think, like in 1989.  I
9     was unloading a box off of a truck, and I was
10    pulling one of those strapping bands, and I pulled
11    on it, and it broke, and I fell back, my shoulder
12    right into a--I think it was my left shoulder.  I
13    fell right into the door of the little box truck.  I
14    landed into the door and kind of twisted around, and
15    my neck and shoulder were you know, out of wack for
16    a little time.
17 Q. Who was your employer at the time?
18 A. Waterfront Seafoods.
19 Q. Where were they out of?
20 A. They were in Cleveland.  They actually have--they
21    sold their business and have re-opened under another
22    name.
23 Q. Do you know what the name is?
24 A. I believe it's called Catonese (phonetic) Classic

22 (Pages 85 to 88)

**Page 85**

1    Seafood.
2    Q. Did a claim generate from that shoulder/neck injury?
3    A. It did because I went to a chiropractic for--I
4      believe it was maybe a month or six weeks.
5    Q. What was the chiropractor's name?
6    A. I don't remember. This was in Mentor, Ohio, but I
7      went to him, and he did the stim. thing and twisted
8      my neck and made my neck pop and did alignments, and
9      I did that like twice, sometimes three times a week,
10     and then I was, you know--it feels fine. So I
11     didn't continue on with it.
12   Q. You didn't have any other treatment as a result of
13     that?
14   A. No.
15   Q. Did a lawsuit come out of that prior incident?
16   A. No.
17   Q. Did you get any other--was your claim approved for
18     payment? You said you had a claim?
19   A. Yeah, I mean, they covered it for the--as far as I
20     know. I mean, it was a family-owned business. I
21     went in. They took care of your insurance benefits.
22     So I don't know how it was handled as far as that
23     goes. I know I didn't have any out-of-pocket out of
24     it for that treatment.

**Page 86**

1    Q. You said you had a claim as a result of this
2      incident with your employer; correct?
3    A. Uh-huh, yes.
4    Q. What was that claim for?
5    A. The workmen's comp. claim with Schwan's?
6    Q. Yes.
7    A. Was for the injury.
8    Q. Let me clarify. Was it to have your medical
9      expenses paid, or were you looking for wages?
10   A. I just went in and--I did what they asked me to do,
11     which was to file within our office for it. I was
12     told to contact somebody within the office, let them
13     know of the incident, and then when I went to my
14     doctor, and they ask how it happened, I had to--you
15     know, I was informed to tell him that it happened
16     during--at work, and how it was--you know, how the
17     whole thing happened that way so it was billed
18     appropriately.
19   Q. Were you ever awarded any wages as a result of this
20     injury?
21   A. There was a lawsuit that was--for wages that were--a
22     difference in my wages from the time period that I
23     did not get--you know, from the time I was let go
24     from the company until I was able to recoup getting

**Page 87**

1    back to the same salary level. There was an award
2      given for that.
3    Q. What was that award?
4    A. I believe it was, I think, $50,000 for wages over a
5      22 month period.
6    Q. Was that paid? Did you receive that money?
7    A. Yes.
8    Q. In your answer to Interrogatory No. 5, which asks
9      about prior injuries, you indicated that you pulled
10     a muscle in your shoulder and your upper back while
11     working in your yard years before the accident. Is
12     that your recollection?
13   A. No, it was actually while working in the seafood
14     business prior to the accident.
15   Q. So you never pulled a muscle in your shoulder or
16     back working in your yard?
17   A. I may have, but I don't remember.
18   Q. You have no recollection of it?
19   A. I don't. I know that it did happen definitely while
20     I was working the seafood business.
21   Q. And is there any reason you can recall why you
22     didn't tell my client about the incident with the
23     seafood company back in the '80s?
24   A. That didn't come up in--I don't understand.

**Page 88**

1    Q. Did you look at the interrogatories that you
2      answered from my client prior to signing them? Why
3      don't I put them into evidence?
4    A. I haven't seen the interrogatories from your client.
5          MR. LEEDBERG: Can I have that marked as
6      Exhibit 4?
7          (The answers to interrogatories was marked
8      Exhibit No. 4 for identification.)
9    Q. You know, I'm going to drop this line of
10     questioning. It seems to me that that incident was
11     prior to the date that we signed,
12     February 6, 1992. Was it prior to that date?
13   A. Yes.
14   Q. Okay. I'm going to drop this line of questioning.
15     Have you ever had any other accidents, whether it be
16     auto accidents, prior to 2003, slip and falls, any
17     accident you can recall where you were injured?
18   A. I had two automobile accidents. One in 1983 while
19     living in Akron, Ohio. I was driving through an
20     intersection. Somebody coming across, who was
21     timing the lights, T-boned me right into my
22     passenger door.
23   Q. Did you suffer any injuries in that accident?
24   A. No.

Page 89

1  Q. Any injury or claim come out of that accident?
2  A. No.
3  Q. And what was the other accident?
4  A. The other one was I was backing up in--I had just
5     backed out of a parking space in a Kroger parking
6     lot in Reynoldsburg, Ohio, and a gentleman in a
7     pickup truck just was backing up while he was
8     talking to one of the employees who was gathering
9     carts and backed straight into my vehicle. He never
10    looked behind him.
11 Q. Were you injured in that accident?
12 A. No.
13 Q. Any other accidents of any kind where you recall
14    being injured that required medical care prior to
15    2003?
16 A. No.
17 Q. Any since the 2003 accident?
18 A. No.
19 Q. You've never had treatment for any lower back
20    related problem?
21 A. No.
22 Q. You mentioned earlier that you belonged to a gym
23    prior to this accident?
24 A. Uh-huh.

Page 90

1  Q. And that question, I think, was in response to what
2     were your activities prior to the incident. Any
3     other activities such as hobbies, recreation,
4     sports, anything you did prior to this incident in
5     2003 that you can no longer do as a result of this
6     incident in 2003?
7  A. From the hobby standpoint, I would say that my yard
8     work. I have had to--which was something I always
9     found great pleasure in doing work in my yard. I
10    now have to hire a lawn service, and I've had to
11    hire people to do landscaping for me. Shovelling my
12    driveway. I've had to hire people to do that for me
13    while I lived in Upstate New York. Virginia, they
14    don't really--or in Maryland, I mean, they don't
15    really hire people to do that because it doesn't
16    snow as often. The--you know, as far as routine
17    painting and work around the house in that way,
18    there's a number of projects that I have had to get
19    someone else to do. When we moved to our new house,
20    I had to hire a painter because I was unable to do
21    all of that painting that needed to be done
22    before--you know, when we were moving into it.
23    Essentially any handwork around the house has been
24    an item is something that I've just basically

Page 91

1  haven't been able to do as a result of it.
2  Hobbywise, you know, my greatest joy was playing
3  with my kids, and it's very unfortunate now that my
4  daughter, who is the oldest, remembers me prior to
5  my injury, now will ask me if I'm having good back
6  day or a bad back day in wanting to play with her or
7  do something. My four-year-old son, who is now
8  four, who was just an infant at the time has only
9  known me as a person with a back injury as my
10 21 month old is the same way. He's not even old
11 enough to understand yet, but he only will know me
12 as a guy with a back injury. What its done is I had
13 a lot of fun with my daughter playing on the floor,
14 and you know, we'd go for walks and that kind of
15 thing with regularity. Now I'm restricted to doing
16 that on days that I feel up to it, and it's based on
17 the pain level. I go into the pain management.
18 They ask what your pain level is for the day, and
19 it's very unfortunate that you go in, and there's a
20 pain level that--I mean, there's pain everyday, but
21 you get to a point where you tolerate it, and you
22 just deal with it, if you will, but what you have to
23 do is evaluate how much above that acceptable, this
24 is what I have to live with, level that you give

Page 92

1  them as a response, and I average, you know,
2  basically an eight on the pain scale out of ten on a
3  regular basis when I'm in there. That's just how it
4  is. It's unfortunate, but I've had to come to
5  accept that that's the level of pain that I'm in on
6  a daily basis. It's--you know, I have a high
7  tolerance for pain typically, and a great example of
8  that is I fall asleep during root canals, and I
9  never have problems with it, but the pain in my back
10 has been so severe that it's debilitated me.
11 Q. Any other recreation, sports, hobbies?
12 A. I used to play softball. I don't do that. I used
13    to play golf a lot. I haven't played golf since the
14    accident.
15 Q. Where did you play golf regularly prior to the
16    accident?
17 A. I played with customers. I played--as I travelled,
18    I played in different locations, you know, for work.
19    We'd play in different locations all over. You
20    know, with different clients and that, we'd take
21    them out to different places and play. So it was a
22    regular weekend activity for me to do.
23 Q. Any local courses that you'd go to regularly?
24 A. I never got into any of the ones in the Syracuse

24 (Pages 93 to 96)

Page 93

1 area because by the time I got settled in up there,
2 it was--we got settled in September. It was the end
3 of the season. I didn't really have time to get
4 acclimated as I just moving into the area. So I
5 never got a chance to play up there, but I played in
6 Florida, and I played in Georgia and that type of
7 thing throughout that fall and winter with different
8 meetings that we went to. I played in Las Vegas,
9 that kind of thing, and then after the incident or
10 the accident and everything, I haven't been able to
11 do anything. In fact, I was staying near a driving
12 range, and I still--I love golf. I mean, it's one
13 of those things that I've always--I've been playing
14 since I was 11 years old, and my father-in-law and I
15 used to play, you know, as our--that was a big
16 connection for us, and it was one of those things
17 that, you know, I stopped at a driving range just to
18 kind of be in the environment and see what was going
19 on, and I ran into somebody I knew, and they're
20 like, "Hey, you want to take a couple swings?" And
21 I tried it, and I just felt miserable. I couldn't
22 even do it, and I just handed the club over, and I
23 said, "I can't do this."
24 Q. Who was this person?

Page 94

1 A. It was a gentleman I worked for at the time. He was
2 up in Long Island, Dave Horowitz, and I just
3 didn't--I couldn't hit the ball. I mean, I hit it,
4 but I just--I felt miserable.
5 Q. What was your typical 18-hole score prior to the
6 incident?
7 A. Anywhere from 89 to 91, in that range.
8 Q. Did you say you played softball?
9 A. Yes.
10 Q. Did you play for a league?
11 A. I played in leagues until my wife and I moved to
12 Columbus, and then I was travelling too much so I
13 couldn't play. Our weekends got--we met in
14 Cleveland. I played in Cleveland, and I played
15 shortstop.
16 Q. What year was that?
17 A. I played up until--I played through '93.
18 Q. Prior to the incident you hadn't played softball for
19 a league for ten years?
20 A. No, I didn't have a chance to. I was working too
21 much, travelling too much.
22 Q. Would you call softball one of your pastimes at the
23 time of this incident?
24 A. Not at the time of the incident. Golf was my--was

Page 95

1 definitely the pastime of choice when I had time to
2 do it. My kids were the primary, hobby, pastime,
3 and everything. Once we had children, you know, the
4 time to do other things really went away.
5 Q. Any other hobbies, sports, recreational activities?
6 A. No. There may be, but I can't think of any at this
7 point.
8      MR. LEEDBERG: Can I mark this
9 Defendant's 5, please?
10      (The letter 2-10-03 was marked
11 Exhibit No. 5 for identification.)
12 Q. I'm going to show you a document marked as
13 Defendant's 5. Do you recognize that document?
14 A. If I could have a moment to read it? Yes, I do.
15 Q. Did you create that document?
16 A. Yes.
17 Q. Is that your signature at the bottom?
18 A. Yes.
19 Q. Explain to me the remark about the stretcher being
20 faulty?
21 A. Because the legs did not come down on the stretcher.
22 To me it was the fact that the stretcher did not
23 work.
24 Q. Do you think that's what caused the incident?

Page 96

1 A. I think if the legs had come down, they wouldn't
2 have dropped me.
3 Q. Did you suffer from hypertension prior to this
4 incident?
5 A. My blood pressure had recently started to elevate,
6 yes.
7 Q. Has there been any change in the status of your
8 blood pressure since this incident that you
9 attribute to this incident?
10 A. My blood pressure continued to elevate, and rather
11 than being on one medication, I was--I went to a
12 cardiologist where I was switched to two medications
13 to balance it out, and I currently have my blood
14 pressure under control.
15 Q. How long did it take you to get your blood pressure
16 under control?
17 A. Just under a year.
18 Q. Do you think that any blood pressure related
19 condition was caused by this incident?
20 A. My primary care physician and the pain management
21 doctor, Dr. Tiso and Dr. Diaz both made comments to
22 the fact that when you're in pain, your blood
23 pressure elevates, which was the result of why at
24 the time of the incident my blood pressure was as

Page 97

1    elevated as it was was directly a result of the pain
2    that I was in, and it noted on the
3    Defendant Item No. 1 in the upper right corner there
4    the blood pressure at 194 over 106. It indicates a
5    high blood pressure right there at that point, and
6    even the paramedics had listed 160 over 120 at the
7    time that they had me in the back of the ambulance.
8    So that was directly related to the pain that I was
9    in at that point.
10   Q. Who's Dr. Cameron Huckle?
11   A. If I remember correctly, he is a doctor that was
12   doing an experimental procedure for disk replacement
13   surgery, and my name was given to him--actually I
14   don't know how my name was given to him, but I was
15   contacted by him to see if I was interested in
16   participating in a disk replacement surgery, and I
17   would be actually as a live guinea pig, if you will.
18   I went through and was examined by him and talk to
19   him and such, and after listening to what they had
20   to say as far as--I looked at the whole scenario and
21   said, "I need to seek advice from--you know, I need
22   to talk to some other doctors to see if this is the
23   right course of action for me," and I just didn't
24   feel right about going with something that, No. 1,

Page 98

1    at the time wasn't FDA approved. No. 2, was still
2    in experimental phase, and it just was too risky to
3    me.
4    Q. So have you since decided not to go forward with
5    this disk replacement surgery?
6    A. Yes, I've decided not to. You're correct.
7    Q. Have you discussed any other treatment options with
8    any of your physicians?
9    A. Most recently I spoke with a neurosurgeon.
10   Q. What was that neurosurgeon's name?
11   A. His name is--let me think of it here. It's
12   Dr. Nathan Swami, S-w-a-m-i, and he's in Maryland.
13   When I went to get my MRI--I had an MRI done on my
14   head for my testosterone. It seems unusual, but the
15   testosterone at times is directly related to
16   sometimes the tumors on the pituitary gland, and the
17   only way they can find that out is to do an MRI. At
18   the time of that, they discovered that maybe it
19   happened when I was a baby, but--I might have been
20   dropped on my head as a baby or something. I had
21   like an indentation or something in the--where there
22   was spinal fluid on the front corner, just a little
23   corner in my brain. It doesn't affect anything, but
24   it showed up on the MRI, and it alarmed the

Page 99

1    endocrinologist because she didn't know how to read
2    it. So they advised me to go immediately to see the
3    neurosurgeon. I went in. We were talking, and I
4    told him about some of the treatment methods that
5    have been discovered--it was a non-related
6    conversation, if you will. They went in and
7    discovered this was nothing to be concerned about.
8    I said, "While I've got you here, can I ask you a
9    question," and I explained the treatments that I'd
10   been going through and that, and he basically told
11   me his advice and not knowing my history and not--he
12   says, "But just in my casual advice, your best
13   option is to not have surgery." He says, "My advice
14   to you is to try to slowly--over time you're going
15   to have to wean yourself off the pain medication and
16   find other ways to manage the pain," in which I
17   said, "What does that mean?" He said, "Well, we'll
18   have to set an appointment and talk about that
19   further." He says, "I really think that surgery is
20   not the answer. Once you start cutting into
21   somebody's back, it presents a problem that becomes
22   a long-time problem."
23   Q. Did you ever actually see Dr. Huckle?
24   A. Yes.

Page 100

1    Q. You did?
2    A. I spent four hours in his office one afternoon.
3        MR. LEEDBERG: For the record, I don't
4    think we have his report.
5    A. It was a--like I said, I got contact--I don't even
6    know who contacted me, and it was in
7    Buffalo, New York that I had to go there for the
8    appointment. I don't know that an actual report was
9    ever generated. He was talking to me kind of as
10   a--it was a discussion to see if I was interested in
11   participating in a--in this study. It was not
12   something that workmen's comp. would endorse either,
13   and they did not feel strongly about it either. So
14   I didn't have any comfort going through with it, but
15   I know that the reports are available if you need
16   them.
17   Q. So your present plan is to stay the course of
18   treatment you're currently receiving?
19   A. At this point to try to manage things as best I can.
20   You know, that's where I'm at at this point until I
21   can get to another doctor--until I get back to
22   Dr. Swami and discuss with him further options that
23   he wasn't at liberty to talk about the day we were
24   there because he didn't have my records in front of

26 (Pages 101 to 104)

|  | Page 101 |
|---|---|
| 1 | me to look at my history. |
| 2 | Q. The truck that you rented and drove back to |
| 3 | Connecticut in, was that an automatic or standard? |
| 4 | A. Automatic. |
| 5 | Q. You mentioned that you were terminated from your |
| 6 | employment in your view because they didn't want you |
| 7 | to have a worker's compensation case; is that |
| 8 | correct? |
| 9 | A. Yes. |
| 10 | Q. Could you explain that to me? |
| 11 | A. My former direct supervisor, Pat McCoy, never once |
| 12 | acknowledged my injury at all. Never said, "How are |
| 13 | you feeling?" Never said, "Wow, what happened?" |
| 14 | Never said anything regarding the injury. In fact, |
| 15 | I had to fly--about three or four weeks after the |
| 16 | accident I had to fly to Florida for a national |
| 17 | sales meeting and awards presentation that the |
| 18 | entire company was going to, and I was in a back |
| 19 | brace, and I was heavily medicated and falling |
| 20 | asleep in meetings in front of people, walking bent |
| 21 | over most the time, you know, like I said in a |
| 22 | brace, very uncomfortable, and he never once made a |
| 23 | comment at all about, you know, "Hey, what's wrong? |
| 24 | Hey, how you feeling or anything?" Nothing. No |

|  | Page 103 |
|---|---|
| 1 | it was very suspect as to why it happened. |
| 2 | Q. Do you think them terminating your employment would |
| 3 | compromise your ability to bring a worker's |
| 4 | compensation claim? |
| 5 | MR. DURSO: I'm sorry, could you say that |
| 6 | again? |
| 7 | Q. Do you think that them terminating your employment |
| 8 | would compromise your ability to bring a worker's |
| 9 | compensation claim? Your testimony earlier today |
| 10 | was that they terminated you because they did not |
| 11 | want you to have a worker's compensation case. |
| 12 | A. My impression was is that they--by the fact that I |
| 13 | got a workmen's comp. case--there was a workmen's |
| 14 | compensation case, and it was going to raise their |
| 15 | insurance rates on workmen's compensation, that that |
| 16 | did not go over well with them. They were angry |
| 17 | about that. |
| 18 | Q. And you think that these other reasons they gave for |
| 19 | terminating your employ were a front because they |
| 20 | were displeased with your worker's compensation |
| 21 | claim? |
| 22 | A. Yes, and when I was awarded the back wages, you |
| 23 | know, it was based on that same thing, that there |
| 24 | was not just cause for termination. |

|  | Page 102 |
|---|---|
| 1 | management personnel acknowledged it. Every other |
| 2 | person at the event came up and talked to me about |
| 3 | it. None of the management personnel ever |
| 4 | acknowledged it at all, and then all of a sudden out |
| 5 | of the blue after it was--between that and my |
| 6 | challenging the fact that they changed the policy on |
| 7 | bonuses and it affected one of my employees, and I |
| 8 | challenged that to my boss's boss, and asked the HR |
| 9 | department how to handle it, they weren't pleased |
| 10 | with me getting involved at that level and started |
| 11 | to really give me a lot of grief. So they |
| 12 | said--they made up this thing about me |
| 13 | inappropriately using a company credit card, which |
| 14 | was I had a direct billing on the card for my cell |
| 15 | phone, and they came out with a policy in January, |
| 16 | and I had already had a direct billing for my cell |
| 17 | phone. They came out with a policy in January that |
| 18 | no more could you charge your cell phone to that. |
| 19 | Well, I had contacted the cell phone company to do |
| 20 | that, but there were two charges that came through |
| 21 | on the card anyhow, and they said that was |
| 22 | inappropriate because I had already been given the |
| 23 | notice, and then two things came through, and that |
| 24 | was their reasoning. So to me in my interpretation, |

|  | Page 104 |
|---|---|
| 1 | MR. LEEDBERG: I'm going to look over my |
| 2 | notes. Do you have any questions? |
| 3 | MR. CETKOVIC: Nope. |
| 4 | MR. LEEDBERG: I'm going to look over my |
| 5 | notes. |
| 6 | (Brief break.) |
| 7 | (The Syracuse Orthopedic records were |
| 8 | marked Exhibit No. 6 for identification.) |
| 9 | Q. (Mr. Leedberg) Mr. Koran, I'm going to ask you a |
| 10 | couple questions on Defendant's 6, which I'll |
| 11 | represent to you are the documents that we got back |
| 12 | from Warren Wulff as a result of a request for |
| 13 | medical records from him, and I want to refer you |
| 14 | specifically to the second page under--it says, |
| 15 | "Review of Systems 4" and it says, "Review of |
| 16 | Systems." Do you see that paragraph a couple down? |
| 17 | A. Uh-huh. |
| 18 | Q. If you could read that, read that last sentence in |
| 19 | that? |
| 20 | MR. DURSO: Of which one? |
| 21 | MR. LEEDBERG: "Review of Systems," I'm |
| 22 | sorry. |
| 23 | MR. DURSO: "Review of Systems 4" or-- |
| 24 | MR. LEEDBERG: No, the one without the |

Page 105

1   four.
2   A. "Patient denies dysuria, hematuria, nocturia,
3       frequency, and sexual dysfunction."
4   Q. Do you recall denying sexual dysfunction on that
5       date, which seems to be September 7, 2004?
6   A. No.
7   Q. And I presume later in record he says it again--it
8       was actually an earlier visit on July 17, 2003, and
9       it would be your testimony here today that that's
10      not accurate?
11  A. No, because I was taking--you know, if I needed to,
12      I was doing the Cialis. So that was--I mean, it
13      might have been interpreted that it wasn't
14      dysfunctional because I was taking the Cialis to fix
15      it. That would be my interpretation.
16  Q. Do you recall having discussions in particular about
17      sexual dysfunction?
18  A. No, not at all.
19  Q. Where do you fill your prescriptions now that you're
20      down in Maryland?
21  A. We go to a CVS, and then there are some mail order
22      prescriptions, but the pain management ones I do all
23      through a place called Medicine Plus, which is a
24      small pharmacy that I have everything done through

Page 106

1       that pharmacy because the way the State of Maryland
2       is structured, if you're on a controlled substance,
3       you have to declare a single pharmacy. So I had to
4       call around and find a pharmacy that would have the
5       medications that I was looking for when I needed to
6       fill the prescriptions. So this small pharmacy
7       called Medicine Plus, which is like an old fashioned
8       pharmacy actually has the items that I need, and as
9       a result of that--
10  Q. Do you know where they're based out of?
11  A. They're in Newmarket. They're actually right in
12      Newmarket.
13  Q. You were saying as a result?
14  A. As a result of that, I utilized them for all of my
15      pain management medication. I do mail order for my
16      other maintenance prescriptions that I'm able to do,
17      but controlled substances have to be done, you know,
18      on a monthly basis.
19  Q. Do they call that the Rush Limbaugh Act?
20  A. I have no idea.
21  Q. The CVS, where is that located?
22  A. That's in Frederick.
23      MR. LEEDBERG: Okay. I'm just going to
24      state for the record that it appears we're missing

Page 107

1       some medical records, some of which we were aware
2       of, some of which we were not, in particularly the
3       records for Diaz pre-loss, and there was some
4       mention of a Dr. Huckle, some physicians down in
5       Maryland that we have no records from. So just for
6       those reasons, I'm going to state for the record
7       that I think we should reserve our rights to
8       reconvene at a later date if those records raise any
9       issues with regards to the claim.
10      MR. DURSO: Just so I'm clear, you have
11      some Diaz records.
12      MR. LEEDBERG: I have the records from
13      Diaz February 10th, your first visit forward, and
14      there are at least seven or eight visits to that
15      office previously, which I understand from
16      conversation yesterday, Dr. Dispensa (phonetic) took
17      Mr. Koran's chart after the business dissolved.
18      That was his partner. I think Dr. Dispensa
19      (phonetic), but that's what they say at this point,
20      but we'll see if that pans out.
21      MR. DURSO: Okay.
22      (Deposition suspended at 1:49 p.m.)
23
24

Page 108

1       C E R T I F I C A T E
2
3       I, the undersigned, JOSEPH KORAN, do hereby
4   certify that I have read the foregoing deposition,
5   taken on 21st, July, 2006, and that to the best of
6   my knowledge, said deposition is true and accurate
7   (with the exception of the following corrections
8   listed below):
9   Page    Line        Correction
10
11
12
13
14
15
16
17
        Signed:_____
18
19
20
21      Date:_____
22
23
24

28 (Page 109)

Page 109

COMMONWEALTH OF MASSACHUSETTS

1
2
3      I, Leslie D'Emilia, a Court Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
4   do hereby certify that the foregoing deposition was
taken before me on the 21st day of July, 2006;
5
        That the witness named in the deposition, prior
6   to being examined, was by me first duly sworn;
7        That said deposition was taken before me at the
time and place herein set forth, and was taken down
8   by me in shorthand and thereafter transcribed into
typewriting under my direction and supervision;
9
        That said deposition is a true record of the
10  testimony given by the witness and of all objections
made at the time of examination.
11
        I further certify that I am neither counsel for
12  nor related to any party to said action, nor in any
way interested in the outcome thereof.
13
        IN WITNESS WHEREOF I have subscribed my name and
14  affixed my seal of this 21st day of July, 2006.
15
16
17

18            _____
              Leslie D'Emilia
              Notary Public
19            Massachusetts
              My Commission Expires:
20            March 13, 2009
21
22

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Case No.  05-11454 RGS

JOSEPH H. KORAN, and KIMBERLY )
KORAN, Individually and on Behalf of )
ANA KORAN, JOSEPH KORAN, JR. )
and ERIK KORAN, Minors, )
  )
    Plaintiffs )
V. )
  )
ELIZABETH WEAVER, and )
TOWN OF SHERBORN, )
  )
    Defendants )

# PLAINTIFF'S DISCLOSURES UNDER
# FED. R. CIV. P. 26(a)(1), LR 26.2(A) & LR 35.1

### I.  FED. R. CIV. P. 26(a)(1) & LR 26.2(A)

In accordance with Fed. R. Civ. P. 26(a)(1) and LR 26.2(A), plaintiff makes the following disclosures:

A.  Individuals likely to have discoverable information relevant to disputed facts:

| NAME: | ADDRESS: | SUBJECT |
|---|---|---|
| Joseph Koran | 6101 Twain Drive<br>New Market, MD 21774 | Facts/Medical/Damages |
| Kimberly Koran | 6101 Twain Drive<br>New Market, MD 21774 | Medical/Damages |
| Robert Tiso, M.D. | New York Pain Center<br>7209 Buckley Road, Ste. 2R<br>Liverpool, NY 13088 | Medical |
| James A. Dispenza, M.D. | North Medical, P.C.<br>5100 West Taft Rd., Ste. 10<br>Liverpool, NY 13088 | Medical |

| Felipe Diaz, M.D. | 5586 Legionnaire Drive<br>Cicero, NY 13039 | Medical |
| Warren Wulff, M.D. | Syracuse Ortho. Specialists<br>4115 Medical Center Drive<br>Fayetteville, NY 13066 | Medical |
| Joseph Catania, M.D. | New York Pain Center<br>7209 Buckley Rd., Ste. 2R<br>Liverpool, NY 13088 | Medical |
| Sergio Zappala, P.T. | CNY Physical Therapy &<br>  AquaticCenters<br>5700 W. Genesee St.<br>Camilus, NY 13031 | Medical |
| Clyde Satterly, M.D. | Lakeshore Family Medicine<br>6221 Route 31 - Ste. 108<br>Cicero, NY 13039 | Medical |
| Harvey Sauer, M.D. | Urology Consultants of Syracuse<br>739 Irving Avenue - Ste. 600<br>Syracuse, NY 13210 | Medical |

B.    Documents produced/identified because they are believed to be relevant to disputed facts:

**DESCRIPTION/CATEGORY:**                              **LOCATION:**

Medical Records

| Sherborn Fire Dept. EMS | Produced |
| Robert Tiso, M.D. (NY Pain Center) | Produced |
| James A. Dispenza, M.D. (Carebest Internal Med.) | Produced |
| Felipe Diaz, M.D. (Carebest Internal Med.) | Produced |
| Warren Wulff, M.D. (Syracuse Orthopedic) | Produced |
| Joseph Catania, M.D. | Identified |
| Sergio Zappala, P.T. | Produced |

2

| | |
|---|---|
| Clyde Satterly, M.D. | Identified |
| Harvey Sauer, M.D. | Identified |

Medical Bills

| | |
|---|---|
| -Warren Wulff, M.D. | Produced |
| -Syracuse Orthopedic Specialists | Produced |
| -Sherborn Fire Dept. | Produced |
| -Magnetic Diagnostic Resources | Produced |
| -New York Pain Center | Produced |
| -CNY Physical Therapy Aquatic Centers | Produced |
| -Carebest Internal Medicine | Produced |
| -North Medical, P.C. | Identified |
| -Magnetic Diagnostic Resources of Central NY | Identified |
| -Clyde Satterly, M.D. | Identified |
| -Harvey Sauer, M.D. | Identified |

C.  Computation of the categories of damages suffered by plaintiff in this action, and the production/identification of relevant documents:

1.  Medical Expenses:  (Incomplete)

2.  Future Medical Expenses: As yet, undetermined.

3.  Lost Wages: Not computed as yet.

4.  Future Lost Wages:  Undetermined.

5.  Lost Earning Capacity: Past and future, undetermined.

6.  Pain and Suffering: Plaintiff continues to suffer with severe back pain.  He expects to undergo back surgery in the near future.

7.  Permanent loss or impairment of a bodily function: This will be supplemented.

3

8.   Substantial disfigurement: Plaintiff will have scarring after he undergoes the necessary back surgery.

D.   Plaintiff has received, and continues to receive, Worker's Compensation benefits, for which there will be a lien.

## II.  LR 35.1

In accordance with LR 35.1, plaintiff makes the following disclosure of medical information:

**1.    Itemized Medical Expenses**: (Incomplete)

| | | |
|---|---|---|
| a. | Sherborn Fire Dept. EMS 2/6/03 | $ 348.40 |
| b. | NY Pain Center (8/8/03-12/11/03) | 2,319.51 |
| c. | St. Joseph's Imaging Assoc. (2/10/03-10/29/03) | 650.00 |
| d. | Magnetic Diagnostic Resource (2/12/03) | 2,000.00 |
| e. | CYN Physical Therapy (3/7/03-7/16/03) | 1,096.98 |
| f. | Carebest Internal Medicine ( 2/10/03-3/24/03) | 421.00 |
| g. | Syracuse Ortho Specialists (7/17/03-11/18/03) | 270.00 |

**2A.   Non-Privileged Medical Records (Produced)**:

| | | |
|---|---|---|
| a. | Robert Tiso, M.D. | Produced |
| b. | James A. Dispenza, M.D. | Produced |
| c. | Felipe Diaz, M.D. | Produced |
| d. | Warren Wulff, M.D. | Produced |
| e. | Sergio Zappala, P.T. | Produced |
| f. | Sherborn Fire Dept. EMS | Produced |

**2B.   Non-Privileged Medical Records (Identified)**:

4

a.  Joseph Catania, M.D.                    Identified

b.  Clyde Satterly, M.D.                    Identified

c.  Harvey Sauer, M.D.                      Identified

**3.   Privileged Medical Records**:   None.

By his Attorney,

CARMEN L. DURSO, ESQUIRE
B.B.O. # 139340
Suite 3232
100 Summer Street
Boston, MA 02110-2104
(617) 728-9123

### CERTIFICATE OF SERVICE

I, Carmen L. Durso, attorney for plaintiffs, hereby certify that I served Plaintiff's Disclosures Under Fed.R.Civ.P. 26a)(1), LR 26.2(A) and LR 35.1 on the parties, by delivering a copy, in hand, to Darlene Tonucci, Esquire, Pierce, Davis & Perritano, LLP, 10 Winthrop Square, Boston, MA 02110 and to Dragan A. Cetkovic, Esquire, Black, Cetkovic & Whitestone, 200 Berkeley Street, Boston, MA 02116.

DATED: November 30, 2005

CARMEN L. DURSO, ESQUIRE

5

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH H. KORAN, and KIMBERLY | ) | |
| KORAN, Individually and on Behalf of | ) | |
| ANA KORAN, JOSEPH KORAN, JR. | ) | |
| and ERIK KORAN, Minors, | ) | |
| Plaintiffs | ) | |
| v. | ) | C. A. No. 05-11454 RGS |
| | ) | |
| ELIZABETH WEAVER, and | ) | |
| TOWN OF SHERBORN, | ) | |
| Defendants | ) | |

## PLAINTIFF JOSEPH H. KORAN'S ANSWERS TO
## DEFENDANT TOWN OF SHERBORN'S INTERROGATORIES

**INTERROGATORY 1.**   Please describe how the incident occurred.

**ANSWER**:   On February 6, 2003, I called 911 after my left foot was run over by Elizabeth Weaver during the aftermath of our minor auto accident. The ambulance came to the scene of the accident and I was placed on a gurney by the paramedics, and then into the back of the ambulance. I was strapped to the gurney in an upright position, and transported to the Natick Hospital. While removing the gurney from the rear of the ambulance, the paramedics dropped me to the ground in the process.

**INTERROGATORY 2.**   Kindly explain how you were "negligently dropped", as alleged in your complaint.

**ANSWER**: As I was being removed from the back of the ambulance, the paramedic behind me (the one who exited the ambulance first and grabbed the feet/bottom of the gurney) asked the second paramedic (who was still in the van, at my head/front of the gurney) "You got him?", to which the second paramedic answered "Yep." As I was rolled out of the ambulance, the gurney wheels did not come down to release the legs when the paramedics simultaneously released me from the top of the ambulance. They dropped me straight onto my tail bone (as I was in a semi-sitting position) from nearly three feet up. The paramedics apologized profusely, and asked if I was OK. I told them to just get the gurney raised to the correct level and to get me inside the hospital as it was freezing outside. They tried unsuccessfully for several minutes to raise and lock the gurney into the proper position. Eventually they gave up and wheeled me into the hospital at ground level. One of the ER nurses commented about this as it appeared funny to her to see a patient coming in basically on the floor.

**INTERROGATORY 3.** Please identify each date on which you were examined or treated by any doctor or physician with respect to any injury or disability which you claim to have sustained as a result of the incident, setting forth as to each such date of examination and treatment.

**ANSWER:** When I was first injured at the scene, and dropped outside the ER, I was examined by the ER doctors and nurses at the Natick Hospital. I had my left foot x-rayed, and was told it was a lot of soft tissue damage. I did mention that the paramedics had dropped me, and that I was concerned that my back may be injured. However, the ER doctors said that this wasn't what I was being seen for. Two days after the injury/being dropped, I developed the worst back pain of my life (up until that point of my life) and felt as if a golf ball had been lodged in my lower spine. I went to see my primary care physician, Dr. Felipe Diaz at Carebest Medicine (they have since dissolved the practice) in Cicero, NY. Dr. Diaz examined me, and determined (based on what I had told him about the accident) that I was in a spastic state from the injury. He explained that such an injury typically takes several days to manifest when you have that type of back injury. Dr. Diaz gave me a shot of Demerol to numb the pain, and something to help calm down my back. He then sent me home with a script for aqua physical therapy, pain medications and anti-spasmodics. Since that time, I have been to a doctor many times, often weekly, for this injury. I have sought treatment through physical therapy, orthopedics, MRIs and other tests, pain management appointments and procedures, urologists, and so on.

**INTERROGATORY 4.** As a result of the incident, how long and between which dates were you:

      a.     Wholly incapacitated from your normal activities, giving particulars as to each such activity from which you were so incapacitated; and

      b.     Partially incapacitated from your normal activities, giving particulars as to each such activity from which you were so incapacitated

**ANSWER:** When the injury first happened, I was unable to perform any of my work duties involving travel for several weeks. I worked only periodically on the phone from my home office. I was unable to care for my children as I couldn't lift them or get on the floor to change a diaper. I couldn't do any housework or shovel the snow, etc. I was either on a heating pad or an ice pack while lying in bed or on the couch, or, for brief periods, at my desk chair. Although I have since been able to go back to work and travel when necessary, it is very uncomfortable. I have to take a large amount of strong narcotic painkillers, and have regular and painful epidural pain blocks. I also have to keep up on all of the tests that the pain management physicians have to do in order to determine how much worse my back is getting over time, inasmuch as I haven't been able to have surgery (which is the only end result, per my physicians, that I can expect from this injury) as of yet. Having the surgery will incapacitate me for up to three months, and I have yet to find a job where I can take that amount of time off to recover

from such a major operation. Everyday activities are filled with pain, including caring for my three young children, housework, and even sexual relations with my wife. These are activities which require me to push through the pain, as it is a part of my life.

My wife and I had another baby after my accident (Erik was born 10/20/04), and because of all of my erectile dysfunction stemming from the accident, and all of the medications that I am now on, as well as a sudden decrease in my sperm count (never a problem when we conceived our first two children - 2 and 4 years prior to Erik), my wife had to undergo painful infertility treatments in order to conceive. She had to endure painful shots, fertility medications that caused her to have mood swings and hot flashes, and invasive procedures such as IUIs (intrauterine inseminations) and transvaginal ultrasounds.

I have to take medications such as Cialis in order to have sexual relations with my wife, again due to the pain medication and nerve damage from the accident. I have to pay someone to mow my lawn, plow my driveway, landscape my yard, and paint my deck, etc., because I am in too much pain to do it all. With difficulty, I can perform, and want to perform, these duties. However, I know that if I do, I will end up in bed with an ice pack, spending days to recover from the activity. It's very costly to have to pay others to do work that I should be able to do myself. It puts a deep hole in our finances.

**INTERROGATORY 5.** Please describe each and every back injury or back-related medical condition from which you have suffered since February 6, 1993.

**ANSWER:** Other than pulling a muscle in my shoulder/upper back after working in my yard years before the accident, I have always been perfectly healthy in this respect. All of my back problems have been diagnosed as a result of the accident on February 6, 2003 according to many of my doctors. I have clearly visible damage to my spinal discs, which are leaking and appear as "shredded wheat" on the tests that I have had (the exact words my first pain management physician, Dr. Robert Tiso, used to describe my discs upon performing a discogram).

**INTERROGATORY 6.** If you are still afflicted with or suffering from the effects of any injury or disability you received as a result of the incident, please describe the nature and duration of each present injury or disability.

**ANSWER:** I still take daily oral pain medication (Kadian 100mg/1X/day; morphine sulphate 30mg/6-8X/day; Motrin 100mg/3X/day) as well as epidural pain block injections every 6-8 weeks. In addition, my pain management doctor is trying other procedures in an attempt to help with my pain (see recent records from the Capital Area Pain Management in Frederick, MD).

**INTERROGATORY 7.** If you are claiming any loss of earning capacity as a result of the incident, please state:

> a.  the inclusive dates between which you were unable to work as a result of the incident;
>
> b.  the total amount of earnings which you lost as a result of your absence; and
>
> c.  the nature of your employment immediately prior to the incident, indicating the name and address of your employer, your place of business, your job title, classification or position, and the amount of your salary, wages or other compensation.

**ANSWER:** I have not been able to calculate my lost earnings, but will supplement this answer in a timely fashion. At the time of the incident, I was the Northeast Zone Sales Manager for Schwan's Food Service, 115 West College Drive, Marshall MN 56258. I had been with the company for approximately 1 ½ years. My base pay for $95,000 per year and I received an annual bonus based on 25% of my annual income.

**INTERROGATORY 8.** Please identify each doctor that ever treated your back before February 6, 2003.

**ANSWER:** None. Common back aches, caused by over-exertion from working in my yard, were the extent of any back discomfort prior to the accident, none of which required medical treatment.

**INTERROGATORY 9.** Please give the names and addresses of all persons who:

> a.  witnessed the incident;
>
> b.  were present at or near the scene of the incident, or
>
> c.  have knowledge with respect to the incident, your injuries, or defendants' alleged negligence.

**ANSWER:** Aside from the two paramedics involved in the accident, any hospital personnel or visitor standing outside of Natick Hospital could have seen me when I was dropped. As to knowledge of defendants' negligence, I cannot answer that question.

**INTERROGATORY 10.** In the 24-hour period preceding the alleged occurrence, please state whether you took or ingested any drug, narcotic, sedative, tranquilizer, or any other form of medication or medical preparation and, if so, state:

> a.  the date and time of any such taking or ingestion;
>
> b.  the name and identity of any such medication or medical preparation;
>
> c.  the amount and quantity of any such medication or medical preparation taken or ingested; and
>
> d.  whether any such medication or medical preparation was procured under a prescription, and, if so, state the name and address of the Person, doctor, or practitioner by whom it was prescribed.

**ANSWER:** I consumed no alcohol or narcotics at all. I was working on this day, and the previous day (February 5). I spent the day driving from my home in Syracuse to Hartford, Connecticut.

**INTERROGATORY 11.** Describe any conversations or other Communications You or anyone on Your behalf had with any employees of Defendant Town of Sherborn ("Sherborn") regarding the Incident, stating the date, time, and place of each such conversation or other Communication, its nature and substance, the name and address of each Person present, and what was said by each.

**ANSWER:** The morning after the incident, I spoke with a woman in the office of the Town of Sherborn, asking for a copy of the ambulance report from the previous night's incident. I also inquired about the gurney and was told that they were looking into it. I made two or three additional follow-up calls over the next few days, until I retained the services of an attorney.

**INTERROGATORY 12.** Kindly Describe any conversations or other Communications You or anyone on Your behalf had with any witnesses regarding the Incident, stating the date, time, and place of each such conversation or other Communication, its nature and substance, the name and address of each Person present, and what was said by each.

**ANSWER:** Upon arrival at the Natick Hospital, after being dropped by the paramedics, they wheeled me into the building at floor level. An ER nurse laughed and commented on this as I was not raised up on the gurney as I should have been. I asked her if she had seen what had happened. Her only response was "Look, it's Mini Me!" (from the movie Austin Powers). The other nurses in the area got a chuckle out of it.

**INTERROGATORY 13.** Identify by name, occupation, professional title, and present address each Person expected to be called as an expert witness at the trial and, for each expert, state the subject matter on which each expert is expected to testify, the substance of the facts to which each expert is expected to testify, the substance of the opinions to which each expert is expected to testify, and a summary of the grounds for each opinion.

**ANSWER:** My attorney has not yet made a determination as to expert witnesses. This answer will be supplemented in a timely fashion.

**INTERROGATORY 14.** Identify each of Your primary care physicians and your health insurance providers since 1993.

**ANSWER:** In Columbus from 1995-2000: Timothy McMullen; in Reynoldsburg, Ohio; in Cincinnati from 2000-2003: Dr. Saaman in Fairfield, Ohio; in Syracuse: Dr. Felipe Diaz in Cicero, NY (practice has closed and they claim to have lost my records); Dr.

Clyde Satterly in Cicero, NY. In Baltimore:    Frederick Primary Care Associates, Heather/Physician Assistant there.

**INTERROGATORY 15.**  Describe all injuries, ailments or pains You claim to have suffered as a result of the Incident, stating the onset date and time, parts of Your body or mind so affected, the nature, extent, and symptoms of such injuries, ailments or pain, and how long each lasted.

**ANSWER:**  When the paramedics dropped the gurney on February 6, 2003, I had an immediate jolt of pain up my spine.  However, the primary pain was in my left foot, as it had just been run over by Ms. Weaver.  My back continued to stiffen and get sore over the next 24 hours.  At approximately 36 hours post incident, I was in very serious pain.  I told my doctor that it felt like there was a golf ball on my spine when I sat back against a seat.  The pain was so excruciating by the time I drove the four hours back to my home in Syracuse from the Boston and Hartford area (where I was doing business and visiting family with my wife and children), that I immediately went in to see my general physician, Dr. Diaz.  The doctor went as far as to shoot my back with a cortisone and steroid solution and also gave me two shots of Demerol for immediate relief.   He prescribed muscle relaxers and pain medications for me.

**INTERROGATORY 16.**   Describe where You were coming from and going to at the time of the Incident.

**ANSWER:**  I was being transported from the scene of the minor auto accident, in which my left foot was run over by Ms. Weaver, to the Natick Hospital for x-rays of my foot. The incident happened in front of the Natick Hospital as the paramedics were removing me from the back of the ambulance.  I was in town for a business meeting at the Sherborn Inn, and pulling into the hotel parking lot when Ms. Weaver and I were involved in the motor vehicle accident.

**INTERROGATORY 17.**  Describe any and all facts upon which You contend that the Town of Sherborn or its agents were not in the exercise of due care.

**ANSWER:**  The paramedics did not take the time to be certain that the gurney legs were up and in the locked position before removing me/the gurney from the back of the ambulance.  As a result, I was dropped to the ground from a height of approximately 3 feet. The first paramedic asked the other (the one at my feet, who pulled the gurney out partially while waiting for the other paramedic at my head to exit with the rest of the gurney), "You got him?" at which time the other paramedic stated "Yep".   The paramedics then proceeded to push/pull the gurney out of the back of the ambulance and just let go, thinking that the legs of the gurney were locked in place.  They obviously were not, as I fell to the ground, HARD, while still strapped to the gurney.  After this, the paramedics were in a panic, attempting to get the gurney to come up on its legs in order to lock them back into place and wheel me into the hospital.  After what seemed like five

minutes of the paramedics messing with the gurney, I demanded that they just bring me into the hospital NOW, as it was freezing outside and I wanted to be seen in the ER. They had to be told what to do by the patient (me) on their gurney and didn't take any control over the situation. When I asked the paramedics what I should do, or whom I should contact if I had any problems from being dropped while in their care, they told me to contact the office in the morning. About an hour after the paramedics handed me over to the ER staff, they stopped by the room where I was being treated, and pointed to the gurney, which was now in the up and locked position, and said "it works now".

**INTERROGATORY 18.** Please Describe all other automobile accidents, legal claims and lawsuits which you were involved in other than this lawsuit against the Town of Sherborn.

**ANSWER:** I had a minor fender-bender in the parking lot of Kroger's in Reynoldsburg, Ohio in or around 1998. I was not cited, and the driver of the other vehicle paid for the damage to my car. In approximately 1983, while attending the University of Akron in Ohio, I was hit in an intersection by a car that was "timing lights" and ran it too soon. I did not make a claim for personal injury and did not lose any time from school.

Signed under the pains and penalties this 10th day of May , 2006.

_____
JOSEPH H. KORAN

## CERTIFICATE OF SERVICE

I, Carmen L. Durso, attorney for plaintiffs, hereby certify that I served Plaintiff JOSEPH H. KORAN'S ANSWER TO DEFENDANT TOWN OF SHERBORN'S INTERROGATORIES on the parties, by mailing a copy, postage prepaid, to John J. Cloherty, Esquire, Pierce, Davis & Perritano, LLP, 10 Winthrop Square, Boston, MA 02110 and to Dragan A. Cetkovic, Esquire, Black, Cetkovic & Whitestone, 200 Berkeley Street, Boston, MA 02116.

DATED: _July 12, 2006_

_Carmen L. Durso_

CARMEN L. DURSO, ESQUIRE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOSEPH H. KORAN, and KIMBERLY       )
KORAN, Individually and on Behalf of )
ANA KORAN, JOSEPH KORAN, JR.        )
and ERIK KORAN, Minors,             )
        Plaintiffs                   )
                                     )       C. A. No. 05-11454-RGS
v.                                  )
                                     )
ELIZABETH WEAVER, and               )
TOWN OF SHERBORN,                   )
        Defendants                   )

## PLAINTIFF JOSEPH H. KORAN'S RESPONSE
## TO DEFENDANT ELIZABETH WEAVER'S
## REQUEST FOR PRODUCTION OF DOCUMENTS

1.      All photographs, drawings, and diagrams which depict:

    a.    the location of the alleged accident;
    b.    the motor vehicles involved in the alleged accident;
    c.    the plaintiffs alleged injuries.

**RESPONSE:**  Plaintiff has no documents responsive to this request.

2.      All written reports of the operators and/or owners of the motor vehicles involved in the alleged accident, and all police reports regarding the alleged accident.

**RESPONSE:**  Plaintiff produces herewith a copy of the Motor Vehicle Crash Police Report, dated 2/12/03 (3 pages); Hertz Vehicle Accident Report (3 pages); EMSAR Equipment Report (2 pages); and Statement of Claimant Compensation Claim (2 pages).

3.      All statements regarding the alleged accident, whether signed or unsigned, handwritten, typewritten or recorded by mechanical or electronic means, made by:

    a.    the plaintiff;
    b.    the defendant;
    c.    any witness to the alleged accident;
    d.    any person on the scene immediately before and/or immediately after the alleged accident.

**RESPONSE:**   Plaintiff has no documents responsive to this request.

4.      All hospital and medical records and reports regarding the injuries and/or treatment received by the plaintiff as the result of the alleged accident.

**RESPONSE:**   Plaintiff has provided signed Authorizations to defense counsel.

5.      All records of bills and charges incurred by the plaintiff or on the plaintiffs behalf as the result of injuries sustained in the alleged accident.

**RESPONSE:**   Plaintiff has produced signed Authorizations to defense counsel.

6.      True copies of the plaintiffs federal income tax returns for the years (3 years prior to accident date) through present and copies of all W-2 forms received by the plaintiff for those years.

**RESPONSE:**   Plaintiff is in the process of collecting past returns, and will produce them in a timely fashion.

7.      All medical and hospital records, reports and bills regarding the injuries and/or treatment received by the plaintiff due to the alleged accident.

**RESPONSE:**   Plaintiff has provided signed Authorizations to defense counsel.

8.      Records of all x-rays, including in these records where the x-rays were taken, the dates taken, and the reports given on them.

**RESPONSE:** Other than the records obtained by defense counsel, plaintiff has no documents responsive to this request.

9.      Records of any and all diagnostic studies done on the plaintiff other than x-rays.

**RESPONSE:**   Other than the records obtained by defense counsel, plaintiff has no documents responsive to this request.

10.     A clearly written treatment protocol by the plaintiffs attending physician at each hospital.

**RESPONSE:**  Plaintiff's treatment protocol would be included in the medical records obtained by defense counsel.

11.     A complete record transcript for each office visit by the plaintiffs treating physicians.

**RESPONSE:**  Plaintiff office visit records would be included in the medical records obtained by defense counsel.

12.    Copies of all operator/accident reports completed and/or filled out by the plaintiff

**RESPONSE:**  Please see Response #2, above.

13.    Copies of all documentation prepared or completed by the plaintiff with respect to any and all applications for and receipt of personal injury protection benefits under any motor vehicle insurance policy.

**RESPONSE:**  Plaintiff produces herewith a copy of the Application For Benefits-Personal Injury Protection, dated 7/20/03 (2 pages).

14.    Copies of all newspaper accounts of the plaintiff's alleged accident.

**RESPONSE:**  Plaintiff has no documents responsive to this request.

15.    If the plaintiff has received workers compensation benefits as the result of the alleged accident, any documents relating to the plaintiff's claim for workers compensation benefits.

**RESPONSE:**   Plaintiff produces herewith the Department of Industrial Accidents - Report of Administrative Judge, filed March 26, 2006.

16.    Each report, letter, memoranda, or other writing prepared by any expert regarding the cause of the plaintiff's alleged injuries and accident.

**RESPONSE:**  Plaintiff has no documents responsive to this request.

17.    Each written communication whereby the defendant Elizabeth Weaver was allegedly given notice of the alleged accident.

**RESPONSE:**   Plaintiff produces herewith a copy of a letter from plaintiff's former counsel directed to the Claims Manager at Liberty Mutual Insurance Company, dated March 21, 2003.

18.    Copies of all reports of investigation regarding the alleged accident prepared by any governmental agency, bureau, or department, whether federal, state or local.

**RESPONSE:**  Plaintiff has no documents responsive to this request.

19.    Copies of all documents exonerating the defendant for the plaintiff's alleged accident.

**RESPONSE:**   Plaintiff has no documents responsive to this request.

JOSEPH H. KORAN
By His Attorney,


*Carmen L. Durso*
_____
CARMEN L. DURSO, ESQUIRE
B.B.O. #129340
ROBERT C. GABLER, ESQUIRE
B.B.O. #547227
175 Federal Street - Ste. 1425
Boston, MA 02110


## CERTIFICATE OF SERVICE

I, Carmen L. Durso, attorney for plaintiffs, hereby certify that I served Plaintiff JOSEPH KORAN'S RESPONSE TO DEFENDANT ELIZABETH WEAVER'S REQUEST FOR PRODUCTION OF DOCUMENTS on the parties, by mailing a copy, postage prepaid, to Dragan A. Cetkovic, Esquire, Black, Cetkovic & Whitestone, 200 Berkeley Street, Boston, MA 02116, and to John J. Cloherty, Esquire, Pierce, Davis & Perritano, LLP, 10 Winthrop Square, Boston, MA 02110.

DATED: *July 12, 2006*


*Carmen L. Durso*
_____
CARMEN L. DURSO, ESQUIRE

# EXHIBIT D

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip ♦

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Kip J. Adams
Patrick D. Banfield
Mia Baron
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence J. Pricher
David G. Schwartz
Adam Simms †

\* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

July 25, 2006

Carmen L. Durso, Esq.
100 Summer Street, Suite 3232
Boston, MA 02110

Re:     Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
        USDC of MA C.A. No. 05-11454 RGS
        D/A:   2/6/03

Dear Attorney Durso:

It was a pleasure meeting with you and your client during the deposition on July 21, 2006.

As discussed at that deposition, it would appear that we are missing some medical and other records regarding your client's treatments and consultations. While we do have your client's authorization, the limited information provided by your client to date on these providers prevents us from independently pursuing the documentation. We hope to avoid unnecessary motion practice, with your client's continued cooperation in providing the details by supplementing/updating his discovery replies. Specifically, the deposition revealed that we are missing the following:

1.  Records from his marriage counselor/therapist in New York;
2.  Records from Mrs. Koran's marriage counselor/therapist in New York;
3.  Records from Dr. Huckell;
4.  Records from Dr. Gonijar of Frederick, Maryland;
5.  Records from his pharmacies;
6.  Records from the neurologists/neurosurgeons that your client consulted with in Maryland; and
7.  Documents supporting a lost wage claim.

**PIERCE, DAVIS & PERRITANO, LLP**
July 25, 2006
Page 2 of 2

We also believe that we are close to obtaining Dr. Diaz's pre-incident chart. As discussed, we believe that Dr. DiSpenza is in possession of his chart. We will send you copies upon receipt, and any assistance you can provide in this regard would also be greatly appreciated. The good doctor is likely to be more responsive to a request from your client, than our office. Dr. DiSpenza is currently practicing out of North Medical Family Physicians, 7209 Buckley Road in Liverpool, New York 13088, telephone number 315-452-2829. The successor company to his former practice, Medbest, has indicated that Dr. DiSpenza took your client's records with him when his practice with Dr. Diaz dissolved in 2004.

Our review of the medical records that have been supplied through discovery also revealed that your client was referred to medical facilities by his attending physicians, from which we have no information and documentation. Specifically, on June 1, 2005, his present primary care physician, Dr. Clyde, referred him to "Psych Health Care Associates." Your client was also apparently seeing a Dr. Alberto Franco for hypertension, according to Dr. Tiso's October 7, 2003 note. Lastly, Dr. Tiso also indicated that your client was referred to a Dr. Jeffrey Winfield, as per his November 22, 2004 note. If indeed your client saw these physicians, we would appreciate copies of their documentation, or sufficient contact information so that we may independently pursue the records using your client's authorization.

We thank you for your continued cooperation and your prompt attention to this very important matter.

Very truly yours,

**PIERCE, DAVIS & PERRITANO, LLP**

Michael D. Leedberg

MDL/rcm
cc:     Dragan A. Cetkovic, Esq.
        Daniel Nucci, MIIA

```
                    *********************
              ***    TX REPORT    ***
                    *********************


          TRANSMISSION OK

          TX/RX NO                3591
          CONNECTION TEL               16174267972
          SUBADDRESS
          CONNECTION ID
          ST. TIME            08/04 12:47
          USAGE T             00'47
          PGS. SENT              2
          RESULT              OK
```

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip ♦

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Kip J. Adams
Patrick D. Banfield
Mia Baron
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence J. Pricher
David G. Schwartz
Adam Simms †

\* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

August 4, 2006

Carmen L. Durso, Esq.
100 Summer Street, Suite 3232
Boston, MA 02110

Re:    Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
       USDC of MA C.A. No. 05-11454 RGS
       D/A:   2/6/03

Dear Attorney Durso:

       Please be advised that the EMTs, Scott Chistensen and Daniel Tolson, and the Town's rule 30(b)(6) designee, Sherborn Fire Chief Neil McPherson (formal designation to follow), have advised that due to scheduling conflicts, they are unable to appear for the depositions on August 16, 2006. They have proposed alternative dates for which all three are available, on August 24, 2006 and August 25, 2006. These dates work for me as well. Kindly advise if your office is willing and able to accommodate one of these dates.

       This letter also confirms my conversation with Matthew Colletti of your office regarding the upcoming 30(b)(6) deposition of the Town, confirming that we would make the EMT's

# PIERCE, DAVIS & PERRITANO, LLP
### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip ♦

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Kip J. Adams
Patrick D. Banfield
Mia Baron
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence J. Pricher
David G. Schwartz
Adam Simms †

* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

August 4, 2006

Carmen L. Durso, Esq.
100 Summer Street, Suite 3232
Boston, MA 02110

Re:     Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
        USDC of MA C.A. No. 05-11454 RGS
        D/A:    2/6/03

Dear Attorney Durso:

Please be advised that the EMTs, Scott Chistensen and Daniel Tolson, and the Town's rule 30(b)(6) designee, Sherborn Fire Chief Neil McPherson (formal designation to follow), have advised that due to scheduling conflicts, they are unable to appear for the depositions on August 16, 2006. They have proposed alternative dates for which all three are available, on August 24, 2006 and August 25, 2006. These dates work for me as well. Kindly advise if your office is willing and able to accommodate one of these dates.

This letter also confirms my conversation with Matthew Colletti of your office regarding the upcoming 30(b)(6) deposition of the Town, confirming that we would make the EMT's supervisor, Fire Chief Neil McPherson, available to testify on behalf of my client, and that you would then decide if any further depositions are warranted, and notice them accordingly.

Please also be advised that I have located your client's pre-incident chart for treatment with Dr. Diaz, as Dr. Dispenza's office has confirmed that they possess the materials. They are forwarding copies in the near future, and I will forward copies to all parties involved upon receipt. Kindly advise as to the other issues outlined in my letter dated July 26, 2006 at your earliest convenience.

PIERCE, DAVIS & PERRITANO, LLP
August 4, 2006
Page 2 of 2

      We thank you for your continued cooperation and your prompt attention to this very important matter.

Very truly yours,

PIERCE, DAVIS & PERRITANO, LLP

Michael D. Leedberg

cc:    Chief McPherson
       Dragan A. Cetkovic, Esq.
       Daniel Nucci, MIIA

Encs.

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip ♦

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Kip J. Adams
Patrick D. Banfield
Mia Baron
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence J. Pricher
David G. Schwartz
Adam Simms †

\* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

August 18, 2006

Carmen L. Durso, Esq.
100 Summer Street, Suite 3232
Boston, MA 02110

Re:    Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
       USDC of MA C.A. No. 05-11454 RGS
       D/A:   2/6/03

Dear Attorney Durso:

Enclosed please find my client's supplemental disclosures, as discussed today. On Tuesday I anticipate receiving additional documents relative to internal and state inspections of the Cot in question, and I will promptly supplement my client's 26.2(A) disclosures.

As discussed, I have advised my clients to be available to be deposed on August 25, 2006, at the previously scheduled times. We agree to push the depositions forward if Judge Stearns grants my pending motion.

Lastly, I attach copies of the pre-February 6, 2003 primary care records from Dr. Diaz and Dr. Samaan, as well as the pharmacy records obtained with your client's authorization. Note that there are significant outstanding issues on written discovery, as indicated in my July 26, 2006 and August 4, 2006 letters. Kindly address these issues with your client, to see if we can better identify and locate the missing records and unidentified medical providers for your clients, Kimberly and Joseph H. Koran.

We thank you for your continued cooperation and your prompt attention to this very important matter.

**PIERCE, DAVIS & PERRITANO, LLP**
August 18, 2006
Page 2 of 2

Very truly yours,

**PIERCE, DAVIS & PERRITANO, LLP**

Michael D. Leedberg

cc:    Dragan A. Cetkovic, Esq.
       Daniel Nucci, MIIA

Encs.

2

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip ♦

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Kip J. Adams
Patrick D. Banfield
Mia Baron
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence J. Pricher
David G. Schwartz
Adam Simms †

* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

August 21, 2006

Carmen L. Durso, Esq.
175 Federal St., suite 1425
Boston, MA 02110

Re:    Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
       USDC of MA C.A. No. 05-11454 RGS
       D/A:   2/6/03

Dear Attorney Durso:

We are writing to update you as to our independent efforts to obtain copies of your client's medical records.

As of this date, despite exhaustive efforts, we are unable to locate the following providers/medical charts:

1.     Records from his marriage counselor/therapist in New York;
2.     Records from Mrs. Koran's marriage counselor/therapist in New York;
3.     Records from "Psych Health Care Associates" (see Dr. Satterly's 6/1/05 office note);
4.     Records from Dr. Jeffrey Winfield (see Dr. Tiso's 11/22/04 office note);
5.     Records from Nurse Practitioner Margaret A. Donovan (see pharmacy records);
6.     Records from Nurse Practitioner Linda Ehrich (see pharmacy records);
7.     Records from Nurse Practitioner Jill C. Malinowski (see pharmacy records);
8.     Records from Dr. Andrew Aiken (see pharmacy records);
9.     Records from Dr. McClellan (see pharmacy records);
10.    Records from Dr. Demory (see pharmacy records 1/19/06);
11.    Records from Dr. Sherlekar (see pharmacy records-4/3/06);
12.    Records from Dr. Schneider, the physician from Ohio that your client testified prescribed him Xanax; and

**PIERCE, DAVIS & PERRITANO, LLP**
August 21, 2006
Page 2 of 2

13.    If your client is claiming lost wages of loss of earning capacity, his tax and wage records from 2000 forward in support of such a claim.

As we discussed on this date, Judge Stearns has granted the Motion to Amend the Scheduling Order.  I understand we will aim for September for the depositions of the six Town employees.  Since there are such a large number of employees, who are all working for the same emergency medical team, it would be quite a burden to have such a large block of them unavailable for duty.  Similarly, it would be quite difficult to find two dates which they are all off at the same time.  To this end, and with the need to get the depositions completed sooner rathert than later, Chief McPherson has asked that the depositions be conducted at the firehouse, located at 22 N. Main Street, Sherborn.  There are plenty of conference rooms available, and this would be best for both our scheduling constraints and public safety.  Kindly advise if you would agree to hold the depositions in Sherborn.

We thank you for your continued cooperation and your prompt attention to this very important matter.

Very truly yours,

**PIERCE, DAVIS & PERRITANO, LLP**

Michael D. Leedberg

MDL/rcm
cc:    Dragan A. Cetkovic, Esq.
        Daniel Nucci, MIIA

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip ♦

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Kip J. Adams
Patrick D. Banfield
Mia Baron
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence J. Pricher
David G. Schwartz
Adam Simms †

\* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

August 24, 2006

Carmen L. Durso, Esq.
175 Federal St., suite 1425
Boston, MA 02110

Re:    Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
       USDC of MA C.A. No. 05-11454 RGS
       D/A:   2/6/03

Dear Attorney Durso:

We are writing to update you as to our independent efforts to obtain copies of your client's medical records, and to supplement our prior discovery replies.

Since our last letter, we have identified McClellan, Donovan, Sherlekar, Ehrich and Malinowski. We still require assistance with the remainder of the providers listed in my last correspondence, and must obtain these documents in the very near future in light of the discovery deadline. My client's ability to have these records reviewed by an expert will be prejudiced if we do not receive them very soon, and we are hoping to avoid burdening the court with otherwise unnecessary motion practice. Thank you for your prompt attention to this urgent matter.

We also confirm that all noticed depositions have been rescheduled for when Dragan returns from vacation on or after September 6, 2006.

Lastly, enclosed please find a packet of materials from my client relative to the cot in question (from 1996 forward), which include license applications, state inspections, internal inspection sheets and licensing data. I apologize for not sending these materials sooner, as I only recently discovered that they exist.

PIERCE, DAVIS & PERRITANO, LLP
August 24, 2006
Page 2 of 2

> We thank you for your continued cooperation and your prompt attention to this very important matter.

Very truly yours,

PIERCE, DAVIS & PERRITANO, LLP

Michael D. Leedberg

cc:    Dragan Ćetković, Esq.
       Black, Ćetković & Whitestone
       200 Berkeley St., 16th floor
       Boston, MA 02116-5022

       Daniel Nucci, MIIA

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

| | | |
|---|---|---|
| Joel F. Pierce | TEN WINTHROP SQUARE | Kip J. Adams |
| John J. Davis * | BOSTON, MA 02110-1257 | Patrick D. Banfield |
| Judith A. Perritano | | Mia Baron |
| John J. Cloherty III * | TELEPHONE (617) 350-0950 | John R. Felice |
| Daniel G. Skrip ♦ | FACSIMILE (617) 350-7760 | David C. Hunter † |

Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence J. Pricher
David G. Schwartz
Adam Simms †

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

\* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

August 30, 2006

Carmen L. Durso, Esq.
175 Federal St., suite 1425
Boston, MA 02110

Re:     Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
        USDC of MA C.A. No. 05-11454 RGS
        D/A:   2/6/03

Dear Attorney Durso:

Please find copies of medical records from Dr. Hakim obtained using your client's authorization.

We have advised our client of the tentative date for Chief McPherson's and the two EMTs' depositions on September 19, 2006 at the Sherborn Fire Department. We'll await your formal re-notice.

We understand that your assistant is currently addressing the issues regarding the outstanding medical records. We appreciate your efforts in this regard.

Very truly yours,

PIERCE, DAVIS & PERRITANO, LLP

Michael D. Leedberg

**PIERCE, DAVIS & PERRITANO, LLP**
August 30, 2006
Page 2 of 2

cc:    Dragan Ćetković, Esq.
       Black, Ćetković & Whitestone
       200 Berkeley St., 16th floor
       Boston, MA 02116-5022

       Daniel Nucci, MIIA

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip ♦

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

September 5, 2006

Kip J. Adams
Patrick D. Banfield
Mia Baron
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence J. Pricher
David G. Schwartz
Adam Simms †

* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

Carmen L. Durso, Esq.
175 Federal St., suite 1425
Boston, MA 02110

Re:    Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
       USDC of MA C.A. No. 05-11454 RGS
       D/A:   2/6/03

Dear Attorney Durso:

Please find copies of medical records from Frederick Primary Care Associates obtained using your client's authorization.

I have confirmed my clients availability for the September 19, 2006 depositions (the Chief and the two EMTs) at the Sherborn Fire Department. We'll await your formal re-notice.

We understand that your assistant is currently addressing the issues regarding the outstanding medical records. We appreciate your efforts in this regard.

Very truly yours,

PIERCE, DAVIS & PERRITANO, LLP

Michael D. Leedberg

**PIERCE, DAVIS & PERRITANO, LLP**
September 5, 2006
Page 2 of 2


cc:    Dragan Ćetković, Esq.
       Black, Ćetković & Whitestone
       200 Berkeley St., 16th floor
       Boston, MA 02116-5022

       Daniel Nucci, MIIA

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip ♦

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Kip J. Adams
Patrick D. Banfield
Mia Baron
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence J. Pricher
David G. Schwartz
Adam Simms †

\* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

September 11, 2006

Carmen L. Durso, Esq.
175 Federal St., suite 1425
Boston, MA 02110

Re:    Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
       USDC of MA C.A. No. 05-11454 RGS
       Our File No.: 282-0403288

Dear Attorney Durso:

    Enclosed please find a blank authorization for the release of medical records to New York Heart Center and the associated physicians, whom have rejected the prior authorization for failure to authorize them to accept a copy as the original (despite having sent them the original). If you have no objection, please have Mr. Koran sign and date the authorization, and return it to our office as soon as possible.

    If you have any questions, please do not hesitate to contact us.

Very truly yours,

PIERCE, DAVIS & PERRITANO, LLP

Michael D. Leedberg

MDL/rcm
Enclosure

## AUTHORIZATION TO USE OR DISCLOSE PROTECTED HEALTH INFORMATION

1.  I, Joseph H. Koran, hereby authorize **New York Heart Center, Dr. Carina Alfaro-Franco and Dr. James Connelly** to use or disclose the following protected health information from my medical records. I understand that information used or disclosed pursuant to this authorization could be subject to **redisclosure** by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

2.  Patient Name, DOB & Address: **Joseph H. Koran, DOB 11/25/61, 6101 Twain Dr., New Market, MD 21774.**

3.  Information to be disclosed to: **Pierce, Davis & Perritano, LLP, 10 Winthrop Square, Boston, MA 02110.**

4.  Disclose the following information for treatment dates: **1/1/2000 to PRESENT:**

| | | |
|---|---|---|
| **XX Complete Records** | ☐ Consult | ☐ Physical Therapy |
| ☐ Abstract | ☐ Outpatient Reports | ☐ Emergency Reports |
| ☐ Face Sheet | ☐ X-Ray | ☐ Other Specified: |
| ☐ Discharge Summary | ☐ Laboratory | |
| ☐ History & Physical | ☐ Pathology | |

5.  The above information is **disclosed for the following purposes**:
    ☐ Medical Care   **XX Legal**   ☐ Insurance   ☐ Personal   ☐ Other _____

6.  **I understand I may revoke this authorization at any time by requesting such of the above-referenced hospital/physician practice in writing, unless action has already been taken in reliance upon it, or during a contestability period under applicable law.**

7.  **This authorization expires upon final judgment in lawsuit in United States District Court, Boston Massachusetts captioned Koran, et al. v. Town of Sherborn, et al., docket no. 05-11454 RGS, but no earlier than June 1, 2007.**

8.  **I agree that a photocopy of this authorization shall be valid as if an original.**

9.  _____   10._____
    Signature of Patient or Legal Representative            Date

    _____
    PRINTED NAME AND RELATIONSHIP OF PATIENT OR PATIENT'S REPRESENTATIVE

## IMPORTANT: THIS AUTHORIZATION SHALL BE DEEMED <u>INVALID</u> UNLESS ALL NUMBERED ENTRIES ARE COMPLETED

**N.B. In certain situations, an additional authorization to release sensitive, legally protected information may be required**

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip '

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey *

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Patrick D. Banfield
Seth B. Barnett
Mia Baron
Koren L. Cohen †
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence D. Pricher
David G. Schwartz
Adam Simms †

\* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

September 14, 2006

Carmen L. Durso, Esq.
175 Federal St., suite 1425
Boston, MA 02110

Re:    Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
       USDC of MA C.A. No. 05-11454 RGS
       D/A:   2/6/03

Dear Carmen:

Please find copies of medical records from Dr. McMullen, obtained using your client's authorization.

I await your formal re-notice of the defendant depositions for next week, and the outstanding discovery materials outlined in my prior correspondence.

I note that we were not afforded an authorization from Mrs. Koran, and we have received none of the pertinent birthing and related records detailing her reported problems conceiving. Since she and Mr. Koran causally relate these issues to the accident, and the birthing/OB-GYN records prior to the accident are also relevant. These records all should have been disclosed in your client's mandatory disclosures months ago. We reiterate our need for copies. Please also include records from Dr. Grant E. Schmidt, 4830 E. Knightsbridge Blvd., suite B1, Columbus, OH 43214, telephone 614-451-2280.

**PIERCE, DAVIS & PERRITANO, LLP**
September 14, 2006
Page 2 of 2

We certainly appreciate you efforts regarding the documentation that we were unable to obtain using your client's authorization. However, we are growing concerned that we will not have enough time to review the records, and/or have an expert review performed if necessary, even with the extended deadlines. We are not optimistic that Judge Stearns will grant another extension. To avoid prejudice to my client, I will need all outstanding discovery by October 7, 2006, or I will have no choice but to move to compel your client's production of the materials. We appreciate your understanding and continued assistance in this urgent matter.

Lastly, my principal has asked that we inquire about the possibility of entering into the Court's mediation program. I welcome your and Dragan's thoughts in this regard.

Thank you for your continued assistance.

Very truly yours,

PIERCE, DAVIS & PERRITANO, LLP

Michael D. Leedberg

cc:    Dragan Ćetković, Esq.
       Black, Ćetković & Whitestone
       200 Berkeley St., 16th floor
       Boston, MA 02116-5022

       Daniel Nucci, MIIA

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip *

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey *

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Patrick D. Banfield
Seth B. Barnett
Mia Baron
Koren L. Cohen †
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence D. Pricher
David G. Schwartz
Adam Simms †

\* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

September 25, 2006

Carmen L. Durso, Esq.
175 Federal St., suite 1425
Boston, MA 02110

Re:     Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
        USDC of MA C.A. No. 05-11454 RGS
        D/A:  2/6/03

Dear Carmen:

I write to confirm that the following additional records were produced to you in hand prior to the depositions of September 19, 2006:

1)      A memo dated April 25, 2003 from Deputy Chief Ron Buckler to Chief Neil McPherson;

2)      13 pages of additional records relative to Ambulance Checklist inventories performed by Town personnel on February 2, 2003 (3 pages), March 7, 2003 (4); March 31, 2003 (3) and April 24, 2003 (3);

3)      Single page Sherborn Fire & Rescue Response log for the dates of January 1, 2003 through March 1, 2003; and

4)      Three pages of Training Classes attended by Town personnel between the dates of January 1, 2003 through March 1, 2003.

PIERCE, DAVIS & PERRITANO, LLP
September 26, 2006
Page 2 of 3

With a carbon copy of this letter, we are disclosing copies of these documents to counsel for Ms. Weaver as well.

You had requested that I summarize the discovery materials known to be outstanding from your clients. My records reveal they are as follows:

1) Records from Mr. Koran's counselor in New York;
2) Records from Mrs. Koran's counselor in New York;
3) Mrs. Koran's birthing and OB-GYN records (limited only to fertility and child-bearing issues), including but not limited to those from Dr. Grant Schmidt;
4) Documents supporting a lost wage/loss of earning capacity claim (if applicable), including but not limited to employee personnel files and tax returns from 2000-present;
5) Records from "Psych Health Care Associates" as referred to by Dr. Clyde in his June 1, 2005 note;
6) Records from a Dr. Jeffrey Winfield, as referenced by Dr. Tiso in his November 22, 2004 note;
7) Records from Dr. Andrew Aiken (from prescription records);
8) Records from Dr. Demory (from prescription records);
9) Records from Dr. Schneider, whom your client testified prescribed him Xanax;
10) Records from Dr. Alfaro-Franco (formerly of NY Heart Center, special authorization required and sent to your for signature on September 11, 2006);
11) Records from Dr. Connolly (formerly of NY Heart Center, special authorization required and sent to your for signature on September 11, 2006);
12) Dr. Adriana Hohl (see Dr. Coyne's note dated May 1, 2006); and
13) Dr. Dey in Rockville, MD (see Dr. Gonchigar's last office note).

Of course, this list is only what we know to be missing, and not meant to supplant your clients' ongoing obligations under Local Rules 26.2 and 35.1. Under those rules, these records should have been identified by your clients and disclosed long ago. As previously discussed, we will need these materials in short order, in light of the looming discovery deadline, the complex issues involved and our related need to have the records carefully reviewed.

Thank you for your continued assistance. Feel free to call me with any questions or concerns.

PIERCE, DAVIS & PERRITANO, LLP
September 26, 2006
Page 3 of 3

Very truly yours,

PIERCE, DAVIS & PERRITANO, LLP

Michael D. Leedberg

cc:    Dragan Ćetković, Esq.
Black, Ćetković & Whitestone
200 Berkeley St., 16th floor
Boston, MA 02116-5022
(w/ encs.)

Daniel Nucci, MIIA

3

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip '

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey *

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Patrick D. Banfield
Seth B. Barnett
Mia Baron
Koren  L. Cohen †
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence D. Pricher
David G. Schwartz
Adam Simms †

\* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

September 27, 2006

Carmen L. Durso, Esq.
175 Federal St., suite 1425
Boston, MA 02110

Re:    Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
       USDC of MA C.A. No. 05-11454 RGS
       D/A:   2/6/03

Dear Carmen:

Please note that my last three-page correspondence, although dated September 14, 2006, was actually authored and sent on September 25, 2006. It is the letter outlining my supplemental production and your client's outstanding discovery. I apologize for the oversight.

Please also note that I have identified one of your client's psychological counselors from Ohio, David Miller, 7664 Slate Ridge Blvd., Reynoldsburg, OH 43068 (614)863-4125. I have also identified two pharmacies that he frequented in the area, Medic Drug in Cleveland (bought out by Walgreen's) telephone 216/944-0691 and Kroger's pharmacy, telephone (614)575-3741. Kindly produce these records as well.

Thank you for your continued assistance. Feel free to call me with any questions or concerns.

**PIERCE, DAVIS & PERRITANO, LLP**
September 27, 2006
Page 2 of 2

Very truly yours,

**PIERCE, DAVIS & PERRITANO, LLP**

Michael D. Leedberg

cc:    Dragan Ćetković, Esq.
       Black, Ćetković & Whitestone
       200 Berkeley St., 16th floor
       Boston, MA 02116-5022

       Daniel Nucci, MIIA

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip ♦

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Kip J. Adams
Patrick D. Banfield
Mia Baron
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence J. Pricher
David G. Schwartz
Adam Simms †

* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

October 4, 2006

Carmen L. Durso, Esq.
175 Federal St., suite 1425
Boston, MA 02110

Re:    Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
       USDC of MA C.A. No. 05-11454 RGS
       Our File No.: 282-0403288

Dear Attorney Durso:

Enclosed please find a blank authorization for the release of medical records to Walgreens, who have rejected the prior authorization for failure to give a specific expiration date. If you have no objection, please have Mr. Koran sign and date the authorization, and return it to our office as soon as possible.

If you have any questions, please do not hesitate to contact us.

Very truly yours,

PIERCE, DAVIS & PERRITANO, LLP

Michael D. Leedberg

MDL/rcm
Enclosure

## AUTHORIZATION TO USE OR DISCLOSE PROTECTED HEALTH INFORMATION

1.  I, Joseph H. Koran, hereby authorize **Walgreens** to use or disclose the following protected health information from my medical records. I understand that information used or disclosed pursuant to this authorization could be subject to **redisclosure** by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

2.  Patient Name, DOB & Address: **Joseph H. Koran, DOB 11/25/61, 6101 Twain Dr., New Market, MD 21774.**

3.  Information to be disclosed to: **Pierce, Davis & Perritano, LLP, 10 Winthrop Square, Boston, MA 02110.**

4.  Disclose the following information for treatment dates: **1/1/1997 to PRESENT:**

    | | | |
    |---|---|---|
    | **XX Complete Records** | ☐ Consult | ☐ Physical Therapy |
    | ☐ Abstract | ☐ Outpatient Reports | ☐ Emergency Reports |
    | ☐ Face Sheet | ☐ X-Ray | ☐ Other Specified: |
    | ☐ Discharge Summary | ☐ Laboratory | |
    | ☐ History & Physical | ☐ Pathology | |

5.  The above information is **disclosed for the following purposes**:
    ☐ Medical Care  **XX Legal**  ☐ Insurance  ☐ Personal  ☐ Other _____

6.  **I understand I may revoke this authorization at any time by requesting such of the above-referenced hospital/physician practice in writing, unless action has already been taken in reliance upon it, or during a contestability period under applicable law.**

7.  **This authorization expires upon final judgment in lawsuit in United States District Court, Boston Massachusetts captioned Koran, et al. v. Town of Sherborn, et al., docket no. 05-11454 RGS, but no earlier than June 1, 2007.**

8.  **I agree that a photocopy of this authorization shall be valid as if an original.**

9.  _____     10._____
    Signature of Patient or Legal Representative            Date

    _____
    PRINTED NAME AND RELATIONSHIP OF PATIENT OR PATIENT'S REPRESENTATIVE

### IMPORTANT: THIS AUTHORIZATION SHALL BE DEEMED <u>INVALID</u> UNLESS ALL NUMBERED ENTRIES ARE COMPLETED

<u>N.B. In certain situations, an additional authorization to release sensitive, legally protected information may be required</u>

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip ♦

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Patrick D. Banfield *
Seth B. Barnett
Mia Baron
Koren L. Cohen †
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Julia C. Martinescu *
Terrence J. Pricher
David G. Schwartz
Adam Simms †
Gregory F. Tinsworth *
* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

November 14, 2006

Carmen L. Durso, Esq.
175 Federal St., Suite 1425
Boston, MA 02110

Re:    Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
       USDC of MA C.A. No. 05-11454 RGS
       Our File No.: 282-0403288

Dear Attorney Durso:

Enclosed please find a blank authorization for the release of medical records to Wegmans, who have rejected the prior authorization for failure to specifically mention HIV, mental health, and/or drug and alcohol treatment information. If you have no objection, please have Mr. Koran sign and date the authorization, and return it to our office as soon as possible.

If you have any questions, please do not hesitate to contact us.

Very truly yours,

PIERCE, DAVIS & PERRITANO, LLP

Michael D. Leedberg

MDL/rcm
Enclosure

## AUTHORIZATION TO USE OR DISCLOSE PROTECTED HEALTH INFORMATION

1.  I, Joseph H. Koran, hereby authorize **Wegmans** to use or disclose the following protected health information from my medical records. I understand that information used or disclosed pursuant to this authorization could be subject to **redisclosure** by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

2.  Patient Name, DOB & Address:  **Joseph H. Koran, DOB 11/25/61, 6101 Twain Dr., New Market, MD 21774.**

3.  Information to be disclosed to:  **Pierce, Davis & Perritano, LLP, 10 Winthrop Square, Boston, MA 02110.**

4.  Disclose the following information for treatment dates:  **1/1/1997 to PRESENT:**

    | | | |
    |---|---|---|
    | **XX Complete Records** | ☐ Consult | ☐ Physical Therapy |
    | ☐ Abstract | ☐ Outpatient Reports | ☐ Emergency Reports |
    | ☐ Face Sheet | ☐ X-Ray | ☐ HIV information |
    | ☐ Discharge Summary | ☐ Laboratory | ☐ Mental health info. |
    | ☐ History & Physical | ☐ Pathology | ☐ Alcohol/drug treatmnt |

5.  The above information is **disclosed for the following purposes**:
    ☐ Medical Care   **XX Legal**   ☐ Insurance   ☐ Personal   ☐ Other _____

6.  **I understand I may revoke this authorization at any time by requesting such of the above-referenced hospital/physician practice in writing, unless action has already been taken in reliance upon it, or during a contestability period under applicable law.**

7.  **This authorization expires upon final judgment in lawsuit in United States District Court, Boston Massachusetts captioned Koran, et al. v. Town of Sherborn, et al., docket no. 05-11454 RGS, but no earlier than June 1, 2007.**

8.  **I agree that a photocopy of this authorization shall be valid as if an original.**

9.  _____     10._____
    Signature of Patient or Legal Representative              Date

    _____
    PRINTED NAME AND RELATIONSHIP OF PATIENT OR PATIENT'S REPRESENTATIVE

### IMPORTANT: THIS AUTHORIZATION SHALL BE DEEMED <u>INVALID</u> UNLESS ALL NUMBERED ENTRIES ARE COMPLETED

N.B. In certain situations, an additional authorization to release sensitive, legally protected information may be required

# Wegmans



November 10, 2006

Pierce, Davis & Perritano, LLP
Attn:  Michael D. Leedberg
Ten Winthrop Square
Boston, MA  02110-1257

**Re:  Joseph Koran**
   **DOB:**    **11/25/1961**
   **File#:**   **282-0403288**
   **Civil Action#:  05-11454RGS**

Dear Mr. Leedberg:

Wegmans Food Markets, Inc. received your request for medical information for the individual referenced above.  Unfortunately, the authorization that you provided did not meet the requirements of the Health Insurance Portability and Accountability Act Privacy regulation (specifically 45 C.F.R. §164.508(c)(2)(ii) and the authorization you provided does not permit Wegmans to disclose HIV or mental health information, or information regarding alcohol or drug treatment.  Unfortunately, Wegmans is unable to determine which medications may or may not have been prescribed by a doctor as a result of these conditions.)  As a result, Wegmans is unable to comply with your request.

If you have any questions about this matter, please contact the undersigned.

Very truly yours,

Joyce M. Duffy
Administrative Assistant to
Mary McCabe, Chief Privacy Officer
585.429.3207

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip ♦

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey*

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Patrick D. Banfield *
Seth B. Barnett
Mia Baron
Koren L. Cohen †
John R. Felice
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Terrence J. Pricher
David G. Schwartz
Adam Simms †
Gregory F. Tinsworth *

\* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

December 12, 2006

**Via fax to 617-462-7972**

Carmen L. Durso, Esq.
175 Federal St., Suite 1425
Boston, MA 02110

Re:   Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
      USDC of MA C.A. No. 05-11454 RGS
      Our File No.: 282-0403288

Dear Attorney Durso:

    We have yet to receive any of the outstanding medical records or authorizations pursuant to my prior letters of 7/26/06, 8/4/06, 8/18/06, 8/21/06, 8/30/06, 9/5/06, 9/14/06, 9/26/06 (which provides the best up to date synopsis of what is outstanding), 9/27/06 and 11/14/06.  Please consider this formal request for a L.R. 37.1 conference within 7 days.

    We understand that discovery in this matter has been extensive and complex due to the circumstances of the case.  But we cannot wait any longer for these records and authorizations. The discovery deadline has passed, and our defense expert has been thus far deprived of the opportunity to review a complete record on the case.  This has and will continue to prejudice my client's right to a full and fair defense of the claims against it.  Kindly see to it that this matter is given your immediate attention.  If I must seek the assistance of the court, I will have no choice but to request costs in the interests of my client.  I would very much like to avoid such unnecessary motion practice, and am optimistic and hopeful that we can resolve this issue on our own.  Your renewed cooperation would be greatly appreciated.

    As per my telephone message last week, I am also writing to request a L.R. 7.1(A)(2) conference on a motion for summary judgment I am intent on filing.  Again, we are under strict

1

constraints, as the motion must be filed by this month's end (the amended/extended deadline). Kindly contact me within 7 days to discuss the motion, and your client's position.  I will file the motion on or around 12/19/06 if I do not hear from your office.

Thank you in advance for your anticipated attention to these urgent matters.  I look forward to the courtesy of your reply.

Very truly yours,

PIERCE, DAVIS & PERRITANO, LLP

Michael D. Leedberg

2

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO              4072
CONNECTION TEL        *0403288#6174267972#
SUBADDRESS
CONNECTION ID
ST. TIME              12/12 15:04
USAGE T               01'07
PGS. SENT             3
RESULT                OK
```

## PIERCE, DAVIS, & PERRITANO, LLP
### Ten Winthrop Square
### Boston, MA 02110

# TELECOPY COVER SHEET

DATE:        December 12, 2006            OUR FILE NO:  282-0403288

TOTAL NUMBER OF PAGES:      - 3 -         (INCLUDING THIS SHEET)


PLEASE DELIVER THE FOLLOWING PAGES TO:

**Name** :    Carmen L. Durso, Esq.        **Fax**   :      617-426-7972

*************************************************************

| **From** | : | Pierce, Davis & Perritano, LLP |
|---|---|---|
| **Name** | : | Michael D. Leedberg, Esq. |
| **Phone No.** | : | (617) 350-0950 |
| **Facsimile No.** | : | (617) 350-7760 |

*************************************************************

**Regarding**        :        *Koran v. Weaver, et al*

*************************************************************

**Remarks**          :        Please see attached.

PIERCE, DAVIS, & PERRITANO, LLP
Ten Winthrop Square
Boston, MA 02110

# TELECOPY COVER SHEET

DATE:      December 12, 2006         OUR FILE NO:   282-0403288

TOTAL NUMBER OF PAGES:     - 3 -      (INCLUDING THIS SHEET)

PLEASE DELIVER THE FOLLOWING PAGES TO:

**Name** :    Carmen L. Durso, Esq.         **Fax**   :      617-426-7972

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| **From** | : | Pierce, Davis & Perritano, LLP |
| **Name** | : | Michael D. Leedberg, Esq. |
| **Phone No.** | : | (617) 350-0950 |
| **Facsimile No.** | : | (617) 350-7760 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Regarding**      :      *Koran v. Weaver, et al*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Remarks**        :      Please see attached.

NOTE: If you do not receive all the pages, please call back as soon as possible:
        (617) 350-0950.

The documents included with this facsimile transmission sheet contain information from the law firm of Pierce, Davis & Perritano, LLP which is confidential and/or privileged. This information is intended to be for the use of the addressee named on this transmittal sheet. If you are not the addressee, note that any disclosure, photocopying, distribution or use of the contents of this faxed information is prohibited. If you have received this facsimile in error, please notify us by telephone (collect if you wish) immediately so that we can arrange for the retrieval of the original documents at no cost to you.

# PIERCE, DAVIS & PERRITANO, LLP

### COUNSELLORS AT LAW

Joel F. Pierce
John J. Davis *
Judith A. Perritano
John J. Cloherty III *
Daniel G. Skrip ♦
John R. Felice

Of counsel:
Gerald Fabiano
Jeffrey M. Sankey *

TEN WINTHROP SQUARE
BOSTON, MA 02110-1257

TELEPHONE (617) 350-0950
FACSIMILE (617) 350-7760

Patrick D. Banfield*
Seth B. Barnett
Mia Baron
Koren L. Cohen †
Sean T. Delaney
David C. Hunter †
Michael D. Leedberg ●
Robert S. Ludlum †●
Adam Simms †

* also admitted in RI
♦ also admitted in PA
† also admitted in NY
● also admitted in CT

email: mleedberg@piercedavis.com
phone: 617/350-0950 x 105

April 18, 2007

Via fax to 617-462-7972

Carmen L. Durso, Esq.
175 Federal St., Suite 1425
Boston, MA 02110

Re:    Joseph H. Koran, et al. vs. Elizabeth Weaver, et al.
       USDC of MA C.A. No. 05-11454 RGS
       Our File No.: 282-0403288

Dear Attorney Durso:

Pursuant to our conversation today, please be advised that my client's principal does not feel as though mediation or arbitration would be fruitful at this juncture. While they have not ruled out high/low arbitration, with so many questions regarding liability and damages, the parameters discussed do not seem like something your client could or would consider, in light of the workman's compensation lien. With trial unexpectedly just around the corner, we all agreed that our resources are best spent on trial preparation. If you had a particular settlement demand or "high/low" for arbitration in mind, I would be happy to communicate them to my client and their principal.

Regarding your client's overdue discovery, everything is as it was when I sent my letter dated December 12, 2006. We have received nothing since that letter. While I do have an authorization from your client, your client did not fully disclose these providers, and despite efforts I could not locate them with the limited information supplied. Unfortunately, there is not enough time for my client to independently pursue that information, even if your client supplied the missing contact data. Certainly my client's expert or prospective experts would not have time

to review and report on the data. I have sought this information on behalf of my client for months, communicating my fears that we would run out of time all along. Now that is our reality. I am afraid that I have no choice at this time but to secure an order from the court compelling your client's compliance, in order to protect my client's interests at trial. In the interim, I will hold on to the hope that the missing documentation is forthcoming before the motion is decided. The outstanding records of which I am aware include:

1)   The marital therapy records of your client and his wife (separate, unknown providers in New York per his deposition)(relevant to your client's claim of marital strain due to accident);

2)   Pharmacy records from Kroger's, Medic Drug in Cleveland and Wegman's Pharmacy (Wegman's rejected our authorization per mine dated 11/14/06);

3)   Records from the neurologist from Maryland whose name your client could not recall at his deposition;

4)   Records from "Psychological Health Care Associates" as identified by Dr. Clyde in his June 1, 2005 note (relevant due to your client's claims of depression due to injuries);

5)   Dr. Jeffrey Winfield, as referenced by Dr. Tiso in his 11/22/04 note;

6)   Dr. Andrew Aiken (from prescription records);

7)   Dr. Demory (from prescription records);

8)   Dr. Schnieder from Ohio, whom your client testified prescribed him Xanax;

9)   Mrs. Koran's birthing and OB/GYN records, including but not limited to a Dr. Grant Schmidt (relevant due to your client's claim of causally related difficulties conceiving);

10)  Dr. Adriana Hohl (as referred to by Dr. Coyne in his note dated 5/1/06);

11)  Dr. Dey of Rockville, Maryland (as identified in Dr. Gonchigar's last office note);

12)  Dr. David Miller, 7664 Slate Ridge Blvd., Reynoldsburg, OH 43068 (614)863-4125 (psychologist/counselor-unable to obtain for lack of psychiatric-approved authorization); and

13)  Lost wage/loss of earning capacity records.

As you may know, the court has also issued a procedural order on this date requiring certain joint submissions. I propose we prepare drafts to compare and consolidate where appropriate, in advance of the June 29, 2007 deadline.

Thank you in advance for your anticipated attention to these urgent matters. I look forward to the courtesy of your reply.

Very truly yours,

**PIERCE, DAVIS & PERRITANO, LLP**

Michael D. Leedberg

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 05-11454 RGS

————————————————————— )
                                               )
JOSEPH H. KORAN, and KIMBERLY KORAN,           )
Individually and on Behalf of ANA KORAN,       )
JOSEPH KORAN, JR. and ERIK KORAN, Minors,)
     Plaintiffs,                              )
v.                                             )
                                               )
ELIZABETH WEAVER and                           )
TOWN OF SHERBORN,                              )
     Defendants.                              )
————————————————————— )

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT, TOWN OF SHERBORN'S MOTION TO COMPEL**

## I.    INTRODUCTION

The plaintiff brought this state-law negligence claim against Sherborn under the

Massachusetts Tort Claims Act [hereinafter "MTCA"], alleging bodily injury as a result of the

defendant's negligence. Pl.'s Compl. The plaintiff claims a back injury which has in turn

caused him to be depressed and anxious, which he claims has in turn impacted his marriage in a

negative way. Dep. of Pl., pp. 35:2-35:13;  70:20-70:23; 71:18-20 (Exhibit A).  The plaintiff

also claims that the treatment he requires is causing him erectile dysfunction, and had caused

problems when he and his wife were trying to conceive their third child. Id., pp. 73:3-73:8;

79:13-79:17.

As discovery had evolved through December, 2006, it became apparent through the

plaintiff's deposition, and the medical documents that were obtained, that there were many more

medical providers involved in the plaintiff's medical care (and treatment for past, similar

conditions) than were revealed in the plaintiff's Initial Disclosures (Exhibit B) and in his replies

to the defendant's discovery requests (Exhibit C). Although the plaintiff provided an authorization, there were many providers that either rejected the authorization or for whom the plaintiff did not provide sufficient contact data to independently pursue. The amended deadline for discovery passed on October 30, 2006. See, Court's Order granting Motion to Extend Discovery Deadline (document #14) dated Aug. 18, 2006. As of this date, the plaintiff has yet to produce the following documentation:

a. The marital therapy records of the plaintiff and his wife, or the names of the two known providers of such care, to support the plaintiff's claim of marital strain due to accident, the names of which the plaintiff could not recall at his deposition (Ex. A, p. 43:17-43:21);

b. Pharmacy records from Kroger's Pharmacy, Medic Drug in Cleveland Walgreen's Pharmacy and Wegman's Pharmacy (authorizations rejected) for prescriptions filled relative to the plaintiff's alleged injuries;

c. Records from or further information for "Psychological Health Care Associates" as identified by a Dr. Clyde in his June 1, 2005 note, relative to the plaintiff's claims of depression and anxiety due to injuries;

d. Records from or further information for a Dr. Jeffrey Winfield, as referenced by a Dr. Tiso in his 11/22/04 note;

e. Records from or further information for a Dr. Andrew Aiken (a prescribing physician identified in the prescription records obtained);

f. Records from or further information for a Dr. Demory (a prescribing physician identified in the prescription records obtained);

g. Records from or further information for a Dr. Schnieder from Ohio, whom the plaintiff testified prescribed him anxiety medications, relative to the plaintiff's claims of anxiety

and depression due to his claimed injuries;

h.  Records from or further information for Mrs. Koran's birthing and OB/GYN records, including but not limited to those from a Dr. Grant Schmidt, relative to the plaintiff's claims of causally related difficulties conceiving;

i.  Records from or further information for a Dr. Adriana Hohl (as referred to by a Dr. Coyne in his note dated 5/1/06);

j.  Records from or further information for a Dr. Dey of Rockville, Maryland (as identified in a Dr. Gonchigar's office note);

k.  Records from Dr. David Miller, 7664 Slate Ridge Blvd., Reynoldsburg, OH 43068 (614)863-4125 (authorization rejected).

l.  Any records supporting the plaintiff's lost wage and lost of earning capacity claim.

None of these medical providers were identified in the plaintiff's Initial Disclosures (Exhibit B), nor were the records therefrom produced in response to the defendant's Interrogatories three or eight, or its Requests for Production numbered four through five and seven through eleven. (Exhibit C). Similarly, the wage documents were promised in response to production requests numbered 6, but never supplied. Id.

The defendant wrote to the plaintiff's attorney on 15 separate occasions starting in July, 2006 (after the plaintiff's deposition) through present day, requesting conforming authorizations (where applicable), further contact data or the medical documents from the given providers. (all letters in consolidated Exhibit D). The defendant pointed out many times that time for compliance was running out on several occasions. The undersigned also conferred over the telephone with plaintiff's counsel on August 30, 2006, and spoke with counsel in person after the plaintiff's deposition on July 21, 2006, after defendant Weaver's deposition on August 15, 2006

and after each day of defendant employee depositions on September 19, 2006 and October 17, 2006. The plaintiff has never communicated any objection as to the discoverability of this information and documentation, and in fact, each time counsel committed to securing his client's cooperation. Yet despite the apparent good faith efforts of plaintiff's counsel, the aforementioned items remain outstanding. There does not appear to be any disagreement among counsel; rather, this seems to be purely a question of compliance. The Court has recently scheduled trial to commence in this matter on July 9, 2007.

## II.    <u>STANDARD OF REVIEW</u>

It is within the Court's discretion to compel a party to produce discoverable information and documentation when a party has failed to do so in a timely fashion. FED.R.CIV.P. 37(a). For the purpose of the rules, an incomplete answer is treated as a failure to answer. FED.R.CIV.P. 37(a)(3). It is no defense that a request is objectionable unless the opposing party has a pending motion for protective order. FED.R.CIV.P. 37(d).

## III.   <u>ARGUMENT</u>

Under the rules the defendant is entitled to full disclosure of all relevant information and documentation in advance of trial. The days of "trial by surprise," or "lying in wait" have long since passed. <u>E.g.</u>, <u>Hickman v. Taylor</u>, 329 U.S. 495, 500-01 (1947). The aim is to ensure a "fair contest." <u>U.S. v. Proctor & Gamble</u>, 356 U.S. 677, 682 (1958).

The plaintiff's failure to comply with his discovery obligations is coming dangerously close to prejudicing the defendant's rights in this respect. The defendant cannot fully evaluate the plaintiff's damages claim without all relevant medical and lost wage data. Moreover, the defendant has incurred the expense of retaining a medical expert, and this expert has also been deprived of a full picture of the plaintiff's medical care. With trial just two months and twenty

days away, time is of the essence. As the present or former patient, the information and documentation are peculiarly within the plaintiff's control, and the plaintiff should be compelled to produce same. An order compelling the plaintiff to produce the afore-mentioned documents is therefore necessary to secure the defendant's right to a fair trial. Moreover, despite the volume of data that has yet to be produced, a period 21 days (from the date of the Court's Order) is a patently sufficient amount of time in light of the looming trial and the history of requests dating back to July, 2006.

## IV.    CONCLUSION

The defendant is entitled to further responses to its discovery requests, or supplementation of the plaintiff's Initial Disclosures, such that the aforementioned records are produced sufficiently in advance of trial on July 9, 2007. The defendant therefore respectfully requests that this Honorable Court order the production within 21 days of its order.

The defendant,

TOWN OF SHERBORN,
By its attorneys,

**PIERCE, DAVIS & PERRITANO, LLP**

Michael D. Leedberg, BBO #660832
Ten Winthrop Square
Boston, MA 02110
(617) 350-0950

Dated April 19, 2007

5

## CERTIFICATE OF SERVICE

I, Michael D. Leedberg, attorney for the defendant in the above-entitled action, hereby certify that I served upon counsel of record a copy of the foregoing by electronically filing it and all related documents with the U.S. District Court, on this 19th day of April 2007.

Michael D. Leedberg

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 05-11454 RGS

———————————————————————
                                                    )
JOSEPH H. KORAN, and KIMBERLY KORAN,    )
Individually and on Behalf of ANA KORAN,         )
JOSEPH KORAN, JR. and ERIK KORAN, Minors, )
     Plaintiffs,                                 )
v.                                                  )
                                                    )
ELIZABETH WEAVER and                            )
TOWN OF SHERBORN,                               )
     Defendants.                                )
———————————————————————

## CERTIFICATE OF COMPLIANCE

In support of its Motion to Compel, counsel for the defendant, Town of Sherborn, hereby certifies that, pursuant to Local Rules 7.1(A)(2) and 37.1, and Rules 37(a)(1) & (2) of the Federal Rules of Civil Procedure, I was able to confer with plaintiff's counsel via telephone on December 19, 2006 at 3:45 P.M. and on April 18, 2007, and during those conferences, plaintiff's counsel gave assurances of a good faith effort and of the plaintiff's full discovery compliance in the future. The defendant has also sent 15 letters since July 25, 2006, has had a telephone conference with plaintiff's counsel on August 30, 2006 and had discussed the discovery issues in-person with plaintiff's counsel on three occasions after party depositions. Despite repeated assurances of compliance, virtually all discovery issues remain outstanding with the discovery deadline expired and trial scheduled to start in less than three months.

There does not appear to be any disagreement between the parties as to the discoverability of the materials sought; rather, the issue appears to be purely one of the plaintiff's

1

noncompliance. The defendant has therefore made a good faith effort to achieve full compliance, to no avail. Trial was recently scheduled for July 9, 2007, and time is now of the essence.

The defendant,

TOWN OF SHERBORN,
By its attorneys,
**PIERCE, DAVIS & PERRITANO, LLP**

Michael D. Leedberg, BBO #660832
Ten Winthrop Square
Boston, MA 02110
(617) 350-0950

Dated: April 19, 2007

## CERTIFICATE OF SERVICE

I, Michael D. Leedberg, attorney for the defendant in the above-entitled action, hereby certify that I served upon counsel of record a copy of the foregoing by electronically filing it and all related documents with the U.S. District Court, on this 19th day of April 2007.

Michael D. Leedberg

2